JUDGE BERMAN

# 14 CV    9371

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLACKROCK ALLOCATION TARGET SHARES: SERIES S PORTFOLIO; BLACKROCK CORE BOND PORTFOLIO; BLACKROCK COREALPHA BOND FUND E; BLACKROCK COREALPHA BOND MASTER PORTFOLIO; BLACKROCK COREPLUS BOND FUND B; BLACKROCK DYNAMIC HIGH INCOME – STRUCTURED CREDIT PORTFOLIO; BLACKROCK ENHANCED GOVERNMENT FUND, INC.; BLACKROCK FIXED INCOME GLOBALALPHA MASTER FUND LTD.; BLACKROCK INCOME TRUST, INC.; BLACKROCK LONG DURATION ALPHAPLUS BOND FUND; BLACKROCK MASTER TOTAL RETURN PORTFOLIO OF MASTER BOND LLC; BLACKROCK MULTI-ASSET INCOME – NON-AGENCY MBS PORTFOLIO; BLACKROCK MULTI-SECTOR INCOME TRUST; BLACKROCK STRATEGIC INCOME OPPORTUNITIES PORTFOLIO; BLACKROCK TOTAL RETURN PORTFOLIO (INS – SERIES); BLACKROCK US MORTGAGE; AST PIMCO TOTAL RETURN BOND PORTFOLIO; FIXED INCOME SHARES (SERIES R); FIXED INCOME SHARES: SERIES C; FIXED INCOME SHARES: SERIES LD; FIXED INCOME SHARES: SERIES M; LVS I LLC; LVS II LLC; PACIFIC BAY CDO, LTD.; PCM FUND, INC.; PIMCO ABSOLUTE RETURN STRATEGY 3D OFFSHORE FUND LTD.; PIMCO ABSOLUTE RETURN STRATEGY II MASTER FUND LDC; PIMCO ABSOLUTE RETURN STRATEGY III MASTER FUND LDC; PIMCO ABSOLUTE RETURN STRATEGY IV IDF LLC; PIMCO | Case No. <br><br> **VERIFIED DERIVATIVE COMPLAINT AND ALTERNATIVE CLASS ACTION AGAINST WELLS FARGO BANK, NATIONAL ASSOCIATION FOR BREACH OF CONTRACT; VIOLATION OF THE TRUST INDENTURE ACT OF 1939; BREACH OF FIDUCIARY DUTY; BREACH OF DUTY OF INDEPENDENCE; AND NEGLIGENCE** <br><br> <u>**JURY DEMAND**</u> |



RECEIVED
NOV 24 2014
U.S.D.C. S.D. N.Y.
CASHIERS

RECEIVED
2014 NOV 24 P 12: 11
US DISTRICT COURT SDNY

ABSOLUTE RETURN STRATEGY IV
MASTER FUND LDC; PIMCO
ABSOLUTE RETURN STRATEGY V
MASTER FUND LDC; PIMCO
BERMUDA TRUST II: PIMCO
BERMUDA INCOME FUND (M); PIMCO
BERMUDA TRUST IV: PIMCO
BERMUDA GLOBAL BOND EX-JAPAN
FUND; PIMCO BERMUDA TRUST:
PIMCO EMERGING MARKETS BOND
FUND (M); PIMCO CAYMAN SPC
LIMITED: PIMCO CAYMAN GLOBAL
AGGREGATE BOND SEGREGATED
PORTFOLIO; PIMCO CAYMAN SPC
LIMITED: PIMCO CAYMAN JAPAN
COREPLUS SEGREGATED
PORTFOLIO; PIMCO CAYMAN SPC
LIMITED: PIMCO CAYMAN JAPAN
COREPLUS STRATEGY SEGREGATED
PORTFOLIO; PIMCO CAYMAN SPC
LIMITED: PIMCO CAYMAN JAPAN
LOW DURATION SEGREGATED
PORTFOLIO; PIMCO CAYMAN SPC
LIMITED: PIMCO CAYMAN
UNCONSTRAINED BOND
SEGREGATED PORTFOLIO; PIMCO
CAYMAN TRUST: PIMCO CAYMAN
GLOBAL AGGREGATE BOND FUND;
PIMCO CAYMAN TRUST: PIMCO
CAYMAN GLOBAL AGGREGATE EX-
JAPAN (YEN-HEDGED) BOND FUND
II; PIMCO CAYMAN TRUST: PIMCO
CAYMAN GLOBAL AGGREGATE EX-
JAPAN BOND FUND; PIMCO CAYMAN
TRUST: PIMCO CAYMAN GLOBAL
EX-JAPAN (YEN-HEDGED) BOND
FUND; PIMCO COMBINED ALPHA
STRATEGIES MASTER FUND LDC;
PIMCO CORPORATE & INCOME
OPPORTUNITY FUND; PIMCO
CORPORATE & INCOME STRATEGY
FUND; PIMCO DISTRESSED SENIOR
CREDIT OPPORTUNITIES FUND II,
L.P.; PIMCO DYNAMIC CREDIT
INCOME FUND; PIMCO DYNAMIC
INCOME FUND; PIMCO EQUITY

SERIES: PIMCO BALANCED INCOME
FUND; PIMCO ETF TRUST: PIMCO
ENHANCED SHORT MATURITY
ACTIVE EXCHANGE-TRADED FUND;
PIMCO ETF TRUST: PIMCO LOW
DURATION ACTIVE EXCHANGE-
TRADED FUND; PIMCO ETF TRUST:
PIMCO TOTAL RETURN ACTIVE
EXCHANGE-TRADED FUND; PIMCO
FUNDS: GLOBAL INVESTORS SERIES
PLC, DIVERSIFIED INCOME
DURATION HEDGED FUND; PIMCO
FUNDS: GLOBAL INVESTORS SERIES
PLC, DIVERSIFIED INCOME FUND;
PIMCO FUNDS: GLOBAL INVESTORS
SERIES PLC, EMERGING LOCAL
BOND FUND; PIMCO FUNDS: GLOBAL
INVESTORS SERIES PLC, EMERGING
MARKETS BOND FUND; PIMCO
FUNDS: GLOBAL INVESTORS SERIES
PLC, EURO BOND FUND; PIMCO
FUNDS: GLOBAL INVESTORS SERIES
PLC, EURO INCOME BOND FUND;
PIMCO FUNDS: GLOBAL INVESTORS
SERIES PLC, GLOBAL ADVANTAGE
REAL RETURN FUND; PIMCO FUNDS:
GLOBAL INVESTORS SERIES PLC,
GLOBAL BOND FUND; PIMCO FUNDS:
GLOBAL INVESTORS SERIES PLC,
GLOBAL INVESTMENT GRADE
CREDIT FUND; PIMCO FUNDS:
GLOBAL INVESTORS SERIES PLC,
INCOME FUND; PIMCO FUNDS:
GLOBAL INVESTORS SERIES PLC,
INFLATION STRATEGY FUND; PIMCO
FUNDS: GLOBAL INVESTORS SERIES
PLC, PIMCO CREDIT ABSOLUTE
RETURN FUND; PIMCO FUNDS:
GLOBAL INVESTORS SERIES PLC,
PIMCO DIVIDEND AND INCOME
BUILDER FUND; PIMCO FUNDS:
GLOBAL INVESTORS SERIES PLC,
STOCKSPLUS™ FUND; PIMCO
FUNDS: GLOBAL INVESTORS SERIES
PLC, STRATEGIC INCOME FUND;
PIMCO FUNDS: GLOBAL INVESTORS

SERIES PLC, TOTAL RETURN BOND
FUND; PIMCO FUNDS: GLOBAL
INVESTORS SERIES PLC,
UNCONSTRAINED BOND FUND;
PIMCO FUNDS: PIMCO
COMMODITIESPLUS® STRATEGY
FUND; PIMCO FUNDS: PIMCO
COMMODITY REAL RETURN
STRATEGY FUND®; PIMCO FUNDS:
PIMCO CREDIT ABSOLUTE RETURN
FUND; PIMCO FUNDS: PIMCO
DIVERSIFIED INCOME FUND; PIMCO
FUNDS: PIMCO EM FUNDAMENTAL
INDEXPLUS® AR STRATEGY FUND;
PIMCO FUNDS: PIMCO EMERGING
LOCAL BOND FUND; PIMCO FUNDS:
PIMCO EMG INTL LOW VOLATILITY
RAFI®-PLUS AR FUND; PIMCO
FUNDS: PIMCO FLOATING INCOME
FUND; PIMCO FUNDS: PIMCO
FOREIGN BOND FUND (U.S. DOLLAR-
HEDGED); PIMCO FUNDS: PIMCO
FOREIGN BOND FUND (UNHEDGED);
PIMCO FUNDS: PIMCO
FUNDAMENTAL ADVANTAGE
ABSOLUTE RETURN STRATEGY
FUND; PIMCO FUNDS: PIMCO
GLOBAL ADVANTAGE® STRATEGY
BOND FUND; PIMCO FUNDS: PIMCO
GLOBAL BOND FUND (U.S. DOLLAR-
HEDGED); PIMCO FUNDS: PIMCO
GLOBAL BOND FUND (UNHEDGED);
PIMCO FUNDS: PIMCO GLOBAL
MULTI-ASSET FUND; PIMCO FUNDS:
PIMCO INCOME FUND; PIMCO
FUNDS: PIMCO INFLATION
RESPONSE MULTI-ASSET FUND;
PIMCO FUNDS: PIMCO
INTERNATIONAL FUNDAMENTAL
INDEXPLUS® AR STRATEGY FUND;
PIMCO FUNDS: PIMCO
INTERNATIONAL STOCKSPLUS® AR
STRATEGY FUND (U.S. DOLLAR-
HEDGED); PIMCO FUNDS: PIMCO
INTERNATIONAL STOCKSPLUS® AR
STRATEGY FUND (UNHEDGED);

PIMCO FUNDS: PIMCO INTL LOW
VOLATILITY RAFI®-PLUS AR FUND;
PIMCO FUNDS: PIMCO INVESTMENT
GRADE CORPORATE BOND FUND;
PIMCO FUNDS: PIMCO LONG
DURATION TOTAL RETURN FUND;
PIMCO FUNDS: PIMCO LONG-TERM
CREDIT FUND; PIMCO FUNDS: PIMCO
LONG-TERM U.S. GOVERNMENT
FUND; PIMCO FUNDS: PIMCO LOW
DURATION FUND; PIMCO FUNDS:
PIMCO LOW DURATION FUND II;
PIMCO FUNDS: PIMCO LOW
DURATION FUND III; PIMCO FUNDS:
PIMCO LOW VOLATILITY RAFI®-
PLUS AR FUND; PIMCO FUNDS:
PIMCO MODERATE DURATION
FUND; PIMCO FUNDS: PIMCO
MORTGAGE OPPORTUNITIES FUND;
PIMCO FUNDS: PIMCO REAL ESTATE
REAL RETURN STRATEGY FUND;
PIMCO FUNDS: PIMCO REAL RETURN
ASSET FUND; PIMCO FUNDS: PIMCO
REAL RETURN FUND; PIMCO FUNDS:
PIMCO SHORT-TERM FUND; PIMCO
FUNDS: PIMCO SMALL CAP
STOCKSPLUS® AR STRATEGY FUND;
PIMCO FUNDS: PIMCO SMALL
COMPANY FUNDAMENTAL
INDEXPLUS® AR STRATEGY FUND;
PIMCO FUNDS: PIMCO
STOCKSPLUS® ABSOLUTE RETURN
FUND; PIMCO FUNDS: PIMCO
STOCKSPLUS® AR SHORT
STRATEGY FUND; PIMCO FUNDS:
PIMCO STOCKSPLUS® FUND; PIMCO
FUNDS: PIMCO TOTAL RETURN
FUND; PIMCO FUNDS: PIMCO TOTAL
RETURN FUND II; PIMCO FUNDS:
PIMCO TOTAL RETURN FUND III;
PIMCO FUNDS: PIMCO TOTAL
RETURN FUND IV; PIMCO FUNDS:
PIMCO UNCONSTRAINED BOND
FUND; PIMCO FUNDS: PIMCO
UNCONSTRAINED TAX MANAGED
BOND FUND; PIMCO FUNDS: PIMCO

WORLDWIDE FUNDAMENTAL
ADVANTAGE AR STRATEGY FUND;
PIMCO FUNDS: PRIVATE ACCOUNT
PORTFOLIO SERIES ASSET-BACKED
SECURITIES PORTFOLIO; PIMCO
FUNDS: PRIVATE ACCOUNT
PORTFOLIO SERIES DEVELOPING
LOCAL MARKETS PORTFOLIO;
PIMCO FUNDS: PRIVATE ACCOUNT
PORTFOLIO SERIES EMERGING
MARKETS PORTFOLIO; PIMCO
FUNDS: PRIVATE ACCOUNT
PORTFOLIO SERIES HIGH YIELD
PORTFOLIO; PIMCO FUNDS: PRIVATE
ACCOUNT PORTFOLIO SERIES
INTERNATIONAL PORTFOLIO; PIMCO
FUNDS: PRIVATE ACCOUNT
PORTFOLIO SERIES MORTGAGE
PORTFOLIO; PIMCO FUNDS: PRIVATE
ACCOUNT PORTFOLIO SERIES REAL
RETURN PORTFOLIO; PIMCO FUNDS:
PRIVATE ACCOUNT PORTFOLIO
SERIES SHORT-TERM PORTFOLIO;
PIMCO FUNDS: PRIVATE ACCOUNT
PORTFOLIO SERIES U.S.
GOVERNMENT SECTOR PORTFOLIO;
PIMCO GLOBAL CREDIT
OPPORTUNITY MASTER FUND LDC;
PIMCO GLOBAL INCOME
OPPORTUNITIES FUND; PIMCO
GLOBAL STOCKSPLUS & INCOME
FUND; PIMCO HIGH INCOME FUND;
PIMCO INCOME OPPORTUNITY
FUND; PIMCO INCOME STRATEGY
FUND; PIMCO INCOME STRATEGY
FUND II; PIMCO LARGE CAP
STOCKSPLUS ABSOLUTE RETURN
FUND; PIMCO MULTI-SECTOR
STRATEGY FUND LTD.; PIMCO
OFFSHORE FUNDS - PIMCO
ABSOLUTE RETURN STRATEGY IV
EFUND; PIMCO OFFSHORE FUNDS:
PIMCO OFFSHORE FUNDS - PIMCO
ABSOLUTE RETURN STRATEGY V
ALPHA FUND; PIMCO REAL RETURN
STRATEGY FUND; PIMCO STRATEGIC

INCOME FUND, INC.; PIMCO
TACTICAL OPPORTUNITIES MASTER
FUND LTD.; PIMCO VARIABLE
INSURANCE TRUST: PIMCO
COMMODITY REAL RETURN
STRATEGY PORTFOLIO; PIMCO
VARIABLE INSURANCE TRUST:
PIMCO EMERGING MARKETS BOND
PORTFOLIO; PIMCO VARIABLE
INSURANCE TRUST: PIMCO FOREIGN
BOND PORTFOLIO (U.S. DOLLAR
HEDGED); PIMCO VARIABLE
INSURANCE TRUST: PIMCO GLOBAL
ADVANTAGE STRATEGY BOND
PORTFOLIO; PIMCO VARIABLE
INSURANCE TRUST: PIMCO GLOBAL
BOND PORTFOLIO (UNHEDGED);
PIMCO VARIABLE INSURANCE
TRUST: PIMCO LONG TERM U.S.
GOVERNMENT PORTFOLIO; PIMCO
VARIABLE INSURANCE TRUST:
PIMCO LOW DURATION PORTFOLIO;
PIMCO VARIABLE INSURANCE
TRUST: PIMCO REAL RETURN
PORTFOLIO; PIMCO VARIABLE
INSURANCE TRUST: PIMCO SHORT-
TERM PORTFOLIO; PIMCO VARIABLE
INSURANCE TRUST: PIMCO TOTAL
RETURN PORTFOLIO; PIMCO
VARIABLE INSURANCE TRUST:
PIMCO UNCONSTRAINED BOND
PORTFOLIO; CREF BOND MARKET
ACCOUNT; CREF SOCIAL CHOICE
ACCOUNT; TIAA GLOBAL PUBLIC
INVESTMENTS, MBS LLC; TIAA-CREF
BOND FUND; TIAA-CREF BOND PLUS
FUND; TIAA-CREF LIFE BOND FUND;
TIAA-CREF LIFE INSURANCE
COMPANY; TIAA-CREF SHORT-TERM
BOND FUND; TIAA-CREF SOCIAL
CHOICE BOND FUND; PRUDENTIAL
BANK & TRUST, FSB; PRUDENTIAL
RETIREMENT INSURANCE AND
ANNUITY COMPANY; PRUDENTIAL
TRUST COMPANY; THE GIBRALTAR
LIFE INSURANCE COMPANY, LTD.;

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA; THE
PRUDENTIAL INVESTMENT
PORTFOLIOS 2; THE PRUDENTIAL
INVESTMENT PORTFOLIOS 9; THE
PRUDENTIAL INVESTMENT
PORTFOLIOS INC.; THE PRUDENTIAL
INVESTMENT PORTFOLIOS, INC. 17;
THE PRUDENTIAL SERIES FUND;
BROOKFIELD MORTGAGE
OPPORTUNITY INCOME FUND INC.;
MILLERTON ABS CDO LTD.; KORE
ADVISORS LP; SEALINK FUNDING
LIMITED; and DZ BANK AG,
derivatively, on behalf of the Trusts
Identified in Exhibit 1,

        Plaintiffs,

    -against-

WELLS FARGO BANK, NATIONAL
ASSOCIATION,

        Defendant,

    -and-

the Trusts Identified in Exhibit 1,

        Nominal Defendants.

## TABLE OF CONTENTS

**Page**

I.  NATURE AND SUMMARY OF THE ACTION ........................................................ 1

II. PARTIES .................................................................................................. 10

    A. Plaintiffs ............................................................................................ 10

        1. BlackRock Funds ........................................................................ 11

        2. Brookfield ................................................................................. 12

        3. DZ Bank ................................................................................... 12

        4. Kore ........................................................................................ 13

        5. PIMCO ..................................................................................... 13

        6. Prudential ................................................................................. 25

        7. Sealink .................................................................................... 28

        8. TIAA ....................................................................................... 28

    B. Defendants ......................................................................................... 29

        1. Wells Fargo .............................................................................. 29

        2. The Nominal Defendant Trusts ..................................................... 30

III. OVERVIEW OF THE TRUSTS ...................................................................... 31

IV. JURISDICTION AND VENUE ....................................................................... 32

V. COMPLIANCE WITH THE NO ACTION CLAUSE IS EXCUSED ............................ 32

VI. DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS .................................... 32

VII. BACKGROUND - THE TRUSTEE'S ROLE AS GATEKEEPER IN THE SECURITIZATION PROCESS ........................................................................ 34

VIII. WELLS FARGO'S CONTRACTUAL OBLIGATIONS .......................................... 38

    A. The Mortgage Loan Purchase And Sale Agreement ................................. 38

    B. The Pooling And Servicing Agreements ................................................. 40

        1. Wells Fargo's Duties And Obligations Under The PSAs ..................... 40

            a) Duty To Provide Notice Of Breaches And To Enforce Putback Rights ........................................... 42

|  | b) | Wells Fargo's Duties Regarding The Servicers | 43 |
|  | c) | Duties Upon Knowledge Of An Event Of Default | 43 |
| 2. |  | The Servicers' Duties And Obligations Under The PSAs | 44 |
|  | a) | Duty To Provide Notice Of Breaches And To Enforce Putback Rights | 44 |
|  | b) | Duty To Perform Prudent And Customary Servicing Practices | 45 |
|  | c) | Duty To Perform Prudent Foreclosure Practices | 46 |
|  | d) | Duty To Perform Prudent Servicing Advances | 47 |
| C. |  | The Indentures And Sale Servicing Agreements | 48 |

IX.   THE TRUSTS SUFFERED FROM PERVASIVE BREACHES OF REPRESENTATIONS AND WARRANTIES BY THE SELLERS ............................. 51

A.   High Default Rates Of The Mortgage Loans And Plummeting Credit Ratings Are Indicative Of Massive Seller Breaches ................................. 51

B.   The Systemic Disregard Of Underwriting Standards Was Pervasive During The Relevant Period ................................. 52

C.   There Is Evidence Of Widespread Breaches Of Representations And Warranties By The Specific Originators That Sold Loans To The Trusts ................................. 55

| 1. | Option One | 55 |
| 2. | Argent | 59 |
| 3. | WMC | 61 |
| 4. | First Franklin | 65 |
| 5. | Fremont | 66 |
| 6. | Countrywide | 69 |
| 7. | New Century | 74 |

D.   The Systemic Disregard Of Prudent Securitization Standards Was Pervasive During The Relevant Period ................................. 76

E.    There Is Evidence Of Widespread Breaches Of Representations And Warranties By The Specific Sponsors Of The Trusts .................................. 77

    1.    Bank Of America ....................................................... 78

    2.    Park Place ................................................................. 83

    3.    Merrill Lynch ............................................................ 84

    4.    Lehman ..................................................................... 86

    5.    Morgan Stanley ......................................................... 88

    6.    Barclays .................................................................... 90

    7.    Carrington ................................................................. 92

    8.    RBS .......................................................................... 95

    9.    Credit Suisse (DLJ Mortgage Capital) ...................... 97

X.    WELLS FARGO KNEW THAT THE TRUSTS WERE FILLED WITH DEFECTIVE LOANS ............................................................................. 100

A.    The Trusts' Poor Performance ........................................................ 101

B.    Credit Rating Downgrades Of The Certificates Further Support The Sellers' Problems ...................................................................... 103

C.    Wells Fargo Discovered Widespread Seller Breaches Of Representations And Warranties In Its Capacity As Servicer ........................... 104

D.    Wells Fargo Received Written Notice Of Pervasive And Systemic Seller Breaches From Financial Guaranty Insurers ........................... 105

E.    Wells Fargo Repeatedly Received Written Notice Of Pervasive And Systemic Seller Breaches From Certificateholders And Trustees ......................................................................................... 108

F.    Wells Fargo Was Named In RMBS Litigation Involving Common Loan Sellers' Systemic Abandonment Of Underwriting Guidelines ................ 112

G.    Wells Fargo Has Selectively Asserted The Trusts' Repurchase Rights Against The Sellers ................................................................. 114

XI.   THE TRUSTS ALSO SUFFERED FROM PERVASIVE SERVICER VIOLATIONS .............................................................................................. 116

A.    The Servicers Failed To Give Notice Of Seller Breaches Of Representations And Warranties And Enforce The Sellers' Repurchase Obligations ................................................................... 116

B.    The Servicers Have Violated Their Prudent Servicing Obligations .................. 119

|       |    | C. | The Servicers Have Violated Their Foreclosure Obligations | 123 |

C.      The Servicers Have Violated Their Foreclosure Obligations .............................. 123

D.      The Servicers Have Violated Their Modification Obligations ........................... 128

E.      The Servicers Have Abused Their Servicing Advances Obligations ................ 129

XII.    WELLS FARGO HAS KNOWN OF SERVICER VIOLATIONS
        PLAGUING THE TRUSTS ........................................................................... 132

        A.      Wells Fargo Itself Was Involved In Government Enforcement
                Actions And Litigation Stemming From The Servicers' Violations ................ 132

        B.      Wells Fargo And Its Responsible Officers Received Written Notice
                From Certificateholders Of Pervasive And Systemic Servicer
                Breaches ........................................................................................................ 134

        C.      Wells Fargo Had Knowledge Of The Servicers' Failures Through
                The Monthly Servicer And Remittance Reports ...................................... 136

XIII.   WELLS FARGO FAILED TO DISCHARGE ITS CRITICAL PRE- AND
        POST-DEFAULT DUTIES ........................................................................... 136

        A.      Failure To Enforce The Trusts' Repurchase Rights .......................................... 137

        B.      Failure To Provide Notice To The Servicers Of Events Of Default ................ 137

        C.      Failure To Act Prudently Subsequent To The Uncured Events Of
                Default ......................................................................................................... 138

        D.      Failure To Provide Notice To The Certificateholders Of The
                Uncured Events Of Default ....................................................................... 139

XIV.    WELLS FARGO FAILED TO PROTECT THE TRUSTS FOLLOWING
        THE INSOLVENCY OF CERTAIN SPONSORS .......................................... 139

XV.     WELLS FARGO FAILED TO PROTECT THE TRUSTS DUE TO ITS
        CONFLICTS OF INTEREST ........................................................................ 141

        A.      Wells Fargo Was Economically Beholden To The Mortgage Loan
                Sellers ......................................................................................................... 141

        B.      Wells Fargo Was Engaged In The Same Wrongful Servicing
                Activities .................................................................................................... 142

        C.      Wells Fargo Originated And Sponsored Defective Loans ............................. 144

                1.      Wells Fargo's Appointment Of A Special Trustee Is
                        Ineffective ...................................................................................... 146

        D.      Wells Fargo Refused To Discharge Its Duties In Order To Preserve
                Profits ......................................................................................................... 147

XVI.    CAUSATION ............................................................................................... 149

XVII.   DAMAGES........................................................................................................ 149

XVIII. CAUSES OF ACTION ........................................................................................ 150

FIRST CAUSE OF ACTION  BREACH OF CONTRACT (In The Right Of The
        Trustee And On Behalf Of The Trusts Against Wells Fargo) ......................................... 150

SECOND CAUSE OF ACTION  VIOLATION OF THE TRUST INDENTURE
        ACT OF 1939, 53 STAT. 1171 (In The Right Of The Trustee And On
        Behalf Of The Trusts Against Wells Fargo) .................................................................. 157

THIRD CAUSE OF ACTION  NEGLIGENCE - BREACH OF PRE-DEFAULT
        DUTY OF INDEPENDENCE (In The Right Of The Trustee And On
        Behalf Of The Trusts Against Wells Fargo) .................................................................. 160

FOURTH CAUSE OF ACTION  BREACH OF FIDUCIARY DUTY – DUTY
        OF CARE (In The Right Of The Trustee And On Behalf Of The Trusts
        Against Wells Fargo) ..................................................................................................... 162

FIFTH CAUSE OF ACTION  NEGLIGENCE – DUTY OF CARE (In The Right
        Of The Trustee And On Behalf Of The Trusts Against Wells Fargo).......................... 165

SIXTH CAUSE OF ACTION  BREACH OF FIDUCIARY DUTY – BREACH
        OF POST-DEFAULT DUTY OF INDEPENDENCE (In The Right Of
        The Trustee And On Behalf Of The Trusts Against Wells Fargo) ................................ 167

XIX.    CLASS ACTION ALLEGATIONS ...................................................................... 169

XX.     RELIEF REQUESTED.......................................................................................... 170

XXI.    JURY DEMAND ................................................................................................... 171

Plaintiffs BlackRock Funds (as defined herein); Brookfield (as defined herein); Deutsche Zentral-Genossenschaftsbank AG, New York Branch, d/b/a DZ Bank AG, New York Branch ("DZ Bank"); Kore Advisors, L.P. (as defined herein); PIMCO (as defined herein); Prudential (as defined herein); Sealink Funding Limited ("Sealink"); and TIAA (as defined herein) (collectively, "Plaintiffs") by and through their undersigned attorneys, hereby bring this derivative complaint (the "Complaint") in the right of the trustee and on behalf of and for the benefit of the residential mortgage-backed securities ("RMBS") Trusts listed in Exhibit 1 ("Trusts"), against Wells Fargo Bank, National Association ("Wells Fargo" or the "Trustee"), the Trustee for the Trusts to recover losses sustained by the Trusts as a result of Wells Fargo's wrongful conduct.  Alternatively, Plaintiffs bring this action on their own behalf and on behalf of a class of all current owners of certificates in the Trusts (the "Class") to recover for the losses directly suffered by Plaintiffs and the Class as a result of Wells Fargo's wrongful conduct.

## I.    NATURE AND SUMMARY OF THE ACTION

1.    Defendant Wells Fargo is a nationally chartered banking association and is the Trustee for hundreds of RMBS trusts issued between 2004 and 2008 originally securitized by over $400 billion of residential mortgage loans.  Among them are the Trusts at issue in this action: 274 private-label RMBS Trusts securitized between 2004 and 2008 collateralized with loans worth more than $253.7 billion at the time of securitization.  Wells Fargo, as Trustee or Securities Administrator, is the gatekeeper for the protection of the Trusts and their beneficial certificateholders (the "Certificateholders"), and must at all times act in the best interests of the Trusts.  As alleged herein, Wells Fargo wholly failed to discharge its duties and obligations to protect the Trusts. Instead, to protect its own business interests, Wells Fargo ignored pervasive and systemic deficiencies in the underlying loan pools and the servicing of those loans and

unreasonably refused to take any action.  This derivative action seeks to recover billions of dollars in damages to the Trusts caused by Wells Fargo's abdication of responsibility.[1]

2.      RMBS trusts are created to facilitate the securitization and sale of residential mortgage loans to investors.  The trust's assets consist entirely of the underlying loans, and the principal and interest payments on the loans are "passed through" to the certificateholders. Between 2004 and 2008, a handful of large banks – including Wells Fargo − dominated the RMBS market and controlled the process from beginning to end.  These banks act as "sponsors" of the RMBS, acquiring the mortgage loans from originators, who often were affiliates of the sponsors, or beholden to them through warehouse lending or other financial arrangements.  Once the loans are originated, acquired and selected for securitization, the sponsor creates a trust where the loans are deposited for the benefit of the Certificateholders.  The sponsor also hand-picks the servicer, often an affiliate of the sponsor or originator, to collect payments on the loans. Finally, a select number of these same banks that originate, securitize and service RMBS also act as trustees on other sponsor's deals.

3.      To ensure the quality of the RMBS and the underlying loans, the Trust documents generally include representations and warranties from the loan sellers attesting to the quality and characteristics of the mortgages as well as an agreement to cure, substitute, or repurchase mortgages that do not comply with those representations and warranties.  Because the risk of non-payment or default on the loans is "passed through" to investors, other than these representations and warranties, the large investment banks and other players in the mortgage

---

[1] This complaint does not allege in any way that the Trustees were or are burdened by conflicts in connection with their negotiation, evaluation, or acceptance of any RMBS settlement, including the $8.5 billion settlement with Bank of America/Countrywide, the $4.5 billion settlement with JPMorgan, or the $1.125 billion settlement with Citibank.

securitization industry have no "skin" in the game once the RMBS are sold to certificateholders. Instead, their profits are principally derived from the spread between the cost to originate or purchase loans, how much they can sell them to investors once packaged as securities, as well as various servicing-related income.  Accordingly, volume became the focus, and the quality of the loans was disregarded.

4.      The fundamental role of a trustee in an RMBS securitization is to ensure that there is at least one independent party, free from any conflicting self-interest, to protect the trust corpus.  Certificateholders have no access to the underlying loan files and other documents necessary to confirm compliance with the representations and warranties, cannot monitor the servicers' conduct and performance, cannot act independently to enforce the trusts' contractual rights, and must rely on the trustee to protect their interests.  Wells Fargo, as Trustee, was the sole contractual party in the Trusts' securitization process intended to be independent of the investment banks that sponsored the securitization, the lenders that originated the loans, and the servicers that were often affiliated with either the sponsors or lenders, or both.  Certificateholders must rely on the trustee to protect the rights and interests of the trusts.

5.      Wells Fargo knew that the pools of loans backing the Trusts were filled with defective mortgage loans.  The abysmal performance of the Trust collateral – including spiraling defaults, delinquencies and foreclosures – is outlined on monthly remittance reports that Wells Fargo, as Trustee, publishes and publicly files with the government.  The monthly remittance reports detail how, by January 1, 2009, the Trusts had suffered collateral losses exceeding $11.3 billion.  On average, nearly one in every four loans in the Trusts was delinquent.  Moreover, 99 Trusts had delinquency rates exceeding 33%, and 28 Trusts had delinquency rates of over 50%. By January 2011, the Trusts' total losses had nearly *doubled* to $21.5 billion.  By the start

of 2010, virtually all of the securities issued by the Trusts had experienced multiple downgrades, with most reduced to "junk" status.

6.       A steady stream of public disclosures has linked the abject performance of the Trusts to systemic abandonment of underwriting guidelines, and the deficient and often fraudulent securitization practices of the sponsors. Highly publicized government investigations, reports and enforcement actions; high-profile RMBS litigation by government agencies, federal banks, and institutional investors; and claims and litigation instituted by monoline insurers have repeatedly noted the "pervasive disregard" and "systemic abandonment" of underwriting guidelines in the years leading up to the financial crisis.   Voluminous complaints in these proceedings detail gross misstatements in the Trust documents of key metrics concerning the quality of the underlying loan pools, including loan-to-value ratios ("LTVs"), owner occupancy status, and borrower credit scores – as well as the completeness of the loan files themselves.

7.       Numerous forensic and loan level reviews conducted in extensive RMBS litigation have demonstrated staggering levels of breaches of representations and warranties by the sellers of the securitized mortgage loans.  In particular, forensic reviews performed by RMBS trustees in at least forty-two lawsuits against loan sellers in connection with RMBS trusts to which Wells Fargo serves either as servicer or custodian, have found pervasive and systemic breaches of representations and warranties by major originators and sponsors to the Trusts (such as Option One Mortgage Corporation ("Option One"), UBS, Credit Suisse, Morgan Stanley and WMC Mortgage Corp. ("WMC").  In one such matter, Deutsche Bank National Trust Company advised Wells Fargo that "we have determined a breach rate of **99.7 percent.**"

8.       Loan level reviews performed by monoline insurers have reached similar findings, including in at least ten lawsuits against loan sellers to RMBS trusts for which Wells

Fargo serves either as Trustee or servicer.  For example, in a lawsuit against Bank of America, a loan level review of approximately 31,000 mortgage loans from twenty-two securitizations found that more than ***two-thirds*** of the loans contained at least one material defect.  Similar findings of systemic and pervasive defects in the loans pools underlying the Trusts can be found in forensic reviews commissioned by government agencies and banks involving ***dozens*** of the Trusts here at issue, including in RMBS fraud litigation brought by the Federal Housing and Finance Agency ("FHFA"), Federal Home Loan Banks ("FHLB"), and the National Credit Union Administration ("NCUA").  Through the foregoing litigation involving the Trusts at issue in this action or the principal loan sellers to the Trusts (or both), Wells Fargo was informed of specific, systemic and pervasive deficiencies in the Trusts' mortgage collateral.

9.    Wells Fargo was further informed of pervasive and systemic deficiencies infecting the Trusts' collateral though large-scale putback initiatives led by many of the world's largest institutional mortgage investors.  These initiatives – several of which have yielded ***multi-billion dollar settlements*** – have targeted Wells Fargo and five other leading sponsors of non-agency RMBS and cover wide swaths of the RMBS market, including entire labels and shelves.

10.    For example, in December 2011, a group of major institutional investors asked Wells Fargo, as trustee, to investigate large numbers of ineligible mortgages in loan pools underlying dozens of JPMorgan sponsored trusts and deficient servicing of those loans. Together with similar requests provided to four other trustees, the initiative covered more than ***$95 billion*** of JPMorgan-issued RMBS from 2005 to 2007.  Less than two years later, Wells Fargo and the other trustees were presented with a comprehensive $4.5 billion settlement offer covering 330 JPMorgan-sponsored trusts.  On August 1, 2014 and October 2, 2014, Wells Fargo and the other trustees involved in the putback initiative ***accepted*** JPMorgan's $4.5 billion offer for the vast

majority of the 330 trusts included in the offer and petitioned for *court approval* of the settlement.  In January 2012, Wells Fargo received a similar request from a group of major institutional investors in dozens of Trusts sponsored by Morgan Stanley or its affiliates (collectively, "Morgan Stanley"), which are also at issue in this action. Together with instructions provided to two other trustees of the Morgan Stanley-sponsored Trusts, the initiative covered more than *$25 billion* of RMBS issued from 2005 to 2007.  And in yet another investor-led initiative, Wells Fargo, as trustee, gave its *approval* to an $8.7 billion settlement covering, among other trusts, 570 RMBS trusts sponsored by Residential Capital and its affiliates ("ResCap") largely from 2004 to 2008 with an original face amount of more than *$320 billion*.[2]

11.     These and other certificateholder-led initiatives sought to "putback" large quantities of loans (i) originated by many of the same lenders that also originated large quantities of the loans sold to the Trusts, including Option One ($44.9 billion of loans sold to the Trusts) and Citibank   ($25.1 billion of loans sold to the Trusts); and (ii) securitized by the same investment banks and financial institutions that sponsored the Trusts, including Morgan Stanley ($14 billion of sponsored Trusts) and Citibank ($1.6 billion of sponsored Trusts). In addition, these initiatives identified and sought recovery of losses relating to servicing deficiencies by many of the same major servicers of loans backing the Trusts, including Option One (servicer to $49.8 billion of loans sold to the Trusts) and Bank of America (servicer to $41.7 billion of loans sold to the Trusts).

---

[2] In January 2014, after a nine-week trial, New York Supreme Court Justice Barbara Kapnick largely approved an $8.5 billion settlement resolving mortgage repurchase claims for 530 RMBS trusts issued by Countrywide Financial Corporation and its affiliates ("Countrywide"). That initiative began in October 2010 and covers more than *$424 billion* of RMBS issued from 2004 to 2008.

12.     Not surprisingly, in the _**one**_ action that Wells Fargo brought to protect a financial crisis-era RMBS trust (not at issue in this litigation), Wells Fargo itself identified systemic and pervasive breaches of representations and warranties.  According to Wells Fargo, loans backing that trust – which was filled with loans originated by EMC Mortgage Corporation ("EMC") (a subsidiary of JPMorgan Chase Company), securitized by Bear, Stearns & Co., Inc. ("Bear Stearns"), and serviced by EMC's servicing division – suffered a "***staggeringly high breach rate***" – as high as ***89%*** – due to "***unscrupulous practices***" and "***scandalous conduct.***"  Wells Fargo alleged the loans were "***routinely approved . . . despite clear defects***" that should have been obvious, including "***faulty appraisals*** that ***grossly exaggerated*** the true market value of the mortgaged properties; ***unreasonable and inconceivable overstatement of income*** . . . and ***pervasive failure*** of the originators to follow their own mandatory underwriting practices . . . ."  Consequently, Wells Fargo concluded that Bear Stearns trust was "***plagued by an alarming rate of defaults and foreclosures***."

13.     Wells Fargo also knew of industrywide abandonment of underwriting guidelines and sound securitization practices because Wells Fargo was itself a major mortgage originator, a major RMBS sponsor, and a major servicer.  Indeed, Wells Fargo has been named as a defendant in significant RMBS litigation and settlements in its capacity as an underwriter of RMBS.  For example, in March 2009, RMBS investors filed suit against Wells Fargo alleging that it misrepresented its underwriting guidelines and loan quality in connection with the sale of over $36 billion in Wells Fargo-label RMBS.  In denying in part a motion to dismiss, the court found that plaintiffs had adequately pled that "variance from the stated [underwriting] standards was essentially [Wells Fargo's] norm," and that this conduct "infected the entire underwriting process." *In re Wells Fargo Mortgage-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 972 (N.D.

Cal. 2010). Wells Fargo agreed to settle the investors' claims, which were rooted in Wells Fargo's desire to "approve as many mortgages as possible."

14.     Moreover, Wells Fargo is the target of an ongoing investor-led putback initiative launched in October 2011 with respect to **$45 billion** of Wells Fargo-label RMBS.  In that initiative, certificateholders provided notice to Wells Fargo of specific ongoing "Events of Default" and demanded that Wells Fargo take immediate action to satisfy its obligations and substantial repurchase liability for ineligible loans securitizing over **149 RMBS trusts** issued by Wells Fargo from 2004 to 2007.  Again, those trusts are filled with mortgage loans originated by many of the same lenders that sold large quantities of loans to the Trusts, including WMC ($17 billion of loans sold to the Trusts).

15.     Finally, as a major player in the RMBS securitization market, Wells Fargo learned of the rampant, industrywide servicer violations by the same servicers for the Trusts.  Indeed, many of the servicers to the Trusts have faced federal and state regulatory enforcement actions which have led to landmark settlements, including the $25 billion "National Mortgage Settlement" entered into between forty-nine state Attorneys general and some of the Trusts' servicers.  Notably, without receiving Certificateholder approval, many of these settlement agreements effectively permit the servicers to use trust assets to finance their settlement payments for their own wrongdoing.

16.     Moreover, Wells Fargo itself was the target of government investigations and lawsuits regarding its deficient servicing operations.  For example, during the fourth quarter of 2010, the Federal Reserve Board, the Office of the Comptroller of the Currency ("OCC"), the Federal Deposit Insurance Corporation ("FDIC"), and the Office of Thrift Supervision ("OTS") conducted on-site reviews of the adequacy of controls and governance over servicers' foreclosure

processes at Wells Fargo.  The reviews uncovered significant problems in foreclosure processing at Wells Fargo, including "critical weaknesses in [Wells Fargo's] foreclosure governance processes, foreclosure document preparation processes, and oversight and monitoring of third-party vendors, including foreclosure attorneys."  Based on the deficiencies in the review and the risk of additional issues as a result of weak controls and processes, the Federal Reserve Board initiated formal enforcement actions requiring Wells Fargo to address its pattern of misconduct and negligence related to deficient practices in residential mortgage loan servicing and foreclosure processing.  Ultimately, Wells Fargo entered into a consent order with the OCC, which found that it had engaged in "unsafe or unsound practices with respect to the manner in which [Wells Fargo] handled various foreclosure and related activities."

17.     Under the governing Pooling and Servicing Agreements ("PSA"), upon Wells Fargo's knowledge of an Event of Default by a servicer, Wells Fargo is obligated to provide written notice of the default to the servicer.  Wells Fargo systematically failed, however, to provide notice to the servicers of their defaults because Wells Fargo did not want to jeopardize its close business relationships with the servicers.  Moreover, Wells Fargo, which also acts as a servicer for billions of dollars of other RMBS, has itself engaged in the same improper and illicit servicing activities that plagued the Trusts.  Similarly, Wells Fargo originated billions of dollars in loans that have been securitized in other RMBS and that contain pervasive breaches of representations and warranties.  Many of the same entities that act as servicers for the Trusts also service these defective Wells Fargo-originated loans.  Thus, Wells Fargo, acting in its own self-interest, refused to provide notice to the servicers of their defaults to avoid scrutiny of its own servicing business and evade liability for its own defective loans.

18.     Further, under the PSAs, within sixty to ninety days after the occurrence of an Event of Default, Wells Fargo is obligated to transmit by mail to all Certificateholders notice of each Event of Default known to Wells Fargo, unless the Event of Default has been cured or waived.  Although Events of Default occurred and were not – and have not been – cured or waived, Wells Fargo has similarly failed to provide written notice to the Certificateholders of the Events of Default.  Wells Fargo has covered up the Events of Default for several self-interested reasons.  Among other things, as noted above, providing notice of the servicers' default could jeopardize Wells Fargo's close business relationships with the servicers and lead to Wells Fargo's own potential liability in its capacity as an originator, sponsor and servicer to other RMBS trusts. Moreover, as discussed in greater detail below, had Wells Fargo provided notice of an Event of Default, it would have greatly increased Wells Fargo's liabilities and duties, but Wells Fargo's compensation under the PSAs would have remained the same.

19.     Finally, after the Events of Default, Wells Fargo failed to exercise its rights under the Governing Agreements as a prudent person would, under those circumstances, in the conduct of its own affairs.  Wells Fargo did nothing to protect the Trusts and Certificateholders, choosing instead to deliberately ignore the egregious Events of Default for its own benefit and to the detriment of the Trusts.

**II.     PARTIES**

**A.     Plaintiffs**

20.     Each of the plaintiffs identified below (collectively, the "Plaintiffs") is a Certificateholder in the Trusts as identified in Exhibit 1 attached hereto.  Each of the Plaintiffs was a Certificateholder of the respective Trusts at the time of the transactions of which it complains, or interests therein devolved upon it by operation of law in accordance with New York General Obligations Law § 13-107.

21.     The Plaintiffs hold the economic and beneficial interest in their Certificates and are the true parties in interest.  No other party has an economic or beneficial interest in the Plaintiffs' Certificates in this matter.

### 1.     BlackRock Funds

22.     The following plaintiffs are collectively referred to as "BlackRock Funds."

23.     Plaintiff BlackRock Allocation Target Shares: Series S Portfolio is a Cayman Island Private trust.

24.     Plaintiff BlackRock Core Bond Portfolio is a registered investment company with its principal place of business in Wilmington, Delaware.

25.     Plaintiff BlackRock CoreAlpha Bond Fund E is a collective trust fund with its principal place of business in San Francisco, California.

26.     Plaintiff BlackRock CoreAlpha Bond Master Portfolio is a registered investment company with its principal place of business in Wilmington, Delaware.

27.     Plaintiff BlackRock CorePlus Bond Fund B is a Cayman Island Private Fund.

28.     Plaintiff BlackRock Dynamic High Income – Structured Credit Portfolio is a Cayman Island Private Fund.

29.     Plaintiff BlackRock Enhanced Government Fund, Inc. is a registered investment company with its principal place of business in Wilmington, Delaware.

30.     Plaintiff BlackRock Fixed Income GlobalAlpha Master Fund Ltd. is a Cayman LLC with its principal place of business in San Francisco, California.

31.     Plaintiff BlackRock Income Trust, Inc. is a registered investment company with its principal place of business in Wilmington, Delaware.

32.     Plaintiff BlackRock Long Duration AlphaPlus Bond Fund is a Cayman Island Private Fund.

33.    Plaintiff BlackRock Master Total Return Portfolio of Master Bond LLC is a limited liability company.

34.    Plaintiff BlackRock Multi-Asset Income – Non-Agency MBS Portfolio is a registered investment company with its principal place of business in Wilmington, Delaware.

35.    Plaintiff BlackRock Multi-Sector Income Trust is a registered investment company with its principal place of business in Wilmington, Delaware.

36.    Plaintiff BlackRock Strategic Income Opportunities Portfolio is a registered investment company with its principal place of business in Wilmington, Delaware.

37.    Plaintiff BlackRock Total Return Portfolio (Ins – Series) is a registered investment company with its principal place of business in Wilmington, Delaware.

38.    Plaintiff BlackRock US Mortgage is a registered investment company with its principal place of business in Wilmington, Delaware.

### 2. **Brookfield**

39.    The following plaintiffs are collectively referred to as "Brookfield."

40.    Plaintiff Brookfield Mortgage Opportunity Income Fund Inc. is a corporation organized under the laws of the State of Maryland.

41.    Plaintiff Millerton ABS CDO Ltd. is a Cayman exempted company with limited liability.

### 3. **DZ Bank**

42.    Plaintiff DZ Bank is a commercial bank incorporated in Germany.  DZ Bank maintains an office at 609 Fifth Avenue, New York, New York, 10017.  DZ Bank is a Certificateholder in the Trusts identified in Exhibit 1 attached hereto.  DZ Bank has been a Certificateholder of these Trusts at the time of the transactions of which it complains, or its

interests therein devolved upon it by operation of law in accordance with New York General Obligations Law § 13–107.

### 4. <u>Kore</u>

43. Plaintiff Kore is a Delaware Limited Partnership with its principal place of business located at 1501 Corporate Drive, Suite 230, Boynton Beach, Florida 33426. Kore is the investment manager to Kore Fixed Income Fund Ltd., a private fund formed under the laws of the Cayman Islands and Sunrise Partners Limited Partnership, a private fund formed under the laws of Delaware (collectively, the "Private Funds"). Kore, through the Private Funds, is a Certificateholder in the Trusts identified in Exhibit 1 attached hereto. Kore, through the Private Funds, has been a Certificateholder of these Trusts at the time of the transactions of which it complains, or its interests therein devolved upon it by operation of law in accordance with New York General Obligations Law § 13–107.

### 5. <u>PIMCO</u>

44. The following plaintiffs are collectively referred to as "PIMCO."

45. Plaintiff AST PIMCO Total Return Bond Portfolio is a Cayman Islands business trust.

46. Plaintiff Fixed Income SHares (Series R) is a Massachusetts business trust.

47. Plaintiff Fixed Income SHares: Series C is a Massachusetts business trust.

48. Plaintiff Fixed Income SHares: Series LD is a Massachusetts business trust.

49. Plaintiff Fixed Income SHares: Series M is a Massachusetts business trust.

50. Plaintiff LVS I LLC is a Delaware limited liability company.

51. Plaintiff LVS II LLC is a Delaware limited liability company.

52. Plaintiff Pacific Bay CDO, Ltd. is a Cayman Islands exempted company.

-13-

53.     Plaintiff PCM Fund, Inc. is a corporation existing under the laws of Maryland, with its principal place of business located at 1345 Avenue of the Americas, New York, New York.

54.     Plaintiff PIMCO Absolute Return Strategy 3D Offshore Fund Ltd. is a limited partnership existing under the laws of the Cayman Islands.

55.     Plaintiff PIMCO Absolute Return Strategy II Master Fund LDC is a limited duration company existing under the laws of the Cayman Islands.

56.     Plaintiff PIMCO Absolute Return Strategy III Master Fund LDC is a limited duration company existing under the laws of the Cayman Islands.

57.     Plaintiff PIMCO Absolute Return Strategy IV IDF LLC is a limited liability company existing under the laws of Delaware.

58.     Plaintiff PIMCO Absolute Return Strategy IV Master Fund LDC is a limited duration company existing under the laws of the Cayman Islands.

59.     Plaintiff PIMCO Absolute Return Strategy V Master Fund LDC is a limited duration company existing under the laws of the Cayman Islands.

60.     Plaintiff PIMCO Bermuda Trust II: PIMCO Bermuda Income Fund (M) is a Bermuda business trust.

61.     Plaintiff PIMCO Bermuda Trust IV: PIMCO Bermuda Global Bond Ex-Japan Fund is a Cayman Islands business trust.

62.     Plaintiff PIMCO Bermuda Trust: PIMCO Emerging Markets Bond Fund (M) is a business trust existing under the laws of the Cayman Islands.

63.     Plaintiff PIMCO Cayman SPC Limited: PIMCO Cayman Global Aggregate Bond Segregated Portfolio is a Cayman Islands exempted company.

64.     Plaintiff PIMCO Cayman SPC Limited: PIMCO Cayman Japan CorePLUS Segregated Portfolio is a Cayman Islands business trust.

65.     Plaintiff PIMCO Cayman SPC Limited: PIMCO Cayman Japan CorePLUS Strategy Segregated Portfolio is a Cayman Islands business trust.

66.     Plaintiff PIMCO Cayman SPC Limited: PIMCO Cayman Japan Low Duration Segregated Portfolio is a Cayman Islands business trust.

67.     Plaintiff PIMCO Cayman SPC Limited: PIMCO Cayman Unconstrained Bond Segregated Portfolio is a Cayman Islands exempted company.

68.     Plaintiff PIMCO Cayman Trust: PIMCO Cayman Global Aggregate Bond Fund is a Cayman Islands business trust.

69.     Plaintiff PIMCO Cayman Trust: PIMCO Cayman Global Aggregate Ex-Japan (Yen-Hedged) Bond Fund II is a Cayman Islands business trust.

70.     Plaintiff PIMCO Cayman Trust: PIMCO Cayman Global Aggregate Ex-Japan Bond Fund is a Cayman Islands business trust.

71.     Plaintiff PIMCO Cayman Trust: PIMCO Cayman Global Ex-Japan (Yen-Hedged) Bond Fund is a business trust existing under the laws of the Cayman Islands.

72.     Plaintiff PIMCO Combined Alpha Strategies Master Fund LDC is a limited duration company existing under the laws of the Cayman Islands.

73.     Plaintiff PIMCO Corporate & Income Opportunity Fund is a business trust existing under the laws of Massachusetts.

74.     Plaintiff PIMCO Corporate & Income Strategy Fund is a business trust existing under the laws of Massachusetts.

75.     Plaintiff PIMCO Distressed Senior Credit Opportunities Fund II, L.P. is a limited partnership existing under the laws of Delaware.

76.     Plaintiff PIMCO Dynamic Credit Income Fund is a business trust existing under the laws of Massachusetts.

77.     Plaintiff PIMCO Dynamic Income Fund is a business trust existing under the laws of Massachusetts.

78.     Plaintiff PIMCO Equity Series: PIMCO Balanced Income Fund is a business trust existing under the laws of Massachusetts.

79.     Plaintiff PIMCO ETF Trust: PIMCO Enhanced Short Maturity Active Exchange-Traded Fund is a statutory trust existing under the laws of Delaware.

80.     Plaintiff PIMCO ETF Trust: PIMCO Low Duration Active Exchange-Traded Fund is a statutory trust existing under the laws of Delaware.

81.     Plaintiff PIMCO ETF Trust: PIMCO Total Return Active Exchange-Traded Fund is a statutory trust existing under the laws of Delaware.

82.     Plaintiff PIMCO Funds: Global Investors Series plc, Diversified Income Duration Hedged Fund is a business trust organized under the laws of Ireland.

83.     Plaintiff PIMCO Funds: Global Investors Series plc, Diversified Income Fund is a Cayman Islands business trust.

84.     Plaintiff PIMCO Funds: Global Investors Series plc, Emerging Local Bond Fund is a corporation existing under the laws of Ireland.

85.     Plaintiff PIMCO Funds: Global Investors Series plc, Emerging Markets Bond Fund is a corporation existing under the laws of Ireland.

86.     Plaintiff PIMCO Funds: Global Investors Series plc, Euro Bond Fund is a Cayman Islands business trust.

87.     Plaintiff PIMCO Funds: Global Investors Series plc, Euro Income Bond Fund is a corporation organized under the laws of Ireland.

88.     Plaintiff PIMCO Funds: Global Investors Series plc, Global Advantage Real Return Fund is a Cayman Islands business trust.

89.     Plaintiff PIMCO Funds: Global Investors Series plc, Global Bond Fund is a Cayman Islands business trust.

90.     Plaintiff PIMCO Funds: Global Investors Series plc, Global Investment Grade Credit Fund is a Cayman Islands business trust.

91.     Plaintiff PIMCO Funds: Global Investors Series plc, Income Fund is a corporation organized under the laws of Ireland.

92.     Plaintiff PIMCO Funds: Global Investors Series plc, Inflation Strategy Fund is a corporation existing under the laws of Ireland.

93.     Plaintiff PIMCO Funds: Global Investors Series plc, PIMCO Credit Absolute Return Fund is a Cayman Islands business trust.

94.     Plaintiff PIMCO Funds: Global Investors Series plc, PIMCO Dividend and Income Builder Fund is a corporation existing under the laws of Ireland.

95.     Plaintiff PIMCO Funds: Global Investors Series plc, StocksPLUS™ Fund is a Cayman Islands business trust.

96.     Plaintiff PIMCO Funds: Global Investors Series plc, Strategic Income Fund is a Cayman Islands business trust.

97.     Plaintiff PIMCO Funds: Global Investors Series plc, Total Return Bond Fund is a corporation organized under the laws of Ireland.

98.     Plaintiff PIMCO Funds: Global Investors Series plc, Unconstrained Bond Fund is a corporation organized under the laws of Ireland.

99.     Plaintiff PIMCO Funds: PIMCO CommoditiesPLUS® Strategy Fund is a business trust existing under the laws of Massachusetts.

100.    Plaintiff PIMCO Funds: PIMCO Commodity Real Return Strategy Fund® is a Cayman Islands business trust.

101.    Plaintiff PIMCO Funds: PIMCO Credit Absolute Return Fund is a business trust existing under the laws of Massachusetts.

102.    Plaintiff PIMCO Funds: PIMCO Diversified Income Fund is a business trust existing under the laws of Massachusetts.

103.    Plaintiff PIMCO Funds: PIMCO EM Fundamental IndexPLUS® AR Strategy Fund is a business trust existing under the laws of Massachusetts.

104.    Plaintiff PIMCO Funds: PIMCO Emerging Local Bond Fund is a business trust existing under the laws of Massachusetts.

105.    Plaintiff PIMCO Funds: PIMCO EMG Intl Low Volatility RAFI®-PLUS AR Fund is a business trust existing under the laws of Massachusetts.

106.    Plaintiff PIMCO Funds: PIMCO Floating Income Fund is a business trust existing under the laws of Massachusetts.

107.    Plaintiff PIMCO Funds: PIMCO Foreign Bond Fund (U.S. Dollar-Hedged) is a business trust existing under the laws of Massachusetts.

108.    Plaintiff PIMCO Funds: PIMCO Foreign Bond Fund (Unhedged) is a business trust existing under the laws of Massachusetts.

109.    Plaintiff PIMCO Funds: PIMCO Fundamental Advantage Absolute Return Strategy Fund is a business trust existing under the laws of Massachusetts.

110.    Plaintiff PIMCO Funds: PIMCO Global Advantage® Strategy Bond Fund is a business trust existing under the laws of Massachusetts.

111.    Plaintiff PIMCO Funds: PIMCO Global Bond Fund (U.S. Dollar-Hedged) is a business trust existing under the laws of Massachusetts.

112.    Plaintiff PIMCO Funds: PIMCO Global Bond Fund (Unhedged) is a business trust existing under the laws of Massachusetts.

113.    Plaintiff PIMCO Funds: PIMCO Global Multi-Asset Fund is a business trust existing under the laws of Massachusetts.

114.    Plaintiff PIMCO Funds: PIMCO Income Fund is a business trust existing under the laws of Massachusetts.

115.    Plaintiff PIMCO Funds: PIMCO Inflation Response Multi-Asset Fund is a business trust existing under the laws of Massachusetts.

116.    Plaintiff PIMCO Funds: PIMCO International Fundamental IndexPLUS® AR Strategy Fund is a business trust existing under the laws of Massachusetts.

117.    Plaintiff PIMCO Funds: PIMCO International StocksPLUS® AR Strategy Fund (U.S. Dollar-Hedged) is a business trust existing under the laws of Massachusetts.

118.    Plaintiff PIMCO Funds: PIMCO International StocksPLUS® AR Strategy Fund (Unhedged) is a business trust existing under the laws of Massachusetts.

119.    Plaintiff PIMCO Funds: PIMCO Intl Low Volatility RAFI®-PLUS AR Fund is a business trust existing under the laws of Massachusetts.

120.    Plaintiff PIMCO Funds: PIMCO Investment Grade Corporate Bond Fund is a business trust existing under the laws of Massachusetts.

121.    Plaintiff PIMCO Funds: PIMCO Long Duration Total Return Fund is a Massachusetts business trust.

122.    Plaintiff PIMCO Funds: PIMCO Long-Term Credit Fund is a Massachusetts business trust.

123.    Plaintiff PIMCO Funds: PIMCO Long-Term U.S. Government Fund is a Massachusetts business trust.

124.    Plaintiff PIMCO Funds: PIMCO Low Duration Fund is a Massachusetts business trust.

125.    Plaintiff PIMCO Funds: PIMCO Low Duration Fund II is a Massachusetts business trust.

126.    Plaintiff PIMCO Funds: PIMCO Low Duration Fund III is a Massachusetts business trust.

127.    Plaintiff PIMCO Funds: PIMCO Low Volatility RAFI®-PLUS AR Fund is a Massachusetts business trust.

128.    Plaintiff PIMCO Funds: PIMCO Moderate Duration Fund is a Massachusetts business trust.

129.    Plaintiff PIMCO Funds: PIMCO Mortgage Opportunities Fund is a Massachusetts business trust.

130.    Plaintiff PIMCO Funds: PIMCO Real Estate Real Return Strategy Fund is a Massachusetts business trust.

131.    Plaintiff PIMCO Funds: PIMCO Real Return Asset Fund is a Massachusetts business trust.

132.    Plaintiff PIMCO Funds: PIMCO Real Return Fund is a Massachusetts business trust.

133.    Plaintiff PIMCO Funds: PIMCO Short-Term Fund is a Massachusetts business trust.

134.    Plaintiff PIMCO Funds: PIMCO Small Cap StocksPLUS AR Strategy Fund is a Massachusetts business trust.

135.    Plaintiff PIMCO Funds: PIMCO Small Company Fundamental IndexPLUS® AR Strategy Fund is a business trust existing under the laws of Massachusetts.

136.    Plaintiff PIMCO Funds: PIMCO StocksPLUS® Absolute Return Fund is a Massachusetts business trust.

137.    Plaintiff PIMCO Funds: PIMCO StocksPLUS® AR Short Strategy Fund is a Massachusetts business trust.

138.    Plaintiff PIMCO Funds: PIMCO StocksPLUS® Fund is a Massachusetts business trust.

139.    Plaintiff PIMCO Funds: PIMCO Total Return Fund is a Massachusetts business trust.

140.    Plaintiff PIMCO Funds: PIMCO Total Return Fund II is a Massachusetts business trust.

141.    Plaintiff PIMCO Funds: PIMCO Total Return Fund III is a Massachusetts business trust.

142.    Plaintiff PIMCO Funds: PIMCO Total Return Fund IV is a Massachusetts business trust.

143.    Plaintiff PIMCO Funds: PIMCO Unconstrained Bond Fund is a Massachusetts business trust.

144.    Plaintiff PIMCO Funds: PIMCO Unconstrained Tax Managed Bond Fund is a Massachusetts business trust.

145.    Plaintiff PIMCO Funds: PIMCO Worldwide Fundamental Advantage AR Strategy Fund is a Massachusetts business trust.

146.    Plaintiff PIMCO Funds: Private Account Portfolio Series Asset-Backed Securities Portfolio is a Massachusetts business trust.

147.    Plaintiff PIMCO Funds: Private Account Portfolio Series Developing Local Markets Portfolio is a Massachusetts business trust.

148.    Plaintiff PIMCO Funds: Private Account Portfolio Series Emerging Markets Portfolio is a Massachusetts business trust.

149.    Plaintiff PIMCO Funds: Private Account Portfolio Series High Yield Portfolio is a Massachusetts business trust.

150.    Plaintiff PIMCO Funds: Private Account Portfolio Series International Portfolio is a Massachusetts business trust.

151.    Plaintiff PIMCO Funds: Private Account Portfolio Series Mortgage Portfolio is a Massachusetts business trust.

152.     Plaintiff PIMCO Funds: Private Account Portfolio Series Real Return Portfolio is a Massachusetts business trust.

153.     Plaintiff PIMCO Funds: Private Account Portfolio Series Short-Term Portfolio is a Massachusetts business trust.

154.     Plaintiff PIMCO Funds: Private Account Portfolio Series U.S. Government Sector Portfolio is a Massachusetts business trust.

155.     Plaintiff PIMCO Global Credit Opportunity Master Fund LDC is a limited duration company existing under the laws of the Cayman Islands.

156.     Plaintiff PIMCO Global Income Opportunities Fund is a trust existing under the laws of Canada.

157.     Plaintiff PIMCO Global StocksPLUS & Income Fund is a Massachusetts business trust.

158.     Plaintiff PIMCO High Income Fund is a Massachusetts business trust.

159.     Plaintiff PIMCO Income Opportunity Fund is a Massachusetts business trust.

160.     Plaintiff PIMCO Income Strategy Fund is a Massachusetts business trust.

161.     Plaintiff PIMCO Income Strategy Fund II is a Massachusetts business trust.

162.     Plaintiff PIMCO Large Cap StocksPLUS Absolute Return Fund is a Delaware business trust.

163.     Plaintiff PIMCO Multi-Sector Strategy Fund Ltd. is a Cayman Islands Exempted Company.

164.     Plaintiff PIMCO Offshore Funds - PIMCO Absolute Return Strategy IV eFund is a Cayman Islands business trust.

165.    Plaintiff PIMCO Offshore Funds: PIMCO Offshore Funds - PIMCO Absolute Return Strategy V Alpha Fund is a Cayman Islands business trust.

166.    Plaintiff PIMCO Real Return Strategy Fund is a business trust existing under the laws of Massachusetts.

167.    Plaintiff PIMCO Strategic Income Fund, Inc. is a corporation existing under the laws of Maryland.

168.    Plaintiff PIMCO Tactical Opportunities Master Fund Ltd. is a limited partnership existing under the laws of the Cayman Islands.

169.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Commodity Real Return Strategy Portfolio is a Cayman Islands Exempted Company.

170.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Emerging Markets Bond Portfolio is a Delaware business trust.

171.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Foreign Bond Portfolio (U.S. Dollar Hedged) is a Delaware business trust.

172.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Global Advantage Strategy Bond Portfolio is a Delaware business trust.

173.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Global Bond Portfolio (Unhedged) is a Delaware business trust.

174.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Long Term U.S. Government Portfolio is a Delaware business trust.

175.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Low Duration Portfolio is a Delaware business trust.

176.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Real Return Portfolio is a Delaware business trust.

177.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Short-Term Portfolio is a Delaware business trust.

178.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Total Return Portfolio is a Delaware business trust.

179.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Unconstrained Bond Portfolio is a Delaware business trust.

### 6.    **Prudential**

180.    The following plaintiffs are collectively referred to as "Prudential."

181.    Plaintiff Prudential Bank & Trust, FSB ("PB&T"), is a federally chartered bank with its principal place of business at 280 Trumbull Street, Hartford, Connecticut 06103. PB&T is a subsidiary of Prudential IBH Holdco., Inc., and ultimately Prudential Financial, Inc.

182.    Plaintiff Prudential Retirement Insurance and Annuity Company ("PRIAC") is an insurance company formed under the laws of Connecticut, with its principal place of business in Hartford, Connecticut.   PRIAC is a wholly owned subsidiary of The Prudential Insurance Company of America, which is owned by Prudential Holdings, LLC, and ultimately by Prudential Financial, Inc.    PRIAC established and maintains the following open-end, commingled, insurance company separate accounts: Western Asset: Enhanced Cash, Wellington: Investment Grade Fixed Income, the Core Plus Bond Fund / REAMS Fund, Core Plus Bond Pimco Fund, High Grade Bond Fund / GSAM Fund, North Carolina Fixed Income Fund - JP Morgan Chase and Union Carbide I (collectively, the "Separate Accounts").

183.    Plaintiff Prudential Trust Company ("PTC") is a corporation formed under the laws of Pennsylvania, with its principal place of business in Scranton, Pennsylvania.  PTC is a

wholly owned subsidiary of Prudential Investment Management, and ultimately Prudential Financial, Inc. PTC serves as Trustee for the Institutional Core Plus Bond Fund of the Prudential Company Master Commingled Investment Fund for Tax Exempt Trusts, the Institutional Core Bond Fund of the Prudential Trust Company Master Commingled Investment Fund for Tax Exempt Trusts, and the Prudential Merged Retirement Plan.

184.    Plaintiff The Gibraltar Life Insurance Company, Ltd. ("Gibraltar") is a life insurance company formed under the laws of Japan, with its principal place of business at Prudential Tower 2-13-10, Nagatacho, Chiyoda-ku, Tokyo, Japan 100-0014.  Gibraltar is a wholly owned subsidiary of Prudential Holdings of Japan, Inc., and ultimately Prudential Financial, Inc.

185.    Plaintiff The Prudential Insurance Company of America ("Prudential Insurance") is an insurance company formed under the laws of, and domiciled in, the State of New Jersey, with its principal place of business at 751 Broad Street, Newark, New Jersey.  Prudential insurance is a wholly owned subsidiary of Prudential Holdings, LLC, which is a Delaware limited liability company.  Prudential Holdings, LLC is a wholly owned subsidiary of Prudential Financial, Inc.

186.    Plaintiff The Prudential Investment Portfolios 2 ("PIP 2"), formerly known as the Dryden Investment Fund, is a Delaware statutory trust with a principal place of business in Newark, New Jersey.  PIP2 is an open-ended management investment company registered with the Securities and Exchange Commission.  PIP 2 is comprised of two series funds, including the Prudential Core Short-Term Bond Fund.

187.    Plaintiff The Prudential Investment Portfolios 9 ("PIP 9"), formerly known as the Dryden Large-Cap Core Equity, is a Delaware statutory trust with a principal place of business in

Newark, New Jersey.  PIP 9 is an open-ended management investment company registered with the Securities and Exchange Commission.  PIP 9 is comprised of three series funds, including the Prudential Absolute Return Bond Fund.

188.    Plaintiff The Prudential Investment Portfolios Inc. is a Maryland Corporation with a principal place of business at Gateway Center Three, 100 Mulberry Street, Newark, New Jersey 07102.  It is an open-end management investment company registered with the Securities and Exchange Commission ("SEC").   It consists of six series, including the Prudential Asset Allocation Fund.

189.    Plaintiff The Prudential Investment Portfolios, Inc. 17 ("PIP 17"), formerly known as Prudential Total Return Bond Fund, Inc., is a Maryland Corporation with a principal place of business in Newark, New Jersey.  It is an open-ended management investment company registered with the Securities and Exchange Commission.  PIP 17 consists of two series funds, including the Prudential Total Return Bond Fund.  PIP 17, through the Prudential Total Return Bond Fund, is a Certificateholder in the Trusts identified in Exhibit 1 attached hereto.

190.    Plaintiff The Prudential Series Fund ("PSF"), formerly known as Prudential Series Fund, Inc., is an unincorporated Delaware statutory trust with a principal place of business at Gateway Center Three, 100 Mulberry Street, Newark, New Jersey.  PSF is an open-end management investment company registered with the Securities and Exchange Commission. PSF consists of eighteen series funds, including The Prudential Series Fund-Conservative Balanced Portfolio, The Prudential Series Fund-Diversified Bond Portfolio, The Prudential Series Fund-High Yield Portfolio and The Prudential Series Fund-Flexible Managed Portfolio. PSF, through The Prudential Series Fund-Conservative Balanced Portfolio, The Prudential Series

Fund-Diversified Bond Portfolio, The Prudential Series Fund-High Yield Portfolio and The Prudential Series Fund-Flexible Managed Portfolio.

### 7.   <u>Sealink</u>

191.    Plaintiff Sealink is a company incorporated under the laws of Ireland with the registered address of Sealink Funding Limited, Fourth Floor, 3 George's Dock, IFSC, Dublin 1, Ireland.   Sealink is a Certificateholder in the Trusts identified in Exhibit 1 attached hereto. Sealink has been a Certificateholder of these Trusts at the time of the transactions of which it complains, or its interests therein devolved upon it by operation of law in accordance with New York General Obligations Law § 13–107.

### 8.   <u>TIAA</u>

192.    The following plaintiffs are collectively referred to as "TIAA."

193.    Plaintiff CREF Bond Market Account is a Delaware mutual fund with its principal place of business in the State of New York.

194.    Plaintiff CREF Social Choice Account is a New York investment company with its principal place of business in the State of New York.

195.    Plaintiff TIAA Global Public Investments, MBS LLC, a wholly owned subsidiary of TIAA-CREF Life Insurance Company, is a Delaware limited liability company with its principal place of business in the State of New York.

196.    Plaintiff TIAA-CREF Bond Fund is a Delaware mutual fund with its principal place of business in the State of New York.

197.    Plaintiff TIAA-CREF Bond Plus Fund is a Delaware mutual fund with its principal place of business in the State of New York.

198.    Plaintiff TIAA-CREF Life Bond Fund is a Delaware mutual fund with its principal place of business in the State of New York.

-28-

199.     Plaintiff TIAA-CREF Life Insurance Company is a direct wholly-owned subsidiary of Teachers Life Insurance and Annuity Association of America, a legal reserve life insurance company established under the insurance laws of the State of New York.  Through its separate accounts (General Pension Act.; TIAA Stable Value; TIAA-CREF Life Ins. GFA; General Acct PA; T-C Life Ins. PA; TIAA Stable Return Annuity), TIAA-CREF Life Insurance Company is a Certificateholder in the Trusts identified in Exhibit 1 attached hereto.  TIAA-CREF Life Insurance Company, through its managed accounts, has been a Certificateholder of these Trusts at the time of the transactions of which it complaints, or interests therein devolved upon it by operation of law in accordance with New York General Obligations Law § 13-107.

200.     Plaintiff TIAA-CREF Short-Term Bond Fund is a Delaware mutual fund with its principal place of business in the State of New York.

201.     Plaintiff TIAA-CREF Social Choice Bond Fund is a Delaware mutual fund with its principal place of business in the State of New York.

B.     **Defendants**

1.     **Wells Fargo**

202.     Defendant Wells Fargo Bank, National Association is a national banking association organized and existing under the laws of the State of South Dakota with its principal executive offices at 101 N. Phillips Avenue, Sioux Falls, South Dakota 57104.  Wells Fargo operates fifty corporate trust offices across the country, including in New York City, and currently serves as trustee for more than 400 RMBS trusts issued between 2004 and 2008, including the 274 Trusts at issue in this litigation.

203.     Wells Fargo is the primary United States operating subsidiary of Wells Fargo & Company, a multinational banking and financial services holding company with $1.5 trillion in assets that is headquartered in San Francisco, California, with 265,000 employees and offices

worldwide, including numerous offices in New York State and New York City.  Wells Fargo & Company is the second largest bank and the twenty-third largest company in the United States.  In 2008, Wells Fargo & Company acquired the Charlotte-based bank Wachovia, including Wachovia's RMBS trustee business, in an all-stock transaction valued at approximately $14.8 billion.

204.    Wells Fargo, together with its affiliates, is involved in virtually all aspects of the private-label RMBS market.  For example, Wells Fargo originated approximately $1.5 trillion in residential mortgages between 2004 and 2008 that were sold and securitized in various RMBS.  Wells Fargo also sponsored approximately 160 RMBS securitizations between 2004 and 2008 with an original face amount of approximately $165 billion.  Finally, Wells Fargo, together with various of its loan servicing arms including America's Servicing Company, is one of the largest mortgage loan servicing businesses in the United States, serving as master servicer for approximately $1.16 trillion in RMBS issued between 2004 and 2008.

### 2.    The Nominal Defendant Trusts

205.    Each Trust is named herein as a nominal defendant.  Each of the Trusts is a New York common law trust established under its respective PSA, or a Delaware statutory trust established under its respective Indenture and Sale Servicing Agreement ("SSA").   All of the Trusts are governed by the substantive laws of the state of New York, and are subject to the Trust Indenture Act of 1939 (15 U.S.C. § 77aaa, *et seq*.).[3]

---

[3] The Trusts' Governing Agreements set forth Wells Fargo's duties as Trustee.  Over 90% of the Trusts are governed by an agreement styled as a PSA and certain related agreements that the PSA references and incorporates.  The remaining Trusts are governed by a document styled as an Indenture and certain related agreements that the Indenture references and incorporates, including the Sales and Servicing Agreement.  All of the Governing Agreements are substantially similar, and impose the same duties on Wells Fargo as Trustee to the Trusts and

III.    **OVERVIEW OF THE TRUSTS**

206.    The Trusts in this action, identified in the attached Exhibit 1, are 264 New York common law trusts and ten Delaware statutory trusts, resulting from non-agency residential mortgage-backed securitizations issued between 2004 and 2008, inclusive.  The Trusts, which have a total original principal balance of over $253.7 billion and current balance of over $43.6 billion, as of November 1, 2014.  To date, the Trusts have suffered total realized collateral losses of over $32.2 billion.   Moreover, as a result of defective mortgage collateral and servicer violations, the Trusts have incurred and will continue to incur substantial losses.

207.    The Trusts have a high concentration of loans originated by seven lenders; specifically, Option One, Argent Mortgage Company, LLC ("Argent"), WMC, First Franklin Financial Corporation ("First Franklin"), Fremont Investment & Loan Co. ("Fremont"), Countrywide, and New Century Mortgage Corp. ("New Century").  These lenders collectively originated approximately $128.7 billion in loans, representing approximately 50% of the total original face value of the mortgage loans in the Trusts.

208.    A significant portion of the Trusts were sponsored by nine entities; specifically, Banc of America, Park Place Securities ("Park Place"), Merrill Lynch & Co., Inc. ("Merrill Lynch"), Lehman, Morgan Stanley & Co., Inc. ("Morgan Stanley"), Barclays Capital, Inc. ("Barclays"), Carrington Securities, LP ("Carrington"), RBS Greenwich/Soundview, and Credit Suisse.  These financial institutions collectively sponsored over $192.9 billion, representing approximately 75% of the total face value of the mortgage loans in the Trusts.

---

Certificateholders.  Accordingly, this Complaint primarily refers to the PSAs when discussing the Trustee's contractual obligations.

209.    An overwhelming majority of the Trusts' loans are serviced by four entities. Specifically, $178.7 billion in loans were originally serviced by Option One, Bank of America/Countrywide, Aurora, and Barclays representing over 70% of the total original face value of the mortgage loans in the Trusts.

## IV.    JURISDICTION AND VENUE

210.    This Court has federal question jurisdiction over this action pursuant to 20 U.S.C. § 1331 for violations of the TIA, and supplemental jurisdiction over the remaining claims.  This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d).

211.    Venue is proper in this District under 28 U.S.C. § 1391(b).

## V.    COMPLIANCE WITH THE NO ACTION CLAUSE IS EXCUSED

212.    Compliance with the pre-suit requirements of the Trusts' "no action" clause is excused.  For nearly all of the Trusts, the no action clause in the PSA identifies Wells Fargo, as Trustee, as the sole notice party.  The no action clause for the remaining two Trusts also identifies Wells Fargo, in its capacity as either Trust Administrator or Master Servicer, as a notice party.  If the no action clause's pre-suit requirements for the Trusts were to apply, they would require Plaintiffs to demand that Wells Fargo initiate proceedings against itself and to indemnify Wells Fargo for its own liability to the Trusts, an "absurd" requirement that the parties did not intend.  *See Cruden v. Bank of New York*, 957 F.2d 961, 968 (2d Cir. 1992).

## VI.    DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

213.    Plaintiffs bring the claims set forth below derivatively in the right of the Trustee and on behalf of the Trusts.  Plaintiffs have the right to bring this suit derivatively under New York law.  All of Plaintiffs' claims relate to Wells Fargo's breach of common duties owed to the Trusts and Certificateholders through its mismanagement of the Trusts and its failure and unreasonable refusal to act in the best interests of the Trusts, including enforcing the Trusts'

-32-

rights against those who have harmed the Trusts.  This is a concern common to all holders of interests in the Trusts, not just Plaintiffs, because all of the Certificateholders are paid from the cash flow generated by the same pool of mortgages in the Trusts.  Accordingly, Plaintiffs' claims concern a purported injury to the Trusts as a whole, and any injury sustained by the Certificateholders is indirect and based only on their ownership of interests in the Trusts.  *See Dallas Cowboys Football Club, Ltd. v. Nat'l Football League Trust*, No. 95 Civ. 9426, 1996 WL 601705, at *2-4 (S.D.N.Y. Oct. 18, 1996).

214.    The terms of the PSAs are consistent with asserting the claims derivatively, as they specifically provide as follows:

> no one or more Holders of Certificates shall have any right in any manner whatever by virtue or by availing itself or themselves of any provisions of this Agreement to affect, disturb or prejudice the rights of the Holders of any other of the Certificates, or to obtain or seek to obtain priority over or preference to any other such Holder or to enforce any right under this Agreement, except in the manner herein provided *and for the common benefit of all Certificateholders*.

PSA § 12.07 (emphasis added).

215.    This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

216.    Plaintiffs are Certificateholders and have been beneficial owners of RMBS in each of the Trusts during all or a large portion of Wells Fargo's wrongful course of conduct alleged herein.  Moreover, by operation of law, under New York General Obligations Law §13-107, the transfer of ownership in the certificates vested in the Plaintiffs all claims or demands of the transferors of the certificates.

217.    Plaintiffs will adequately and fairly represent the interests of the Trusts and their investors in enforcing and prosecuting the rights that form the subject matter of this action.  At

all relevant times, Plaintiffs have acted equitably and in good faith, without any ulterior motive, and in the belief that the Certificateholders are entitled to the relief sought on their behalf.

218.    As set forth below, Plaintiffs have not made a demand on Wells Fargo or Wells Fargo to institute this action because such demand would be futile.

219.    Any demand on Wells Fargo to institute this action would be futile because the wrongful acts alleged herein were committed by Wells Fargo and Wells Fargo would not agree to sue itself, particularly since it faces claims for losses by the Trusts in excess of $32.2 billion.  In addition, since Wells Fargo itself committed the wrongdoing complained of herein, and is accused of negligent and willful misconduct, it therefore is not disinterested and lacks independence to exercise business judgment.  Moreover, Wells Fargo has benefitted from, and continues to benefit from, its wrongdoing as alleged herein, (i.e., its failure to act in the best interest of the Trusts and Certificateholders), as Wells Fargo has maintained and preserved its business relationships with the Sellers and Servicers and thereby continues to derive financial benefits from serving as Trustee to Trusts, and many other RMBS trusts, due to its continuing wrongdoing as alleged herein.

220.    Any demand on Wells Fargo to institute this action on behalf of the remaining two Trusts in which it is identified as a notice party under the PSAs' no action clause also would be futile because, as alleged above, Wells Fargo also committed wrongdoing in its capacity as Master Servicer, and has liability in this capacity to the Trusts.

## VII.    BACKGROUND - THE TRUSTEE'S ROLE<br>AS GATEKEEPER IN THE SECURITIZATION PROCESS

221.    Residential mortgage-backed securities provide investors with an interest in the income generated by one or more designated pools of residential mortgages.  The securities themselves represent an interest in an "issuing trust" that holds the designated mortgage pools.

The corpus of the trust – like the Trusts at issue here – consists entirely of the underlying mortgage loans.

222.    The TIA requires that a trustee be appointed for all bond issues over $10 million so that the rights of investors are not compromised.  In RMBS transaction, the "issuer" appoints the trustee, which is the only independent party to the PSAs.  Accordingly, the trustee serves the critical role of an independent party with access to all relevant information, including the mortgage loan files.  Investors reasonably understand that the trustee is under an affirmative duty to take action to protect the interests of the trusts and their beneficiaries, the certificateholders.  As part of the RMBS transaction, the trustee is assigned "all right, title and interest" in the underlying mortgage loans.   The PSAs require the trustee, or its agent, to take physical possession of the mortgage loans, ensure that each mortgage loan was properly conveyed and certify that the documentation for each loan was accurate and complete.

223.    The trustee is contractually responsible for the transactions of the "issuing trust." The trustee is responsible for administering the trust for the benefit of investors, including guaranteeing that the transactions are administered in accordance with the related documentation, following compliance and performance-related matters, and handling cash and information processing for the investors.  The trustee must work closely with the issuer and servicer to protect the welfare of the trust.  In contrast to the roles of issuer or servicer, which can be combined, the trustee's sole purpose is to represent the investor and, therefore, the trustee must be an independent entity without any conflicts of interest.  The PSAs contractually obligate the trustee to oversee and manage the servicer, including granting the trustee the power to replace the servicer for its failure to act in accordance with the servicer's contractual obligations.

224.    Although the structure and underlying collateral of the mortgages may vary from trust to trust, RMBS trusts all function similarly: the cash flow from interest and principal payments is passed through to the trust and distributed to certificateholders in the order laid out in the securitization agreements, commonly referred to as the cash-flow "waterfall."  The duties and responsibilities of the trustee are identical in all RMBS transactions – namely to represent the trusts and their investors as an independent third party.  Between 2003 and 2009, private-label RMBS offerings totaled more than $3 trillion.  Yet, only a handful of major American financial institutions served as trustees and contractually agreed to perform the vitally important gatekeeping functions to protect certificateholders.  Among this handful of major RMBS trustees, Wells Fargo held the fourth largest market share during this period.



225.    The process of securitizing mortgages into RMBS involves a number of steps, each of which is critical to finalize the securitization and sell the RMBS to investors.  First, a

sponsor creates a loan pool from mortgages it originated or purchased from other financial institutions. The sponsor has the right to require the seller to repurchase or replace loans that do not meet represented quality standards after purchasing a mortgage pool.

226. Second, the sponsor transfers the loans to a "depositor," which segments the cash flows and risks in the loan pool among different levels of investment or "tranches." Generally, cash flows from the loan pool are applied in order of seniority, going first to the most senior tranches. In addition, any losses to the loan pool due to defaults, delinquencies, foreclosure or otherwise, are applied in reverse order of seniority, and are generally applied first to the most junior tranches.

227. Third, the depositor transfers the mortgage pool to the issuing trust so that it can be used as collateral for RMBS that will be issued and sold to investors. The depositor then passes the RMBS to the underwriters for sale to investors in exchange for payment.

228. The servicer is appointed by the sponsor and is a party to the PSAs. The servicer is often an affiliate of the sponsor or an originator of a substantial portion of the loans in the trust. The servicer collects payments from the underlying borrowers. After collection, the servicer sends the funds to the trustee, which then makes payments to the certificateholders. Mortgage defaults reduce the available principal and interest payments to be paid to the trust and passed through to investors. Mortgage delinquencies similarly reduce the available principal and interest to be paid to the trust and distributed to investors.

229. Accordingly, if an underlying borrower does not timely make the required payments to the servicer, the servicer may have to take action to mitigate or minimize the losses to the trust, including foreclosing on the property and providing property maintenance to maximize the return on the investment to the trust and its beneficial owners – the

certificateholders.  Foreclosures result in higher losses to the trust (and therefore to the RMBS investors) if the value of the collateral is lower than anticipated.  For these reasons, proper loan origination and underwriting of the mortgages underlying the RMBS, and proper and timely loan servicing and oversight are essential to the quality of the RMBS and the timely receipt of principal and interest payments to the trust for distribution to the certificateholders.

## VIII.   WELLS FARGO'S CONTRACTUAL OBLIGATIONS

230.    The Trusts and Certificateholders' rights and Wells Fargo's contractual duties, as Trustee for the Trusts at issue in this action are set forth in the relevant securitization agreements, including the Mortgage Loan Purchase and Sale Agreements ("MLPAs") (or similar documents) and the Governing Agreements.

231.    Although the Governing Agreements for each of the Trusts are separate agreements that were individually negotiated and differ slightly in certain respects, the terms that are pertinent to the subject matter of this Complaint are substantially similar, if not identical, in all of the Governing Agreements and impose substantially the same, if not identical, duties and obligations on the parties to the Governing Agreements.

### A.    The Mortgage Loan Purchase And Sale Agreement

232.    The MLPA is a contract between either the originator and the sponsor, or the sponsor and the depositor.  The MLPA governs the terms of the sale of the mortgage loans acquired for securitization.  In its capacity as "seller" under the MLPA, the originator or sponsor makes extensive representations and warranties concerning the characteristics, quality, and risk profile of the mortgage loans.

233.    The seller's typical representations and warranties in the MLPAs include, *inter alia*, the following: (i) the information in the mortgage loan schedule is true and correct in all material respects; (ii) each loan complies in all material respects with all applicable local, state

and federal laws and regulations at the time it was made; (iii) the mortgaged properties are lawfully occupied as the principal residences of the borrowers unless specifically identified otherwise; (iv) the borrower for each loan is in good standing and not in default; (v) no loan has a loan-to-value ("LTV") ratio of more than 100%; (vi) each mortgaged property was the subject of a valid appraisal; and (vii) each loan was originated in accordance with the underwriting guidelines of the related originator.  To the extent mortgages breach the seller's representations and warranties, the mortgage loans are worth less and are much riskier than represented.

234.   Under the MLPAs, upon discovery or receipt of notice of any breach of the seller's representations and warranties that has a material and adverse effect on the value of the mortgage loans in the Trusts or the interests of the Certificateholders therein, the seller is obligated to cure the breach in all material respects.  The MLPAs do not specify what constitutes "discovery" of a breach or what evidence must be presented to the seller in providing notice of a breach.

235.   If a breach is not cured within a specified period of time, the seller is obligated to either substitute the defective loan with a loan of adequate credit quality, or repurchase the defective loan at a specified purchase price (the "Repurchase Price") equal to the outstanding principal balance and all accrued but unpaid interest on the loan to be paid to the Trust.  For breaches related to a mortgage loan or acquired property already sold from the Trust (for example, as a result of foreclosure), the seller must pay to the Trust the amount of the Repurchase Price that exceeds the net liquidation proceeds received upon the sale of the mortgage loan or acquired property.

236.   The repurchase provisions ensure that the Trust need not continue to hold mortgage loans for which the seller breached its representations and warranties. Thus, the

repurchase provisions transfer from the Trusts to the sellers the risk of any decline, or further decline, in the value of those mortgage loans.

237.    Under the MLPAs, the demanding party must merely show that the breach has a material and adverse effect on the value of the mortgage loans in the Trusts or the interests of the Certificateholders in the loans.  The seller's cure, substitute and repurchase obligations do not require any showing that the seller's breach of representations caused any realized loss in the related mortgage loan in the form of default or foreclosure, or that the demanding party prove reliance on servicing and origination documents.

238.    Upon the sale of the mortgage loans to the Trust, the rights under MLPAs, including the sellers' representations and warranties concerning the mortgage loans, were assigned to Wells Fargo, as Trustee for the benefit of the Trust and all the Certificateholders, in accordance with the PSAs.

**B.    The Pooling And Servicing Agreements**

239.    The PSAs are contracts between, among others, the depositor, the servicer, and Wells Fargo, as Trustee, which govern the Trusts that issued certificates.  Plaintiffs, as investors in the Trusts, are third party beneficiaries of the PSAs.

240.    The PSAs for each of the Trusts are substantially similar and memorialize (i) the transfer and conveyance of the mortgage loans from the depositor to the Trust; (ii) the Trusts' issuance of beneficial certificates of interests in the Trusts to raise the funds to pay the depositor for the mortgage loans; and (iii) the terms of those certificates.

**1.    Wells Fargo's Duties And Obligations Under The PSAs**

241.    The PSAs set forth Wells Fargo's contractual duties and obligations, which are substantially similar for each Trust governed by a PSA.  Further, upon information and belief,

Wells Fargo employed the same general set of policies and procedures to oversee and manage the Trusts regardless of variations among the PSAs.

242.    Most importantly, each of the PSAs requires that Wells Fargo acquire and protect the trust corpus for the benefit of Certificateholders.[4]

243.    The PSAs also require Wells Fargo to oversee and enforce the sellers' and the servicers' obligations.  In performing these contractual obligations, Wells Fargo is required to act in the best interests of and for the protection of the Trusts and their Certificateholders. Certificateholders, unlike the trustee, have no direct contact with the sellers and servicers and have no ability to influence or examine the servicers' decisions.  Moreover, under the PSAs, Certificateholders do not have the right to directly enforce the responsible party's representations and warranties or the servicers' duties, absent satisfaction of the collective action provisions. Thus, Certificateholders must rely on Wells Fargo to protect their interests.

244.    The PSAs require the depositor to deliver to and deposit with, or cause to be delivered to and deposited with, Wells Fargo, the mortgage files, which must at all times be identified in the records of Wells Fargo as being held by or on behalf of the Trust.  Furthermore, the PSAs require Wells Fargo to acknowledge receipt of the mortgage files on behalf of the Trust and to acknowledge that all mortgage pool assets, mortgage files and related documents and property held by it at any time are held by it as Trustee of the Trust.

245.    Once the mortgage files are in Wells Fargo's possession, the PSAs require Wells Fargo to ensure that the underlying mortgage loans were properly conveyed to the Trusts, and that the Trusts have perfected enforceable title to the mortgage loans by reviewing the mortgage files for each of the mortgage loans.  Wells Fargo is required to review each mortgage file within

---

[4] This duty typically is expressed in Section 2.2 of the PSAs.

a certain time period after the "Closing Date" and deliver to the depositor a certification that all documents required have been executed and received.

246.    If Wells Fargo identifies any defect in a mortgage loan file for an underlying mortgage loan contained in a Trust, Wells Fargo must promptly notify either the servicer or depositor, and that party shall promptly notify the applicable seller of the defect and take appropriate steps on behalf of the Trust to enforce such seller's obligation to correct or cure the defect or repurchase or substitute such mortgage loan.

> **a)      Duty To Provide Notice Of
> Breaches And To Enforce Putback Rights**

247.    Under the PSAs, Wells Fargo is entrusted to ensure that mortgage loans in the Trusts were properly underwritten, were of a certain risk profile, and had characteristics of a certain quality as represented by the sellers in the MLPAs.  The Trusts were assigned all of the rights under the MLPAs pertaining to the mortgage loans, including the right to put back loans that breached the sellers' representations and warranties.

248.    To protect the Trusts and the Certificateholders, the PSAs require Wells Fargo to give prompt written notice to all parties to the PSA upon its discovery of a breach of a representation or warranty made by the seller in respect of the mortgage loans that materially and adversely affects the value of any mortgage loan or the interests of the Certificateholders in any loan, and to take such action as may be necessary or appropriate to enforce the rights of the Trusts with respect to the breach.[5]

---

[5] With modest variation among the PSAs, this duty typically is expressed in Sections 2.3 and 2.8 of the PSAs.

b)      **Wells Fargo's Duties Regarding The Servicers**

249.    Under the PSAs, Wells Fargo, as Trustee, has certain duties with respect to enforcing the obligations of the servicers, whose authority and responsibilities are delegated by Wells Fargo.  In particular, the PSAs set forth Wells Fargo's obligations upon occurrence of an "Event of Default," which is defined as a specified failure of the servicer to perform its servicing duties and cure this failure within a specified time period.  The PSAs identify several types of failures by the servicer that may give rise to an Event of Default.  Such failures include, breach of servicer representations and warranties and failure to observe or perform in any material respect any other covenants or agreements, which continues unremedied for no more than thirty to sixty days after written notice of such failure shall have been given to the servicer by the trustee requiring the same to be remedied, or knowledge of such failure by a "Servicing Officer" of the servicer, whichever is earlier.[6]

250.    The remedies for uncured servicer Events of Default include termination of the servicer and reimbursement for trust assets lost as a result of the servicers' violations.  As detailed herein, Wells Fargo did not perform its duties to monitor the servicers and did not initiate any action against the servicers for the benefit of the Trusts and Certificateholders.

c)      **Duties Upon Knowledge Of An Event Of Default**

251.    The PSAs impose additional obligations upon Wells Fargo once a responsible officer of Wells Fargo has knowledge of the occurrence of an Event of Default.  ***First***, Wells Fargo must give written notice to the relevant servicer of the occurrence of such an event within the specified time period after Wells Fargo obtains knowledge of the occurrence.  ***Second***, within sixty to ninety days after the occurrence of any Event of Default, Wells Fargo is required to

---

[6] These duties are typically expressed in Section 7 of the PSAs.

provide written notice to all Certificateholders of the Event of Default, unless the Event of Default has been cured or waived. ***Third***, and most importantly, the PSAs require Wells Fargo to exercise the rights and powers vested in it by the PSA using the same degree of care and skill as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.[7]

252.    Wells Fargo's failure to give notice to the servicers of an Event of Default does not prevent the triggering of an Event of Default should Wells Fargo's failure result from its own negligence or willful misconduct.

### 2.    The Servicers' Duties And Obligations Under The PSAs

253.    The PSAs also establish the servicers' duties and obligations to the Trusts and all Certificateholders.  In essence, the servicers' contractual role is to manage the mortgage loans for the benefit of the Trust and its Certificateholders.[8]

### a)    Duty To Provide Notice Of Breaches And To Enforce Putback Rights

254.    The PSAs require the servicers to notify all parties to the PSA if the servicers discover a breach of any of the sellers' representations and warranties that adversely and materially affects the value of the mortgage loan or the interests of the Trusts.  The PSAs generally require the servicers, on behalf of the Trusts, to enforce the sellers' obligation to repurchase, substitute, or cure such defective mortgage loans or mortgage loan files.

255.    The servicers are greatly disincentivized to enforce these contractual duties related to the sellers' repurchase obligations.  The servicer is selected by the sponsor, and

---

[7] This duty is typically expressed in Section 8.1 of the PSAs.

[8] The servicer duties described below are generally found in Section 3 of the PSAs.

therefore risks losing future business and becoming adverse to the seller if it vigilantly enforces the sellers' repurchase obligations. Additionally, the servicers often are affiliates of the sellers because in connection with the sale of a loan pool, the seller typically retains the loan servicing rights for its own servicing division. In addition, due to the fact that the servicers' affiliates, in their capacity as sellers, likewise sold loans in breach of specific representations and warranties to other RMBS trusts and face similar repurchase liability, the servicers were disincentivized from enforcing these contractual duties.

256.    Consequently, it is crucial that the trustee monitor the servicer to ensure that the servicer is enforcing the Trusts' repurchase rights against the sellers so that the Trusts hold mortgage loans of the same credit quality and characteristics as bargained for. Moreover, where the servicers fail to enforce the Trusts' repurchase rights, the trustee must step in and exercise the Trusts' rights.

### b)    Duty To Perform Prudent And Customary Servicing Practices

257.    The PSAs require the servicers to service and administer the mortgage loans for and on behalf of the Trusts and the Certificateholders (i) in the same manner in which they service and administer similar mortgage loans for their own portfolio or for other third parties, giving due consideration to customary and usual standards of practice of prudent institutional mortgage lenders servicing similar loans; (ii) with a view to maximizing the recoveries with respect to such mortgage loans on a net present value basis; and (iii) without regard to, among other things, the right of the servicers to receive compensation or other fees for its services under the PSA, the obligation of the servicers to make servicing advances under the PSA, and the servicers' ownership, servicing or management for others of any other mortgage loans.

258.   In truth, the servicers' financial interests in managing the Trusts' loans often diverge from those of the Trusts.   Servicers typically pay upfront for mortgage servicing rights. To make a profit, servicers must recoup their outlay based on their net servicing income (i.e., gross servicing income minus servicing costs).   The amount of servicers' compensation in the form of servicing fees, float, and retained interests varies based on factors beyond the servicers' control, particularly mortgage prepayment speeds, which are largely a function of interest rates. Accordingly, a servicer's ability to maximize its net servicing income depends in large part on its ability to levy ancillary fees and to control servicing costs.   For this reason, servicers are incentivized to aggressively pursue ancillary fees and to pursue loss mitigation strategies that minimize costs, even if they are inconsistent with – or contrary to – the interests of the Trusts and the Certificateholders.

259.   Accordingly, it is essential that the Trustee takes action where it learns of imprudent servicing activities to ensure that servicers: (i) maintain accurate and adequate loan and collateral files so as not to prejudice the interests of the Trusts and the Certificateholders in the mortgages by fostering uncertainty as to the timely recovery of collateral; and (ii) avoid incurring unnecessary servicing fees to maintain mortgaged property.

### c)      Duty To Perform Prudent Foreclosure Practices

260.   The PSAs require the servicers to use their best efforts, consistent with accepted servicing practices, to foreclose upon or otherwise comparably convert the ownership of properties securing the mortgage loans as they come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments.   Moreover, the PSAs contemplate that foreclosures and liquidations of defaulted mortgages will proceed forthwith and in accordance with applicable law, provided the documentation is in order, as a matter of fairness to all parties.

261.    In truth, the servicers' financial interests in managing loans often diverge from those of the Trusts.  For example, to minimize the costs of foreclosures, servicers from 2007 through 2010 pervasively cut corners in the discharge of their servicing duties at the expense of the accuracy, reliability and currency of loan documents and information.

262.    Thus, it is essential that trustees the Trustee takes action where it learns of imprudent foreclosure practices subsequent to borrower defaults to ensure the servicers function in a way that maximizes value for the Trusts and the Certificateholders.

### d)    Duty To Perform Prudent Servicing Advances

263.    The PSAs provide that the servicers may recover servicing advances.  Servicers are required to advance monthly principal and interest ("P&I") and taxes and insurance payments on delinquent loans. Servicers also advance legal fees, maintenance, and preservation costs on properties that have already been foreclosed and become wholly owned by the Trust (or "REO"), rather than sold to a third party.  Servicers are able to recover these advances from the net proceeds of the property when sold.

264.    Under the PSAs, the servicer's advancing obligations are subject to a deemed non-recoverability standard where the servicer has the right to curtail additional advances based on a reasonable analysis that the servicer could not otherwise recover its advances based on projected, probable net liquidation proceeds.  Thus, if a servicer believes that the P&I advances will exceed the net proceeds of a foreclosure on the mortgaged property, the servicer generally has the right to cease making the P&I advances and to look to the rest of the Trust's loan pool for recovery of any excess paid.  This means that servicers' P&I advances are functionally the most senior claim on the Trusts and the servicers get paid **first** before any certificateholder.  As explained by Ocwen Financial Corporation ("Ocwen"), a major subprime servicer: "Most of our advances have the highest reimbursement priority (i.e., they are on 'top of the waterfall') so that

we are entitled to repayment [from loan proceeds] before any interest or principal is paid on the bonds."[9]  In the majority of cases, the servicer may recover advances in excess of loan proceeds from pool-level proceeds.  Additionally, under the PSAs, the servicers are only entitled to recoup customary, reasonable and necessary out-of-pocket costs and expenses incurred in the performance by the servicer of its servicing obligations.

265.    In practice, servicers are incentivized to abuse their advancing obligations by incurring unnecessary or inflated expenses related to delinquent loans because those advances are the senior-most claims on the Trusts and will almost always be recoverable.

266.    Thus, it is critical that trustees monitor the servicers and, in particular, servicing advances to ensure servicers do not manipulate the recoverable and "reasonable and necessary" designations to their own advantage and to the Trusts' detriment.

### C.    The Indentures And Sale Servicing Agreements

267.    The minority of the trusts have a different structure—they issued notes pursuant to an indenture (collectively, the "Indentures") on which Wells Fargo serves as indenture trustee. A separate agreement, such as a Sale and Servicing Agreement ("SSA"), governs other terms of these transactions.  As evinced below, although there are some differences between the PSA and Indenture structures, with regard to this Complaint, both the nature of the claims asserted and Wells Fargo's duties and obligations are similar under the two structures.

268.    The Indentures are contracts between, among others, the Trust, as issuer, and Wells Fargo, as Trustee.  In this agreement, the issuer (i.e., the Trust) pledges the mortgage loan assets of the Trust to Wells Fargo, the Indenture Trustee.  Wells Fargo accepts the pledge of the

---

[9]  Ocwen, Annual Report (Form 10-K) at 40 (Mar. 13, 2008), *available at* http://www.sec.gov/Archives/edgar/data/873860/000101905608000419/ocn_10k07.htm.

mortgage loans and holds the assets of the Trust in trust for the Noteholders.  The Trust, in turn, issues the notes to investors.

269.    The Indentures set forth duties on the part of the Trust as issuer.  Such duties, which must be punctually performed and observed, include taking all action necessary or advisable to cause the Trust or the Indenture Trustee to: (i) enforce any of the rights to the mortgage loans; and (ii) preserve or defend title to the Trust Estate and the rights of the Indenture Trustee and the Noteholders in such Trust Estate against the claims of all persons and parties.

270.    The Indentures set forth Wells Fargo's contractual duties and obligations, which are substantially similar, if not identical, to Wells Fargo's contractual duties and obligations in the PSAs.  For example, as pledgee of the mortgage loans, Wells Fargo, as Indenture Trustee, has the benefit of the representations and warranties made by the sellers in the MLPAs.  If a responsible officer of Wells Fargo has actual knowledge of any breach of representation or warranty made by the seller in the MLPA, Wells Fargo shall promptly notify the seller of the breach and the sellers' obligation to cure such defect or repurchase or substitute for the related mortgage loan.

271.    Like the PSAs, the Indentures impose similar obligations on the trustee following an "Event of Default."  However, pursuant to the Indenture, only the conduct of the issuer, the Trust, can constitute an Event of Default.  An Event of Default occurs under the Indenture, when, among other things, a default occurs in the observance or performance of any covenant or agreement of the Trust made in the Indenture, and such default is not cured within a specified period of time after notice is given to the Trust by Wells Fargo or to the Trust and Wells Fargo by a requisite number of Noteholders.  The Indentures define a "default" as "[a]ny occurrence which is or with notice or the lapse of time or both would become an Event of Default."

272.     Once Wells Fargo has actual knowledge of an Event of Default, Wells Fargo must enforce the rights of the Noteholders, whether for the specific performance of any covenant, agreement or right under the Indenture, or to enforce any other proper remedy or legal or equitable right vested by law.  In carrying out these post-Event of Default duties, Wells Fargo must exercise its rights and obligations under the Indenture using the same degree of care and skill as a prudent person would, under the circumstances, in the conduct of his or her own affairs.

273.     The SSAs are contracts between, among others, the depositor, the trust (typically a Delaware statutory trust), as issuer, Wells Fargo, as Indenture Trustee, and the master servicer.  The SSAs contain substantially similar, if not identical, provisions to the PSAs.  Like the PSAs, the SSAs call for the depositor's conveyance of mortgage loans to the Trust in which the notes participate and establish the rights and obligations of the master servicer for the notes.

274.     Like the PSAs, the SSAs for each of the Trusts are substantially similar and provide for nearly identical obligations on the part of master servicers with respect to servicing the mortgage loans, including covenants (i) to provide notice of seller breaches; (ii) to administer the mortgage loans consistently with industry practice; (iii) to use reasonable efforts to collect all payments owed on the mortgage loans, including with respect to foreclosure, and to follow the same collection procedures it follows for servicing mortgage loans in its own portfolio; and (iv) to make proper servicing advances.

275.     The SSAs also define "Master Servicer Events of Default," which include a failure to observe or perform material covenants and agreements set forth in the SSA to be performed by the master servicer, which materially affects the rights of the Noteholders, and such failure continues unremedied for a specified period after written notice was given.  If a Servicer Event of Default occurs under the SSA which a responsible officer of Wells Fargo, as

Indenture Trustee, has received written notice or has actual knowledge of, Wells Fargo must immediately terminate the Master Servicer and either substitute in as master servicer or find a successor.  Wells Fargo must also give prompt written notice to all Noteholders of Servicer Events of Default.

## IX.  THE TRUSTS SUFFERED FROM PERVASIVE BREACHES OF REPRESENTATIONS AND WARRANTIES BY THE SELLERS

276.    Each of the Trusts' loan pools contain a high percentage of loans that materially breached the sellers' representations and warranties, which adversely affected the value of those mortgage loans and the Trusts' and Certificateholders' rights in those mortgage loans. Specifically, the representations and warranties regarding the originators' compliance with underwriting standards and practices, owner occupancy statistics, appraisal procedures, LTV and combined LTV ("CLTV") ratios were systemically and pervasively false. The falsity of these representations and omissions is demonstrated by the high default rates of the mortgage loans, the plummeting credit ratings of the RMBS and certificates, the results of investors' forensic reviews and re-underwriting of loans within the Trusts in other litigation, and evidence highlighting the originators' abandonment of underwriting standards.

### A.    High Default Rates Of The Mortgage Loans And Plummeting Credit Ratings Are Indicative Of Massive Seller Breaches

277.    The extremely high default rates of the mortgage loans within the Trusts and the decline in the credit ratings of the RMBS to below investment grade are strong evidence of the originators' misrepresentation of the credit quality and characteristics of the mortgage loans they sold to the Trusts.

278.    The Trusts have experienced payment problems significantly beyond what was expected for loan pools that were properly underwritten, and which contained loans that actually

had the characteristics originators represented and warranted.  For example, at the time of filing this Complaint, across all 274 of the Trusts, over 12% of the relevant mortgage loans have been written off for a loss.  Within certain RMBS sponsor labels, such as Option One Trusts, over 20% of the relevant mortgage loans had been written off for a loss.  Moreover, as of January 1, 2009, an astounding 30% or more of the relevant mortgage loans were delinquent in 110 individual Trusts.

279.    Not only have the mortgage loans experienced extraordinary rates of delinquency and default, but the ratings of the RMBS supported by them have significantly deteriorated.  Because of the high delinquency, foreclosure, and default rates of the underlying mortgage loans, more than 75% of all certificates within the Trusts have been downgraded.

280.    The economic downturn cannot explain the abnormally high percentage of defaults, foreclosures, and delinquencies observed in the loan pools ultimately backing the certificates. Loan pools that were properly underwritten and containing loans with the represented characteristics would have experienced substantially fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquencies. The significant rating downgrades experienced by the RMBS are also strong evidence that they were improperly underwritten, and that they did not have the credit risk characteristics the sellers represented and warranted.

**B.    The Systemic Disregard Of Underwriting Standards Was Pervasive During The Relevant Period**

281.    It is well documented that during the height of the mortgage and securitization boom in the United States market between 2004 and 2008, originators of residential mortgage loans sold and securitized loans in RMBS in violation of their stated underwriting guidelines and in breach of the representations and warranties provided to the purchasers of the loan pools.

282.    Government reports and investigations and newspaper reports have uncovered the extent of pervasive abandonment of underwriting standards. The Permanent Subcommittee on Investigations in the United States Senate ("PSI") released a report detailing the causes of the financial crisis. Using Washington Mutual Bank ("WaMu") as a case study, the PSI concluded through its investigation:

> Washington Mutual was far from the only lender that sold poor quality mortgages and mortgage backed securities that undermined U.S. financial markets. The Subcommittee investigation indicates that Washington Mutual was emblematic of a host of financial institutions that knowingly originated, sold, and securitized billions of dollars in high risk, poor quality home loans. These lenders were not the victims of the financial crisis; the high risk loans they issued became the fuel that ignited the financial crisis.[10]

283.    The Financial Crisis Inquiry Commission ("FCIC") issued its final report in January 2011 that detailed, among other things, the collapse of mortgage underwriting standards and subsequent collapse of the mortgage market and wider economy.[11] The FCIC Report concluded that there was a "systemic breakdown in accountability and ethics." "Unfortunately – as has been the case in past speculative booms and busts – we witnessed an erosion of standards of responsibility and ethics that exacerbated the financial crisis." *Id*. at xxii. The FCIC found:

> [I]t was the collapse of the housing bubble – fueled by low interest rates, easy and available credit, scant regulation, and toxic mortgages – that was the spark that ignited a string of events, which led to a full-blown crises in the fall of 2008. Trillions of dollars in risky mortgages had become embedded throughout the financial system, as mortgage-related securities were packaged, repackaged, and sold to investors around the world.

*Id*. at xvi.

---

[10] *Wall Street And The Financial Crisis: Anatomy Of A Financial Collapse*, United States Senate Permanent Subcomm. on Investigations, 112th Cong. 50 (2011).

[11] *Final Report Of The National Commission Of The Causes Of The Financial And Economic Crisis In The United States*, Fin. Crisis Inquiry Comm'n ("FCIC Report") (2011).

284.    During the housing boom, mortgage lenders focused on quantity rather than quality, originating loans for borrowers who had no realistic capacity to repay the loan. The FCIC Report found "that the percentage of borrowers who defaulted on their mortgages within just a matter of months after taking a loan nearly doubled from the summer of 2006 to late 2007." *Id.* at xxii. Early payment default is a significant indicator of pervasive disregard for underwriting standards. The FCIC Report noted that mortgage fraud "flourished in an environment of collapsing lending standards . . . ." *Id.*

285.    Recent landmark settlements between the government and major financial institutions have further detailed the systemic and pervasive disregard of underwriting standards by lenders during the relevant time period, and have confirmed that these practices infiltrated the Trusts.  For example, on November 19, 2013, the Justice Department, along with federal and state regulators, announced a $13 billion settlement with JPMorgan − the largest settlement with a single entity in American history − to resolve federal and state civil claims arising out of the packaging, marketing, sale and issuance of 1,128 RMBS offerings by JPMorgan, Bear Stearns and WaMu prior to January 1, 2009, including 62 of the Trusts.  As part of the settlement, JPMorgan acknowledged that it regularly included loans within the securitizations "***that did not comply*** with the originator's underwriting guidelines" and breached the originator's representations and warranties.

286.    On July 14, 2014, the Justice Department, together with federal and state regulators, announced a $7 billion settlement with Citigroup Inc. to resolve federal and state civil claims related to Citigroup's conduct in the packaging, securitization, marketing, sale and issuance of 633 RMBS offerings issued prior to January 1, 2009, including 28 of the Trusts.  The settlement included an agreed upon statement of facts wherein Citigroup acknowledged that

significant percentages of the mortgage loans within the securitizations contained material defects.

### C. There Is Evidence Of Widespread Breaches Of Representations And Warranties By The Specific Originators That Sold Loans To The Trusts

287.    Much like other RMBS trusts of the same vintage, the Trusts have been materially and adversely impacted by the loan origination industry's rampant underwriting failures. The originators' systemic and pervasive sale to the Trusts of residential mortgage loans in breach of representations and warranties is confirmed through several federal and state government investigations and published reports, well publicized news reports, and public and private enforcement actions that have described rampant underwriting failures throughout the period in which the Trusts were created and, more specifically, failures by the same originators whose mortgage loans were sold to the Trusts.

288.    A summary of testimonial and documentary evidence as to each of the major originators of the mortgage loans to the Trusts is set forth below.

#### 1. Option One

289.    Option One, a wholly owned subsidiary of H&R Block, Inc. ("H&R Block"), is among the Trusts' largest mortgage loan sellers. Option One originated approximately $44.9 billion of mortgage loans included in the Trusts at issue here. Additionally, Option One sponsored approximately $23 billion of mortgage loans sold to eighteen of the Trusts. Due to the extremely poor credit quality of the loans, the Option One-label Trusts have suffered severe collateral write-downs. As of November 1, 2014, the Option One-label Trusts have suffered approximately $4.7 billion in realized losses, representing over 20% of the original face amount of the Option One deals.

290.    In 2006 and 2007, Option One was one of the country's largest subprime lenders. In its fiscal year 2006, Option One originated nearly $40 billion in subprime mortgage loans. Option One stopped originating subprime loans in 2007 and, in 2008, changed its name to Sand Canyon Corporation. Like its peers, Option One's origination practices have been the subject of government investigations, reports and enforcement actions, as well as private RMBS lawsuits. Option One was ranked as the sixth worst mortgage originator by the OCC's "Worst Ten in the Worst Ten" list based on originations from 2005 to 2007. Government actions, investor litigation, and putback actions made public Option One's pervasive noncompliance with its own underwriting standards.

291.    On August 9, 2011, H&R Block, Option One's parent company, agreed to settle a suit initiated by the Massachusetts State Attorney General for $125 million. See Massachusetts Attorney General Press Release, "H&R Block Mortgage Company Will Provide $125 Million in Loan Modifications and Restitutions" (Aug. 9, 2011). In announcing the August 9, 2011 settlement, Massachusetts' Attorney General stated that Option One engaged in "ultra-risky practices," a "blatant disregard for prudent underwriting standards," and "made loans that it knew were likely to fail." At bottom, in making loans – including loans that were sold into the Trusts – Option One "did not take into account anything [such as a borrower's ability to repay] but the fees that were to be generated."

292.    Investors in significant RMBS lawsuits against underwriting banks have made similar allegations regarding Option One's abusive origination and securitization practices which resulted in large percentages of defective Option One loans being sold and securitized in Trusts that are at issue here. See, e.g., The Prudential Ins. Co. of Am. v. Bank of America, N.A., No. 2:13-cv-01586 (D.N.J.) (alleging Option One systematically abandoned its underwriting

guidelines in connection with OOMLT 2004-1 and OOMLT 2005-3, two of the Option One-label Trusts at issue here); *Royal Park Invs. SA/NV v. The Royal Bank of Scotland Grp. PLC, et al.*, Index No. 653541/2013 (N.Y. Sup. Ct.) (alleging that "Option One had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, without any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral" in connection with OOMLT 2007-3, OOMLT 2007-4 and OOMLT 2007-5, three Option One-label Trusts at issue here).

293.   The results of loan file reviews conducted by investors of Option One originated or sponsored loans from the Option One-label Trusts at issue here and substantially similar securitizations involving Option One originated loans have further confirmed Option One's pervasive and systemic breach of material representations and warranties regarding quality and characteristics of the loans it originated and sold to the Trusts. For example, in *FHFA v. Bank of America Corporation*, No. 11-cv-06195 (S.D.N.Y.), the Federal Housing Finance Agency ("FHFA") conducted a forensic review of four of the Option One-label Trusts at issue here: OOMLT 2005-5, OOMLT 2007-2, OOMLT 2007-6, and OOMLT 2007-FXD1. The FHFA found that the loans within these securitizations "systematically disregarded underwriting guidelines" and that Option One made material misrepresentations regarding the characteristics and credit quality regarding these loans. The FHFA's audit revealed that Option One had understated non-owner occupied loans within these Trusts by between 7%-10.5%. The FHFA additionally found that the true percentage of loans with LTV ratios over 100% within each of these Trusts exceeded 14%, with one as high as approximately 22.5%, which was contrary to Option One's representation that no loan had an LTV ratio exceeding 100%.

294.    The FHFA's audit of six Option One-label Trusts at issue here, OOMLT 2005-4, OOMLT 2006-1, OOMLT 2006-3, OOMLT 2007-3, OOMLT 2007-4, OOMLT 2007-5, and OOMLT 2007-CP1 in *FHFA v. The Royal Bank Scotland Group PLC, et al.*, No. 11-cv-01383 (D. Conn. Feb. 1, 2013) corroborated its earlier findings of pervasive and systemic breaches within Option One originated and sponsored loans sold to the Trusts. The FHFA's loan level review of the each of these Trusts found that Option One understated the percentage of non-owner occupied properties within these securitizations by at least 6%, and for two of these securitizations by 10% or more. Additionally, the true percentage of loans with LTV ratios over 100% within each of these Trusts exceeded 13.55%, with one as high as approximately 20.75%, contrary to Option One's representation that no loan had an LTV ratio exceeding 100%.

295.    The FHFA reached similar conclusions regarding Option One's deficient underwriting and securitization practices in *FHFA v. Merrill Lynch & Co., Inc., et al.,* No. 1:11-cv-06202 (S.D.N.Y.). There, the FHFA conducted a review of OOMLT 2007-1, another Option One-label Trust at issue, and found "that for the vast majority of the loans reviewed in th[at] Securitization[], there were numerous significant violations of the originator's underwriting guidelines, such as a failure to evaluate the reasonableness of the borrower's stated income or to correctly account for the borrower's debt, both key factors bearing on eligibility for a mortgage loan." In support of this allegation, the FHFA pointed out that Option One had understated non-owner occupied properties by more than 9% and that the true percentage of loans with an LTV ratio over 100% was over 20%, contrary to Option One's representation that no loan's LTV ratio exceeded 100%.

296.    In *Phoenix Light SF Ltd., et al., v. J.P. Morgan Securities LLC*, Option One originated all the mortgage loans in OOMLT 2007-3, OOMLT 2007-4, OOMLT 2007-5, SVHE

2007-OPT4, and ABFC 2006-OPT2. *Phoenix Light SF Ltd., et al. v. J.P. Morgan Sec LLC, et al.*, Index No. 651755/2012, Compl. ¶322 (N.Y. Sup. Ct. Oct. 5, 2012). The plaintiff's forensic review found that: (i) for OOMLT 2007-3, 29.50% of the loans had LTVs over 100% and owner occupancy was overstated by 8.83 %. *Id*. at ¶¶777, 791; (ii) for OOMLT 2007-4, 30.51% of the loans had LTVs over 100% and owner occupancy was overstated by 7.17%. *Id*. at ¶¶777, 791; (iii) for OOMLT 2007-5, 28.90% of the loans had LTVs over 100% and owner occupancy was overstated by 10.06%. *Id*. at ¶¶777, 791; (iv) for SVHE 2007-OPT4, 21.51% of the loans had LTVs over 100% and owner occupancy was overstated by 5.87%. *Id*. at ¶¶777, 791; and (v) for ABFC 2006-OPT2, 24.59% of the loans had LTVs over 100% and owner occupancy was overstated by 7.64%. *Id*. at ¶¶778, 792. Notably, OOMLT 2007-3, OOMLT 2007-4, and OOMLT 2007-5 are Trusts at issue in this action.

### 2. **Argent**

297.    Argent originated approximately $25.1 billion of mortgage loans included in the Trusts at issue here.[12] As detailed below, between 2004 to 2008, Argent systemically originated loans in violation of its underwriting guidelines and in breach of the representations and warranties it provided to the purchasers of its loans. By 2011, this became apparent to all players in the RMBS industry, including Wells Fargo.

298.    Argent's systemic and pervasive origination of loans that breached representations and warranties concerning adherence to stated underwriting guidelines was well documented through government investigations and published reports, investor litigation, insurer actions, and nationally published news articles. For example, the OCC's "Worst Ten in the Worst Ten" list

---

[12] In September of 2007, Citibank acquired Argent, including its wholesale mortgage origination division and the servicing rights to collect on more than $45 billion in home loans. Argent merged into CitiMortgage shortly thereafter.

included Argent as the eighth worst mortgage originator based on 2005-2007 loan originations as of March 29, 2009. During his April 7, 2010 testimony before the FCIC, Richard Bowen, the former Business Chief Underwriter at Citibank, testified that he advised against the acquisition of Argent because "we sampled loans that were originated by Argent, and we found large numbers that did not – that were not underwritten according to the representations that were there." *Hearing on Subprime Lending And Securitization And Government Sponsored Enterprises, Testimony of Richard M. Bowe, III: Before the Fin. Crisis Inquiry Comm'n* (Apr. 7, 2010) at 239.

299.    Litigation by government sponsored entities also shed light on Argent's loan origination problems. In September of 2011, the FHFA sued Citigroup seeking $3.6 billion concerning misrepresentations of the quality of the underlying collateral for certain mortgage-backed securities purchased by the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). *See FHFA v. Citigroup, Inc., et al.*, No. 1:11-cv-06196 (S.D.N.Y. Sept. 2, 2011). The lawsuit accused Citigroup of misleading the government-sponsored housing finance companies about the risks embedded in ten mortgage-backed securities, including significantly overstating borrowers' abilities to repay the loans. Argent was one of the largest sources of loans at issue in this action.

300.    Private investors, such as Ellington Management Group, L.L.C., sued to recover losses stemming from loans originated by Argent and misrepresentations about the debt's risks. *See Ellington Mgmt. Grp., L.L.C., et al. v. Ameriquest Mortg. Co., et al.*, 1:09-cv-00416-JSR (S.D.N.Y. Jan. 14, 2009).

301.    Reports from national and local news media also revealed systemic and pervasive origination of loans that breached representations and warranties. For example, on October 20,

2009, Bloomberg reported that about 60% of mortgages originated by Argent were connected to homes in default, according to MDA DataQuick. *See* Dan Levy Countrywide Mortgages Lead California in Defaults (Update 2), *Bloomberg* (Oct. 20, 2009).

302.    Also, the *Miami Herald* reported that a Vice President at Argent "spent three years during the height of the housing boom tutoring Florida mortgage brokers in the art of fraud" and "taught them how to doctor credit reports, coached them to inflate income on loan applications, and helped them invent phantom jobs for borrowers."  Jack Dolan, Matthew Haggman and Rob Barry, Home Loan Racket Flourished in Florida, *Miami Herald* (Jan. 29, 2009).  According to the news report, out of 129 loan applications obtained by the *Miami Herald* from a local broker that were funded by Argent, "103 contained red flags: non-existent employers, grossly inflated salaries and sudden, drastic increases in the borrower's net worth." *Id*.

### 3.    WMC

303.    WMC originated approximately $17 billion in loans included in the Trusts at issue here.[13]  As detailed below, WMC systemically originated loans in violation of its underwriting guidelines and in breach of the representations and warranties.  By 2011, this became apparent to all players in the RMBS industry, including Wells Fargo.   WMC's systemic and pervasive origination of defective loans was well documented through government investigations, investor and insurer litigation, and national news reports.  For example, the OCC's "Worst Ten in the Worst Ten" list included WMC, a subsidiary of GE Money Bank, FSB, as ***the second worst mortgage originator*** based on 2005-2007 loan originations as of March 29, 2009.

---

[13] General Electric Capital ("GE") purchased WMC from a private-equity firm in 2004.  While home prices peaked in June 2006, it wasn't until a year later that GE finally decided to unload WMC after it lost almost $1 billion in 2007.

304.    On September 2, 2011, the FHFA sued GE alleging that the company made inaccurate statements about the quality of loans underlying the securities, including those issued in 2005 by WMC.  *See FHFA v. Gen. Elec. Co.*, No. 1:11-cv-07048 (S.D.N.Y.).  In *Federal Housing Finance Agency v. WMC Mortgage, LLC,* No. 1:13-cv-00584 (S.D.N.Y.) the FHFA's allegations that WMC misrepresented approximately $1 billion in mortgages it pooled and sold were sustained by the court.  Investigations in 2011, 2012 and 2013 identified problems among at least 55% of the loans, and these problems include loan documentation that understated credit risk by overvaluing properties or misstating their purpose.  These FHFA actions were widely publicized.  *See, e.g.,* Rachel Layne, *GE Says FHFA Filed Mortgage-Security Suit Without Warning*, Bloomberg (Sept. 7, 2011); Nate Raymond, *FHFA Says Settlement Reached With GE In Mortgage Case*, Reuters (Jan. 23, 2013).

305.    Bond insurance companies also filed actions to recoup losses arising from WMC's fraudulent loan originations.  For example, in *PMI Mortgage Insurance Co., et al. v. WMC Mortgage Corp., et al.,* ("*PMI*"), No. BC-381972 (L.A. Sup. Ct.), WMC and GE were sued for loans made in violation of the stated underwriting standards.  There, a review of loans found "a systemic failure by WMC to apply sound underwriting standards and practices." Reviewing a sample of the nearly 5,000 loans in the pool, PMI identified 120 "defective" loans for which borrowers' incomes and employment were incorrect or where the borrower's intention to live in the home was incorrect.  *The New York Times* reported on this action.  *See* Vikas Bajaj*, If Everyone's Finger-Pointing, Who's to Blame?* N.Y. Times (Jan. 22, 2008).

306.    PMI filed another lawsuit against WMC in September 2009 after a review of WMC's mortgage loan files found that WMC "followed few, if any, objective standards or criteria in underwriting [mortgage loans] and showed little concern, if any, for any borrower's

ability to repay."  *PMI Mortg. Ins. Co. v. WMC Mortg. Corp.*, No. BC-391072 (L.A. Super. Ct.).

According to PMI's complaint, a review of a sample of thousands of WMC-originated loans

revealed that WMC "breached various representations and warranties [attesting that,] *inter alia*,

the loan-to-value ratio at the time of origination was greater than 100%; fraud, errors,

misrepresentations, or gross negligence took place on the part of WMC . . . ; the loans did not

comply with WMC's own underwriting standards at the time of origination; certain documents

were missing; and/or WMC had failed to utilize a methodology in underwriting the loans that

employed objective mathematical principles designed to determine that, at the time of

origination, the borrower had the reasonable ability to make timely payments on the Mortgage

Loans."  According to the PMI complaint, the investigation "demonstrate[d] a systemic failure

by WMC to apply sound underwriting standards and practices which cuts across all of the [loans

in the securitization]."  In the defective loans, the investigation discovered "unreasonable stated

income and/or misrepresentations of income and/or employment by the borrower."  Moreover,

nearly a quarter of the loans sampled were shown to contain "misrepresentations of occupancy

by the borrower."

307.    So-called "putback" actions by trustees against WMC for breach of contract and

damages further show the pervasive and systemic breaches of representations and warranties.  In

*MASTR Asset Backed Securities Trust 2006-HE3 v. WMC Mortgage Corp., et al.*, No. 11-02542

(D. Minn. Sept. 2, 2011), U.S. Bank, as trustee, alleged that WMC falsely assured purchasers that

the loans were creditworthy, but more than 45% of the $555 million in the original loan balance

had been liquidated and more than 30% of the remaining loans were delinquent.  A review of a

$550 million pool of mortgages booked by WMC and another subprime lender found inflated

borrower incomes, missing documents and other "material breaches" in 150 loan files out of a sample of 200 – a "stunning 75 percent failure rate."

308.     Similarly, in *J.P. Morgan Mortgage Acquisition Trust, Series 2006-WMC4, by the Bank of New York Mellon, solely in its capacity as Securities Administrator v. WMC Mortgage, LLC*, Index No. 654464/2012 (N.Y. Sup. Ct. Dec. 20, 2012) the plaintiff trustee alleged that a review revealed more than 3,000 mortgages originated by WMC with "materially and adversely" breaches of information regarding characteristics of the loans, including misrepresentations as to the occupancy of the owner and the "defects" included "repeated failure to adhere to sound underwriting practices, a blatant disregard for a borrower's ability to repay the loan, and intentional ignorance of warning signs of fraud."  These types of putback actions against WMC were widely reported on by the national media.  *See, e.g.,* Margaret Fisk and Jody Shenn, *WMC Mortgage, EquiFirst Sued by Trustee Over Mortgage Loans*, Bloomberg (Sept. 6, 2011); and Chris Dolmetsch, *WMC Mortgage Sued By Trust Administrator In N.Y. Court*, Bloomberg (Dec. 21, 2012).

309.     WMC's improper loan originating practices have been the subject of investigation and regulatory enforcement actions as well.  For example, in June 2008, the Washington State Department of Financial Institutions, Division of Consumer Services, filed a Statement of Charges and Notice of Intention to Enter an Order to Revoke License, Prohibit From Industry, Impose Fine, Order Restitution and Collect Investigation Fees against WMC and its principal owners individually.  The Statement of Charges included a review of eighty-six loan files, which revealed that at least seventy-six loans (or more than 88%) were defective or otherwise in violation of Washington state law.  Among other things, the investigation uncovered that WMC had originated loans with unlicensed or unregistered mortgage brokers, understated amounts of

finance charges on loans, understated amounts of payments made to escrow companies, understated annual percentage rates to borrowers and committed many other violations of Washington state deceptive and unfair practices laws.

### 4. First Franklin

310. First Franklin, a subsidiary of Merrill Lynch (which was purchased by Bank of America), originated approximately $15.6 billion in mortgage loans included in the Trusts at issue here. During the mortgage and securitization boom, First Franklin systemically originated loans in breach of the representations and warranties it provided to the purchasers of its loans.

311. First Franklin's abandonment of its underwriting standards and poor origination practices are well documented through government investigations and reports, investor litigation, insurer actions, and news media sources. For example, the OCC's "Worst Ten in the Worst Ten" list included First Franklin as the *fifth worst originator* based on 2005-2007 loan originations as of March 29, 2009. Moreover, the Senate Report identified First Franklin as one of five mortgage originators to which Goldman Sachs directed the most repurchase requests for breaches of representations and warranties concerning underwriting loan quality. *See* Senate Report at 487, n.2051.

312. On September 2, 2011, the FHFA sued Merrill Lynch and its subsidiary First Franklin, among others, for $24.8 billion, for misrepresenting the quality of mortgage-backed securities sold to Fannie Mae and Freddie Mac. *See FHFA v. Merrill Lynch & Co., Inc., et al.*, No. 1:11-cv-06202 (S.D.N.Y. Sept. 2, 2011). This action, along with similar actions initiated by the FHFA, was covered by the national media. *See, e.g., FHFA Sues 17 Banks Over Massive Mortgage Losses At Fannie and Freddie*, Forbes (Sept. 2, 2011).

313. Similarly, on August 8, 2011, AIG sued First Franklin, among others, for $10 billion, alleging that First Franklin and others falsely asserted that the underlying mortgage-

backed securities' collateral mortgages were issued according to objective underwriting guidelines, when in fact, the defendants encouraged borrowers to falsify loan applications, pressured property appraisers to inflate home values, and ignored obvious red flags in the underwriting process. *See AIG, et al., v. Bank of America Corp., et al.,* Index No. 652199/2011 (N.Y. Sup. Ct. Aug. 8, 2011).

314.    On April 16, 2012, bond insurer Ambac Assurance Corp. ("Ambac") sued Bank of America, accusing the company's First Franklin and Merrill Lynch units of misrepresentations concerning mortgage-backed securities. *See Ambac Assurance Corp., et al. v. First Franklin Fin. Corp., et al.*, Index No. 651217/2012 (N.Y. Sup. Ct. Apr. 16, 2012). Ambac reviewed 1,750 loans in the securitization and found that representations and warranties were breached *in 94% of the loans*. *Id.* Ambac further alleged that First Franklin originated most of the loans, and that the misrepresentations included underwriting practices and the due diligence done on the pooled loans, and at the loan level, such as borrowers' incomes and employment. The national media reported on these types of bond insurer actions. *See, e.g., Ambac Sues Bank of America Over Mortgage-Based Securities*, Bloomberg (Apr. 16, 2012); *Ambac Backed $856M In Bad MBS Due To Merrill's Tricks: Suit*, Law360 (Apr. 16, 2012).

## 5.    Fremont

315.    Fremont originated approximately $12.2 billion in mortgage loans included in the Trusts at issue here. As detailed below, Fremont systemically originated loans in violation of its underwriting guidelines and in breach of the representations and warranties. By 2011, this became apparent to all players in the RMBS industry, including Wells Fargo. Fremont's systemic and pervasive origination of defective loans was well documented through government investigations, investor litigation, and national news reports. For example, the OCC's "Worst

Ten in the Worst Ten" list included Fremont as ***the sixth worst mortgage originator*** based on 2005-2007 loan originations as of March 29, 2009.

316.    Beginning in 2009, Fremont's origination practices have been the subject of numerous governmental investigations and reports.  For example, the FCIC Report discusses how the credit rating agency Moody's Investors Service ("Moody's") created an independent surveillance team in 2004 in order to monitor previously rated deals.  The Moody's surveillance team began to see a rise in early payment defaults in mortgages originated by Fremont in 2006 and downgraded several securities with underlying Fremont loans or put them on watch for future downgrades. Moody's chief credit officer remarked that Moody's had never had to put on watch deals rated in the same calendar year.  In 2007, in an unprecedented move, Moody's downgraded 399 subprime mortgage-backed securities that had been issued in 2006 and put an additional thirty-two securities on watch.  Moody's noted that about 60% of the securities affected contained mortgages from one of four originators, one of which was Fremont.  FCIC Report at 221-22.

317.    According to the FCIC Report, when securitizers kicked loans out of securitization pools, some originators simply put those loans into new pools.  Roger Ehrnman, Fremont's former regulatory compliance and risk manager, told the FCIC that Fremont had a policy of putting loans into subsequent pools until they were kicked out three times.  FCIC Report at 168.

318.    The Senate Report also paints Fremont in a negative light, noting that Fremont was a lender "well known within the industry for issuing poor quality loans."  Senate Report at 11.  In March of 2007, Fremont, once the nation's fifth largest subprime mortgage lender, stopped originating subprime loans after receiving a cease and desist order from the FDIC.  *Id.* at

45, 237; FCIC Report at 233. The cease and desist letter "exposed the existence of unsafe and unsound subprime lending practices" by Fremont when it determined that Fremont had been operating with "a large volume of poor quality loans" and maintained "unsatisfactory lending practices." Senate Report at 45, 238. Finally, in June of 2008, shortly after the FDIC filed a second public enforcement action against the bank, Fremont declared bankruptcy. *Id.* at 238.

319.   In June of 2009, the Attorney General of Massachusetts reached a $10 million settlement with Fremont in order to redress, among other things, Fremont's predatory lending practices. *Attorney General Martha Coakley Reaches $10 Million Settlement with Subprime Lender Fremont Investment and Loan*, Attorney General of Massachusetts Press Release (June 9, 2009). According to the Attorney General Office's complaint, Fremont was selling risky loan products that it knew were designed to fail, such as 100% financing loans and "no documentation" loans. *See Massachusetts v. Fremont Inv. & Loan and Fremont Gen. Corp.*, No. 07-4373 (Mass. Sup. Ct. Oct. 4, 2007).

320.   In an amended complaint filed by the FHFA on December 21, 2011, *FHFA v. UBS Americas Inc.*, No. 11-cv-05201, 2011 WL 7629299 (S.D.N.Y. Dec. 21, 2011), the FHFA alleged: a confidential witness who previously worked at Fremont in its system operations and underwriting sections stated that Fremont consistently cut corners and sacrificed underwriting standards in order to issue loans. He noted that "Fremont was all about volume and profit," and that when he attempted to decline a loan, he was regularly told "you have signed worse loans than this." The same witness also said that employees at Fremont would create documents that were not provided by the borrowers, including check stubs and tax documents, in order to get loans approved. The confidential witness stated that Fremont regularly hired underwriters with no experience, who regularly missed substantial numbers of answers on internal underwriting

exams. He explained that like many Fremont employees, he quit because he was uncomfortable with the company's practices.  Second Amended Compl. ¶333; *See also NCUA v. UBS Sec., LLC*, No. 13-cv-6731 (S.D.N.Y. Sept. 23, 2013) Compl. ¶176.  On July 25, 2013, the FHFA announced that it had reached an agreement to settle the case for $885 million.  *FHFA Announces Settlement with UBS*, Federal Housing Finance Agency Press Release (July 25, 2013).

321.    Investor litigation also exposed Fremont's improper origination practices.   In *Cambridge Place Investment Management Inc. v. Morgan Stanley & Co., Inc., et al.*, No. 10-2741, 2010 WL 3001725 (Mass. Sup. Ct. July 9, 2010), plaintiffs based much of their case on sixty-three confidential witnesses who testified in court documents about the reckless lending practices that dominated the subprime market during the real estate boom.  Fremont, according to the lawsuit, regularly approved loans with unrealistic stated incomes – such as pizza delivery workers making $6,000 a month.  *Id.* Compl. ¶175; s*ee also NCUA v. UBS Sec., LLC*, No. 13-cv-6731 (S.D.N.Y. Sept. 23, 2013) Compl. ¶175.

### 6.    Countrywide

322.    Countrywide Financial Corporation and related entities ("Countrywide") were among the largest sellers of mortgage loans sold to the Trusts, originating approximately $5.7 billion mortgage loans.

323.    It is beyond dispute that Countrywide was one of the most notorious and worst loan originators and securitizers, routinely abandoning all underwriting standards and requirements while pumping billions of dollars of toxic loans into the United States RMBS securitization market.

324.    Countrywide's default rates reflected its approach to underwriting.  In November 2008, the OCC researched the ten metropolitan areas with the highest foreclosure rates and identified ten lenders in each area with the most foreclosed loans.  Countrywide appeared on the

top ten list in six of the ten markets: 4th in Las Vegas, Nevada; 8th in Sacramento, California; 9th in Stockton, California and Riverside, California; and 10th in Bakersfield, California and Miami, Florida. When the OCC issued its updated 2009 "Worst Ten in the Worst Ten" Report, Countrywide appeared on the top ten list in every market, holding 1st place in Las Vegas, Nevada; 2nd in Reno, Nevada; 3rd in Merced, California; 6th in Fort Myers-Cape Coral, Florida, Modesto, California, and Stockton-Lodi, California; 7th in Riverside-San Bernardino, California and Fort Pierce-Port St. Lucie, Florida; 8th in Vallejo-Fairfield-Napa, California; and 9th in Bakersfield, California. *See* 2009 "Worst Ten in the Worst Ten" Report.

325.    Countrywide's abandonment of its underwriting standards and deplorable origination practices have been exposed by highly publicized governmental investigations and reports.  For example, the FCIC Report noted that as early as September 2004, "Countrywide executives recognized that many of the loans they were originating could result in 'catastrophic consequences.'  Less than a year later, [these same executives noted] that certain high-risk loans they were making could result not only in foreclosures but also in 'financial and reputational catastrophe' for the firm.  But they did not stop."  FCIC Report at xxii.  The Countrywide executives' concerns regarding its defective loan pools came to full fruition.  The FCIC Report states that in January 2011, Bank of America reached a deal with Fannie Mae and Freddie Mac, settling claims relating to ineligible Countrywide-originated loans with a payment of more than $2.5 billion.  And, from 2007 through 2010, Fannie Mae "putback" $6.9 billion in loans to Bank of America, despite the fact that its random sample review of 2% to 5% of the loan pools revealed higher rates for delinquent loans.  *See* FCIC Report at 225.

326.    The Senate Report similarly addressed Countrywide's systemic violations of underwriting guidelines resulting in billions of dollars of defective loans originated during the

same time period as the Countrywide loans securitized in the Trusts.  For example, the Senate Report disclosed that after reviewing certain loans purchased from Countrywide, Goldman Sachs personnel found that about 50% of the loans reviewed were candidates for "return to the lender." Senate Report at 487.

327.    Countrywide's origination practices have also been the focus of regulatory enforcement actions.  For example, on June 4, 2009, the SEC filed an enforcement action against the three most senior Countrywide executives, including Chief Executive Officer ("CEO") Angelo Mozilo ("Mozilo"), charging them with fraudulently misleading investors by representing that Countrywide had issued loans primarily to "prime" or low risk borrowers, when it had actually originated increasingly risky loans that senior executives knew would result in substantial defaults and delinquencies.  The investigation and enforcement action uncovered telling evidence regarding the quality and characteristics of Countrywide-originated loans.  For example, in a March 28, 2006 email sent by Mozilo to Countrywide's President David Sambol and others, Mr. Mozilo stated that Countrywide's 100% loan-to-value (also known as 80/20) subprime product is "the most dangerous product in existence and there can be nothing more toxic . . ."  On October 15, 2010, the SEC announced that Mozilo would pay a then record $22.5 million penalty to settle the SEC charges.

328.    Countrywide's origination practices have also been the focus of several private RMBS lawsuits initiated by investors, including in many of the Trusts substantially similar to those at issue here.  For example, on August 8, 2011, AIG and various affiliates filed a highly publicized securities fraud action against Bank of America Corporation and several acquired entities concerning Bank of America, Merrill Lynch and Countrywide sponsored RMBS offerings.  *AIG v. Bank of Am., et al.*, Index No. 652199/2011 (N.Y. Sup. Ct.).  AIG alleges that

Countrywide systemically ignored its stated underwriting guidelines and misrepresented LTV ratios, CLTV ratios, and owner occupancy levels for the loans sold to these Trusts.

329.   Countrywide-originated loans have been the subject of numerous putback demands as a result of pervasive and systemic breaches of representations and warranties.  As of October 2010, Bank of America, which acquired Countrywide in January 2008, had received more repurchase requests than any other bank, due almost exclusively to Countrywide's systematic abandonment of sound underwriting practices.

330.   Likewise, on June 29, 2011, Bank of America announced an $8.5 billion settlement with The Bank of New York Mellon ("BNYM"), as trustee, resolving, among other things, all claims that Countrywide violated the representations and warranties when it sold loans pertaining to over 530 RMBS trusts.  On August 4, 2011, New York Attorney General Eric T. Schneiderman ("NYAG") moved to intervene and object to Bank of America's proposed $8.5 billion settlement with BNYM "to protect the marketplace and the interests of New York investors," in part because the NYAG's investigation found that Countrywide and Bank of America "face Martin Act liability because there are repeated false representations in the Governing Agreements [for RMBS] that the quality of the mortgages sold into the Trusts would be ensured."

331.   In January 2014, after a nine-week trial in which Countrywide's high-risk, poor quality home loans were scrutinized, New York Supreme Court Justice Barbara Kapnick partially approved the settlement, resolving putback claims for 530 Countrywide RMBS trusts.

332.   Loan file reviews of Countrywide-originated loans sold to the Trusts during the period 2004 through 2008 conducted by investors provide direct evidence of Countrywide's pervasive and systemic breaches of representations and warranties.  For example, Principal Life

Insurance Company and various affiliates filed a complaint against Countrywide concerning fourteen securitizations, including GSCC 2006-1 which contained a high percentage of Countrywide-originated loans.  *In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*, Nos. 11-ML-02265-MRP, 12-CV-4317-MRP, 2012 WL 8505599 (C.D. Cal. Aug. 20, 2012).  Plaintiffs performed a loan level review of a large sample of loans from this offering and found that 32.8% of loans sampled had understated LTV/CLTV ratios by more than 10 percentage points, 28.1% of loans were assigned to a party other than the Trust and owner occupancy was overstated by 12.7%.

333.    In *Minnesota Life Insurance Company v. Countrywide Financial Corporation, et al.*, No. 62-CV-12-4832, 2012 WL 2057921 (D. Minn. June 7, 2012), the plaintiff insurers filed a complaint against Countrywide concerning sixteen RMBS issued by Countrywide, including CWL 2006-S6, which contained a high percentage of Countrywide originated loans.  The insurers performed a loan level review of a large sample of loans from this offering and found that the actual percentage of loans with a LTV/CLTV above 100% was 43.5%; the actual percentage of loans with a LTV/CLTV of 90.01% or greater by loan balance was understated by approximately 17.5%; and owner occupancy was overstated by approximately 12%.

334.    In *Texas County and District Retirement System v. J.P. Morgan Securities LLC, et al.*, No. D-1-GN-14-000998, 2014 WL 1335434 (Tex. Dist. Apr. 3, 2014), Texas County and District Retirement System filed a complaint against Countrywide and others, to recover $64 million in damages suffered on RMBS, including CWHL 2005-4 which contained a high percentage of Countrywide originated loans.  The insurers performed a loan level review of a large sample of loans from this offering and found that the actual percentage of loans with a LTV/CLTV above 100% was 11%; the actual percentage of loans with a LTV/CLTV of 80% or

greater by loan was understated by approximately 34%; and owner occupancy was overstated by approximately 7%.

### 7. **New Century**

335.    New Century originated approximately $7.9 billion in mortgage loans included in the Trusts at issue here.  As of March 29, 2009, New Century was ranked as the worst mortgage originator by the OCC's "Worst Ten in the Worst Ten" list based on originations from 2005 to 2007.  Multiple highly publicized government investigations and lawsuits exposed New Century's improper loan origination practices and pervasive noncompliance with its underwriting guidelines.

336.    New Century's systemic origination of defective loans during the same time period as the New Century loans were originated and sold to the Trusts were detailed in the FCIC Report and the Senate Report.  The Senate Report found that "[s]ubprime lenders like . . . New Century Financial Corporation . . . were known for issuing poor quality subprime loans." Senate Report at 21.  The Senate Report identified "a number of [New Century's] harmful mortgage practices, including 'increasing loan originations, without due regard to the risks associated with that business strategy'; risk layering in which it issued high risk loans to high risk borrowers, including originating in excess of 40% of its loans on a stated income basis; allowing multiple exceptions to underwriting standards; and utilizing poor risk management practices that relied on the company's selling or securitizing its high risk mortgages rather than retaining them." *Id*. at 236.

337.    The FCIC Report concluded that "New Century—once the nation's second-largest subprime lender − ignored early warnings that its own loan quality was deteriorating and stripped power from two risk-control departments that had noted the evidence." FCIC Report at 157.  For instance, "[i]n a June 2004 presentation, the Quality Assurance staff reported they had found

severe underwriting errors, including evidence of predatory lending, federal and state violations, and credit issues, in 25% of the loans they audited in November and December 2003. In 2004, Chief Operating Officer and later CEO Brad Morrice recommended these results be removed from the statistical tools used to track loan performance, and in 2005, the department was dissolved and its personnel terminated." *Id*.

338.    Such massive underwriting failures led to high default rates and eventually New Century's collapse.  According to the Bankruptcy Court Examiner for New Century, Michael J. Missal, "New Century had a brazen obsession with increasing loan originations, without due regard to the risks associated with that business strategy . . . . Although a primary goal of any mortgage banking company is to make more loans, New Century did so in an aggressive manner that elevated the risks to dangerous and ultimately fatal levels." Final Report of Michael J. Missal, Bankruptcy Court Examiner, *In re New Century TRS Holdings, Inc*., No. 07-10416 (KJC) (Bankr. Del. Feb. 29, 2008), *available at* http://graphics8.nytimes.com/packages/pdf/business/ Final_Report_New_Century.pdf.

339.    The New Century Bankruptcy Report, which also found that in June 2005, the Internal Audit Department audited the company's loan origination process at its Sacramento wholesale fulfillment center and found that 45% of the loans had improper Real Estate Settlement Procedures Act ("RESPA") disclosures, 32% of the loans did not have approval stipulations fully satisfied, 39% of the loans had noted exceptions with income calculations and/or verification of income, and 23% had appraisal exception problems.  *Id*. at 152.

340.    New Century's poor underwriting practices and defective loans have also been the subject of well publicized lawsuits brought on behalf of government agencies.  In December 2009, the SEC charged three former New Century executives, including the CEO, "with

fraudulent accounting that misled investors about the company's finances." Senate Report at 236. The SEC alleged that the New Century executives were "downplaying the riskiness of the company's loans and concealing their high delinquency rates."   The complaint stated that, although New Century had represented itself as a prudent subprime lender, it "soon became evident that its lending practices, far from being 'responsible,' were the recipe for financial disaster." *Id*.

341.    Loan file reviews confirm New Century's pervasive and systemic breach of material representations and warranties regarding the quality and characteristics of the loans it originated.   For example, in *FHFA v. HSBC N. Am. Holdings Inc., et al*., the FHFA reviewed a sample of loan files in the HASC 2005-I1 and HASC 2006-NC1 securitizations.   New Century originated all of the loans in these two trusts.   The FHFA found that 17.53% of the loans in HASCC 2005-I1 and 18.12% of the loans in HASC 2006-NC1 had LTV ratios over 100%. *FHFA v. HSBC No. Am. Holdings Inc., et al*., No. 11-cv-06189 (S.D.N.Y. June 28, 2012) Amended Compl.  ¶113.

>    **D.    The Systemic Disregard Of Prudent Securitization
>    Standards Was Pervasive During The Relevant Period**

342.    It is equally well documented that between 2004 and 2008, the sponsors that securitized the residential mortgages and transferred them into the RMBS trusts failed to conduct adequate due diligence reviews of the mortgage pools to ensure the mortgage loans were of the same credit quality as represented and complied with federal and state law, as well as that the purported mortgaged property's appraised value was accurate.

343.    As the FCIC Report noted:

The Commission concludes that firms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards. Potential investors were not fully

informed or were misled about the poor quality of the mortgages contained in some mortgage-related securities. These problems appear to have been significant.

FCIC Report at 187.

344.   As made clear in the FCIC Report, in their zeal to keep the securitization machine going and at the behest of originators, RMBS sponsors and their third party due diligence providers failed to analyze adequate sample sizes of the loan pools, sometimes reviewing as little as 2%-3% of the entire loan pools.  Moreover, when the sponsors' and their due diligence firms identified high percentages of mortgage loans in their sample reviews as deficient, sponsors pervasively "waived in" mortgage loans to preserve their business relationships with the originators or to keep the defective loans off their own books.  Consequently, by 2011, it was equally apparent to all players in the United States mortgage and securitization industry that the mortgage loans deposited in RMBS trusts issued between 2004 and 2008 materially breached the sponsors' representations and warranties.

### E.   There Is Evidence Of Widespread Breaches Of Representations And Warranties By The Specific Sponsors Of The Trusts

346.   As with other RMBS trusts of the same vintage, the Trusts have been materially impacted by the sponsors' faulty securitization practices.  The sponsors' systemic and pervasive sale of residential mortgage loans in the Trusts in breach of representations and warranties is confirmed through several federal and state government investigations and published reports, well publicized news reports, and public and private enforcement actions that have described endemic due diligence failures throughout the period in which the Trusts were created and, more specifically, failures by the same sponsors whose mortgage loans were deposited into the Trusts. A summary of testimonial and documentary evidence as to each of the major sponsors of the mortgage loans to the Trusts is set forth below.

1.      **Bank Of America**

347.    Bank of America sponsored approximately $52.8 billion of mortgage loans securitized in 92 of the Trusts and originated over $41.9 billion of mortgage loans in the Trusts. Although the securities issued from Trusts containing Bank of America-originated and sponsored loans were generally marketed to investors as conservative, AAA credit rated investments, by January 2009 it became clear that the underlying loan collateral for these Trusts did not match Bank of America's representations.   Specifically, the Bank of America-label Trusts averaged delinquencies of over 10.6%.   Twelve of these Trusts had delinquency rates of over 20%, including ABFC 2005-HE2, ABFC 2006-OPT3, ABFC 2006-OPT1, ABFC 2005-WMC1, ABFC 2007-NC1 and ABFC 2006-OPT2, which each had delinquency rates of over 40%.  As a result of these delinquencies, the Bank of America-label Trusts began to incur significant losses.  From January 2009 to January 2011, realized losses increased from approximately $760.6 million to $1.8 billion.  The poor performance of these Trusts has persisted, as altogether these Trusts have suffered have suffered realized losses of over $3.1 billion.

348.    Bank of America was instrumental in originating and securitizing an enormous volume of defective loans, including by providing financing to four of the five largest subprime lenders during the 2004-2008 time period.  In 2004, Bank of America announced its plan to devote $750 billion to provide home loans in low- and moderate-income ("LMI") communities, thereby greatly expanding its subprime lending profile.   In 2005 alone, Bank of America provided more than $33.2 billion in mortgage loans to LMI borrowers.  According to the FCIC Report, in June 2012, approximately 17% of the LMI loans originated by Bank of America between 2004 and 2007 were delinquent at some point for ninety days or more.  (Bank of America Letter to FCIC, Schedule 2.5. (June 16, 2010))  Bank of America, however, retained

only about 50% of those LMI loans on its balance sheet and either sold or securitized the rest.
*Id*.

349.    During the 2004-2008 time period, Bank of America also helped to finance loans originated by Countrywide, the nation's top subprime originator; it purchased and securitized loans from Ameriquest, the second largest subprime originator; it financed loans by New Century, the third largest subprime lender; and it partnered with First Franklin, the fourth largest subprime lender, to securitize and sell its subprime loans.   In July 2008, Bank of America acquired Countrywide, which was investigated that same year by the Federal Bureau of Investigation ("FBI"), the DOJ and multiple state attorneys general offices for predatory lending and securities fraud.   Bank of America is still contending with legacy liability from Countrywide's unscrupulous loan origination and underwriting practices.

350.    Bank of America's securitization practices have been the subject of investigations and enforcement actions by both state and federal regulators.   For example, on August 6, 2013, the DOJ filed suit against Bank of America for defrauding investors in connection with the sale of over $850 million of RMBS, including the same BOAMS shelf from which several of the Trusts in this action issued.   The complaint alleges that Bank of America lied to investors about the relative riskiness of the mortgage loans backing the Bank of America-label RMBS, made false statements after intentionally not performing proper due diligence, and filled the securitization with a disproportionate amount of risky mortgages originated through third party mortgage brokers.   In particular, the Justice Department alleged that more than 40% of the mortgages in the BOAMS 2008-A collateral pool did not substantially comply with Bank of America's underwriting standards in place at the time they were originated and did not have sufficient documented compensating factors.  As alleged in the DOJ complaint, Bank of America

knew that specific loans in the BOAMS 2008-A collateral pool did not comply with Bank of America's underwriting standards and that Bank of America also concealed significant risks associated with the mortgages backing the BOAMS 2008-A securitization. For instance, Bank of America sponsored more than 70% of the loans through third party mortgage brokers. These loans, known as "wholesale mortgages," were riskier than similar mortgages originated directly by Bank of America.  More significantly, at the same time Bank of America was finalizing this deal, it was receiving a series of internal reports that showed an alarming and significant decrease in the quality and performance of its wholesale mortgages.

351.   Bank of America's mortgage securitization practices also have been the subject of an ongoing New York Attorney General investigation since May 2011, and Bank of America separately and as successor-in-interest to Countrywide has been the target of numerous lawsuits alleging misconduct in connection with loan origination, underwriting, servicing, and securitization practices.

352.   Bank of America has been sued numerous times for its own defective loan underwriting practices, as well as those of Countrywide, First Franklin, Merrill Lynch and other affiliates or acquired lenders.  For example, in August 2011, AIG sued Bank of America for violations of the federal securities laws for misrepresentations in connection with certain RMBS collateralized by loans originated by Bank of America, Countrywide, and Merrill Lynch, including BAFC 2006-B, one of the Bank of America-label Trusts at issue here.  *See AIG, Inc., et al. v. Bank of Am. Corp., et al.*, Index No. 652199/2011 (N.Y. Sup. Ct. Aug. 8, 2011).  Among other things, AIG's complaint detailed Bank of America's own risky lending practices, citing for example a June 13, 2005 internal email from Countrywide CEO Angelo Mozilo to Countrywide Chief Financial Officer ("CFO") David Sambol, in which Mozilo complained that even

Countrywide could not match some of Bank of America's riskier products. The AIG complaint also provided detailed accounts of former Bank of America employees who confirmed that Bank of America "abandoned its underwriting guidelines," including routinely granting manual "exceptions" in order to ensure that sufficient loan volume was maintained.

353.    Forensic and loan level reviews of several Bank of America-label Trusts have confirmed the poor quality of mortgage loans securitized and sold by Bank of America to the Trusts. For example, in *FHFA v. Bank of America*, No. 11-cv-06195 (S.D.N.Y.), the FHFA conducted a review of nine Bank of America-label Trusts at issue here: ABFC 2005-WMC1, ABFC 2006-OPT2, ABFC 2006-OPT3, BOAA 2005-10, BOAA 2005-11, BOAA 2005-12, BOAA 2006-1, BOAA 2006-2, and BOAA 2006-3. The FHFA's review of these Trusts revealed that Bank of America's representations regarding the true percentage of non-owner occupied loans within the loan pool were materially inaccurate, understating the percentage of non-owner occupied properties by between 7-10%. The forensic review also revealed that at least 2.54% of the mortgage loans for each securitization had a LTV ratio over 100%, and for most securitizations this figure was between 10-20% percent of the mortgages. For ABFC 2006-OPT3, the data review revealed that more than 40% of the mortgages in the sampled loan group had a true LTV ratio over 100%. *See also Federated Inv. v. Countrywide*, No. BC465659 (Cal. Sup. Ct.) (alleging Bank of America's faulty securitization practices led to inclusion of high percentage of defective loans in BOAMS 2007-3, one of the Trusts at issue here).

354.    The plaintiff investors in *Prudential v. Bank of America*, No. 2:13-cv-01586 (D. N.J.) reached similar conclusions regarding defective loans included in Bank of America securitizations. There, the plaintiffs reviewed loan files from six Bank of America-label Trusts at issue here: BOAA 2005-12, BOAA 2005-7, BOAA 2006-5, BOAMS 2004-E, BOAMS 2005-A,

and BOAMS 2005-B. The investors' review of these Trusts revealed that Bank of America overstated the percentage of owner occupied properties by between 7-15%. The forensic review also revealed that Bank of America understated the percentage of loans with LTVs of greater than 80% for many of these securitizations by as high as 54%. Further, Bank of America understated the loans with LTV ratios of greater than 100% for several of the securitizations by over 10%.

355.    The plaintiff's loan level analysis in *CMFG Life Insurance Company, et al. v. Banc of America Sec. LLC, et al.*, No. 13-cv-00579 (W.D. Wis. Aug. 15, 2013) of five Bank of America-label Trusts at issue here − BOAA 2005-11, BOAA 2005-12, BOAA 2005-6, BOAA 2006-6, and BOAA 2007-1 − revealed similar deficiencies in Bank of America securitizations. CMFG's loan level analysis of these trusts revealed that 80-90% of the mortgage loans contained in these securitizations had at least one material defect.

356.    Similarly, in *In re Countrywide Financial Corporation*, Nos. 11-ML-02265-MRP, 12-cv-4317-MRP (C.D. Cal.), the plaintiffs' loan level review of BOAA 2006-5 revealed that 32.2% of the sampled mortgages had been assigned to a party other than the Trust, and that Bank of America had understated the true LTV/CLTV of 29.6% of the loans sampled loans by more than 10 percentage points. Likewise, in *In re Countrywide Financial Corporation Mortgage-Backed Securities Litigation*, No. 12-cv-04775 (C.D. Cal. Jan. 30, 2013), the plaintiffs found alarming breach rates within the loans sampled from BOAMS 2005-C and BOAMS 2005-F, two of the Trusts at issue here. Specifically, the plaintiffs' loan level review of revealed for between 27%-28% of the sampled mortgages Bank of America had understated the true LTV/CLTV by more than 10 percentage points.

357.    The plaintiffs in *Western and Southern Life Insurance Company, et al. v. Bank of America, et al.*, No. 1:11-cv-00667 (S.D. Ohio Sept. 26, 2011) found similar breach rates within BOAMS 2007-1 and BOAMS 2007-3, two Bank of America-label Trusts at issue here.  For example, the plaintiffs found that 96% and 98% of the loans for BOAMS 2007-1 and BOAMS 2007-3, respectively, had not been assigned to the Trusts.  The plaintiffs also found that Bank of America had understated the loans with greater than 100% LTV ratios by 7.39% and 13.74%, respectively.  The plaintiffs also found that Bank of America grossly understated the number of loans with LTV ratios of greater than 80% and 90% for these two securitizations, as well as the percentage of non-owner occupancy loans.

## 2.    Park Place

358.    Park Place was the sponsor for $33.5 billion of mortgage loans in fourteen of the Trusts, which were largely supplied by Park Place's parent Ameriquest and its wholesale mortgage channel Argent.  The Park Place-label Trusts have been plagued by abject performance as a result of the extremely poor credit quality of the loans it packaged and sold.  By January 1, 2009, the Park Place-label Trusts had an average delinquency rate of over 37.4%.  As a result of these delinquencies, collateral losses increased between January 2009 and January 2011 from $2 billion to $2.9 billion.  To date, the Park Place-label Trusts have suffered over $3.8 billion in realized losses, representing over 11% of the original face amount of the Park Place-label securitizations.

359.    Ameriquest invented the "stated income" loan, which allowed potential borrowers to obtain loans without providing any documentation substantiating actual income, and was one of the largest subprime lenders until it stopped originating loans in September 2007.

360.    On August 31, 2008, Citigroup completed its acquisition of Argent and Ameriquest's loan servicing unit, AMC Mortgage Services, and shut down Ameriquest.

Unscrupulous and improper loan origination practices by Ameriquest and Argent are described in detail throughout this Complaint (*see* Section VIII.C.) and have been the subject of numerous, well publicized government investigations, reports and enforcement actions, as well as private litigation.  Park Place – an alter-ego of Ameriquest and Argent – securitized and sold these defective loans into the Trusts with full knowledge of Ameriquest's and Argent's underwriting practices.

361.    Park Place's standard practice of packaging defective loans has been the subject of significant RMBS litigation.  For example, in *Cambridge v. Morgan Stanley*, No. 10-2741 (Sup. Ct. Mass.), the plaintiff alleged that as a result of originators' abandonment of stated underwriting guidelines, the PPSI 2004-MHQ1, PPSI 2004-WCW1, PPSI 2004-WCW2, PPSI 2004-WHQ2, PPSI 2005-WCH1, PPSI 2005-WCW1, PPSI 2005-WHQ4 Trusts, all of which are at issue here, were filled with defective loans.

### 3.      Merrill Lynch

362.    Merrill Lynch, through its affiliate Merrill Lynch Mortgage Lending, sponsored approximately $20.5 billion of mortgage loans securitized in twenty-five of the Trusts under the MLCC and MLMI shelves.  Merrill Lynch was also a major seller of loans to the Trusts, originating more than $8.8 billion of the mortgage loans underlying the Trusts.  By January 1, 2009, it was evident that the credit quality of underlying loan collateral for Merrill Lynch-label Trusts did not match Merrill Lynch's and originators' representations and warranties.  At this time, over 16% of the loans within the Merrill Lynch-label Trusts were delinquent.  Moreover, the Merrill Lynch-label Trusts had incurred realized losses of over $599.8 million.  The Merrill Lynch-label Trusts' realized losses continued to mount over the next two years, reaching $813.3 million in January 2011.  As of November 1, 2014, the Merrill Lynch-label Trusts have suffered realized losses of over $1.1 billion.

363.    Highly publicized government reports and RMBS litigation have exposed Merrill Lynch's improper securitization practices.  For instance, Clayton's Holdings Inc.'s (Clayton") trending reports showed that in the period from the first quarter of 2006 to the second quarter of 2007, 23% of the mortgage loans that Merrill Lynch submitted to Clayton to review in residential mortgage-backed securities groups were rejected by Clayton as falling outside the applicable underwriting guidelines.  Of the mortgage loans that Clayton found defective, 32% of the loans were subsequently waived in by Merrill Lynch without proper consideration and analysis of compensating factors.

364.    Over the past five years, Merrill Lynch's false representations regarding the quality and characteristics of the mortgage loans it securitized have been the focus of several significant RMBS individual and class actions.  For example, on September 2, 2011, the FHFA filed suit against Merrill Lynch in connection with seventy-two Merrill Lynch-sponsored or underwritten securitizations, including MLMI 2005-HE2, one of the Merrill Lynch-label Trusts. *FHFA v. Merrill Lynch & Co., Inc., et al*., No. 11-cv-06202 (S.D.N.Y. Sept. 2, 2011).  The FHFA's review of at least 1,000 randomly selected mortgage loans from each trust revealed that for each securitization Merrill Lynch understated the percentage of non-owner occupied properties by more than 6%, and for some securitizations by more than 10%.  In addition, the percentage of mortgage loans with a LTV ratio over 100% was over 10% in sixty-three of seventy-two securitizations, and for twenty securitizations over 20% of the mortgages had a true LTV ratio over 100%.

365.    The FHFA's findings are supported by RMBS trustee-led putback actions against Merrill Lynch in its capacity as sponsor.  For example, in *Merrill Lynch Mortgage Investors Trust, Series 2006-RM4, et al. v. Merrill Lynch Mortgage Lending, Inc., et al.*, Index No.

654403/2012 (N.Y. Sup. Ct. Dec. 18, 2012), U.S. Bank, N.A., as trustee filed an action against Merrill Lynch as sponsor of MLMI 2006-RM4 and MLMI 2006-RM5, securitizations that are substantially similar to the Trusts, for Merrill Lynch's breach of its repurchase obligations in connection with loans violating representations and warranties. A forensic review of more than 1,000 loans from each of these trusts revealed that at least 73% of the loans in the MLMI 2006-RM4 and 76% of the loans in the MLMI 2006-RM5 trust breached representations and warranties in a manner that materially and adversely affects the value of the mortgage loan and the interest of the certificateholders therein.

### 4.    Lehman

366.    Lehman sponsored over $25.4 billion of mortgage loans securitized in twenty-eight of the Trusts under the BNCMT, LABSM, LMT, SAIL, SARM and SASC shelves. Lehman also originated approximately $14.8 billion in mortgage loans included in the Trusts. Lehman acquired the mortgage loans either from Lehman's own loan origination affiliates and subsidiaries, Aurora and BNC, whose underwriting abuses are well documented, or in direct purchases (including in auctions) from third-party loan originators, some of which are among the most notorious financial crisis lenders, including GreenPoint, Countrywide Home Loans, Inc., IndyMac Bank, F.S.B. ("IndyMac"), First Franklin, New Century, and American Home. Given the poor performance of the Lehman label-Trusts, it was clear by January 2009 that Lehman and the originators had materially and adversely breached representations and warranties to the Trusts. For example, at this time, approximately 27% of the Lehman-label Trusts' loans were delinquent. Moreover, the Lehman-label Trusts had suffered collateral losses in excess of $852 million. Realized losses increased to over $2.2 billion by January 2011. As of November 1, 2014, the Lehman-label Trusts have suffered collateral losses of over $3.2 billion, representing over 12% of these securitizations' original balance.

367.   Lehman's faulty due diligence practices with respect to RMBS securitization is well known to Wells Fargo.  Lehman's "due diligence" principally occurred not during the underwriting phase of the offering, but while Lehman was inspecting smaller bulk loans for possible purchase from third-party loan originators after successfully bidding on the loans at auction.  Accordingly, at that stage, there was a disincentive for Lehman to reject, or "kick-back," loans as non-compliant with stated guidelines since the originator would be less likely to select Lehman as the winning bidder in future auctions. Indeed, according to the FCIC Report, in connection with securitizing loans, Lehman used Clayton to perform due diligence services. Clayton found that 26% of the total loans underwritten by Lehman failed to meet the underwriting standards, but that Lehman waived its right to reject 37% of these non-conforming loans, and included them in the RMBS it securitized anyway.  Further, the motto among Lehman's residential mortgage-backed securities origination sales group became "there are no bad loans only badly priced loans" – meaning loans found not to comply with underwriting guidelines were generally not rejected, but simply negotiated to be purchased more cheaply.

368.   Over the past six years, Lehman's securitization practices have been the focus of several, significant RMBS lawsuits.  For example, in their Consolidated Securities Class Action Complaint filed on February 23, 2009, in *In re Lehman Brothers Mortgage-Backed Securities Litigation*, No. 08-cv-6762 (S.D.N.Y.), the class plaintiffs described in detail Lehman's faulty due diligence practices in securitizing loans in Lehman-label trusts issued under, among other shelves, the SARM and SASC shelves.

369.   The results of investor loan file reviews conducted by investors have further confirmed Lehman's faulty due diligence practices and pervasive and systemic breach of material representations and warranties regarding quality and characteristics of the loans it

securitized.  For example, in *AIG v. Countrywide Financial Corp.*, Nos. 11-ML-02265/11-cv-10549, AIG reviewed 188 loans originated by Countrywide from the SARM 2006-10 securitization, which demonstrated that the mortgage pools contain loans rife with fraud and other violations of representations and warranties.  Specifically, AIG's review revealed violations of underwriting guidelines in over 90% of the loans, including blatant misrepresentations of employment, and breaches of guidelines.

### 5.   <u>Morgan Stanley</u>

370.   Morgan Stanley, through its affiliates Morgan Stanley Mortgage Capital, Inc. and Saxon Capital, Inc., ("Saxon") sponsored more than $14 billion in mortgage loans securitized in twelve Trusts under the MSAC and MSHLC shelves.  Given the astounding delinquencies within the Morgan Stanley-label Trusts, it was evident by January 1, 2009, that Morgan Stanley had dumped toxic loans within these trusts. By January 1, 2009, nearly 48% of all loans within these securitizations were delinquent, and these Trusts had suffered over $927 million in collateral losses.  Realized losses nearly doubled over the next two years to reach approximately $1.3 billion by January 2011.  As of November 1, 2014, the Morgan Stanley-label Trusts have suffered approximately $1.9 billion in collateral losses, signifying that nearly 13% of the entire loan pool has been written off.

371.   According to the FCIC, Morgan Stanley devoted minimal resources to due diligence on the loans it securitized. For instance, the head of due diligence was based not in New York but rather in Boca Raton, Florida, and he had, at any one time, only two to five individuals reporting to him directly—and they were actually employees of a personnel consultant, Equinox.  FCIC Report at 168.

372.   Government investigations and lawsuits involving Morgan Stanley-sponsored offerings exposed the consequences of its poor due diligence. In *FHFA v. Morgan Stanley*, a

forensic review conducted by the FHFA of 210 loans from the MSM 2007-2AX and SAST 2007-1 securitizations revealed that approximately 93% of the reviewed loans had not been underwritten in accordance with the applicable underwriting guidelines. *FHFA v. Morgan Stanley, et al.*, No.11-cv-6739 (S.D.N.Y. June 13, 2012) Amended Compl. ¶112. During an 18-month period ending June 31, 2007, a third-party due diligence firm, Clayton, rejected 16% of the loans it reviewed for Morgan Stanley. This information was provided to Morgan Stanley, but it overruled Clayton's findings and "waived in" approximately 56% of those loans. (*See* Clayton All Trending Report at 8, *available at* http://fcic.law.stanford.edu/hearings/testimony/the-impact-of-the-financial-crisissacramento#documents.)  Amended Compl. ¶201.

373.    In Morgan Stanley's 2006 and 2007 New Century-originated loan pools, the large majority of the loans reviewed by Clayton were identified by Clayton as having some type of exception. Most loans had multiple exceptions. *In re: Morgan Stanley & Co. Inc*., Civil Action No. 10-2538, Assurance of Discontinuance at ¶26 (Suffolk Cnty. Sup. Ct. June 24, 2010). However, in instances where Clayton found material exceptions to the guidelines, Clayton found that only approximately 9% of the loans had sufficient compensating factors to offset such exceptions; meaning, 91% of the loans failed to have compensating factors.  *Id.* at ¶27.

374.    During 2006 and 2007, Morgan Stanley waived exceptions on and purchased a large number of the loans found by Clayton to violate guidelines without sufficient compensating factors. In the last three quarters of 2006, Morgan Stanley waived more than half of all material exceptions found by Clayton (there can be more than one material exception on one "exception" loan), and purchased a substantial number of New Century loans found by Clayton to violate guidelines without sufficient compensating factors.  *Id.* at ¶28.

375.    Morgan Stanley agreed to pay $102 million to settle the claims asserted by the Massachusetts Attorney General and also agreed to drastic changes in its underwriting practices. *Id.* at ¶¶45-52.

### 6.    Barclays

376.    Barclays sponsored more than $16.3 billion in mortgage loans securitized in seventeen of the Trusts under the SABR and BCAP shelves.  The Barclays-label Trusts have been marked by poor performance.  By January 1, 2009, the Barclays-label Trusts were averaging delinquency rates of over 44.8%, with three trusts (SABR 2005-HE1, SABR 2005-FR5, and SABR 2005-FR3) experiencing delinquency rates in excess of 60%.  As a result of these severe delinquencies, the Barclays-label Trusts began to incur alarming losses.  For example, between 2009 and 2011 collateral losses among the Barclays-label Trusts increased from approximately $1.3 billion to $2.1 billion.  As of November 1, 2014, these trusts have suffered collateral losses of approximately $2.8 billion, meaning that nearly 17% of the entire loan pool has been written off.

377.    Barclays' faulty due diligence and securitization practices were addressed by the government reports.  For example, during the FCIC investigation, Clayton provided evidence that Barclays securitized a significant number of loans that did not comply with the stated underwriting guidelines.  Clayton reviewed 6,275 loans for Barclays. It found that 1,711 (27%) did not comply with the stated underwriting guidelines and did not have compensating factors.  Barclays waived the defects for 471 of the 1,711 (27.5%).  Moreover, even though the reports from Clayton gave notice to Barclays that on average 27% of the sampled loans did not comply with underwriting guidelines or possess compensating factors, Barclays failed to conduct any additional review of the loans not yet sampled.  In other words, even though it knew that the un-sampled set would contain approximately the same proportion of bad loans (as such is the

purpose of sampling), Barclays ignored this obvious defect, and instead, placed all of the un-sampled loans into the securitizations as well.

378.    Barclays' securitization practices have also been the target of regulatory investigations and enforcement actions. For example, on December 22, 2011, the Financial Industry Regulatory Authority (FINRA) fined Barclay's $3 million for Barclay's alleged misrepresentations regarding residential mortgage-backed securities. FINRA stated that Barclay's provided inadequate supervision and incorrect delinquency data in issuing RMBS, leaving investors without critical information for valuing the securities. According to FINRA, Barclay's had inaccurate data on its website from 2007 to 2010 regarding three RMBS it underwrote and sold.

379.    Barclays' securitization practices have also been the subject of several significant RMBS cases brought by investors.  For example, on December 29, 2011, German bank HSH Nordbank AG ("HSH") sued Barclays in connection with approximately $123 million of RMBS that HSH purchased that were issued under the SABR shelf, including two Barclays-label Trusts at issue here, SABR 2005-FR4 and SABR 2006-FR1.  HSH alleged that Barclays misrepresented the quality of the mortgages underlying the securities, particularly with respect to lien status, LTV ratios and the percentage of properties occupied by the owners.  HSH performed a forensic analysis of loans within these Barclays-sponsored securitizations and found that between 38.4% and 60.4% of the sampled loans were never assigned to the Trusts. HSH similarly found that owner occupancy was overstated between 14.3% and 19.2%.  HSH further found that the weighted average CLTV was overstated between 7.1% and 19.6%.

380.    Other investor loan file reviews of Barclays-label Trusts at issue here confirm Barclays' pervasive and systemic sale of defective loans to the Trusts.  For example, in *Federal*

*Home Loan Bank v. Ally Financial Inc., et al.*, No. 11-cv-10952 (D. Mass. May 26, 2011), plaintiff reviewed loans from BCAP 2006-AA1, one of the Trusts at issue here. The plaintiff's review revealed that 14.4% of the sampled loan group's loans had a LTV ratio exceeding 100%, contrary to Barclays' representation that no loan's LTV exceeded 100%. The plaintiff found that Barclays had understated the number of loans with a LTV ratio higher than 80% by 70.1% and a LTV ratio higher than 90% by 37.1%.

381. Similarly, in *Sealink Funding v. Barclays Bank Plc, et al.*, No. 12-cv-7966 (S.D.N.Y. Oct. 25, 2012), plaintiff conducted loan level analysis and investigation of the mortgage loans within one Barclays-label Trust, SABR 2006-HE1, and found that the loans were dramatically inconsistent with the originators' and Barclays' representations and warranties. Plaintiff found that the actual percentage of loans within this securitization with a CLTV over 100% was 62.2%, contrary to Barclays' representation that no loan had a CLTV ratio exceeding 100%. Plaintiff also found that Barclays had overstated owner occupancy by 24.7%, and that 42.4% of the mortgage loans had been assigned to a party other than the Trust.

### 7. Carrington

382. Carrington Securities, LP ("Carrington") sponsored more than $12.7 billion in mortgage loans securitized in eleven of the Trusts. Carrington Holding Company, LLC and its subsidiaries are involved in all aspects of real estate investment, from mortgages and title services to hedge funds and mortgage-backed securities. Carrington's specific business model was "to package subprime debt into private-label securities." From 2004 through 2008, Carrington was a prolific securitizer of subprime mortgages, sponsoring over twenty-one RMBS deals under the CARR shelf, representing over $21.7 billion in subprime debt. Carrington's prolific subprime securitization business was facilitated through a strong relationship with New

Century, which provided seed funding to Carrington in exchange for a stake in its fund, and it often supplied loans to Carrington and serviced its deals.

383.    As a result of including loans originated by notorious subprime lenders such as New Century, Residential Funding Corporation ("Residential Funding") and Option One, Carrington has become known for securitizing "terrible pools of loans." American Banker, *A Servicer's Alleged Conflict Raises Doubts About 'Skin in the Game' Reforms* (Feb. 24, 2011). Carrington's 2004 through 2008 securitizations on average have suffered severe collateral losses, typically averaging over 20% of face amount of the deals.

384.    The eleven Carrington-label Trusts at issue here have performed exceptionally poor, even for Carrington's standards.  By January 2009, the Carrington-label Trusts had already suffered collateral losses of $362 million.  Moreover, the Carrington-label Trusts had severe delinquencies, as 36% of the loans within these Trusts were delinquent.  Over the next two years, realized losses increased almost five-fold to over $1.8 billion.  The Trusts continue to suffer tremendous collateral writedowns, as the Carrington-label Trusts have suffered over $3.4 billion in realized losses, representing over 26% of the Trusts' original balance.

385.    The poor performance of Carrington-label securitizations has been often attributed to its packaging of defective loans.  For example, in *Cambridge v. Morgan Stanley*, No. 10-2741 (Sup. Ct. Mass.), the plaintiff alleged that as a result of originators' abandonment of stated underwriting guidelines, the CARR 2006-FRE1, CARR 2006-NC1, CARR 2006-NC3, CARR 2006-FRE2, CARR 2006-NC2, CARR 2006-NC4, and CARR 2006-RFC1 Trusts, all of which are at issue here, were filled with defective loans.

386.    Similarly, in *Bayerische Landesbank v. Bear Stearns & Co. Inc., et al.,* No. 12-cv-02804 (S.D.N.Y. Apr. 9, 2012), the plaintiff investor sued investment bank underwriters alleging

that in connection with CARR 2006-NC3, CARR 2006-NC5, CARR 2006-OPT1, CARR 2006-RFC1, CARR 2007-FRE1, and CARR 2007-RFC, the originators New Century and Residential Funding had (i) "abandoned [their] underwriting guidelines, verification procedures and quality control standards in order to increase loan originations; (ii) allowed pervasive exceptions to the company's underwriting guidelines in the absence of existing compensating factors; (iii) consistently failed to properly document prospective borrowers' ability to repay their mortgage loans; and (iv) systematically disregarded its stated appraisal standards and in many instances materially inflated the values of the underlying mortgaged properties in the loan origination and underwriting process."[14]

387.    Investors' forensic reviews of various Carrington-label Trusts at issue here confirm that Carrington's pervasive and systemic securitization and sale of defective loans to all of the Carrington-label Trusts.  For example, in *IKB International v. JPMorgan*, No. 1:12-cv-04617 (S.D.N.Y.), commissioned a review of loan level data for the mortgages pooled in the CARR 2006-NC5, CARR 2006-OPT1, and CARR 2006-RFC1 securitizations, which are Trusts at issue here.  The plaintiff found that Carrington had materially understated the CLTV/LTV by more than 10 percentage points, ranging from 31% to as high as 49% of the sampled loans in these securitizations.  The plaintiff also concluded that Carrington overstated owner occupancy by more than 10% in one of these securitizations (CARR 2006-RFC1), and more than 20% in the other two Trusts (CARR 2006-NC5 and CARR 2006-OPT1).

---

[14] *See also, Dexia v. Bear Stearns, et al.*, No. 12-cv-04761 (S.D.N.Y. June 18, 2012) (making similar allegations regarding Carrington's securitization of defective loans in five Carrington-label Trusts at issue here, CARR 2006-NC3, CARR 2006-NC5, CARR 2006-OPT1, CARR 2006-RFC1, and CARR 2007-FRE1).

388.    Similarly, in *Sealink Funding v. Bear Stearns*, Index No. 652681/2011 (N.Y. Sup. Ct. Sept. 29, 2011), the plaintiff performed an analysis of a sizeable sample of loans supporting CARR 2006-OPT1.  The plaintiff concluded that Carrington had underreported non-owner occupied loans by more than 179.15%.  The plaintiff also found that the actual percentage of loans within the securitization with a LTV ratio exceeding 100% was over 8%.

### 8.    RBS

389.    The Royal Bank of Scotland Group PLC ("RBS"), through its affiliates RBS Financial Products, Inc. (f/k/a Greenwich Capital Financial Products, Inc.) and Soundview, sponsored more than $9.7 billion in mortgage loans securitized in nine of the Trusts.  By virtue of the staggering delinquencies and collateral losses, it was clear that by January 1, 2009, that RBS had filled with toxic loan pools.  By that time, the RBS-label Trusts averaged delinquency rates of over 33%.  As a result of these delinquencies, realized losses grew from $516 million in January 1, 2009, to $1.5 billion in January 2011, representing a 500% increase.  In total, the RBS-label Trusts have suffered collateral losses of over $2.8 billion, representing over 28% of the Trusts' original balance.

390.    RBS's poor mortgage securitization practices have been the subject of government and investor lawsuits, including RBS's sale of defective loans to the Trusts at issue here.  For example, in *FHFA v. Royal Bank of Scotland Group PLC, et al.*, No. 11-cv-01383 (D. Conn. Feb. 1, 2012), the FHFA performed a forensic analysis of sixty-eight RBS-sponsored securitizations and/or RBS-underwritten securitizations, including five RBS-label Trusts at issue here: HVMLT 2007-1, SVHE 2007-OPT2, SVHE 2007-OPT3, and SVHE 2007-OPT5.  The FHFA found that "at least 3.12 percent of the mortgage loans for each Securitization had a LTV ratio over 100 percent, and for most Securitizations this figure was much larger." *FHFA v. RBS, et al.*, No. 3:11-cv-01383, Amended Compl. ¶113.  The FHFA also found that "the Prospectus

Supplement for each Securitization was grossly inaccurate, understating the percentage of non-owner occupied properties by at least six percent, and for many Securitizations by ten percent or more." *Id*. at ¶107.

391.    Similarly, in *NCUA v. RBS* (D. Kan. Aug. 24, 2012), *supra*, the NCUA board alleged systemic and pervasive misrepresentations regarding the loan quality and characteristics of three RBS-label Trusts that are at issue here, HVMLT 2006-10, HVMLT 2006-11 and HVMLT 2007-1.  In support of this contention, NCUA commissioned a forensic review of loans within certain of these securitizations.  The NCUA determined that the actual weighted average LTV of HVMLT 2006-10 was 15.15% higher than RBS represented, and that the actual weighted average CLTV of HVMLT 2006-10 was 18.57% higher than RBS represented.  NCUA also found that owner occupancy was overstated in HVMLT 2006-10 by 17.2%.[15]

392.    Likewise, in *Federal Home Loan Bank v. Ally Financial Inc.*, No. 11-cv-10952 (D. Mass. June 29, 2012), the plaintiff's review of loans from HVMLT 2007-1, one of the RBS-label Trusts at issue here, revealed that 30.14% of the sampled loan group's loans had a LTV ratio exceeding 100%, contrary to RBS's representation that no loan's LTV exceeded 100%.  The plaintiff also found that RBS had understated the number of loans with a LTV ratio higher than 80% by 75.9% and a LTV ratio higher than 90% by 49.3%.

393.    Further in *Texas County and District Retirement System v. J.P. Morgan Securities, et al.*, No. D-1-GN-14-000998 (Tex. Dist. Apr. 3, 2014), the plaintiff analyzed two RBS-label Trusts at issue here.  The plaintiff determined that with respect to HVMLT 2006-11, RBS had overstated owner occupancy by 6.79%, understated loans that had a LTV greater than 80% by

---

[15] Plaintiff also found alarming breach rates within IMSA 2005-2, a securitization sponsored by Impac, which is at issue here.

more than 49%, and understated loans that had a LTV greater than 100% by more than 15.71%. Similarly, with respect to SVHE 2007-OPT1, RBS had overstated owner occupancy by 7.11%, understated loans that had a LTV greater than 80% by more than 13.21%, and understated loans that had a LTV greater than 100% by more than 29%.[16]

394.   In February 2014, RBS agreed to pay $275 million to employee health and pension funds to resolve a consolidated class action alleging that RBS misled investor with respect to the quality of the loans in fourteen RBS-sponsored securitizations. *N.J. Carpenters Vacation Fund, et al. v. Royal Bank of Scotland Grp. PLC, et al.*, No. 08-cv-05093 (S.D.N.Y. June 3, 2008).

### 9.   Credit Suisse (DLJ Mortgage Capital)

395.   Credit Suisse, through its affiliate DLJ Mortgage Capital ("DLJ Mortgage"), sponsored more than $5.8 billion in mortgage loans securitized in eight of the Trusts under the ABSHE and IRWHE shelves.  By January 1, 2009, the Credit Suisse-label Trusts had all the indicia of pervasive breaches of representations and warranties.  Preliminarily, the Credit Suisse-label Trusts had already suffered collateral losses of $297.9 million.  Moreover, the Credit Suisse-label Trusts had severe delinquencies, as 33% of the loans within these Trusts were delinquent.  Over the next two years, realized losses nearly doubled to approximately $493 million.  The Trusts continue to suffer tremendous collateral write-downs, as the Credit Suisse-label Trusts have suffered collateral losses over $696.8 million.

396.   Credit Suisse has reported that, from 2003 to 2005, it nearly doubled the value of residential mortgage loans it securitized, from more than $27 billion to approximately $50

---

[16] Plaintiff's review disclosed similar breach rates within IMM 2005-6, a securitization sponsored by Impac and which is the subject of this action.

billion. Credit Suisse RMBS securitization continued to explode thereafter. From January 2004 through late 2007, Credit Suisse securitized (either itself or by selling mortgage loans to other sponsors) approximately $128.5 billion in residential mortgage loans. As detailed herein, to accomplish this tremendous volume growth, Credit Suisse abandoned sound underwriting practices and knowingly securitized defective loans.

397.   The extensive public record confirms that DLJ Mortgage securitizations, including many of the Trusts, contain extensive breaches of material representations and warranties. In particular, (i) public investigations have revealed that DLJ Mortgage pervasively and systematically disregarded its own underwriting guidelines and, as a result, issued mortgages that did not meet stated criteria in the offering documents; and (ii) loan file reviews by insurers of transactions that included DLJ Mortgage-sponsored loans have demonstrated pervasive breaches of underwriting standards.

398.   The public record is littered with examples of DLJ Mortgage's disregard for underwriting guidelines and due diligence practices.   For example, the FCIC and states' attorneys' general have investigated Credit Suisse, and specifically, DLJ Mortgage, in the wake of the housing market collapse. In July 2010, Oregon Treasurer Ted Wheeler and Attorney General John Kroger joined several other plaintiffs in suing Credit Suisse on several RMBS.

399.   According to Clayton's trending reports made public in September 2010, Clayton found that 32% of the 56,300 loans that it reviewed for Credit Suisse received the worst possible grade and "failed to meet guidelines."  Despite Clayton's determination that these loans failed to meet applicable underwriting standards, Credit Suisse "waived in" 33% of these defective loans into securitizations.

400.    Credit Suisse has also been the target of other significant RMBS investigations and lawsuits.  Discovery in these actions has uncovered internal reports, emails, and memoranda clearly demonstrating that DLJ Mortgage committed widespread abuses and made material misrepresentations in the Governing Documents.  For example, discovery in RMBS litigation has uncovered evidence that Credit Suisse devised a scheme whereby it was able to profit on defective loans twice: first, by securitizing them and selling the resulting securities to investors; and second, by (i) demanding that the originators of the defective loans repurchase the loans because the defects breached the originators' representations and warranties; (ii) settling the repurchase demands by "repricing" the loans; and (iii) pocketing the proceeds of those settlements instead of passing the money on to or repurchasing the defective loans from the trusts.

401.    A review of loan files by MBIA *in MBIA v. Credit Suisse Securities (USA) LLC, et al.*, Index No. 603751/2009 (N.Y. Sup. Ct. Dec. 14, 2009), which wrote insurance on DLJ Mortgage certificates, demonstrates that DLJ Mortgage routinely misrepresented the quality of loans included in the securitizations.  In carrying out its review of the approximately 1,386 DLJ Mortgage defaulted loan files, MBIA found that 87% of the defaulted or delinquent loans in those securitizations contained breaches of DLJ Mortgage's representations and warranties.  These findings demonstrated "a complete abandonment of applicable guidelines and prudent practices such that the loans were (i) made to numerous borrowers who were not eligible for the reduced documentation loan programs through which their loans were made, and (ii) originated in a manner that systematically ignored the borrowers' inability to repay the loans."  Moreover, "[t]he rampant and obvious nature of the breaches confirms that Credit Suisse made intentional

misrepresentations concerning its mortgage loans and the due diligence that Credit Suisse purported to perform regarding the quality of those loans."

402.    Loan file reviews of Credit Suisse-label Trusts at issue here performed by investors in other actions have confirmed Credit Suisse's pervasive and systemic securitization and sale of defective loans.  For example, in *FHFA v. Credit Suisse*, No. 11-cv-6200 (S.D.N.Y. Sept. 2, 2011), the FHFA conducted a forensic review of loans in the ABSHE 2007-HE2, one of the Credit Suisse-label Trusts at issue here.  The FHFA determined that Credit Suisse had understated the number of non-owner occupied properties in this securitization by 10.49%, and that the true percentage of loans with LTV ratios over 100% was 30.33%.  Similarly, in *The Prudential Insurance Company v. Credit Suisse Securities (USA) LLC, et al.*, No. 12-cv-07242, plaintiff conducted a forensic review of two Credit Suisse-label securitizations –ABSHE 2004-HE3 and ABSHE 2005-HE6 – which revealed alarming breach rates within these Trusts.  The review revealed that the percentage of loans with material defects in these securitizations were 56.50% and 62%, respectively.

## X.    WELLS FARGO KNEW THAT THE TRUSTS WERE FILLED WITH DEFECTIVE LOANS

403.    There is ample evidence that beginning in 2009 and by 2011, Wells Fargo "discovered" that each of the Trusts' loan pools contained high percentages of mortgage loans that materially breached the originators' and sponsors' representations and warranties regarding their credit quality.  As discussed above, since 2009 there has been a steady stream of public disclosures regarding the originators' systemic underwriting abuses and the sponsors' faulty securitization practices.  However, apart from the highly publicized government investigations, reports and enforcement actions, as well as high profile RMBS litigation involving the originators and sponsors, as explained below there is a plethora of additional evidence

demonstrating Wells Fargo's and its responsible officers' knowledge that the Trusts' loan pools contained high percentages of mortgage loans that materially breached seller representations and warranties.

### A.    The Trusts' Poor Performance

404.    Wells Fargo and its responsible officers had discovered by 2009 that the Trusts' loan pools were afflicted by severe and pervasive breaches of seller representations and warranties by virtue of the Trusts' abject performance.  It was evident by January 2009 that given the extremely high mortgage loan default rates within the Trusts' loan pools the mortgage loans sold to the Trusts were not as the sellers had represented and warranted.  For example, in January 2009, 66% of the Trusts had double-digit mortgage loan default rates. Incredibly, more than 40% (110) of the Trusts had mortgage loan default rates in excess of 30%, while over 10% (28) of the Trusts had mortgage loan default rates of over 50%.

405.    These high default rates were no surprise to Wells Fargo by January 2009. Among other things, Wells Fargo, as Trustee, published monthly remittance reports, that were publicly filed with the SEC on Form 10-D, outlining the credit performance of the mortgage loans in the Trusts.  Moreover, the delinquency rates had been steadily rising up to and through 2009.  By about July 2008, the first harbingers of the violations of the representations and warranties regarding the credit quality of the loans started to appear.  The trustees' monthly reports started to show increases in the trends of loan delinquencies, and by January 2009 these trends had become pronounced.



406.   Wells Fargo was also provided regular reports regarding loan modifications granted by the servicers to borrowers that failed to timely make principal and interest payments on their loans to the Trusts.  In general, loan modifications change the terms of the original mortgage contract agreed to by the lender and borrower, typically to ease the borrower's monthly payment obligation so the borrower may remain current and avoid default.  Loan modifications often include changes to the loan's interest rate, term and/or outstanding principal.  As with delinquency rates, the extent of loan modifications is indicative of breaches of representations and warranties for at least two reasons.  First, escalating loan modifications correlate to misstated borrower income and creditworthiness.  Second, the servicers' decisions to modify rather than foreclose on loans indicates that the underlying collateral is not adequate security to satisfy the outstanding balance because the original loan-to-value ratio (or combined loan-to-value ratio) was not as represented because the appraised property value was misstated and additional liens encumbered the mortgaged property.

407.   As indicated below, loan modifications in the Trusts dramatically increased beginning in early 2009, providing Wells Fargo further information regarding the systemic breaches of representations and warranties in the Trusts:



**Cumulative Loan Modifications in Wells Fargo Trusts**

Source: Bloomberg

**B.     Credit Rating Downgrades Of The Certificates
Further Support The Sellers' Problems**

408.   At the time of securitization, all of the Trusts' senior tranches were rated "investment grade."   Bond rating firms, such as Standard & Poor's ("S&P"), use different designations consisting of upper- and lower-case letters 'A' and 'B' to identify a bond's credit quality rating.   "AAA" and "AA" (high credit quality) and "A" and "BBB" (medium credit quality) generally are considered investment grade.   An investment grade rating signifies that the bond has a relatively low risk of default and are judged by the rating agencies as likely to meet payment obligations such that banks and institutional investors are permitted to invest in them. Credit ratings for bonds below investment grade designations (i.e., "BB", "B", "CCC", etc.) are considered low credit quality, and are commonly referred to as "junk bonds."

409.    However, as public disclosures revealed the originators' and sponsors' systemic underwriting and securitization abuses and Wells Fargo began reporting severe collateral losses in the performance of the mortgage loans in the Trusts, the Trusts' certificates' credit ratings were drastically downgraded.  By December 31, 2009, 55% of the senior tranches in the Trusts had been downgraded at least once.  Across all Trusts, nearly 75% of all certificates had been downgraded by at least one ratings agency.  Further, over 38% of the senior certificates had been downgraded to junk bond status.

### C.    Wells Fargo Discovered Widespread Seller Breaches Of Representations And Warranties In Its Capacity As Servicer

410.    In addition to acting as a trustee, Wells Fargo was among the largest mortgage loan servicer to the RMBS industry during the relevant period, servicing a portfolio of nearly 9 million loans.  Many of these loans were originated and sponsored by the same mortgage loan sellers to the Trusts.  In connection with servicing these loan sellers' loans, Wells Fargo was in a front row seat to view mortgage loan sellers' abusive underwriting and securitization practices.  For example, as servicer to these other RMBS trusts containing loan pools originated and securitized by the same mortgage loan sellers to the Trusts, Wells Fargo prepared monthly reports for the trustees that detailed the similarly poor performance of these loan pools.  Additionally, as servicer, Wells Fargo knew of the credit agencies' similar downgrading of these trusts as result of the poor credit quality of these same originators' and sponsors' loan pools.  Further, in servicing and administrating the loans, including during the modification process, Wells Fargo examined the loan files of mortgage loans originated and sponsored by these entities and in the process discovered systemic and pervasive breaches of representations and warranties in the loan pools.

411.    Because the problems Wells Fargo discovered regarding these common originators and sponsors in its capacity as servicer to other RMBS trusts revealed systemic and pervasive violation of underwriting and securitization guidelines, Wells Fargo knew that these same defective underwriting and securitization practices applied to the Trusts.

**D.      Wells Fargo Received Written Notice Of Pervasive And Systemic Seller Breaches From Financial Guaranty Insurers**

412.    Wells Fargo also discovered that the Trusts' loan pools contained high percentages of mortgage loans that materially breached the originators' and sponsors' representations and warranties through its involvement in financial guaranty insurer litigation involving these same originators and sponsors, in its capacity as either trustee or master servicer.

413.    Financial guaranty insurers provide financial guaranty insurance for RMBS issued from many of the Trusts.   Under the Governing Agreements for these insured RMBS, the mortgage loan sellers to the Trusts made numerous representations and warranties concerning quality and origination practices for the mortgage loans.   The Governing Agreements for the insured RMBS also create a repurchase protocol pursuant to which the monoline insurers must provide notice of a breach of representation and warranty to the responsible mortgage loan seller and the parties to the Governing Agreement (including the Trustee), in order to compel the responsible mortgage loan seller to repurchase loans that breach representations and warranties.

414.    Monoline insurers have initiated at least ten lawsuits against responsible mortgage loan sellers for breach of their representations and warranties in connection with other RMBS trusts to which Wells Fargo serves either as master servicer or trustee.[17]   Prior to filing suit

_____

[17] *See, e.g.*, *CIFG Assurance N. Am., Inc. v. Goldman Sachs & Co., et al*., Index No. 652286/2011 (N.Y. Sup. Ct. Aug. 16, 2011); *CIFG Assurance N. Am., Inc. v. GreenPoint Mortg. Funding, Inc*., Index No. 653449/2012 (N.Y. Sup. Ct. Mar. 3, 2013); *Ambac Assurance Corp. v.*

against the originators and/or sponsors, the monoline insurers (unlike certificateholders) were often able to obtain access to the specific loan files or conduct a forensic loan level review of the loans, which showed systemic and pervasive breaches of the representations and warranties. Plaintiffs are informed and believe that consistent with the repurchase protocol under the Trusts' governing documents, Wells Fargo was notified by both the responsible mortgage loan sellers and the parties to the PSAs (including Wells Fargo as Master Servicer) of these sellers' systemic and pervasive breaches of representations and warranties.

415. The monoline insurers' findings from loan level reviews set forth both in their breach notices and subsequent publicly available lawsuits made Wells Fargo and its responsible officers aware of the systemic violation of underwriting and related standards in the mortgage securitization industry between 2004 and 2008 vintage, as well as informed them of specific originators' and sponsors' systemic and pervasive practice of misrepresenting the credit quality and characteristics of the mortgage loans they were selling to keep the RMBS machine running.

416. For example, in *CIFG Assurance North America, Inc. v. Bank of America,* Index No. 654028/2012 (N.Y. Sup. Ct. Nov. 20, 2012), the plaintiff CIFG, a New York-based monoline insurer, wrote insurance relating to two structured transactions arranged by Bank of America, which in turn were backed by twenty-two Bank of America securitizations. CIFG alleged that "Bank of America had these securities in its inventory because it had been unable to sell them

---

*Nomura Credit & Capital, Inc., et al.*, No. 651359/2013 (N.Y. Sup. Ct. May 15, 2013); *CIFG Assurance N. Am., Inc. v. Bank of Am., N.A., et al.*, Index No. 654028/2012 (N.Y. Sup. Ct. Nov. 20, 2012); *Assured Guaranty Corp. v. EMC Mortg. LLC*, No. 1:12-cv-01945 (S.D.N.Y. Mar. 15, 2012); *Assured Guaranty Mun. Corp. v. DLJ Mortg. Capital*, Index No. 652837/2011 (N.Y. Sup. Ct. Oct. 17, 2011); *Assured Guaranty Mun. Corp. v. UBS Real Estate Sec. Inc*., No. 1:12-cv-01579 (S.D.N.Y. Mar. 05, 2012); *Ambac Assurance Corp. v. EMC Mortg. LLC*, Index No. 651013/2012 (N.Y. Sup. Ct. Aug. 14, 2012); and *Assured Guaranty Mun. Corp. v. GMAC Mortg., LLC, et al*, No. 1:12-cv-03776 (S.D.N.Y. May 11, 2012).

when it served as underwriter on the original RMBS offerings." CIFG claimed that "Bank of America knew of the poor quality of the Mortgage Loans, and knew the unsold Original RMBS were a ticking time bomb on the bank's books." According to CIFG, Bank of America, unable to sell the securities in pieces, then "hatched a new plan of financial engineering," repackaged the bonds, and induced CIFG to provide more than $150 million in insurance to make them marketable to investors. CIFG alleged that Bank of America gave it "garbage data" that made the loans and the certificates they backed appear less risky than they actually were, including with respect to LTV, CLTV and the percentage of the mortgages where the property would be occupied by the borrowers.

417. To highlight the falsity of the originators' and Bank of America's representations and warranties regarding the underlying loans, CIFG revealed the findings of its loan level analysis of over 31,000 mortgage loans from the twenty-two securitizations showing that a staggering *64.37%* of the mortgage loans contained at least one material defect. A summary of testimonial and documentary evidence demonstrates widespread breaches of representations and warranties by each of the major originators of the mortgage loans for those trusts.

418. Because these monoline insurers' findings from loan level reviews set forth both in their breach notices and subsequent publicly available lawsuits reflected these mortgage loan sellers' systemic and pervasive violation of underwriting and securitization guidelines, Wells Fargo discovered that these same defective underwriting and securitization practices applied equally to all of the other Trusts containing loans originated and securitized by these same originators and sponsors.

**E.    Wells Fargo Repeatedly Received Written
Notice Of Pervasive And Systemic Seller
Breaches From Certificateholders And Trustees**

419.    Trustees, at the direction of certificateholders, have initiated at least forty-two lawsuits against responsible mortgage loan sellers for breach of their representations and warranties in connection with other RMBS trusts to which Wells Fargo serves either as Master Servicer or custodian.  This litigation concerns allegations of pervasive and systemic breaches of representations and warranties by originators and sponsors to the Trusts, such as Option One, UBS, Credit Suisse, Morgan Stanley, and WMC.  Prior to the trustees' filing suit against the originators and/or sponsors, the Certificateholders conducted a forensic loan level review of the loans, which showed systemic and pervasive breaches of the representations and warranties. Plaintiffs are informed and believe that consistent with the repurchase protocol under the Trusts' governing documents, Wells Fargo, as Master Servicer or custodian, was notified by the trustee of these sellers' systemic and pervasive breaches of representations and warranties on each occasion.

420.    For example, as servicer and custodian to the Trust, on April 10, 2012, Wells Fargo's Des Moines, Minneapolis, and Columbia, Maryland offices received a letter from counsel for Deutsche Bank National Trust Company, the trustee of "Morgan Stanley ABS Capital I Inc. Trust 2006-WMC2."  The letter identified hundreds of loans in material breach of Morgan Stanley's and WMC's representations and warranties and demanded their repurchase.  The letter also advised Wells Fargo that "[b]ased on the number of material breaches of Representations in the statistically representative sample, we have determined a breach rate of ***99.7 percent***."  On that basis, the trustee provided notice to Wells Fargo that 99.7% of the mortgage loans within this Morgan Stanley-label Trust were defective.

421.    Additionally, Wells Fargo, in its capacity as trustee to other Trusts at issue herein, as well as RMBS trusts that are not the subject of this action but which are secured by loans originated and sponsored by the very same entities that originated and sponsored the loans underlying the Trusts at issue herein, has repeatedly received notice from Certificateholders of pervasive and systemic violations of representations and warranties by the loan sellers.  For example, on October 17, 2011, a group of major institutional mortgage investors in several dozen RMBS trusts sponsored by Citigroup or its affiliates alleged widespread violations of representations and warranties contained in the Governing Agreements for sixty-eight RMBS trusts sponsored by Citigroup from 2005 to 2008 (the "Citibank Putback Initiative"), including sixty of the Trusts at issue herein.  The trustees for these Citigroup-sponsored trusts, which were instructed to investigate these breaches of representations and warranties, are Wells Fargo, U.S. Bank, and HSBC.  On April 7, 2014, Citigroup announced that it had reached an agreement with the investor group to resolve representation and warranty repurchase claims.  Under the agreement, Citigroup agreed to make a binding offer to the trustees to pay $1.125 billion to the trusts, plus certain fees and expenses.  According to Citigroup's press release announcing the agreement, the sixty-eight trusts covered by the agreement issued in the aggregate $59.4 billion of RMBS "and represent all of the trusts established by Citi's legacy Securities and Banking business during 2005-2008 for which Citi affiliates made representations and warranties to the trusts."  The trustees' approval of the settlement remains pending.

422.    The Citibank Putback Initiative identified and seeks to compel the repurchase of large quantities of loans (1) originated by many of the same lenders that also originated large quantities of the loans sold to the Trusts, including Option One ($44.9 billion of loans sold to the Trusts) and Citibank  ($25.1 billion of loans sold to the Trusts); and (2) securitized by the same

investment banks and financial institutions that sponsored the Trusts, including Citibank ($1.6 billion of sponsored Trusts). In addition, the Citibank Putback Initiative identified and seeks recovery of losses relating to servicing deficiencies by many of the same major servicers of loans backing the Trusts, including Countrywide (original servicer to $29 billion of loans sold to the Trusts).

423.     On December 16, 2011, a group of major institutional mortgage investors in hundreds of RMBS trusts sponsored by JPMorgan or its affiliates issued written instructions to Wells Fargo, The Bank of New York Mellon ("BNYM"), Deutsche Bank, HSBC, and U.S. Bank, as trustees, to open investigations into large numbers of ineligible mortgages in the loan pools securing those trusts and deficient servicing of those loans (the "JPMorgan Putback Initiative"). The notices covered more than $95 billion of RMBS issued by JPMorgan from 2005 to 2007, including thirty-one trusts for which Wells Fargo serves as trustee.  Less than two years later, Wells Fargo and the other trustees were presented with a $4.5 billion settlement offer covering 330 JPMorgan-sponsored RMBS trusts.   On August 1, 2014 and October 2, 2014, all of the trustees involved in the JPMorgan Putback Initiative, including Wells Fargo, accepted JPMorgan's $4.5 billion offer for the vast majority of the 330 trusts included in the offer and petitioned the Supreme Court of the State of New York for approval of the settlement.

424.     The JPMorgan Putback Initiative identified and seeks to compel the repurchase of large quantities of loans (1) originated by many of the same lenders that also originated large quantities of the loans sold to the Trusts, including Citibank ($25.1 billion of loans sold to the Trusts) and WMC ($17 billion of loans sold to the Trusts); and (2) securitized by the same investment banks and financial institutions that sponsored the Trusts, including Morgan Stanley ($14 billion of sponsored Trusts). In addition, the JPMorgan Putback Initiative identified and

seeks recovery of losses relating to servicing deficiencies by many of the same major servicers of loans backing the Trusts, including Option One (original servicer to $49.8 billion of loans sold to the Trusts) and Countrywide (original servicer to $29 billion of loans sold to the Trusts).

425.   On January 31, 2012, a group of major institutional mortgage investors in several dozen RMBS trusts sponsored by Morgan Stanley or its affiliates issued written instructions to Wells Fargo, U.S. Bank and Deutsche Bank, as trustees, to open investigations into large numbers of ineligible mortgages in the loan pools securing those trusts and the deficient servicing of those loans (the "Morgan Stanley Putback Initiative").  The notices covered more than $25 billion of RMBS issued by Morgan Stanley from 2005 to 2007, including certain of the Trusts at issue herein.

426.   The Morgan Stanley Putback Initiative identified and seeks to compel the repurchase of large quantities of loans (1) originated by many of the same lenders that also originated large quantities of the loans sold to the Trusts, including WMC ($17 billion of loans sold to the Trusts) and Fremont  ($12.2 billion of loans sold to the Trusts); and (2) securitized by the same investment banks and financial institutions that sponsored the Trusts, including Morgan Stanley ($14 billion of sponsored Trusts). In addition, the Morgan Stanley Putback Initiative identified and seeks recovery of losses relating to servicing deficiencies by many of the same major servicers of loans backing the Trusts, including Saxon (original servicer to $5.5 billion of loans sold to the Trusts) and JPMorgan (original servicer to $5.3 billion of loans sold to the Trusts).

427.   On May 14, 2012, a group of major institutional mortgage investors in several hundred RMBS trusts sponsored by ResCap or its affiliates reached agreement with ResCap and its affiliated debtors to resolve claims for breaches of representations and warranties concerning

large numbers of loans in the pools securing those trusts (the "ResCap Putback Initiative").  The settlement covered more than $320 billion of RMBS largely issued between 2004 and 2008, including eighteen trusts for which Wells Fargo serves as trustee.  The trustees for these ResCap-sponsored trusts, which were aware of the repurchase and servicing claims through, among other things, the bankruptcy proceedings, are Wells Fargo, U.S. Bank, Deutsche Bank, and BNYM.

428.    The ResCap Putback Initiative identified and sought to compel the repurchase of large quantities of loans originated by many of the same lenders that also originated large quantities of the loans sold to the Trusts, including New Century ($7.9 billion of loans sold to the Trusts). This initiative additionally identified and sought recovery of losses relating to servicing deficiencies by many of the same major servicers of loans backing the Trusts, including GMAC (original servicer to $4.3 billion of loans sold to the Trusts).

429.    Based on the sheer volume of the defective mortgage loans identified, together with the systemic and pervasive faulty origination and securitization practices complained of in the breach notice letters and the frequency in which it was notified, Wells Fargo and its responsible officers knew that the Trusts' loan pools similarly contained high percentages of defective mortgage loans.

**F.    Wells Fargo Was Named In RMBS Litigation Involving Common Loan Sellers' Systemic Abandonment Of Underwriting Guidelines**

430.    Wells Fargo's knowledge of pervasive breaches of representations and warranties by the originators and sponsors at issue herein is also demonstrated by Wells Fargo's involvement in significant RMBS litigation in its capacity as securitization underwriter, whereby facts were developed showing that originators' industrywide during the relevant period, including major originators of loans sold to the Trusts, systematically abandoned their stated underwriting guidelines.

431.    For example, in March 2009, RMBS investors filed suit against Wells Fargo, alleging that it had misrepresented its underwriting guidelines and loan quality in connection with the sale of over $36 billion in Wells Fargo-label RMBS.  *See In re Wells Fargo Mortgage-Backed Certificates Litig.*, No. 09-cv-01376 (N.D. Cal. Mar. 27, 2009). The complaint alleged that originators that both supplied loans to the Wells Fargo-label RMBS and to the Trusts at issue "greatly reduced and/or eliminated its underwriting standards in order to approve as many mortgages as possible."  In denying in part a motion to dismiss, the court found that plaintiffs had adequately pled that "variance from the stated [underwriting] standards was essentially [Wells Fargo's] norm," and that this conduct "infected the entire underwriting process." *In re Wells Fargo Mortgage-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 972 (N.D. Cal. 2010). Wells Fargo agreed to settle the investors' claims.

432.    The evidence and testimony perpetuated in these and other RMBS actions against Wells Fargo support the conclusion that Wells Fargo knew that by virtue of the originators' abandonment of their underwriting guidelines they sold defective loans to both the trusts in which Wells Fargo served as the sponsor and underwriter, as well as the loans sold to the Trusts at issue here, and that Wells Fargo knew that these originators' representations regarding its adherence to the guidelines were false. Additionally, based on Wells Fargo's extensive participation in the mortgage market and due diligence process, Wells Fargo knew the mortgage loan sellers' representations were false.

433.    Moreover, Wells Fargo had a vested financial interest in the loans originated by many of the Trusts' originators.  For example, a Wells Fargo affiliate served as an Option One warehouse lender pursuant to a $1 billion, five-year revolving credit facility used to fund non-prime mortgage loan originations, including loans sold to the OOMLT 2004-1, OOMLT 2004-2,

OOMLT 2005-1, OOMLT 2005-3, OOMLT 2005-4, OOMLT 2005-5, OOMLT 2006-1, OOMLT 2006-3, OOMLT 2007-1, OOMLT 2007-2, OOMLT 2007-3, and OOMLT 2007-FXD1, Trusts at issue in this action.  Warehouse lending agreements, such as the agreement between Wells Fargo and Option One, are short-term revolving credit facilities extended by banks to mortgage originators to fund mortgage loans.  The bank – here, Wells Fargo – provides the capital to originate the loans, and the originator – here, Option One – quickly sells the loans to repay the debt.  Warehouse lending agreements such as the agreement between Wells Fargo and Option One facilitated the securitization of bad loans.  Moreover, the FCIC Report noted that warehouse lending agreements enabled the lenders to have unrestricted access to the underwriting practices of originators such that the banks "knew a significant percentage of the sampled loans did not meet their own underwriting standards or those of the originators."

### G.   Wells Fargo Has Selectively Asserted The Trusts' Repurchase Rights Against The Sellers

434.   Wells Fargo's knowledge of pervasive breaches of representations and warranties by the originators and sponsors at issue herein is also demonstrated by its own actions by 2009.  For example, in 2007, New Century, a major loan seller to the Trusts, filed for bankruptcy.  Thereafter, Wells Fargo filed a proof of claim in the bankruptcy action against New Century to enforce its repurchase obligations for breaches of representations and warranties and early payment defaults, but only in connection with five Carrington-label Trusts.  On November 4, 2009, Wells Fargo entered into a stipulation resolving its claims against the New Century Liquidating Trust.   Despite the steady stream of reports of New Century breaches of representations and warranties and poor performance of its loan pools, Wells Fargo did not pursue responsible sponsors to enforce representation and warranty claims as to the thousands of breaching New Century mortgage loans in the Trusts that these sponsors stood behind.

435.     Similarly, in 2008, Lehman, a major originator and sponsor for the Trusts filed for bankruptcy.  In connection with Lehman's bankruptcy, Wells Fargo through Law Debenture Trust Company of New York, U.S. Bank, Wilmington Trust Company, Wilmington Trust, National Association, and Deutsche Bank National Trust Company, in their capacity as trustee, separate trustee or indenture trustee (collectively, the "Lehman Bankruptcy RMBS Trustees"), filed proofs of claims, asserting that Lehman was liable to 405 trusts for breaches of representations and warranties for all 1 million of the mortgage loans underlying these Trusts.  Wells Fargo was the trustee for at least 26 of these 405 trusts.  In pursuing these claims, the Lehman Bankruptcy RMBS Trustees undertook a re-underwriting and a detailed review of a sample of nearly 5,000 loans in 255 of the 405 RMBS trusts that suffered a loss.  The Lehman Bankruptcy RMBS Trustees' experts found breaches of representations and warranties in approximately 57% of the sampled loans.  Wells Fargo made these claims even though Lehman was not liable for all of the mortgage loans in most of those Trusts, and in fact there were many other solvent originators to those Trusts who had made representations and warranties for those mortgage loans and were thus liable for them. Wells Fargo's "omnibus" claim for breach of representations and warranties as to all of the mortgage loans in all of those Trusts, including for mortgage loans that Lehman was not even potentially liable for, and in fact other originators were, demonstrates Wells Fargo's knowledge of pervasive breaches by all of the originators to those Trusts.  Nonetheless, Wells Fargo has not pursued any of those originators to enforce representation and warranty claims as to the thousands of breaching mortgage loans in those Trusts.[18]

---

[18] Given that Wells Fargo filed claims against Lehman in the bankruptcy case for those twenty-six Trusts, Plaintiffs do not allege that Wells Fargo breached the Governing Agreements by failing to make representation and warranty claims against Lehman for the Trusts. However, Plaintiffs do allege that Wells Fargo breached the Governing Agreements by failing to make

## XI.   THE TRUSTS ALSO SUFFERED FROM
## <u>PERVASIVE SERVICER VIOLATIONS</u>

436.   In the aftermath of the financial crisis, the mortgage loan servicing industry has received increased scholarly, popular, regulatory and political attention as a result of rampant servicing abuses in connection with the administration of and foreclosing on mortgage loans backing private-label RMBS.

437.   Much like other private-label RMBS trusts of the same vintage, each of the Trusts suffer from ongoing Events of Default caused by the servicers' failure to observe and perform, in material respects, the covenants and agreements imposed on them by the PSAs.  The servicers' breach of their covenants is confirmed through several federal and state government investigations and published reports, well publicized news reports, and public and private enforcement actions that have described RMBS servicers' systemic and pervasive deviation from usual, customary and lawful servicing practices in their administration of the mortgages and, more specifically, illegal and illicit servicing activities by the same servicers who service the loans held by the Trusts.

### A.   The Servicers Failed To Give Notice Of Seller
### Breaches Of Representations And Warranties
### <u>And Enforce The Sellers' Repurchase Obligations</u>

438.   As with the Trustee, the PSAs require the servicers to give prompt written notice to all parties to the PSAs of a breach of a representation or warranty made by a seller in respect of the mortgage loans that materially and adversely affects the value of any mortgage loan or the interests of the Certificateholders in any such mortgage loan, upon the servicer's discovery of

---

representation and warranties claims against the many other responsible parties, including sellers to the Lehman-label Trusts at issue.

such breach. Moreover, the servicers are required under the PSAs to enforce the sellers' obligation to repurchase, substitute, or cure such defective loans.

439. In many cases, the servicers are affiliates of the sellers because in connection with the sale of a loan pool, the seller secured the retention of servicing rights to loans for its servicing division. These servicers had actual knowledge of their affiliate mortgage loan sellers' abusive underwriting and securitization practices, and therefore had actual knowledge at the time of the Trusts' purchase of these loans that the sellers included high percentages of defective loans within the loan pools. These servicers failed to notify parties to the PSAs of the discovery of mortgages that were in violation of applicable representations and warranties at the time they were purchased by the Trusts, and failed to enforce the sellers' repurchase obligations, despite their awareness of loans that were in violation of representations and warranties.

440. Additionally, for the benefit of the Trusts, and pursuant to the PSAs, the sponsors acquired primary mortgage guaranty insurance ("PMI") policies for loans that had a LTV ratio in excess 80% which served as a "credit enhancement" in order to offer additional security to Certificateholders in the Trusts and to induce rating services to provide a higher credit rating for the Certificates, thereby making the Certificates more attractive to potential purchasers. In the aftermath of the financial crisis, servicers have tendered claims to mortgage insurers under the PMI policies on the Trusts' behalf on defaulted loans. The mortgage insurers have denied coverage, canceled or rescinded the mortgage insurance policies, or invoked policy exclusions for a high percentage of claims as a result of misrepresentations regarding the insured mortgage loans, including on the basis that the originator engaged in predatory lending or systemic fraud in the underwriting of the mortgage loans. After these mortgage insurance claim denials, the servicers failed to observe or perform in a material respect their covenants and/or agreements

under in the PSAs by failing to notify parties to the PSAs that the mortgage loan sellers violated representations and warranties at the time they sold loans to the Trusts..  Moreover, the servicers failed to tender the defective, defaulted loans to the sellers for repurchase.  Instead, the servicers charged the over-collateralized accounts for losses, causing damage to the Trusts and their Certificateholders.

441.    Further, as noted above, the servicers have regularly modified mortgage loans held by the Trusts.  Plaintiffs are informed and believe that in the process of modifying these mortgage loans, the servicers have discovered that specific loans breached applicable seller representations and warranties because the loan modification process involves scrutinizing the underlying origination and mortgage loan files, and any supplemental information provided by the borrower to assess the borrower's ability to pay.  Thus, in the process of performing loan modifications, the servicers had to have discovered breaches of representations and warranties regarding the characteristics of the loan, the creditworthiness of the borrower, the adequacy of the collateral and the title status of the mortgages.  Nevertheless, the servicers systemically failed to notify the other parties of these breaches.

442.    As also set forth above, there has been widespread public evidence of the originators' abandonment of underwriting guidelines and the sponsors' faulty securitization practices that made the servicers aware of material seller breaches representations and warranties within the Trusts' loan pools.  Nevertheless, the servicers have not notified the other parties to the PSAs of these seller breaches or enforced the sellers' repurchase obligations.

443.    The servicers' systemic and pervasive failure to give notice of the sellers' material breaches of representations and warranties and to enforce the sellers' repurchase obligations have materially affected the rights of the Trusts and all Certificateholders under the PSAs in that they

have deprived the Trusts of mortgage loans of adequate credit quality as initially represented, or alternatively funds representing the "Repurchase Price" as defined by the PSAs, with respect to each defective mortgage loan.

**B.     The Servicers Have Violated
        Their Prudent Servicing Obligations**

444.    The PSAs require that the servicer service and administer the mortgage loans for and on behalf of the Certificateholders, and, consistent with the terms of the PSAs (i) in the same manner in which it services and administers similar mortgage loans for its own portfolio or for other third parties, giving due consideration to customary and usual standards of practice of prudent institutional mortgage lenders servicing similar loans; (ii) with a view to maximizing the recoveries with respect to such mortgage loans on a net present value basis; and (iii) without regard to, among other things, the right of the servicer to receive compensation or other fees for its services under the PSA, the obligation of the servicer to make servicing advances under the PSA, and the servicer's ownership, servicing or management for others of any other mortgage loans.

445.    Highly publicized government enforcement actions and settlements reached with the servicers demonstrate that the servicers have systemically and pervasively violated these prudent servicing obligations.  For example, on June 7, 2010, the Federal Trade Commission ("FTC") filed a civil enforcement action against Countrywide Home Loans, Inc. and BAC Home Loans Servicing, LP (f/d/b/a Countrywide Home Loans Servicing, LP), a wholly-owned subsidiary of Bank of America, National Association, (collectively, "Countrywide/BAC") for their "unlawful acts and practices in servicing mortgage loans."  *See Fed. Trade Comm'n v. Countrywide Home Loans, Inc. and BAC Home Loan Servicing, LP*, No. CV-10-4193 (C.D. Cal. June 7, 2010).  In March 2008, prior to being acquired by Bank of America Corporation,

Countrywide was ranked as the top mortgage servicer in the United States and had a servicing portfolio with a balance of over $1.4 trillion. In September 2009, after its acquisition of Countrywide, Bank of America was ranked as the nation's top mortgage servicer with a servicing portfolio of over $2.1 trillion. As noted above, Countrywide/BAC are servicers for many of the Trusts. The FTC emphasized that many of the loans improperly serviced by Countrywide/BAC are the same "risky, high-cost loans that had been originated or funded by Defendants' parent company, Countrywide Financial Corporation [], and its subsidiaries []."

446. According to the FTC, when borrowers fell behind on their payments, Countrywide/BAC imposed a number of default-related services (such as property inspections and foreclosure trustee services) "by funneling the work through panoply of Countrywide subsidiaries." In its mortgage servicing operation, Countrywide/BAC follows a so-called "vertical integration strategy" to generate default-related fee income. Rather than obtain default-related services directly from third-party vendors and charge borrowers for the actual cost of these services, Countrywide/BAC formed subsidiaries to act as middlemen in the default services process. These subsidiaries exist solely to generate revenues for Countrywide/BAC and do not operate at arms'-length with Countrywide/BAC. Countrywide/BAC and their subsidiaries – "[a]s a matter of practice" – added a substantial mark-up to their actual costs for the services and then charged the borrowers the marked-up fees. The inflated fees were both contrary to prudent servicing standards and violated the mortgage contracts, which limit fees chargeable to the borrower to actual costs of the services and as are reasonable and appropriate to protect the noteholder's interest in the property and rights under the security instrument.

447. Countrywide/BAC similarly breached servicing standards and mortgage contracts when servicing loans for borrowers who sought to save their homes through a Chapter 13

bankruptcy.  According to the FTC, Countrywide/BAC made various representations to those borrowers about their mortgage loans that were false or lacked a reasonable basis, and failed to disclose to borrowers during their bankruptcy case when fees and escrow shortages and deficiencies accrued on their loan.  After the bankruptcy cases have closed and borrowers no longer have the protection of the bankruptcy court, Countrywide/BAC collected those amounts, including through foreclosure actions.

448.    By way of further example, in February 2012, forty-nine state attorneys general and the federal government announced a historic joint $25 billion state-federal settlement with the country's five largest mortgage servicers and their affiliates for misconduct related to their origination and servicing of single family residential mortgages: (i) Residential Capital, LLC, Ally Financial, Inc., and GMAC Mortgage, LLC; (ii) Bank of America Corporation, Bank of America, N.A., BAC Home Loans Servicing, LP, Countrywide Financial Corporation, Countrywide Home Loans, Inc., Countrywide Mortgage Ventures, LLC, and Countrywide Bank FSB; (iii) Citigroup Inc., Citibank, N.A., and CitiMortgage, Inc.; (iv) J.P. Morgan Chase & Company and J.P. Morgan Chase Bank, N.A.; and (v) Wells Fargo & Company and Wells Fargo Bank, N.A. of the state and federal investigations of these mortgage servicers.

449.    In their corresponding complaint filed on March 14, 2012, the state attorneys generals and the federal government alleged that these servicers had engaged in unfair, deceptive and unlawful servicing processes, including (i) failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements; (ii) charging excessive or improper fees for default-related services; (iii) failing to properly oversee third-party vendors involved in servicing activities on behalf of the banks; (iv) imposing force-placed insurance without properly notifying the borrowers and when borrowers already had adequate coverage;

(v) providing borrowers false or misleading information in response to borrower complaints; and (vi) failing to maintain appropriate staffing, training, and quality control systems.

450.     Similarly, on December 19, 2013, the Consumer Financial Protection Bureau ("CFPB"), authorities in forty-nine states, and the District of Columbia filed a proposed court order requiring the country's largest nonbank mortgage loan servicer, Ocwen and its subsidiary, Ocwen Loan Servicing, to provide $2 billion in first lien principal reduction to underwater borrowers in order to compensate for years of systemic misconduct at every stage of the mortgage servicing process.   The consent order also covered two companies previously purchased by Ocwen, Litton Loan Servicing LP ("Litton") and Homeward Residential Holdings LLC (previously known as American Home Mortgage Servicing, Inc. or "AHMSI").  According to the CFPB and attorneys generals' complaint, Ocwen violated state consumer law in a number of ways, including (i) failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements; (ii) charging borrowers unauthorized fees for default-related services; (iii) imposing force-placed insurance on consumers when Ocwen knew or should have known that they already had adequate home insurance coverage; and (iv) providing false or misleading information in response to consumer complaints.

451.     High profile class actions against the servicers have further revealed violations of prudent servicing violations. For example, in June 2012, nationwide class actions were brought on behalf of million homeowners against JPMorgan Chase Bank, N.A., Wells Fargo Bank, N.A., Bank of America, N.A., Citibank, N.A., and HSBC Bank, Inc. who claimed that they were overcharged for force-placed insurance. The borrowers specifically alleged that these servicers imposed policies for force-placed insurance that were far more expensive than market rates and received hundreds of millions of dollars in clandestine commissions from the insurance

companies writing the policies.  The servicers' practice of imposing expensive force-placed insurance increased the borrowers' monthly payment by a large amount. As a result, homeowners who were already behind in payments or were facing financial difficulties went into foreclosure. The plaintiff borrowers have also entered into several well publicized settlements with these servicers, including settlements of $300 million settlement with JPMorgan Chase, $110 million with Citibank, $32 million with HSBC, and $19.3 million with Wells Fargo.[19]

452.   Notably, Bank of America, J.P. Morgan Chase, and Ocwen, entities subject to the above-mentioned settlements collectively service and administrate over $2.5 billion in mortgage loans held by the Trusts.  Plaintiffs are informed and believe that these servicers and each of the other servicers to the Trusts have engaged in the same violations of their prudent servicing obligations in servicing and administrating the mortgage loans for the Trusts.

453.   The servicers' systemic and pervasive failure to observe their prudent servicing obligations have materially affected the rights of the Trusts and all Certificateholders under the PSAs in that the violations have exacerbated the Trusts' losses and have fostered uncertainty as to the timely recovery of collateral.

## C.   The Servicers Have Violated Their Foreclosure Obligations

454.   The PSAs require the servicers to use their best efforts, consistent with accepted servicing practices, to foreclose upon or otherwise comparably convert the ownership of properties securing such mortgage loans as they come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments. Moreover, each of the PSAs contemplate that foreclosures and liquidations of defaulted

---

[19] *Alfred Herrick, et al. v. JPMorgan Chase Bank, N.A., et al.*, 13-21107; *Hall v. Bank of Am. Corp.*, 12-22700; *Lopez v. HSBC Bank USA, N.A.*, 13-21104, *Fladell v. Wells Fargo Bank N.A.*, 13-60721, (S.D. Fla.); and *Casey, et al., v. Citigroup Inc.*, 12-00820, (N.D.N.Y.).

mortgages will proceed forthwith and in accordance with applicable law, provided the documentation is in order, as a matter of fairness to all parties.

455.    Highly publicized government enforcement actions and settlements reached with the servicers similarly have revealed the servicers have breached their foreclosure obligations. For example, in the fourth quarter of 2010, the Federal Reserve System, the OCC, the FDIC, and the OTS (collectively, the "Agencies") conducted on-site reviews of foreclosure processing at fourteen federally regulated mortgage servicers which represented more than two-thirds of the servicing market.    These servicers included Ally Bank/GMAC, Aurora, Bank of America, Citibank, EverBank, HSBC, JPMorgan Chase, MetLife, OneWest, PNC, Sovereign Bank, SunTrust, U.S. Bank, and Wells Fargo, many of which are servicers to the Trusts. In April 2011, the Agencies issued a joint report entitled "Interagency Review of Foreclosure Policies and Practices," summarizing the findings of their reviews and providing an overview of the potential impacts associated with instances of foreclosure processing weaknesses that occurred industrywide.    Notably, the Agencies' reviews found "critical weaknesses in each of the servicers' foreclosure governance processes, foreclosure document preparation processes, and oversight and monitoring of third-party vendors, including foreclosure attorneys."    Based on the deficiencies identified in these reviews and the risks of additional issues as a result of weak controls and processes, the Agencies initiated formal enforcement actions against each of the fourteen servicers subject to the review to address those weaknesses and risks. The enforcement actions detailed the weaknesses at each servicer and required each servicer, among other things, to conduct a more complete review of certain aspects of foreclosure actions that occurred between January 1, 2009, and December 31, 2010.

456.     Similarly, as noted above, on March 14, 2012, following an extensive investigation of Wells Fargo, Bank of America, Citigroup, Countrywide, J.P. Morgan Chase, Ally Financial, and GMAC Mortgage, LLC – some of the same servicers for the Trusts – the Justice Department, the Department of Housing and Urban Development ("HUD") and forty-nine state attorneys general filed a complaint against these servicers and announced the $25 billion National Mortgage Settlement of the claims set forth in the complaint.  In the complaint, the attorneys general and federal government alleged that these servicers had engaged in wrongful conduct related to foreclosures, including failing to properly identify the foreclosing party, charging improper fees related to foreclosures, preparing, executing, notarizing or presenting false and misleading documents and engaging in robosigning.

457.     Moreover, in February 2012, the New York Attorney General sued many of the largest Master Servicers and servicers to the Trusts – Wells Fargo, Bank of America, BACHLS, Chase Bank, and EMC. The New York Attorney General also named MERSCORP Inc. and its subsidiary Mortgage Electronic Registration Systems, Inc. (collectively, "MERS"), entities created by the lending and loan servicing industry as a private mortgage registration system to speed the transfer mortgages amongst themselves to facilitate RMBS securitizations and foreclosures and to avoid the cost of traditionally recording the mortgages with county recorders. The New York Attorney General's lawsuit alleged that these servicers exercised complete control over MERS and that its mortgage database was riddled with errors and inaccuracies, thus leading to the massive amounts of foreclosure fraud that was ongoing.  The lawsuit further alleged that the servicers and MERS repeatedly submitted documents to courts in foreclosure proceedings that contained misleading and false information.  The New York Attorney General stated: "'The banks created the MERS system as an end-run around the property recording system, to facilitate

the rapid securitization and sale of mortgages.  Once the mortgages went sour, these same banks brought foreclosure proceedings en masse based on deceptive and fraudulent court submissions, seeking to take homes away from people with little regard for basic legal requirements or the rule of law . . . .'"  The Attorney General charged the Master Servicers and servicers with "deceptive and illegal" business practices that violated New York state laws.

458.    Likewise, as noted above, on December 19, 2013, following an extensive investigation, the CFPB, authorities in forty-nine states, and the District of Columbia simultaneously filed a complaint against Ocwen and announced a $2 billion settlement of the claims stated in the complaint.  The CFPB's and attorneys generals' complaint alleged that Ocwen engaged in same wrongful conduct related to foreclosures described in the complaint against the servicers leading to the National Mortgage Settlement.

459.    In addition, private litigation has shined the light on servicers' wrongful foreclosure practices. For example, in a California class action case that has survived a motion to dismiss, plaintiffs alleged that Aurora, one of the largest servicers in the Trusts, foreclosed on homes without any notice that loan modifications were denied and without allowing borrowers access to any "cure method" despite promises in an agreement to do so. *Mauder, et al. v. Aurora Loan Servs., LLC*, No. 10-cv-03383 (N.D. Cal. Aug. 2, 2010) Class Action Compl. ¶2.

460.    Servicers have also frequently wrongfully foreclosed on properties owned by military servicemembers who were protected under the Servicemembers Civil Relief Act ("SCRA"). Based on a federal government complaint accusing Countrywide Home Loans Servicing LP, one of the largest servicers of loans in the Trusts, of violating the SCRA on approximately 160 properties, Countrywide consented to pay $20 million to the victims. *United*

*States v. BAC Home Loans Servicing, LP F/K/A Countrywide Home Loans Servicing, LP And Any Successors In Interest*, No. 11-cv-04534 (C.D. Cal. May 31, 2011) Consent Order ¶18.

461.    The servicers have also routinely kept defaulted mortgages on their books, rather than foreclose or liquidate them.  Indeed, in several states, the average days for delinquent loans in foreclosure in the Trusts have doubled or quadrupled.



Sources: RealtyTrac, Moody's Analytics

462.    The servicers' delay in foreclosing has allowed the servicers to charge unearned and unwarranted servicing fees, as well as unauthorized fees for default-related services, on mortgages that would have been liquidated but for the servicers' breach of their duties.  For example, in the complaint that led to the National Mortgage Settlement discussed above, the federal government and forty-nine states accused Citigroup, Wells Fargo, Bank of America, J.P. Morgan Chase, Countrywide, and Ally Financial, Inc. (many of which were servicers of loans in the Trusts) of unfair and deceptive practices in the discharge of its loan servicing activities for, among other things, "***charging excessive or improper fees for default-related services.***"  *See*

*United States, et al. v. Bank of America, et al.*, No. 12-cv-0361 (D.D.C. April 4, 2012) Compl. ¶51.

463.    The servicers' systemic and pervasive violation of their foreclosure obligations have materially affected the rights of the Trusts and all Certificateholders under the PSAs in that the Trusts have incurred costs of remedying procedural errors and re-filing affidavits and other foreclosure documents.  The Trusts have also been forced to bear costs related to disputes over note ownership or authority to foreclose, and to allegations of procedural violations through the use of inaccurate affidavits and improper notarizations.  The Trusts have further incurred losses as a result of delays or other damages caused by the weaknesses in the servicers' foreclosure processes.

### D.    The Servicers Have Violated Their Modification Obligations

464.    The PSAs provide that the servicers agree to a modification of any mortgage loan only in certain specified circumstances. When modifications are required to remedy predatory lending violations, the PSAs require that the seller – and not the Trusts or the Certificateholders – bear the costs to cure such breach.

465.    The servicers have breached the PSAs by agreeing to modify loans held in the Trusts for the purpose of settling predatory lending claims made by various attorneys general against their parent companies while breaching their obligation to demand that the offending mortgage seller (their parent companies) bear the costs of curing the violation, as well as the expenses reasonably incurred in enforcement of the seller's obligation to cure predatory mortgages. For instance, on October 6, 2008, attorneys general in eleven states announced a landmark, $8.68 billion settlement with Countrywide Home Loans, Countrywide Financial Corporation and Full Spectrum Lending of predatory lending claims. The settlement enabled eligible subprime and pay-option mortgage borrowers whose loans serviced by Countrywide to

obtain loan modifications valued at up to $3.4 billion worth of reduced interest payments and, for certain borrowers, reduction of their principal balances.

466.    The servicers have also breached the PSAs by agreeing to modify loans held in the Trusts for the purpose of settling claims related to their wrongful servicing and foreclosure practices made by various attorneys general.  For example, with respect to the National Mortgage Settlement, in meeting their payment obligations, the settling servicers receive credit for writing down principal of, and providing forbearance for, mortgage loans held by the Trusts.

467.    The servicers' violation of their modification obligations have materially affected the rights of the Trusts and all Certificateholders under the PSAs in that the servicers and their parent companies have been unjustly enriched to the detriment of the Trusts and Certificateholders by using Trust collateral to settle claims that are not, and could never be, made against the Trusts.

## E.    The Servicers Have Abused Their Servicing Advances Obligations

468.    The PSAs provide that the servicers are to advance principal and interest on a loan only if they determine that the advance payment is recoverable.  The PSAs further provide that the servicers may only recover servicing advances that are customary, reasonable and necessary out-of-pocket costs and expenses incurred in the performance by the servicers of their servicing obligations. The servicers have abused their advancing obligations to enrich themselves to the direct detriment of the Trusts.  In particular, the servicers have manipulated the recoverable designation to their advantage.  During low interest rate environments, the servicers have designated severely delinquent loans as recoverable so that the loans would be kept in the Trusts' loan pools and the servicers could continue to earn their servicing fees on these loans, which exceed the relatively low cost of financing the advances on these delinquent loans.  However, when interest rates have increased, the servicers have strategically switched the mortgage loans'

designation from recoverable to unrecoverable. The switch in designation enables the servicers to recoup all prior advances as a senior claim of the Trusts.

469.    The servicers' manipulation of the recoverable designation was illustrated in the May 2013 remittance reports for many of the Trusts.  Following the Federal Reserve's May 11, 2013 announcement of its plan for tapering its bond-buying program, interest rates quickly shot up.  In a transparent response to the increase in the financing of their advances, the servicers switched the designation from recoverable to unrecoverable for an unprecedented amount of delinquent mortgage loans within the Trusts.  Specifically, the servicers wrote down nearly $4 billion in May 2013 alone, representing a 188.7% increase over the prior reporting period.  The servicers' massive write downs are particularly suspicious, given that the mortgaged property values had been steadily rising for the past twelve months.

470.    The Trusts and its Certificateholders are harmed by the servicers' manipulation of the recoverable designation because the Trusts incur more interest rate risk exposure than expected since the servicers' recoverability designations are strategically determined as a function of interest rates, as opposed to the value of the mortgaged property as required under the PSAs.

471.    The servicers' abuse of their servicing advancing obligations is further illustrated by their increasing use of "unrecognized forbearances."  The servicers modify delinquent mortgage loans by granting forbearances to the borrowers for extended periods of time which act to reduce the principal amount of the mortgage loan.  The forbearances allow the servicers to lower their advanced principal payments on the loans.  Nevertheless, the servicers do not formally write-down the loan balance or make any recognition on the Trusts' accounts.  Thus, the mortgage loans remain in the Trusts at full value, thereby allowing the servicers to earn full

servicing fees, which are calculated as a percentage of the total principal amount of the mortgage loans in the Trusts' loan pools, although the mortgage loans are accruing interest at a lower principal amount and without the servicers having to make any advances.

472.   According to a Credit Suisse study, unrecognized forbearances in the Trusts totaled over $1.0 billion as of April 2013.[20]   At least 142 Trusts had some amount of unrecognized forbearance, and more than 40 of these Trusts had unrecognized forbearance amounts exceeding 3% of the Trust's current collateral balance:

**Top 10 Wells Fargo Trusts By Share Of Current Balance Forborne**

| Offering | Original Face Amount | Then Current Balance | Estimated Unrecognized Forbearance | Unrecognized Forbearance as % of Current Balance |
|---|---|---|---|---|
| ABFC 2006-OPT1 | $1,046,992,000 | $266,537,429 | $23,410,324 | 8.78% |
| OOMLT 2007-CP1 | $800,000,000 | $314,951,912 | $23,113,972 | 7.34% |
| SVHE 2007-OPT2 | $562,080,117 | $291,948,952 | $20,896,916 | 7.16% |
| CARR 2006-OPT1 | $996,482,116 | $235,436,257 | $16,556,304 | 7.03% |
| SVHE 2007-OPT1 | $2,321,786,205 | $1,136,990,552 | $78,148,432 | 6.87% |
| ABSHE 2007-HE2 | $331,928,100 | $128,048,106 | $8,799,554 | 6.87% |
| OOMLT 2007-4 | $1,200,000,000 | $513,839,251 | $34,150,888 | 6.65% |
| OOMLT 2007-6 | $1,013,491,500 | $527,433,503 | $34,607,044 | 6.56% |
| OOMLT 2007-2 | $983,268,782 | $397,307,765 | $25,821,690 | 6.50% |
| OOMLT 2006-3 | $1,500,000,000 | $519,913,394 | $33,339,859 | 6.41% |

Data as of April 2013 distributions. 1st lien only

Source: Credit Suisse, Loan Performance

473.   The servicers' pervasive use of "unrecognized forbearances" harm the Trusts and their Certificateholders since they pay higher servicing fees to the servicers and are not informed in a timely manner about impairments to mortgage loans in the underlying loan pools.

474.   Despite the requirement that servicing advances were to be incurred only for reasonable and necessary out-of-pocket costs, the servicers instead utilized affiliated vendors – who marked up their services to a level 100% or more above the market price – to provide

---

[20] Credit Suisse estimates that as of April 2013 unrecognized forbearances on non-agency RMBS securitizations issued after 2000 (first lien only) totaled around $8.3 billion.

services related to the preservation, restoration, and protection of mortgaged property, in a fraudulent, unauthorized, and deceptive effort to supplement its servicing income.

## XII. WELLS FARGO HAS KNOWN OF SERVICER VIOLATIONS PLAGUING THE TRUSTS

475. There is ample evidence that, beginning in early 2009 and continuing to the present, Wells Fargo and its responsible officers have known of the above described widespread and severe failures on the part of the servicers to observe or perform in material respects their obligations under the PSAs. Preliminarily, as discussed above, since 2009 and continuing to the present, there has been a steady stream of public disclosures regarding the servicers' violations. Nevertheless, apart from the highly publicized government investigations, reports and enforcement actions, as well as high profile litigation involving the servicers, as explained below there is a host of additional evidence demonstrating Wells Fargo and its responsible officers' knowledge that the servicers have materially breached their contractual obligations.

### A. Wells Fargo Itself Was Involved In Government Enforcement Actions And Litigation Stemming From The Servicers' Violations

476. Wells Fargo and its responsible officers knew of the servicers' improper servicing practices because, as described in greater detail below (Section XIII), Wells Fargo and its affiliates, in their capacity as servicers to other RMBS trusts, were targets together with many of the servicers for the Trusts in highly publicized governmental investigations, prosecutions and settlements. For example, along with thirteen other of the nation's largest servicers, the Agencies similarly found deficiencies in Wells Fargo's servicing and foreclosure processes. Accordingly, the Agencies brought a formal enforcement action against Wells Fargo, and Wells Fargo participated in a joint settlement including Aurora, Bank of America, Citibank, Goldman, HSBC, JPMorgan Chase, MetLife Bank, Morgan Stanley, PNC, Sovereign, SunTrust, and U.S. Bank.

Wells Fargo's involvement in such proceedings would have made it acutely aware of the deficiencies of each of the other servicers subject to these actions.

477.    Wells Fargo and its responsible officers also knew of the servicers' improper servicing practices through its involvement in litigation highlighting servicing failures, such as in judicial foreclosure proceedings exposing the servicers' failure to correct irregularities in the chain of title. For example, in *U.S. Bank Nat'l Ass'n v. Ibanez*, 458 Mass. 637, 941 N.E.2d 40 (2011), the court affirmed the trial court's ruling that Wells Fargo did not demonstrate that it was the holder of the mortgage at the time that it foreclosed on a mortgaged property in ABFC 2005-OPT1, one of the Trusts at issue here.  Consequently, Wells Fargo failed to demonstrate that it, as trustee on behalf of the Trust, acquired fee simple title to the property by purchasing it at the foreclosure.  Similarly, in *Wells Fargo Bank Nat'l Ass'n v. Erobobo*, Index No. 31648/2009, 2013 WL 1831799, at *10 (N.Y. Sup. Ct. Apr. 29, 2013), the court denied Wells Fargo's motion for summary judgment in a foreclosure because the assignment of the note and mortgage, which were a part of ABFC 2006-OPT3, were void "for having not been assigned from the Depositor to the Trust . . . in contravention of the PSA."  *See also Wells Fargo Bank, N.A. v. Hampton*, Index No. 25957/2007 (N.Y. Sup. Ct. July 16, 2007) (holding that with respect to a mortgage in OOMLT 2007-1, Wells Fargo's "attempt to retroactively assign the mortgage is insufficient to establish plaintiff's ownership interest at the time the action was commenced" and that Wells Fargo lacked standing to commence the action).

478.    These and other public enforcement actions and private litigation highlighting the servicers' improper servicing practices were well known throughout the RMBS industry, including by Wells Fargo and the other principal financial crisis-era trustees.  For example, in October 2010 Deutsche Bank – which serves as trustee for more than 1,000 RMBS trusts –

issued a notice to all RMBS certificateholders in trusts for which Deutsche Bank served as trustee confirming Deutsche Bank's awareness of ongoing government investigations into improper servicing practices.  Deutsche Bank's notice acknowledged that it had been "widely reported in the news media" that "several major U.S. loan servicers" had "suspended certain foreclosures in some or all states" due to allegations and investigations regarding "defects in foreclosure practices, procedures and/or documentation."  Also in October 2010, Deutsche Bank sent an "urgent and time sensitive" memorandum to all servicers of mortgage loans included in any RMBS trust for which Deutsche Bank acts as trustee.  In the memorandum, Deutsche Bank discussed "an urgent issue requiring your [the servicers] immediate attention" – specifically, the same "serious . . . defects in foreclosure practices, procedures and/or documentation" discussed in Deutsche Bank's notice to certificateholders.  The memorandum referred to the expansive scope of the reported servicer deficiencies, and admitted that foreclosure abuses such as the execution and filing by servicers or their agents of documents containing untrue assertions of fact "would constitute a breach of that Servicer's obligations under the [PSAs] and applicable law."  Wells Fargo, as servicer to more than 150 RMBS trusts for which Deutsche Bank serves as trustee, received Deutsche Bank's memorandum.

### B.   Wells Fargo And Its Responsible Officers Received Written Notice From Certificateholders Of Pervasive And Systemic Servicer Breaches

479.   In its capacity as trustee to other RMBS trusts that are not the subject of this action, Wells Fargo and its responsible officers repeatedly received written notice from Certificateholders of the same systemic servicing violations described above perpetrated by the very same servicers for the Trusts.  Based on the systemic and pervasive practices complained of in the Certificateholders' breach notices, Wells Fargo and its responsible officers knew that

servicers were engaged in the same wrongful conduct in connection with their servicing of the loans for the Trusts.

480.     For example, on December 16, 2011, investors provided notice to Wells Fargo and four other RMBS trustees of, among other things, master servicer violations by JPMorgan and JPMorgan predecessor entities (Bear Stearns and WaMu) in connection with $95 billion of RMBS issued by various affiliates of JPMorgan from 243 trusts issued between 2005 and 2007 under the BALTA, BSABS, BSARM, BSMF, CFLX, CHASE, JPALT, JPMAC, JPMMT, PRIME, SACCO, SAMI, WAMU, and WMALT labels.  The investors demanded that Wells Fargo open an investigation of ineligible mortgages and deficient servicing of these loans.  The December 16, 2011 notice put Wells Fargo on notice of systemic deficient servicing practices by JPMorgan and its affiliates, some of the largest servicers for the Trusts.  Indeed, this same investor group reached an agreement with JPMorgan that calls for the payment of $4.5 billion in cash to 330 trusts issued under these JPMorgan RMBS labels to settle mortgage repurchase and servicing claims, as well as for the implementation of substantial servicing changes to mortgage loans in the covered trusts to rectify the pervasive servicing deficiencies by JPMorgan and its affiliates.  On August 1, 2014 and October 2, 2014, all of the trustees involved in the JPMorgan Putback Initiative – including Wells Fargo – accepted JPMorgan's $4.5 billion offer for the vast majority of the 330 trusts and petitioned the Supreme Court of the State of New York for approval of the settlement.

481.     Similarly, on January 31, 2012, an investor group issued instructions to Wells Fargo, Deutsche Bank, and U.S. Bank, as trustees, to open investigations of ineligible mortgages in pools securing over $25 billion of RMBS issued by various affiliates of Morgan Stanley and deficient servicing of those loans.

482.   On September 19, 2012, the same investor group sent a Notice of Non-Performance ("September 19, 2012 Notice") to Wells Fargo and other RMBS trustees, as well as Morgan Stanley, the servicer or master servicer, identifying breaches by Wells Fargo of specific servicing covenants in PSAs for ninety-five trusts from the Morgan Stanley-label IXIS, MSAC, and MSM and SAST shelves.   The September 19, 2012 Notice alleged that these servicing failures had materially impaired the rights of the certificateholders and constituted ongoing events of default in the servicer's performance under the relevant PSAs.   The December 16, 2011, January 31, 2012 Notice and the September 19, 2012 Notice, put Wells Fargo on notice of systemic deficient servicing practices.

### C.   Wells Fargo Had Knowledge Of The Servicers' Failures Through The Monthly Servicer And Remittance Reports

483.   Wells Fargo and its responsible officers also knew of the servicers' improper servicing practices through the servicers' servicing reports and the monthly remittance reports Wells Fargo itself published.   These reports detailed the Trusts' increasing modifications, staggering losses and write-downs due to the poor credit quality of the loans, but did not reflect the servicers' actions to enforce the sellers' repurchase obligations.   The reports similarly reflected the servicers' abuse of servicing advances.

### XIII.   WELLS FARGO FAILED TO DISCHARGE ITS CRITICAL PRE- AND POST-DEFAULT DUTIES

484.   Despite Wells Fargo's knowledge of the Trusts' high default rates and poor performance, breaches of representations and warranties made by the originators, sellers, depositors, and sponsors, and servicer violations, Wells Fargo failed to perform its duties as trustee to protect the Trusts and Certificateholders.

A.   **Failure To Enforce The Trusts' Repurchase Rights**

485.   As set forth above, beginning in 2009 and continuing to the present, Wells Fargo and its responsible officers discovered the Trusts contained loans that materially breached the sellers' representations and warranties, which adversely affected the value of those mortgage loans and the Trusts' and Certificateholders' interests in those mortgage loans.  Wells Fargo further knew that the servicers had failed to take appropriate steps to enforce the sellers' obligations to cure, replace or repurchase the affected loans, and that the failure on the part of the servicers to take appropriate steps against the sellers was material.

486.   Wells Fargo breached its contractual and statutory duties under TIA and was negligent by failing to (i) provide notice to the servicers and/or the responsible sellers upon its discovery of these breaches, and (ii) take any action to enforce the sellers' repurchase of the defective mortgage loans.

B.   **Failure To Provide Notice
To The Servicers Of Events Of Default**

487.   As set forth above, beginning in 2009 and continuing to the present, Wells Fargo and its responsible officers knew of failures on the part of the servicers to observe or perform in material respects their covenants or agreements in the PSAs, including the servicers' (i) failure to give notice to the other parties of seller breaches of representations and warranties upon discovery thereof and enforce the sellers' repurchase obligations; (ii) violations of prudent servicing obligations; (iii) violations of foreclosure obligations; (iv) violations of modification obligations; and (v) improper servicing advances.  These breaches by the servicers constituted "Events of Default" as defined by the PSAs.  Wells Fargo knew that these servicers' breaches were material.

488.     Wells Fargo breached its contractual and statutory duties under TIA and was negligent by failing to provide notice to the servicers to cure  these Events of Default or terminating the servicers.

### C.     Failure To Act Prudently Subsequent To The Uncured Events Of Default

489.     As set forth above, the Events of Default occurred, remained uncured for the requisite period of time and are continuing.  Consequently, under the PSAs, Wells Fargo had and continues to have the obligation to exercise the rights and powers vested in it by the PSAs, and to use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

490.     A prudent person would have taken action to protect the Trusts and its Certificateholders from the known seller breaches of representations and warranties by exercising all of its rights under the PSAs to enforce the sellers' repurchase obligations, including timely conducting an investigation to determine all of the materially breaching mortgage loans and suing the sellers for specific performance to compel their repurchase of those loans.  Wells Fargo breached its contractual, statutory and fiduciary duties and was negligent by failing to act prudently and taking these actions.

491.     A prudent person would have also taken action to protect the Trusts and its Certificateholders from the known servicer violations by exercising all of his or her rights under the PSAs to enforce the servicers' prudent servicing obligations, including ensuring that all Events of Default were cured, terminating the servicers, substituting itself in as the substitute servicer or replacing the servicers, and enforcing the servicers' obligations to reimburse the Trusts for losses caused as a result of their breaches through suit if necessary.  Wells Fargo

breached its contractual, statutory and fiduciary duties and was negligent by failing to act prudently and taking these actions.

**D.    Failure To Provide Notice To The
Certificateholders Of The Uncured Events Of Default**

492.    As set forth above, the Events of Default occurred, remained uncured for the requisite period of time and are continuing.  Consequently, under the PSAs, Wells Fargo also had and continues to have the obligation to provide all Certificateholders with notice of these Events of Default.

493.    Wells Fargo had no good faith reason for failing to provide notice of these Events of Default to the Certificateholders and, by failing to provide all Certificateholders with notice of these Events of Default, Wells Fargo breached its contractual, statutory and fiduciary duties and was negligent.

**XIV.  WELLS FARGO FAILED TO PROTECT THE TRUSTS
FOLLOWING THE INSOLVENCY OF CERTAIN SPONSORS**

494.    Wells Fargo failed to adequately protect the Trusts after the Sponsors of certain Trusts filed for bankruptcy or otherwise became insolvent.  In these instances, Wells Fargo only acted to assert the Trusts' rights when it was in Wells Fargo's interests and only to the extent consistent with Wells Fargo's interests.  In particular, Wells Fargo failed to adequately and comprehensively pursue relief against numerous solvent third parties that were also contractually liable under the PSAs for servicing violations or representation and warranty violations.  Finally, Wells Fargo failed to provide notice of seller defaults, Events of Defaults, and otherwise notify Certificateholders of information known only to Wells Fargo that was necessary for Certificateholders to take action to protect their rights and avoid or mitigate losses.

495.    Wells Fargo has failed to adequately protect the Trusts against pervasive violations in the servicing of loans collateralizing Trusts sponsored by failed entities.  Loans

collateralizing these Trusts have been serviced (and continue to be serviced) by third parties unaffiliated with the bankrupt or insolvent sponsors. As discussed herein, servicers have independent duties and obligations under the PSAs, and their liability for breach of those duties and obligations is untethered to solvency of the sponsor.

496. For example, JPMorgan Chase is a major servicer of loans securitizing Aegis-sponsored RMBS at issue in this action, servicing all $1.03 billion of loans that Aegis sponsored. There is ample evidence that JPMorgan engaged in rampant, industry-wide servicing abuses in connection with loans backing private-label RMBS, including trusts sponsored by Aegis. Despite BNYM's knowledge of such systemic and pervasive servicing abuses by solvent third party servicers, including Aegis, BNYM failed to adequately protect the rights of Aegis-sponsored Trusts against solvent servicers.

497. In addition, Wells Fargo also has not pursued representation and warranty claims against solvent originators for thousands of breaching mortgage loans backing Trusts sponsored by failed entities. Examples of such solvent third party sellers of loans to bankrupt sponsors include Countrywide/Bank of America, U.S. Bank, RBC Mortgage, Greenpoint, and Option One/HR Block, which collectively sold over $7.1 billion of loans securitizing Trusts sponsored by Lehman at issue in this action.

498. Wells Fargo also failed to discharge its contractual and statutory obligations concerning Trusts sponsored by failed entities by neglecting to provide written notice to Certificateholders of Events of Default arising from pervasive breaches of representations and warranties by the sellers and extensive servicer violations, including with respect to deficient loans sold by solvent responsible parties. Proper notice would have enabled Certificateholders to, among other things, determine whether to take independent or collective action to protect

their interests against such breaches of representations and warranties, including against solvent responsible parties and others engaged in abusive securitization practices.

499.    Finally, Wells Fargo has taken certain actions on behalf of the Trusts and Certificateholders in isolated bankruptcies of sponsors or originators by submitting proofs of claim in the bankruptcy proceedings.  For example, Wells Fargo submitted proofs of claim in the bankruptcy of ResCap in 2013.  However, Wells Fargo did so because such action enabled Wells Fargo to create the appearance of enforcement, but required only minimal effort or expense from Wells Fargo with little legal risk, while simultaneously providing a vehicle for Wells Fargo to seek broad liability releases and exculpation.  Indeed, the broad settlement reached in the ResCap bankruptcy covering 570 trusts was the product of a hard-fought initiative led by certificateholders—not the trustees that ultimately approved the deal and benefitted from its releases and other provisions.  Submitting claims also created no business risk to Wells Fargo because the seller's failure meant that Wells Fargo could selectively enforce the Trusts' repurchase rights without fear of losing valuable repeat business, alienating new sources of business, or provoking claims in response against Wells Fargo for its own liability as a seller for other RMBS.

## XV.   WELLS FARGO FAILED TO PROTECT THE TRUSTS DUE TO ITS CONFLICTS OF INTEREST

500.    Wells Fargo failed and unreasonably refused to discharge its critical pre- and post-default duties owed to the Trusts and all Certificateholders because acting to diligently protect the interests of the Trusts would have conflicted with its own interests.

### A.    Wells Fargo Was Economically Beholden To The Mortgage Loan Sellers

501.    Trustees are selected by the sponsor, which is often an affiliate of the servicer. While Wells Fargo was charged with representing the interests of the Trusts and all

-141-

Certificateholders, it was economically beholden to the sponsors.  Indeed, Wells Fargo had close, repeat business relationships with most, if not all, of the sponsors for the Trusts.  For example, Wells Fargo received approximately 30% of its private-label residential mortgage securitization trusteeship appointments from just three banks (Bank of America, Lehman, and Option One) based on the cumulative original face value of the offerings.  And, the vast percentage of these banks' servicing business was conducted by their respective affiliates: Bank of America, NA (80.25%), Aurora (93.22%), and Option One (100%).  Accordingly, Wells Fargo was incentivized to not require servicers to take necessary action because these servicers were affiliated with the sponsors that provided valuable trustee appointments.  In short, Wells Fargo failed to protect the Trusts because it did not want to risk losing significant business from these sponsors.

> **B.      Wells Fargo Was Engaged In The
> Same Wrongful Servicing Activities**

502.     Wells Fargo failed and unreasonably refused to take action to protect the Trusts and Certificateholders against seller breaches and servicer violations because it would have exposed that Wells Fargo itself was engaged in the same servicing misconduct in its role as servicer for other mortgages and RMBS trusts.

503.     As noted above, during the fourth quarter of 2010, the Federal Reserve, the OCC, the FDIC, and the OTC conducted on-site reviews of the adequacy of controls and governance over servicers' foreclosure processes at Wells Fargo.  The reviews uncovered significant problems in foreclosure processing at Wells Fargo, including "critical weaknesses in [Wells

Fargo's] foreclosure governance processes, foreclosure document preparation processes, and oversight and monitoring of third-party vendors, including foreclosure attorneys."[21]

504.    On April 13, 2011, based on the deficiencies in the review and the risk of additional issues as a result of weak controls and processes, the Federal Reserve Board initiated formal enforcement actions requiring Wells Fargo & Company, the corporate parent of Wells Fargo, to address its pattern of misconduct and negligence related to deficient practices in residential mortgage loan servicing and foreclosure processing.   According to the Federal Reserve Board press release, "[t]hese deficiencies represent significant and pervasive compliance failures and unsafe and unsound practices at [Wells Fargo]."   The enforcement action required Wells Fargo to improve its residential mortgage loan servicing and foreclosure processing practices.

505.    In addition, the OCC entered into consent orders with Wells Fargo and several other servicers (the "OCC Consent Orders").   In the OCC Consent Order with Wells Fargo, the government found, among other things, that beginning in 2009 Wells Fargo filed false or otherwise defective affidavits in connection with foreclosure proceedings and failed to exercise adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third-party management, and training for its foreclosure-related services.

506.    Moreover, Wells Fargo had additional servicing conflicts due to the fact that it served as Trustee ***and*** master servicer on at least one Trust at issue here, BSABS 2004-BO1. This Trust had January 2012 delinquency rate of 23%.   Clearly, Wells Fargo, as Trustee, was

---

[21] *See* Interagency Review of Foreclosure Policies and Practices (Apr. 2011), *available at* http://www.federalreserve.gov/boarddocs/rptcongress/interagency_review_foreclosures_201104 13.pdf.

conflicted in pressing its own servicing affiliates to fulfill their pre- and post- default duties owed to the Trusts and all Certificateholders.

507.   Due to the fact that Wells Fargo itself was engaging in the same illicit and improper acts as the servicers for the Trusts, and had other conflicts, Wells Fargo failed to enforce the servicer violations, or even alert the Certificateholders to the servicers' misconduct.

### C.   Wells Fargo Originated And Sponsored Defective Loans

508.   Wells Fargo, as an originator and sponsor for other RMBS trusts, sold billions of dollars of loans that breached representations and warranties.  From 2004 through 2008, Wells Fargo was a leading sponsor of private-label mortgage-backed securities, sponsoring over 162 RMBS offerings under the WFALT, WFHET, and WFMBS labels that were collateralized by a total of over $164.6 billion in certificates issued from trusts ("Wells Fargo-Sponsored Trusts").  Some of the same entities that acted as sellers or servicers to the Trusts acted in the capacity as trustee for the Wells Fargo-Sponsored Trusts, including Bank of America, U.S. Bank, and HSBC.

509.   Many of the underlying residential mortgage-backed loans for Wells Fargo-Sponsored Trusts were originated and serviced by Wells Fargo affiliates.  In addition, Wells Fargo acquired loans for its securitizations from mortgage originators that later became known to be among the worst in the industry, including First Franklin, Option One, New Century, WMC, and Countrywide, among others.  As a mortgage loan seller, both as an originator and sponsor, Wells Fargo made representations and warranties to the Wells Fargo-Sponsored Trusts regarding the quality and characteristics of the mortgage loans.

510.   There is widespread public evidence of pervasive violations of seller representations and warranties in the Wells Fargo-Sponsored Trusts.  For example, in an

interview before the FCIC on June 1, 2010, Darcy Parmer, a former Wells Fargo underwriter and quality assurance analyst from 2004 until 2007, testified that "at least half the loans she flagged for fraud were nevertheless funded, over her objections" and that she was aware of "hundreds and hundreds and hundreds of fraud cases" in Wells Fargo's home equity loan division. FCIC Report at 162.  Illustrating the consequences of Wells Fargo's fraudulent origination practices, on April 28, 2011, The Union Central Life Insurance Company ("Union Central") sued Wells Fargo, in its capacity as sponsor, for misrepresenting the quality of the loans underlying the $43 million in Wells Fargo securities in which Union Central had invested.  *See The Union Central Life Ins. Co., et al. v. Credit Suisse First Boston Mortg. Sec. Corp., et al.*, No. 1:11-cv-02890 (S.D.N.Y.). Wells Fargo and Union Central came to a confidential settlement in February 2012.

511.    In addition, in July 2011, the Federal Reserve Board issued a cease and desist consent order to Wells Fargo & Co. and Wells Fargo Financial, Inc., in part for "falsif[ying] information about borrowers' incomes to make it appear that the borrowers qualified for loans when they would not have qualified based on their actual incomes."  Wells Fargo also paid an $85 million penalty.  *Press Release*, Board of Governors of the Federal Reserve System (July 20, 2011).

512.    On October 1, 2013, Wells Fargo announced that it would pay Freddie Mac $869 million ($780 million after credit for loans already repurchased) to repurchase loans that Wells Fargo originated and sold to Freddie Mac that breached Wells Fargo's representations and warranties.  The settlement resolved Freddie Mac's repurchase claims for loans sold to the agency before January 1, 2009.  Likewise, on October 11, 2013, Wells Fargo announced that it would pay $541 million to Fannie Mae to settle claims over similarly defective Wells Fargo mortgage loans.

-145-

513.   Other government entities have also sued Wells Fargo for lying about the characteristics and quality of its loans.  In August 2012, the FDIC, as receiver for the now-defunct Alabama-based Colonial Bank ("Colonial"), sued Wells Fargo and twelve other large banks for misrepresentations in connection with the sale of residential mortgage-backed securities to Colonial.  The complaint alleged that Wells Fargo made material misrepresentations in the offering documents regarding loan-to-value ratios, owner occupancy rates, compliance with appraisal standards, and loan issuance practices.  *See FDIC As Receiver For Colonial Bank v. Chase Mortg. Fin. Corp., et al.*, No. 12-CV-6166 (S.D.N.Y. Aug. 10, 2012).

514.   On October 9, 2012, HUD filed suit against Wells Fargo, alleging that Wells Fargo, as originator, made false statements and certifications to HUD regarding the eligibility of loans for HUD mortgage insurance and "engaged in a regular practice of reckless origination and underwriting" from May 2001 through October 2005.  *United States v. Wells Fargo Bank, N.A.*, No. 12-cv-07527 (S.D.N.Y. Oct. 9, 2012) Compl. ¶2.  In September 2013, U.S. District Judge Jesse M. Furman rejected Wells Fargo's motion to dismiss and allowed HUD's claims to proceed.

515.   Accordingly, because Wells Fargo itself faced enormous repurchase liability for billions of dollars of loans originated and sold by Wells Fargo in breach of representations and warranties, including Wells Fargo-originated loans in RMBS trusts serviced by the same servicers as the Trusts, Wells Fargo was disincentivized to take any action against the servicers for the Trusts, or even alert the Certificateholders to servicer misconduct.

### 1.   Wells Fargo's Appointment Of A Special Trustee Is Ineffective

516.   In at least 112 of the Trusts, Wells Fargo has filed a series of Petitions for Instructions in the Administration of a Trust, pursuant to Minn. Stat. § 501B.16, in Minnesota state court, Hennepin County, seeking a court order confirming the appointment of Law

Debenture Trust Company of New York, as a separate trustee for the purpose of evaluating potential repurchase claims.

517.    Wells Fargo's appointment of special trustees is ineffective.  Despite knowing of the sellers' breaches of representations and warranties and Events of Default as early as 2009, when repurchase claims were timely, Wells Fargo waited until 2012 to begin seeking their appointment, after the six-year statute of limitations for the Trusts' contractual putback claims had arguably already run.

### D.    Wells Fargo Refused To Discharge Its Duties In Order To Preserve Profits

518.    Wells Fargo was also conflicted because discharging its critical pre- and post-default duties owed to the Trusts and the Certificateholders would have necessarily diminished its profits.  Specifically, such conduct would have directly impaired Wells Fargo's profits by increasing costs and expenses while revenue remained unchanged.  Indeed, rather than act pursuant to its proscribed contractual, statutory, and common law duties, Wells Fargo failed and unreasonably refused to enforce the sellers' repurchase obligations and servicers' prudent servicing requirements in order to avoid the associated transactional costs of exercising the Trusts' rights against these entities – or provoke the servicers to shine the light on Wells Fargo's own wrongful conduct.

519.    For example, prior to a "default" under the TIA or an "Event of Default" under the PSAs, Wells Fargo had minimal ministerial duties to perform.[22]  Following a default under the TIA or Event of Default under the PSAs, however, Wells Fargo's obligations expand such that it must act as a prudent person.  This requirement carries with it significant and more costly

---

[22] New York common law still imposed certain non-waivable duties on Wells Fargo both before and after a "default" under the TIA or an "Event of Default" under the PSAs.

responsibilities, including seeking direction from the certificateholders regarding the appropriate actions it should take on behalf of the trusts.  However, fulfilling these greater duties increases costs while Wells Fargo's compensation under the PSAs – a fixed fee rate based on the unpaid principal balance of the trust (typically less than one basis point) – would remain unchanged.

520.    Additionally, the occurrence of an Event of Default could lead to the termination of the master servicer, which would have profound financial implications on Wells Fargo.  If the master servicer were terminated, Wells Fargo would have to retain a successor master servicer or substitute itself in as the master servicer.  The compensation that Wells Fargo or the successor master servicer could obtain would be heavily restricted.  For example, typical – and more lucrative – servicing income, such as float, excess spread, and ancillary fees are prohibited for a successor master servicer under the PSAs.  Nevertheless, Wells Fargo or the successor master servicer would be required to hold regulatory capital against the servicing rights.

521.    Further, the occurrence of a default under the TIA or an Event of Default under the PSAs requires Wells Fargo to provide notice of these defaults to the certificateholders.  In addition to alerting certificateholders to seller and servicer violations, the default notice would expose Wells Fargo's negligence in carrying out its ministerial duties, including its failure to receive, process, maintain and hold all or part of the mortgage loan files as required under the PSAs.  Consequently, Wells Fargo's providing notice to the Certificateholders of defaults could lead to potential liability or its removal as trustee of the Trusts.

522.    Accordingly, the increased duties, costs, and liability risk associated with enforcing the Trusts' rights against the above-described seller and servicer violations would make Wells Fargo's trusteeships less profitable and possibly unprofitable.  For these reasons,

Wells Fargo failed and unreasonably refused to enforce the Trusts rights against the sellers and servicers.

## XVI.  CAUSATION

523.    Wells Fargo's failure and unreasonable refusal to enforce the Trusts' rights against the sellers and servicers, and its violations of its other contractual, statutory, fiduciary and independence duties, along with its negligence, have directly and proximately caused billions of dollars in Trust assets to waste away.  The mortgage loans conveyed to the Trusts did not comply with seller representations and warranties, but were instead of a lower quality, which increased the risk of defaults in the principal and interest payments owed to the Trusts. Moreover, servicer violations have exacerbated the Trusts' losses.  Had Wells Fargo performed its duties as Trustee, in particular had it adequately enforced the obligations of the sponsors and originators to cure, substitute, or repurchase mortgage loans that breached the representations and warranties, it would have prevented the Trusts from incurring substantial losses and Trust assets from wasting away.  Had Wells Fargo enforced the Trusts' rights against servicers for reimbursement of losses caused by their misconduct as required, it would have benefited the Trusts and their Certificateholders.

## XVII.  DAMAGES

524.    The Trusts have incurred substantial damages attributable to Wells Fargo's breaches of its contractual, statutory, fiduciary, and common law duties.  In particular, the Trusts' loan pools are filled with loans of inadequate credit quality, which increased the risk of delinquency.  As a result of the loans' poor credit quality, the Trusts have experienced enormous delinquency rates, collateral write-downs, and losses, and have incurred and continued to incur significant losses in connection with servicer violations.  Damages incurred by the Trusts and caused by the Trustee's violation of law will be the subject of expert testimony for proof at trial.

## XVIII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### BREACH OF CONTRACT
### (In The Right Of The Trustee And On Behalf Of The Trusts Against Wells Fargo)

525.   Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

526.   The PSAs are valid contracts that memorialize the issuance of certificates of beneficial interests in the Trusts, and establish Wells Fargo's contractual duties and obligations, in its capacity as trustee, to the Trusts and all their respective Certificateholders.   Each of the relevant contractual provisions is substantively similar if not identical in all of the PSAs, and imposes substantially the same if not identical duties and obligations on Wells Fargo in its capacity as trustee.

527.   The Trusts and each of the Plaintiffs have performed all of the conditions, covenants, and promises required in accordance with each of the PSAs.

528.   Under each PSA, Wells Fargo owed a duty to the Trusts and all Certificateholders (i) to give prompt written notice to all parties to the PSA of a breach of a representation or warranty made by the seller in respect of the mortgage loans that materially and adversely affect the value of any mortgage loan or the interests of the Certificateholders in any mortgage loan, upon Wells Fargo's discovery of the breach; and (ii) to take such action with respect to the breach as may be necessary or appropriate to enforce the rights of the Trusts with respect to the breach.

529.   As set forth above, Wells Fargo materially breached each PSA by (i) failing to provide prompt written notice to all parties to the PSA and related responsible parties of breaches of the sellers' mortgage loan representations and warranties, upon Wells Fargo's discovery of the

breaches; and (ii) failing to enforce the sellers' obligation to repurchase, substitute, or cure the defective mortgage loans.

530.    In addition, the PSAs required Wells Fargo, upon an "Event of Default" to (i) provide written notice to all Certificateholders of the Event of Default within sixty days of its occurrence, unless the Event of Default was cured or waived; and (ii) exercise the rights and powers vested in Wells Fargo by the PSA using the same degree of care and skill as a prudent person would exercise under the circumstances in the conduct of such person's own affairs.

531.    The PSAs define an "Event of Default" to include the failure by the servicer to observe or perform in any material respect the covenants or agreements by the servicer set forth in the PSA, which continues unremedied for no more than thirty to sixty days after written notice of the failure has been given to the servicer by the trustee requiring the failure to be remedied, or actual knowledge of the failure by a "Servicing Officer" of the servicer, whichever is earlier.

532.    Events of Default have occurred, remained uncured for the applicable period of time, and are continuing as a result of the servicers' failure to observe and perform, in material respects, the covenants and agreements imposed on them by the PSAs.

533.    The servicers have failed and refused to do the following, each of which has materially impaired the rights of the Trusts and all Certificateholders:

(a)    Breaches of Representations and Warranties.  As with the Trustee, the PSAs required the servicers to give prompt written notice to all parties to the PSAs of a breach of a representation or warranty made by the seller in respect of the mortgage loans that materially and adversely affects the value of any mortgage loan or the interests of the Certificateholders in any mortgage loan, upon the servicers' discovery of the breach.  The servicers

have failed to give notice to the other parties of the following information, which has exacerbated losses experienced by the Trusts:

(i)     although servicers often modify mortgage loans, and in the process of doing so have discovered that specific loans breached applicable representations and warranties, the servicers have not notified the other parties of these breaches;

(ii)    although there has been widespread public evidence of pervasive breaches of applicable representations and warranties, and although the servicers have been specifically notified by insurers and Certificateholders of these pervasive breaches, the servicers have not notified the other parties to the PSAs (including Wells Fargo) of these breaches; and

(iii)   although aware of specific mortgage loans that breach applicable representations and warranties, the servicers have failed to enforce the sellers' obligation to repurchase, substitute, or cure the defective loans as required under the PSAs.

(b)     <u>Violation of Prudent Servicing Obligations.</u>  The PSAs require the servicer to service and administer the mortgage loans for and on behalf of the Certificateholders, and, consistent with the PSAs (i) in the same manner in which it services and administers similar mortgage loans for its own portfolio or for other third parties, giving due consideration to customary and usual standards of practice of prudent institutional mortgage lenders servicing similar loans; (ii) with a view to maximizing the recoveries with

respect to the mortgage loans on a net present value basis; and (iii) without regard to, among other things, the servicer's right to receive compensation or other fees for its services under the PSA, the servicer's obligation to make servicing advances under the PSA, and the servicer's ownership, servicing or management for others of any other mortgage loans.   In violation of their prudent servicing obligations under the PSAs, the servicers have:

(i)      failed to maintain accurate and adequate loan and collateral files in a manner consistent with prudent mortgage servicing standards;

(ii)     failed to timely and accurately apply payments made by borrowers and maintain accurate account statements;

(iii)    failed to demand that the sellers cure deficiencies in mortgage records when deficient loan files and lien records are discovered;

(iv)     imposed force-placed insurance when the servicers knew or should have known that borrowers already had adequate coverage;

(v)      incurred completely avoidable and unnecessary servicing fees and servicing advances to maintain the mortgaged properties; and

(vi)     prejudiced the interests of the Trusts and the Certificateholders in the mortgages by fostering uncertainty as to the timely recovery of collateral.

(c)     Violation of Foreclosure Obligations.   The PSAs require the servicers to use their best efforts, consistent with accepted servicing practices, to foreclose upon or otherwise comparably convert the ownership of

-153-

properties securing mortgage loans that come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments.   Moreover, each of the PSAs contemplates that foreclosures and liquidations of defaulted mortgages will proceed forthwith and in accordance with applicable law, provided the documentation is in order, as a matter of fairness to all parties.   Despite these covenants, the servicers have:

(i)     continued to keep defaulted mortgage loans on their books, rather than foreclose or liquidate the loans, in order to wrongfully maximize their servicing fees, at the expense of the Trusts' and Certificateholders' best interests, including the right to recover from pool or financial guaranty insurance policies;

(ii)    failed to maintain records in an accurate, appropriate and adequate manner, which has impeded the process of foreclosure and liquidation of defaulted mortgages and caused wholly avoidable delays that have injured the Trusts and Certificateholders;

(iii)   continued to charge unearned and unwarranted servicing fees on mortgages that would have been liquidated but for the servicers' breach of their duties, as well as unauthorized fees for default-related services; and

(iv)    failed to place the interests of the Trusts and Certificateholders before their own interests.

(d)     <u>Violation of Modification Obligations</u>.   The PSAs provide that the servicers may agree to a modification of any mortgage loan only in specified circumstances. When modifications are required to remedy predatory lending violations, the PSAs require the seller – not the Trusts or the Certificateholders – to bear the costs to cure the violations. The servicers have breached the PSAs by agreeing to modify loans held in the Trusts to settle predatory lending claims made by various attorneys general against their parent companies while breaching their obligation to demand that the offending mortgage sellers (their parent companies) bear the costs of curing the violations, as well as the expenses reasonably incurred in enforcing the sellers' obligation to cure predatory mortgages. The servicers have also unjustly enriched their parent companies by using Trust collateral to settle claims that were not, and could never be, made against the Trusts, in a manner that has materially and adversely affected the interests of the Certificateholders.  The servicers have therefore failed:

(i)     to demand that the originators and sponsors comply with their obligation to cure or repurchase predatory and ineligible loans that the servicers agreed to modify in the attorneys general settlements; and

(ii)     to deliver to the trustees a certification of a servicing officer that all requirements have been satisfied with respect to the modified mortgage loan.

(e)    <u>Improper Servicing Advances</u>.  The PSAs provide that the servicers may recover servicing advances that are customary, reasonable and necessary out-of-pocket costs and expenses incurred in the performance by the servicer of its servicing obligations, including, but not limited to, the cost of the preservation, restoration, and protection of a mortgaged property. Despite the requirement that servicing advances be incurred only for reasonable and necessary out-of-pocket costs, the servicers instead utilized affiliated vendors – which marked up their services to a level 100% or more above the market price – to provide services related to the preservation, restoration, and protection of mortgaged property, in a fraudulent, unauthorized, and deceptive effort to supplement the servicers' servicing income.

534.    Wells Fargo and its responsible officers had knowledge of these and other defaults by the servicers through, among other things, public reports, lawsuits, exception reports, remittance reports, and the increasing delinquency and loss rates for the Trusts.  Nevertheless, Wells Fargo failed to deliver written notices to the servicers of the defaults or terminate the servicers.  Similarly, Wells Fargo failed to provide Certificateholders with notice of these Events of Default.  By failing to take these actions, Wells Fargo materially breached the PSAs.

535.    These Events of Default occurred, remained uncured for the requisite period of time and are continuing.  Consequently, under the PSAs, Wells Fargo had and continues to have the obligation to exercise the rights and powers vested in it by the PSAs, and to use the same degree of care and skill in their exercise as a prudent person would use under the circumstances in the conduct of the person's own affairs.  A prudent person would have exercised all of the

trustee's rights to recover for these Events of Default, and would have done so promptly.  By failing to take this action, Wells Fargo materially breached the PSAs.

536.    Wells Fargo's material breaches of the PSAs have directly and proximately caused damages to the Trusts in that they have deprived the Trusts of valuable remedies and allowed billions of dollars in Trust assets to waste away.  For example, had Wells Fargo protected the rights of the Trusts by enforcing the sellers' obligation to cure, repurchase, or substitute mortgage loans affected by breaches of representations and warranties, the Trusts would have received either cured or substitute mortgage loans of adequate credit quality or funds representing the "Repurchase Price" with respect to each defective mortgage loan.  Wells Fargo's inaction with respect to the sellers has allowed the Trusts to be filled with defective mortgage loans of poor credit quality that have increased the severity of the Trusts' losses.  Similarly, had Wells Fargo enforced the servicers' prudent servicing obligations, the Trusts would have been able to avoid incurring unnecessary losses and expenses.  Wells Fargo's inaction with respect to the servicing violations has exacerbated losses experienced by the Trusts.

537.    Wells Fargo's material breaches of the PSAs have injured all Certificateholders, including Plaintiffs, in that they have diminished the value of the certificates held by the Certificateholders and have prevented the Certificateholders from protecting the rights of the Trusts.

## SECOND CAUSE OF ACTION

**VIOLATION OF THE TRUST INDENTURE ACT OF 1939, 53 STAT. 1171**
**(In The Right Of The Trustee And On Behalf Of The Trusts Against Wells Fargo)**

538.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

539.    Congress enacted the Trust Indenture Act of 1939, 15 U.S.C. § 77aaa, *et seq*., to ensure, among other things, that investors in certificates, bonds, and similar instruments have adequate rights against, and receive adequate performance from, the responsible trustees.

540.    Each of the PSAs is an "indenture," and Wells Fargo is an "indenture trustee," within the meaning of the TIA.  15 U.S.C. §§ 77ccc(7), (10).  As noted above, each of the PSAs is substantially similar and imposes substantially the same duties on Wells Fargo in its capacity as Trustee.  Moreover, the TIA applies to and is deemed to be incorporated into each of the PSAs and the related Trusts. 15 U.S.C. § 77ddd(a)(1).  Wells Fargo has violated multiple provisions of the TIA.

541.    First, the TIA requires that, before default, the indenture trustee be liable for any duties specifically set out in the indenture. 15 U.S.C. § 77000(a)(1).  As set forth above, Wells Fargo has failed to comply, in good faith, with numerous duties specifically assigned to it by each of the PSAs, including the duties:

> (a)    to provide prompt written notice to all parties to the PSA and related responsible parties of breaches of the sellers' representations and warranties, upon Wells Fargo's discovery of the breaches;
>
> (b)    to enforce the sellers' obligations to repurchase, substitute, or cure defective mortgage loans; and
>
> (c)    to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, including requiring the originators and sponsors to perform their respective obligations and to service and administer the mortgage loans in accordance with applicable law and

customary and usual standards of practice of mortgage lenders and loan
servicers.

542.    By failing to comply with these specific duties, Wells Fargo violated the TIA.

543.    In addition, the TIA requires Wells Fargo to inform Certificateholders of defaults
within ninety days after their occurrence. 15 U.S.C. § 77ooo(b) (citing 15 U.S.C. § 77mmm(c)).
Here, there were numerous defaults, including (i) the failure of originators and sponsors to
repurchase or substitute defective or nonconforming loans in the Trusts; and (ii) the failure on the
part of the servicers to observe and perform covenants and agreements set forth in the PSAs,
including requiring the originators and sponsors to perform their respective obligations and
servicing and administering the mortgage loans in accordance with applicable law and customary
and usual standards of practice of mortgage lenders and loan servicers.   Given the great
importance of those defaults to the Certificateholders' interests, Wells Fargo had no good faith
reason for failing to provide notice of those defaults.   Accordingly, by failing to provide this
notice, Wells Fargo violated the TIA.

544.    Second, in case of default, the TIA requires Wells Fargo to exercise its rights and
powers under the PSAs as a prudent person would, under those circumstances, in the conduct of
the persons' own affairs.   15 U.S.C. § 77ooo(c).   Again, given the obvious importance of the
defaults set forth in the preceding paragraph, which impaired the rights of the Trusts, any prudent
person under those circumstances would have exercised all of the trustee's rights to, among other
things, enforce the sponsors' and originators' obligation to repurchase, substitute, or cure
defective mortgage loans, and a prudent person would have exercised those rights promptly.
Indeed, with the number of delinquent and defaulting mortgages in the Trusts increasing, as a
result, *inter alia*, of these defects, the Trusts could only have been protected from the resulting

losses through the trustee's prompt exercise of those rights, which were designed precisely to limit the number of delinquent and defaulting mortgages in the Trusts.  By failing to exercise its rights in those circumstances, Wells Fargo violated the TIA.

545.    Wells Fargo's violations of the TIA have directly and proximately caused damages to the Trusts in that they have deprived the Trusts of valuable remedies and allowed billions of dollars in Trust assets to waste away.  For example, had Wells Fargo protected the rights of the Trusts by enforcing the originators' and sponsors' obligation to cure, repurchase, or substitute mortgage loans affected by breaches of representations and warranties, as it was contractually obligated to do under the PSAs, the Trusts would have received either cured or substitute mortgage loans of adequate credit quality or funds representing the "Repurchase Price" of the defective mortgage loans.  Wells Fargo's inaction with respect to the originators and sponsors has allowed the Trusts to be filled with defective mortgage loans of poor credit quality and significant documentation deficiencies that have increased the severity of the Trusts' losses.  Similarly, had Wells Fargo enforced the servicers' servicing obligations, the Trusts would have been able to avoid unnecessary losses.  Wells Fargo's inaction with respect to the servicers has exacerbated losses experienced by the Trusts.

546.    Wells Fargo's violations of the TIA have injured all Certificateholders, including Plaintiffs, in that they have diminished the value of the certificates held by the Certificateholders and have prevented the Certificateholders from protecting the rights of the Trusts.

### THIRD CAUSE OF ACTION

**NEGLIGENCE - BREACH OF PRE-DEFAULT DUTY OF INDEPENDENCE**
**(In The Right Of The Trustee And On Behalf Of The Trusts Against Wells Fargo)**

547.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

548.    Under New York law, Wells Fargo, as trustee, had extra-contractual, pre-default duties to the Trusts and all Certificateholders.  These duties include the absolute, unwaivable duty to give the Trusts and their Certificateholders undivided loyalty, free from any conflicting self-interest.   Trustees like Wells Fargo must discharge their obligations "with absolute singleness of purpose" because of the inability of the Trusts and dispersed Certificateholders to enforce their rights.  This common law duty to avoid conflicts of interest applies notwithstanding the terms of the instrument that purports to define the duties of the trustee.

549.    Under each of the PSAs, Wells Fargo holds the loans for the benefit of the Trusts and all Certificateholders, including Plaintiffs.

550.    Under each of the PSAs, Wells Fargo had the discretion to enforce the sellers' repurchase obligations and to prevent the servicers from engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with respect to any mortgage loans that Wells Fargo held for the benefit of the Trusts and the Certificateholders.

551.    As alleged in detail above, Wells Fargo knew of seller breaches of representations and warranties and that the servicers were engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with regard to their servicing and administration of the mortgage loans in the Trusts.

552.    As alleged herein, however, Wells Fargo was economically beholden to the sellers.  In addition, in their capacity as originator and sponsor with regard to other mortgage loans and RMBS trusts, Wells Fargo's affiliates had sold loans in breach of specific representations and warranties to RMBS trusts in which many of the same sellers and servicers or their affiliates were serving as servicers or trustees.

553.    Because Wells Fargo was economically beholden to the sellers and faced repurchase liability for the sale and securitization of its own loans in breach of its representations and warranties, Wells Fargo has failed to take any action against the servicers, or even notify the Certificateholders that the servicers were engaged in misconduct.

554.    Wells Fargo's negligent breach of its pre-default duty of independence has directly and proximately caused damages to the Trusts.  For example, had Wells Fargo not been conflicted, it would have enforced the sellers' repurchase obligations and exercised its discretion to prevent the servicers from engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with respect to the mortgage loans in the Trusts.  Wells Fargo's inaction has relieved the sellers' of their repurchase liability, and allowed the servicers to charge improper fees that have been passed along to the Trusts and to delay in foreclosing on mortgage loans, which has increased the costs of foreclosure.

555.    Wells Fargo's negligent breaches of its pre-default duty of independence have injured all Certificateholders, including Plaintiffs, in that they have diminished the value of the certificates held by the Certificateholders and have prevented the Certificateholders from protecting the rights of the Trusts.

## FOURTH CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY – DUTY OF CARE
### (In The Right Of The Trustee And On Behalf Of The Trusts Against Wells Fargo)

556.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

557.    Under New York law, after the occurrence of an Event of Default, Wells Fargo's duties expanded to include a fiduciary duty owed to the Trusts and all Certificateholders.  This fiduciary duty included the obligation to exercise its contractually conferred rights and powers in

-162-

good faith and to bring all available claims for the benefit of the Trusts and the Certificateholders following an Event of Default.  Following the Events of Default described above, Wells Fargo breached its fiduciary duties to the Trusts and all Certificateholders in several respects.

558.    First, Wells Fargo, in its capacity as trustee, had standing to bring claims against the sellers of loans to the Trusts for breach of their representations and warranties under the Governing Agreements.  At the time of the Events of Default, meritorious claims existed against the sellers for breach of their representations and warranties under the Governing Agreements. Wells Fargo, however, failed to promptly enforce the sellers' obligation to cure, repurchase, or substitute mortgage loans that had defective mortgage files or were affected by breaches of the sponsors' and originators' representations and warranties, including by filing suits on behalf of the Trusts against the sponsors and originators.  Moreover, Wells Fargo failed to provide notice to the Certificateholders of the breaches or of its intention not to enforce the originators' and sponsors' obligation to cure, repurchase, or substitute the loans with defective mortgage files and breaches of representations and warranties.

559.    Wells Fargo's failure to promptly enforce the originators' and sponsors' obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of the originators' and sponsors' representations and warranties, as well as its failure to provide notice to the Certificateholders of its intention not to promptly enforce the originators' and sponsors' obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of the originators' and sponsors' representations and warranties, constituted breaches of Wells Fargo's fiduciary duty to the Trusts and to all Certificateholders.

560.     Second, Wells Fargo, in its capacity as Trustee, presently has standing to bring meritorious claims against the servicers to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, including to service and administer the mortgage loans in accordance with applicable law and customary and usual standards of practice of mortgage lenders and loan servicers.  Wells Fargo, however, has refused and continues to refuse to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, including by filing suits on behalf of the Trusts against the servicers for compensatory and injunctive relief for harm caused to the Trusts as a result of servicing violations.  Moreover, Wells Fargo failed to provide notice to the Certificateholders of the servicing violations or of its intention not to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs.  Wells Fargo's failure to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, as well as its failure to provide notice to the Certificateholders of the servicing violations or of its intention not to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, constituted breaches of Wells Fargo's fiduciary duty to the Trusts and to all Certificateholders.

561.     Wells Fargo's breach of its fiduciary duty has directly and proximately caused damages to the Trusts.  Specifically, the Trusts' injury includes the loss of verdicts, settlements, or awards, and the interest that the Trusts would have recovered against the sellers and servicers but for Wells Fargo's breach of its fiduciary duty.

562.     Wells Fargo's breaches of its fiduciary duty have injured all Certificateholders, including Plaintiffs, in that they have diminished the value of the certificates held by the

Certificateholders and have prevented the Certificateholders from protecting the rights of the Trusts.

## FIFTH CAUSE OF ACTION

### NEGLIGENCE – DUTY OF CARE
**(In The Right Of The Trustee And On Behalf Of The Trusts Against Wells Fargo)**

563.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

564.    Under New York law, after the occurrence of an Event of Default, Wells Fargo owed duties to the Trusts and all Certificateholders, which included the obligation to bring all available claims for the benefit of the Trusts and the Certificateholders.  Following the Events of Default described above, Wells Fargo breached its duties to the Trusts and to all Certificateholders in several respects.

565.    First, Wells Fargo, in its capacity as Trustee, had standing to bring claims against the sellers of loans to the Trusts for breach of their representations and warranties under the Governing Agreements.  At the time of the Events of Default, meritorious claims existed against the sellers for breach of their representations and warranties under the Governing Agreements. Wells Fargo, however, negligently failed to promptly enforce the sellers' obligation to cure, repurchase, or substitute mortgage loans that had defective mortgage files or were affected by breaches of the sponsors' and originators' representations and warranties, including by filing suits on behalf of the Trusts against the sponsors and originators.  Moreover, Wells Fargo negligently failed to provide notice to the Certificateholders of the breaches or of its intention not to enforce the originators' and sponsors' obligation to cure, repurchase, or substitute the loans with defective mortgage files and breaches of representations and warranties.

566.    Wells Fargo's failure to promptly enforce the originators' and sponsors' obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of the originators' and sponsors' representations and warranties, and failure to provide notice to the Certificateholders of the breaches or of its intention not to promptly enforce the originators' and sponsors' obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of the originators' and sponsors' representations and warranties, constituted negligence.

567.    Second, Wells Fargo, in its capacity as Trustee, presently has standing to bring meritorious claims against the servicers to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, including to service and administer the mortgage loans in accordance with applicable law and customary and usual standards of practice of mortgage lenders and loan servicers.  Wells Fargo, however, has refused and continues to refuse to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, including by filing suits on behalf of the Trusts against the servicers for compensatory and injunctive relief for harm caused to the Trusts as a result of servicing violations.  Moreover, Wells Fargo negligently failed to provide notice to the Certificateholders of the servicing violations or of its intention not to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs.  Wells Fargo's failure to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, as well as its failure to provide notice to the Certificateholders of the servicing violations or of its intention not to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, constituted breaches of its duty to the Trusts and all Certificateholders.

568.    Wells Fargo's negligence has directly and proximately caused damages to the Trusts.  Specifically, the Trusts' injury includes the loss of verdicts, settlements, or awards, and the interest that the Trusts would have recovered against the originators and sponsors but for Wells Fargo's negligence.

569.    Wells Fargo's negligence has injured all Certificateholders, including Plaintiffs, in that it has diminished the value of the certificates held by the Certificateholders and has prevented the Certificateholders from protecting the rights of the Trusts.

### SIXTH CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY – BREACH OF POST-DEFAULT DUTY OF INDEPENDENCE (In The Right Of The Trustee And On Behalf Of The Trusts Against Wells Fargo)

570.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

571.    Under New York law, Wells Fargo, as Trustee, had extra-contractual, post-default duties to the Trusts and all Certificateholders.  These duties include the absolute, unwaivable duty to give the Trusts and their Certificateholders undivided loyalty, free from any conflicting self-interest.   Trustees like Wells Fargo must discharge their obligations "with absolute singleness of purpose" because of the inability of the Trusts and dispersed Certificateholders to enforce their rights.  This common law duty to avoid conflicts of interest applies notwithstanding the terms of the instrument that purports to define the duties of the trustee.

572.    Under each of the PSAs, Wells Fargo holds the loans for the benefit of the Trusts and all Certificateholders, including Plaintiffs.

573.    Under each of the PSAs, Wells Fargo had the discretion to enforce the sellers' repurchase obligations and to prevent the servicers from engaging in activities outside of

customary and usual standards of practice of prudent mortgage servicers with respect to any mortgage loans that Wells Fargo held for the benefit of the Trusts and the Certificateholders.

574.    As alleged in detail above, after Events of Default, Wells Fargo knew of seller breaches of representations and warranties and that the servicers were engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with regard to their servicing and administration of the mortgage loans in the Trusts.

575.    As alleged herein, however, Wells Fargo was economically beholden to the sellers.  In addition, in their capacity as originator and sponsor with regard to other mortgage loans and RMBS trusts, Wells Fargo's affiliates had sold loans in breach of specific representations and warranties to RMBS trusts in which many of the same sellers and servicers or their affiliates were serving as servicers or trustees.

576.    Because Wells Fargo was economically beholden to the sellers and faced repurchase liability for the sale and securitization of its own loans in breach of its specific representations and warranties, Wells Fargo has failed to take any action against the servicers, or even notify the Certificateholders that the servicers were engaged in misconduct.

577.    Wells Fargo's breach of its post-default fiduciary duty of independence has directly and proximately caused damages to the Trusts.  For example, had Wells Fargo not been conflicted, it would have enforced the sellers' repurchase obligations and exercised its discretion to prevent the servicers from engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with respect to any mortgage loans.  Wells Fargo's inaction has relieved the sellers of their repurchase liability, and allowed the servicers to charge improper fees that have been passed along to the Trusts and to delay in foreclosing on mortgage loans, which has increased the costs of foreclosure.

578.     Wells Fargo's breaches of its post-default fiduciary duty of independence have injured all Certificateholders, including Plaintiffs, in that they have diminished the value of the certificates held by the Certificateholders and have prevented the Certificateholders from protecting the rights of the Trusts.

## XIX.   CLASS ACTION ALLEGATIONS

579.     Alternatively, in the event the Court does not permit this action to proceed as a derivative action, Plaintiffs bring this action as a class action on behalf of themselves and a class consisting of all current owners of certificates in the Trusts (the "Class") that have suffered damages as a result of Wells Fargo's misconduct alleged herein.  Excluded from the Class are Defendant Wells Fargo, the sellers and the servicers, and, for each of them, their respective officers and directors, legal representatives, successors or assigns, and any entity in which they respectively have or had a controlling interest.

580.     The members of the Class are so numerous that joinder of all members is impractical.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained though appropriate discovery, Plaintiffs believe that there are at least hundreds of members of the proposed Class.  Record beneficial owners and other members of the Class may be identified from records maintained by Wells Fargo or third parties and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

581.     Plaintiffs' claims are typical of the claims of the members of the Class as (i) Plaintiffs and the members of the Class all own certificates in the Trusts and held them at or after the time of Wells Fargo's misconduct; (ii) all the claims are based upon the Governing Agreements, which are substantially in the same form, common law and the TIA; (iii) Wells

Fargo's alleged misconduct was substantially the same with respect to all class members; (iv) and all class members suffered similar harm as a result. Thus, all members of the class are similarly affected by Wells Fargo's statutory, contractual, and common law breaches and violations that are alleged of herein.

582.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and asset-backed securities litigation.

583.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- Whether Wells Fargo breached its contractual and common law duties to Plaintiffs and the Class under the Governing Agreements.

- Whether Wells Fargo violated the TIA.

- Whether and to what extent Plaintiffs and members of the Class have suffered damages as a result of Wells Fargo's breaches of its statutory, contractual, and common law duties and the proper measure of damages.

584.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. There will be no difficulty in the management of this action as a class action.

## XX.   **RELIEF REQUESTED**

**WHEREFORE**, Plaintiffs demand judgment as follows:

(a)   Determining that this action is a proper derivative action maintainable under law and that demand is excused;

(b)     Awarding to the Trusts monetary damages against Wells Fargo for all losses suffered as a result of Wells Fargo's breaches of contractual, statutory, common law and fiduciary duties and negligence;

(c)     Requiring Wells Fargo to take corrective actions, including taking all necessary actions to reform and improve its internal policies and procedures to comply with its trustee obligations under the PSAs and applicable laws, and to protect the Trusts and the Certificateholders from a repeat of the damaging events described herein;

(d)     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

(e)     In the event the Court determines that this action is not a proper derivative action, determining that this action is a class action pursuant to Fed. R. Civ. P. Rule 23; and

(f)     Granting any other and further relief that the Court deems just and proper.

## XXI.   JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: November 24, 2014

| | |
|---|---|
| BERNSTEIN LITOWITZ BERGER<br>   & GROSSMANN LLP | BERNSTEIN LITOWITZ BERGER<br>   & GROSSMANN LLP |
| *JEROEN VAN KWAWEGEN* | *Blair Nicholas /jrh* |
| JEROEN VAN KWAWEGEN | BLAIR A. NICHOLAS |
| JEROEN VAN KWAWEGEN (JV 1010)<br>JAI CHANDRASEKHAR (JC 3789)<br>1285 Avenue of the Americas, 38th Floor<br>New York, NY 10019<br>Tel:   (212) 554-1400<br>Fax:   (212) 554-1444 | BLAIR A. NICHOLAS<br>TIMOTHY A. DELANGE<br>BENJAMIN GALDSTON<br>BRETT M. MIDDLETON<br>DAVID R. KAPLAN<br>LUCAS E. GILMORE<br>12481 High Bluff Drive, Suite 300<br>San Diego, CA 92130<br>Tel:   (858) 793-0070<br>Fax:   (858) 793-0323<br><br>*Counsel for Plaintiffs* |