**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLACKROCK BALANCED CAPITAL PORTFOLIO (FI); BLACKROCK DYNAMIC HIGH INCOME - STRUCTURED CREDIT PORTFOLIO; BLACKROCK MASTER TOTAL RETURN PORTFOLIO OF MASTER BOND LLC; BLACKROCK MULTI-ASSET INCOME - NON-AGENCY MBS PORTFOLIO; BLACKROCK STRATEGIC INCOME OPPORTUNITIES PORTFOLIO; PIMCO ABSOLUTE RETURN STRATEGY IV MASTER FUND LDC; PIMCO BERMUDA TRUST IV: PIMCO BERMUDA GLOBAL BOND EX-JAPAN FUND; PIMCO DYNAMIC INCOME FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, INCOME FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, TOTAL RETURN BOND FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, UNCONSTRAINED BOND FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, US FUNDAMENTAL INDEX® STOCKSPLUS® FUND; PIMCO FUNDS: PIMCO FOREIGN BOND FUND (U.S. DOLLAR-HEDGED); PIMCO FUNDS: PIMCO FOREIGN BOND FUND (UNHEDGED); PIMCO FUNDS: PIMCO INCOME FUND; PIMCO FUNDS: PIMCO LONG-TERM U.S. GOVERNMENT FUND; PIMCO FUNDS: PIMCO TOTAL RETURN FUND; PIMCO FUNDS: PIMCO TOTAL RETURN FUND IV; PIMCO FUNDS: PIMCO UNCONSTRAINED BOND FUND; PIMCO FUNDS: PRIVATE ACCOUNT PORTFOLIO SERIES MORTGAGE PORTFOLIO; PIMCO VARIABLE INSURANCE TRUST: PIMCO GLOBAL BOND PORTFOLIO | Case No. 14-cv-9371-RMB-SN<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND** |

(UNHEDGED); CREF BOND MARKET
ACCOUNT; CREF SOCIAL CHOICE
ACCOUNT; TEACHERS INSURANCE
AND ANNUITY ASSOCIATION OF
AMERICA; TIAA GLOBAL PUBLIC
INVESTMENTS, LLC; TIAA-CREF
BOND FUND; TIAA-CREF BOND
PLUS FUND; TIAA-CREF SHORT-
TERM BOND FUND; TIAA-CREF
SOCIAL CHOICE BOND FUND;
PRUDENTIAL RETIREMENT
INSURANCE AND ANNUITY
COMPANY; THE PRUDENTIAL
INSURANCE COMPANY OF
AMERICA; KORE ADVISORS LP;
SEALINK FUNDING LIMITED; DZ
BANK AG,

        Plaintiffs,

    -against-

WELLS FARGO BANK, NATIONAL
ASSOCIATION,

        Defendant.

This Amended Class Action Complaint ("Amended Complaint") is filed in redacted form pursuant to the parties' Stipulation and Agreed Protective Order entered on October 5, 2015 [ECF. No. 79] (the "Protective Order") because it includes "Discovery Materials" designated by Defendants as "Confidential" or "Highly Confidential" as those terms are defined under the Protective Order. In accordance with the Protective Order, Plaintiffs are concurrently providing the Court an unredacted version of the Amended Complaint. Plaintiffs reserve all rights to challenge Defendants' confidentiality designations, including on the grounds that the Discovery Materials do not qualify for protection or do not qualify for the level of protection asserted.

# TABLE OF CONTENTS

Page

I.      SUMMARY OF THE ACTION ............................................................................. 1

II.     PARTIES ............................................................................................................. 13

III.    JURISDICTION AND VENUE ......................................................................... 14

IV.     COMPLIANCE WITH THE NO ACTION CLAUSE IS EXCUSED .............. 14

V.      OVERVIEW OF THE TRUSTS ....................................................................... 15

VI.     BACKGROUND ............................................................................................... 16

        A.      The Critical Enforcement Function Of The Indenture Trustee ............. 16

        B.      Securitization Process ........................................................................... 18

VII.    THE GOVERNING AGREEMENTS ............................................................... 19

        A.      The Mortgage Loan Purchase And Sale Agreement ............................. 20

        B.      The Trust Agreement ............................................................................. 22

        C.      The Sale And Servicing Agreement ...................................................... 22

        D.      The Indenture ......................................................................................... 22

VIII.   WELLS FARGO'S DUTIES UNDER THE GOVERNING
        AGREEMENTS .................................................................................................. 22

        A.      Duty To Hold Trust Assets For The Benefit Of Noteholders ............... 23

        B.      Duties To Provide Notice Of Breaches And To Enforce Seller
                Repurchase Obligations ......................................................................... 23

        C.      Duties Regarding The Servicers ........................................................... 23

        D.      Duties Upon An Indenture Event Of Default ....................................... 24

IX.     THE TRUSTS SUFFERED FROM PERVASIVE BREACHES OF
        REPRESENTATIONS AND WARRANTIES BY THE SELLERS .................. 26

        A.      The Trusts' Mortgage Loans Have Experienced High Delinquency,
                Modification, And Loss Severity Rates ................................................ 26

        B.      The Notes Have Experienced Massive Credit Downgrades .................. 28

        C.      The Systemic Disregard Of Underwriting Standards Was Pervasive
                During The Relevant Period .................................................................. 29

D. The Originators' Rampant Underwriting Failures ............................................... 30

E. The Systemic Disregard Of Prudent Securitization Standards Was Pervasive During The Relevant Period ........................................................ 31

F. The Sponsors' Widespread Breach Of Representations And Warranties .............................................................................................................. 34

G. Litigation Confirms The Sellers' Rampant Breaches Of Representations And Warranties By The Sellers ................................................... 34

X. WELLS FARGO KNEW THAT THE TRUSTS WERE FILLED WITH DEFECTIVE LOANS ................................................................................................... 35

A. Unresolved Exception Reports ........................................................................... 35

B. Wells Fargo And Its Responsible Officers Received Written Notice From Investors Of Pervasive And Systemic Seller Breaches ............................... 36

C. Wells Fargo Monitored The Performance Of The Trusts ................................... 38

D. Wells Fargo Received Written Notice Of Pervasive And Systemic Seller Breaches From Insurers ................................................................................. 40

E. Wells Fargo Discovered Widespread Seller Breaches Of Representations And Warranties In Other Capacities .......................................... 41

F. Reports, Investigations And Litigation Involving The Sellers ............................ 42

XI. THE TRUSTS SUFFER FROM PERVASIVE SERVICER VIOLATIONS ................... 42

A. The Servicers Failed To Give Notice Of Seller Breaches Of Representations And Warranties ......................................................................... 43

B. The Servicers Have Violated Their Prudent Servicing Obligations ..................... 44

C. The Servicers Have Violated Their Foreclosure Obligations ............................... 45

D. The Servicers Have Violated Their Modification Obligations ............................. 46

E. The Servicers Have Abused Their Servicing Advances Obligations ................... 48

F. Certain Trusts Have Experienced Triggering Events .......................................... 49

G. Certain Servicers Went Insolvent ...................................................................... 49

XII. WELLS FARGO HAS KNOWN OF SERVICER VIOLATIONS PLAGUING THE TRUSTS .................................................................................................... 49

A. Wells Fargo And Its Responsible Officers Received Written Notice From Interested Parties Of Pervasive And Systemic Servicer Breaches .......................................................................................................... 49

B.     Wells Fargo Had Knowledge Of The Servicers' Failures Through The Monthly Servicer And Remittance Reports ................................... 52

C.     Wells Fargo Itself Was Involved In Government Enforcement Actions And Litigation Stemming From The Servicers' Violations ................... 53

D.     Wells Fargo Discovered Widespread Servicer Breaches In Other Capacities ........................................................................................... 55

XIII.   NUMEROUS INDENTURE EVENTS OF DEFAULT HAVE OCCURRED ................................................................................................ 55

XIV.   WELLS FARGO'S KNOWLEDGE OF INDENTURE EVENTS OF DEFAULT ................................................................................................. 56

XV.    WELLS FARGO FAILED TO DISCHARGE ITS CRITICAL PRE- AND POST-DEFAULT DUTIES ........................................................................ 57

A.     Failure To Enforce The Trusts' Repurchase Rights Against Responsible Sellers ................................................................................. 57

B.     Failure To Provide Notice To The Servicers Of Servicer Events Of Default ................................................................................................. 57

C.     Failure To Act Prudently Subsequent To Indenture Events Of Default ................................................................................................. 58

D.     Failure To Provide Notice To Noteholders Of The Uncured Indenture Events Of Default .................................................................. 59

XVI.   WELLS FARGO FAILED TO PROTECT THE TRUSTS DUE TO ITS CONFLICTS OF INTEREST ........................................................................ 59

A.     Wells Fargo Was Economically Beholden To The Mortgage Loan Sellers ............................................................................................. 59

B.     Wells Fargo Was Engaged In The Same Wrongful Servicing Activities ............................................................................................. 60

C.     Wells Fargo Originated And Sponsored Defective Loans .................... 61

1.     Wells Fargo's Appointment Of A Separate Trustee Is Ineffective ............................................................................... 63

XVII.  CAUSATION .................................................................................... 64

XVIII. DAMAGES ....................................................................................... 65

XIX.   CAUSES OF ACTION ........................................................................ 65

XX.    CLASS ACTION ALLEGATIONS ....................................................... 74

XXI.   RELIEF REQUESTED ....................................................................... 76

XXII.  JURY DEMAND ............................................................................................................ 76

Plaintiffs BlackRock Funds, DZ Bank, Kore Advisors LP, PIMCO, Prudential, Sealink, and TIAA (as defined herein) (collectively, "Plaintiffs"), bring this action on their own behalf and on behalf of a class (the "Class") of all current owners of notes issued by the trusts listed in Exhibit 1 (the "Trusts"), against Defendant Wells Fargo Bank, National Association (collectively, "Wells Fargo," "Trustee," or the "Indenture Trustee"), the Indenture Trustee for the Trusts, to recover for the losses Wells Fargo's wrongful conduct has and is continuing to cause the Trusts and the Class.

## I.    SUMMARY OF THE ACTION

1.    This action centers on Wells Fargo's failure to discharge its essential obligations as Indenture Trustee of 12 RMBS Trusts. Wells Fargo, as Indenture Trustee, has certain contractual, statutory and common law duties to act on behalf of the Trusts and their beneficial noteholders (the "Noteholders" or "Holders") upon learning of problems within the Trusts' loan pools, and must at all times act in the best interests of the Trusts. Specifically, Wells Fargo is obligated to: (i) enforce the Trusts' repurchase rights for loans that it knows do not comply with seller representation and warranties; (ii) remedy known servicing failures; (iii) act prudently subsequent to Events of Default; and (iv) promptly provide notice to all noteholders of all uncured Events of Default. In the face of overwhelming evidence of pervasive seller, servicer and issuer breaches plaguing the Trusts, including internal communications ███████████████████████████████

███████████████████████████████████████████████████████████████

███ Wells Fargo failed to perform these critical tasks. Instead, to protect its own business interests and avoid liability for its own origination, securitization and servicing misconduct, Wells Fargo ignored pervasive and systemic underwriting deficiencies in the underlying loan pools and

-1-

the servicing of those loans and unreasonably refused to take any action. This class action seeks to recover the significant monetary damages Wells Fargo's abdication of responsibility caused.[1]

2.     Plaintiffs are investors that acquired RMBS notes with a purchase value in excess of $1.2 billion issued by the Trusts. As Noteholders, Plaintiffs are beneficiaries of the Trusts.

3.     Defendant Wells Fargo is the Trustee for nearly 450 RMBS trusts originally securitized by almost $1 trillion of residential mortgage loans. Among them are the Trusts at issue in this action: 12 Delaware statutory trusts created between 2004 and 2008 that issued notes secured by loans worth more than $11.6 billion at the time of securitization.

4.     The Trusts, like other RMBS trusts, were created to facilitate the securitization and sale of residential mortgage loans to investors. The Trusts' assets consist entirely of the underlying loans. The Trusts issued classes of notes that were sold to investors and represented obligations of the Trusts, which are secured by the underlying loans. Payments of principal and interest ("P&I") on the notes paid to investors are made from the amounts collected from the Trusts' loan pools. Thus, the value of the mortgage loan pools and the certificates issued by the Trusts are directly linked to the quality of the mortgage loans.

5.     Between 2004 and 2008, a handful of large investment banks dominated the RMBS market and controlled the process from beginning to end. These banks act as "sponsors" of the RMBS, acquiring the mortgage loans from originators, who often were affiliates of the sponsors, or beholden to them through warehouse lending or other financial arrangements. Once the loans

---

[1] This Amended Class Action Complaint ("Complaint") does not allege in any way that Wells Fargo or any other residential mortgage-backed securities ("RMBS") trustee was or is burdened by conflicts in connection with its negotiation, evaluation, or acceptance of any investor-driven RMBS settlement, including the $8.5 billion settlement with Bank of America/Countrywide, the $4.5 billion settlement with JPMorgan, or the $1.125 billion settlement with Citibank.

are originated, acquired and selected for securitization, the seller, through an affiliate called the depositor, creates a trust where the loans are deposited for the benefit of the Noteholders. The sponsor also hand-picks the servicer, often an affiliate of the seller or originator, to collect payments on the loans. Finally, a select number of these same banks that originate, securitize and service RMBS also act as trustees on other sponsors' deals.

6.    To ensure the quality of the RMBS and the underlying loans, the trust documents include representations and warranties from the loan sellers attesting to the quality and characteristics of the mortgages as well as an agreement to cure, substitute, or repurchase mortgages that do not comply with those representations and warranties. Because the risk of non-payment or default on the loans is "passed through" to investors, other than these representations and warranties, the large investment banks and other players in the mortgage securitization industry have no "skin" in the game once the RMBS are sold to investors. Instead, their profits are principally derived from the spread between the cost to originate or purchase loans and, how much they can sell them to investors once packaged as securities, as well as various servicing-related income. Accordingly, volume became the focus, and the quality of the loans was disregarded.

7.    The fundamental role of an indenture trustee is to ensure that there is at least one independent party, free from any conflicting self-interest, to protect the trust corpus, and to enforce the noteholders' rights. Noteholders do not have unfettered access to the underlying loan files and other documents necessary to confirm compliance with the representations and warranties, cannot monitor the servicers' conduct and performance, cannot act independently to enforce the trusts' contractual rights, and therefore must rely on the trustee to protect their interests. Wells Fargo, as Indenture Trustee, was the sole contractual party in the Trusts' securitization process intended to

be independent of the investment banks that sponsored the securitization, the lenders that originated the loans, and the servicers that were often affiliated with either the sponsors or lenders, or both. Noteholders must rely on the Indenture Trustee to protect their rights. The Governing Agreements (as defined herein) therefore require the Indenture Trustee, among others, to enforce the sellers' obligation to cure, substitute, or repurchase such mortgage loans for the benefit of the Noteholders.

8. In turn, as Indenture Trustee for the Trusts, Wells Fargo owes Plaintiffs and the Class certain contractual and common law duties, as well as duties under the Trust Indenture Act of 1939 ("TIA"). In particular, Wells Fargo is required to provide notice of breaches of representations and warranties by the Originators and Sponsors concerning key attributes of the mortgage loans underlying the Trusts, including the origination guidelines applicable to those loans and adherence to state laws regarding predatory lending. Wells Fargo has a duty to enforce the obligation of the responsible parties (typically the Sponsors, and their affiliates that served as the Depositors (the "Depositors") or the Originators to repurchase loans that breached representation and warranty provisions or were missing required documentation. Wells Fargo is also required to address defaults by the Servicers who were required to engage in prudent servicing and loss mitigation practices. Wells Fargo is further required to act prudently subsequent to Events of Default, and to provide notice of all Events of Default to Noteholders.

9. Wells Fargo failed to discharge these critical duties. Specifically, Wells Fargo has had considerable knowledge that the pools of loans backing the Trusts were filled with defective mortgage loans in breach of seller representations and warranties, including those representations and warranties regarding the originators' compliance with underwriting standards and practices, owner occupancy statistics, appraisal procedures, loan-to-value ("LTV") and combined loan-to-

value ("CLTV") ratios. In particular, Wells Fargo's own documents confirm that ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████ Wells Fargo's records also reflect that ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ Nevertheless, Wells Fargo

regularly disregarded its contractual and statutory duties to enforce the rights of the Trusts as

against the responsible parties.

10.     In addition, Wells Fargo knew that the pools of loans backing the Trusts were filled

with defective mortgage loans by virtue of the abysmal performance of the Trust collateral. The

spiraling delinquencies and collateral losses within the Trusts' loan pools and credit downgrades

were outlined on monthly remittance reports that Wells Fargo, as Trustee, publishes and

disseminates to investors, the credit agencies and the government. The monthly remittance reports

detail how, by January 1, 2009, the Trusts had suffered collateral losses exceeding $219 million.

On average, nearly one in every 4 loans in the Trusts was delinquent. Moreover, 6 Trusts had

delinquency rates exceeding 25%, and two Trusts had delinquency rates of over 40%. By January

2011, the Trusts' total losses had increased to $607 million. By the start of 2010, virtually all of

the securities issued by the Trusts had experienced multiple downgrades, with most reduced to

"junk" status. ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████

11.     Indeed, for many of the Trusts, the historical delinquencies and collateral losses

within the Trusts' loan pools has been so severe that it has caused "Triggering Events" under the

Trusts' Governing Agreements, causing Wells Fargo to change the distribution of Trust proceeds, evaluate the performance of the Trusts' servicers, and make increased disclosures to the credit rating agencies. Moreover, for at least two of the Trusts (IMM 2005-6 and IMM 2005-2), these Triggering Events constitute Events of Default under the Governing Agreements and contractually obligate Wells Fargo to act prudently on behalf of the Trusts and Noteholders, including taking action against responsible parties.

12.     Further, a steady stream of public disclosures has linked the abject performance of the Trusts to systemic abandonment of underwriting guidelines, and the deficient and often fraudulent securitization practices of the Sponsors. Highly publicized government investigations, reports and enforcement actions; high-profile RMBS litigation by government agencies, federal banks, and institutional investors; and claims and litigation instituted by monoline insurers have repeatedly noted the "pervasive disregard" and "systemic abandonment" of underwriting guidelines in the years leading up to the financial crisis. Voluminous complaints in these proceedings detail gross misstatements in the Trust documents of key metrics concerning the quality of the underlying loan pools, including LTV ratios, owner occupancy status, and borrower credit scores – as well as the completeness of the loan files themselves. Internal communications confirm ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████

13.     Numerous forensic and loan level reviews conducted in extensive RMBS litigation have also demonstrated staggering levels of breaches of representations and warranties by the Trusts' Sellers, including litigation involving two of the Trusts, FMIC 2007-1 and IMM 2005-6.

In addition, forensic reviews performed by RMBS trustees to other RMBS trusts in several lawsuits against loan sellers in connection with RMBS trusts to which Wells Fargo serves either as servicer or custodian, have found pervasive and systemic breaches of representations and warranties by major Originators and Sponsors to the Trusts, including Morgan Stanley. In one such matter, "a forensic review of 922 mortgage loans revealed that at least 471 of those reviewed loans are in breach of the representations and warranties made by Morgan Stanley Capital."[2]

14.    Wells Fargo was further informed of pervasive and systemic deficiencies infecting the Trusts' collateral though "putback" initiatives led by many of the world's largest institutional mortgage investors. These large-scale initiatives – several of which have yielded *multi-billion dollar settlements* – have targeted six of the leading sponsors of non-agency RMBS and cover wide swaths of the RMBS market, including entire labels and shelves.

15.    For example, in December 2011, a group of major institutional investors asked Wells Fargo, as trustee, to investigate large numbers of ineligible mortgages in loan pools underlying hundreds of JPMorgan-sponsored trusts and deficient servicing of those loans. Together with similar instructions provided to four other trustees of the JPMorgan-sponsored trusts, the initiative covered more than *$95 billion* of RMBS issued from 2005 to 2007. Less than two years later, Wells Fargo and the other trustees were presented with a comprehensive $4.5 billion settlement offer covering 330 JPMorgan-sponsored trusts. On August 1, 2014 and October 2, 2014, Wells Fargo and the other trustees involved in the putback initiative *accepted* JPMorgan's $4.5 billion offer for the vast majority of the 330 trusts included in the offer and petitioned for *court approval* of the settlement.

---

[2] *See* Amended Complaint (Doc. 15), *Morgan Stanley Mortg. Loan Trust 2006-13ARX v. Morgan Stanley Mortg. Capital Holdings LLC*, No. 653429/2012 (N.Y. Sup. Ct.).

16. In January 2012, Wells Fargo received similar written instructions from a group of major institutional investors in dozens of trusts sponsored by Morgan Stanley or its affiliates (collectively, "Morgan Stanley"). Together with instructions provided to two other trustees of the Morgan Stanley-sponsored trusts, the initiative covered more than *$25 billion* of RMBS issued from 2005 to 2007, including sixty-six Trusts at issue in this action. And in yet another investor-led initiative, Wells Fargo, as trustee, gave its *approval* to an $8.7 billion settlement covering 570 RMBS trusts sponsored by Residential Capital and its affiliates ("ResCap") from 2004 to 2008 with an original face amount of more than *$320 billion*.[3]

17. These and other investor-led initiatives sought to "putback" large quantities of loans (1) originated by many of the same lenders that also originated large quantities of the loans sold to the Trusts, including Impac ($7.7 billion of loans sold to the Trusts), and American Home ($1.3 billion of loans sold to the Trusts); and (2) securitized by the same investment banks and financial institutions that sponsored the Trusts, including Morgan Stanley ($850 million of sponsored Trusts). In addition, these initiatives identified and sought recovery of losses relating to servicing deficiencies by many of the same major servicers of loans backing the Trusts, including Litton Loan Servicing (servicer to $358 million of loans sold to the Trusts).

18. Not surprisingly, in the few actions that Wells Fargo has brought to protect financial crisis-era RMBS trusts (not at issue in this litigation), Wells Fargo itself identified systemic and pervasive breaches of representations and warranties by a common Sponsor. According to Wells

---

[3] In January 2014, after a nine-week trial, New York Supreme Court Justice Barbara Kapnick largely approved an $8.5 billion settlement resolving mortgage repurchase claims for 530 RMBS trusts issued by Countrywide Financial Corporation and its affiliates ("Countrywide"). That initiative began in October 2010 and covers more than *$424 billion* of RMBS issued from 2004 to 2008.

Fargo, loans backing the trusts securitized by Bear Stearns & Co., Inc., ("Bear Stearns") suffered an overall breach rate of *89%* due to "*boldfaced misrepresentations* by borrowers that should have been detected by prudent mortgage loan originators." Wells Fargo alleged the loans were "*routinely approved . . . despite clear defects*" that should have been obvious, including "*faulty appraisals* that *grossly exaggerated* the true market value of the mortgaged properties; *unreasonable and inconceivable overstatement of income . . . and pervasive failure* of the originators to follow their own mandatory underwriting practices. . . ." Consequently, Wells Fargo concluded that Bear Stearns trust was "*plagued by an alarming rate of defaults and foreclosures.*"[4]

19. Wells Fargo also knew of industrywide abandonment of underwriting guidelines and sound securitization practices because Wells Fargo was itself a major mortgage originator, a major RMBS sponsor, and a major servicer. Indeed, Wells Fargo has been named as a defendant in significant RMBS litigation and settlements in its capacity as an underwriter of RMBS. For example, in March 2009, RMBS investors filed suit against Wells Fargo alleging that it misrepresented its underwriting guidelines and loan quality in connection with the sale of over $36 billion in Wells Fargo-label RMBS. In denying in part a motion to dismiss, the court found that plaintiffs had adequately pled that "variance from the stated [underwriting] standards was essentially [Wells Fargo's] norm," and that this conduct "infected the entire underwriting process." *In re Wells Fargo Mortgage-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 971-72 (N.D. Cal. 2010). Wells Fargo agreed to settle the investors' claims, which were rooted in Wells Fargo's desire to "approve as many mortgages as possible."

---

[4] *See* Amended Verified Complaint, *Bear Stearns Mortg. Funding Trust 2007-AR2 v. EMC Mortg. LLC*, CA No. 6861 (Del. Ch. Jan. 9, 2012); *see also* Exhibit 14..

20.     Moreover, Wells Fargo is the target of an ongoing investor-led putback initiative launched in October 2011 with respect to *$45 billion* of Wells Fargo-label RMBS. In that initiative, investors provided notice to Wells Fargo of specific ongoing "Events of Default" and demanded that Wells Fargo take immediate action to satisfy its obligations and substantial repurchase liability for ineligible loans securitizing over *149 RMBS trusts* issued by Wells Fargo from 2004 to 2007. Again, those trusts are filled with mortgage loans originated by many of the same lenders that sold large quantities of loans to the Trusts, including American Home ($1.375 billion of loans sold to the Trusts).

21.     Under the Trusts' Governing Agreements, upon Wells Fargo's "discovery" of a loan in breach of the Sellers' representations and warranties, Wells Fargo is obligated to provide written notice of the breach to the responsible Seller (and the other parties to the Governing Agreements) and, if necessary, take action to enforce the Trusts' rights with respect thereto. Wells Fargo systematically failed to provide notice of the Sellers' breaches of representations and warranties because Wells Fargo did not want to jeopardize its close business relationships with the Sellers. Moreover, Wells Fargo originated and sponsored billions of dollars in loans that have been securitized in other RMBS and that contain pervasive breaches of representations and warranties. Many of the same entities that act as sellers for the Trusts here, also service or administrate these defective Wells Fargo-originated or -sponsored loans. Thus, Wells Fargo, in conflict with the Noteholders' interests, refused to provide notice to the responsible Sellers of their breaches to evade liability for its own defective loans.

22.     Apart from Seller representations and warranty breaches, Wells Fargo has known that the Trusts were plagued with systemic servicer violations resulting in Servicing Events of Default under the Governing Agreements. Internal communications reflect ███████████

███████████████████████████████████████

███████████████████████████████████████

█████████

23.     In addition, Wells Fargo has known of Servicer Events of Defaults occurring within the Trusts by virtue of its knowledge of rampant, industrywide servicer violations by the same Servicers for the Trusts.  Indeed, many of the Servicers to the Trusts have faced federal and state regulatory enforcement actions which have led to landmark settlements, including the $25 billion "National Mortgage Settlement" entered into between forty-nine state Attorneys general and some of the Trusts' Servicers.  Notably, without receiving Holder approval, many of these settlement agreements effectively permit the Servicers to use trust assets to finance their settlement payments for their own wrongdoing.

24.     In fact, Wells Fargo itself was the target of many of these same government investigations and lawsuits regarding its deficient servicing operations, standing alongside Servicers to the Trusts, including Countrywide.  For example, during the fourth quarter of 2010, the Federal Reserve Board, the Office of the Comptroller of the Currency ("OCC"), the Federal Deposit Insurance Corporation ("FDIC"), and the Office of Thrift Supervision ("OTS") conducted on-site reviews of the adequacy of controls and governance over servicers' foreclosure processes at Wells Fargo.  The reviews uncovered significant problems in foreclosure processing at Wells Fargo, including "critical weaknesses in [Wells Fargo's] foreclosure governance processes, foreclosure document preparation processes, and oversight and monitoring of third-party vendors, including foreclosure attorneys."[5]  Based on the deficiencies in the review and the risk of additional

---

[5] *See* Interagency Review of Foreclosure Policies and Practices, Federal Reserve System (Apr. 2011), at 2.

issues as a result of weak controls and processes, the Federal Reserve Board initiated formal enforcement actions requiring Wells Fargo to address its pattern of misconduct and negligence related to deficient practices in residential mortgage loan servicing and foreclosure processing. Ultimately, Wells Fargo entered into a consent order with the OCC, which found that it had engaged in "unsafe and unsound practices" with respect to the manner in which Wells Fargo handled various foreclosure and related activities.

25.     Further, Wells Fargo has known of numerous defaults by the Issuers (*i.e.*, the Delaware Statutory Trusts). In particular, in light of these rampant and uncured Seller and Servicer breaches, Wells Fargo knew that the Issuers were breaching their obligations under the Indentures to require (i) the Sellers to abide by their representations and warranties with respect to the mortgage loans and to cure, substitute, or repurchase nonconforming mortgage loans; and (ii) the Servicers to comply with their prudent servicing violations and remedy servicing breaches. Additionally, Wells Fargo knew of the Issuers' failures to provide written notice to Wells Fargo of these Seller and Servicer defaults.

26.     When Wells Fargo learned of these Seller, Servicer and Issuer violations, Wells Fargo had the duty to notify Noteholders of them. Wells Fargo systematically failed, however, to provide notice of the defaults because Wells Fargo did not want to jeopardize its close business relationships with the Sellers and Servicers. Moreover, Wells Fargo had sold defective securities and defective loans and was engaged in the same wrongful servicing conduct. Thus, Wells Fargo, acting in its own self-interest, refused to take action against responsible parties and provide notice to Noteholders of defaults to avoid scrutiny of its own origination, securitization, and servicing business.

27.     Finally, once there were Events of Default, Wells Fargo had the duty to exercise its rights and obligations under the Governing Agreements using the same degree of care and skill as a prudent person would, under the circumstances, in the conduct of his or her own affairs. Wells Fargo blatantly failed to do so. Wells Fargo did nothing to protect the Noteholders, choosing instead to deliberately ignore the Events of Default for its own benefit and to the detriment of the Trusts and Noteholders. The Trusts, and in turn Noteholders, have experienced substantial losses which would not have occurred but for Wells Fargo's failure to perform its responsibilities under the Governing Agreements, the TIA and common law. By failing to perform its duties, Wells Fargo has caused the Trusts and Noteholders to suffer billions of dollars in losses.

## II.     **PARTIES**

28.     Each of the plaintiffs identified in Exhibit 2 attached hereto (collectively, the "Plaintiffs") is a Noteholder in the Trusts as identified in Exhibit 1 attached hereto. Each of the Plaintiffs have or are in the process of receiving authorization to sue from the registered Holder, Cede & Co. for those Trusts identified as containing so-called Negating Clauses that limit the parties who may enforce the Governing Agreement. The Plaintiffs hold the economic and beneficial interest in their Notes and are the true parties in interest. No other party has an economic or beneficial interest in the Plaintiffs' Notes in this matter.

29.     Defendant Wells Fargo is a national banking association organized and existing under the laws of the State of South Dakota with its executive offices at 101 N. Phillips Avenue, Sioux Falls, South Dakota 57104. Wells Fargo operates 50 corporate trust offices across the country, including in New York City, and currently serves as trustee for more than 400 RMBS trusts issued between 2004 and 2008.

30.     Wells Fargo is the primary United States operating subsidiary of Wells Fargo & Company, a multinational banking and financial services holding company with $1.5 trillion in

assets that is headquartered in San Francisco, California, with 265,000 employees and offices worldwide, including numerous offices in New York State and New York City. Wells Fargo & Company is the second largest bank and the twenty-third largest company in the United States. In 2008, Wells Fargo & Company acquired the Charlotte-based bank Wachovia, including Wachovia's RMBS trustee business, in an all-stock transaction valued at approximately $14.8 billion.

31.     Wells Fargo, together with its affiliates, is involved in virtually all aspects of the private-label RMBS market. For example, Wells Fargo originated approximately $1.5 trillion in residential mortgages between 2004 and 2008 that were sold and securitized in various RMBS. Wells Fargo also sponsored approximately 160 RMBS securitizations between 2004 and 2008 with an original face amount of approximately $165 billion. Finally, Wells Fargo, together with various of its loan servicing arms including America's Servicing Company, is one of the largest mortgage loan servicing businesses in the United States, serving as master servicer for approximately $1.16 trillion in RMBS issued between 2004 and 2008.

### III.     JURISDICTION AND VENUE

32.     This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 for violations of the TIA, and supplemental jurisdiction over the remaining claims.

33.     Venue is proper in this District under 28 U.S.C. § 1391(b).

### IV.     COMPLIANCE WITH THE NO ACTION CLAUSE IS EXCUSED

34.     Compliance with the pre-suit requirements of the Trusts' "no action" clause is excused. For all of the Trusts, the no action clause in the Indenture identifies Wells Fargo, as Indenture Trustee, as the sole notice party. If the no action clause's pre-suit requirements for these Trusts were to apply, they would require Plaintiffs to demand that Wells Fargo initiate proceedings against itself and to indemnify Wells Fargo for its own liability to the Trusts, an "absurd"

requirement that the parties did not intend. *See Cruden v. Bank of N.Y.*, 957 F.2d 961, 968 (2d Cir. 1992).

## V.     OVERVIEW OF THE TRUSTS

35.     The Trusts, identified in the attached Exhibit 1, are 12 Delaware statutory trusts, resulting from non-agency residential mortgage-backed securitizations issued between 2004 and 2008, inclusive. The Trusts have a total original principal balance of approximately $11.6 billion, and a current principal balance of approximately $1.7 billion as of January 31, 2016. *See* Exhibit 3. To date, the Trusts have suffered total realized collateral losses of over $914.3 million. *Id.* As a result of defective mortgage collateral and servicer violations, the Trusts have incurred and will continue to incur substantial losses.

36.     Eight lenders were disclosed to have originated loans sold to the Trusts. However, three of these banks collectively contributed over 85% of the loans ($10 billion):



37.    The Trusts were sponsored by seven separate entities:

|   | Sponsor | No. of Trusts | Original Face Amount | Current Amount | Collateral Loss | Loss Severity |
|---|---------|---------------|----------------------|----------------|-----------------|---------------|
| 1 | Impac | 5 | $7,750,463,000 | $676,194,291 | ($488,755,281) | 6.3% |
| 2 | RBS Greenwich | 1 | $489,188,567 | $320,731,055 | n/a | n/a |
| 3 | Morgan Stanley | 1 | $850,000,000 | $311,238,915 | ($58,877,407) | 6.9% |
| 4 | Fieldstone Mortgage | 1 | $358,246,000 | $167,798,970 | ($152,248,359) | 42.5% |
| 5 | American Home Mortgage | 1 | $1,375,335,500 | $89,918,856 | ($28,479,821) | 2.1% |
| 6 | Credit Suisse | 2 | $616,025,000 | $87,801,225 | ($123,961,916) | 20.1% |
| 7 | Bear Stearns | 1 | $189,831,957 | $73,414,127 | ($62,022,139) | 32.7% |
|   | Grand Total | 12 | $11,629,090,024 | $1,727,097,440 | ($914,344,923) | 7.9% |

38.    Seven entities originally served as Master Servicers to the Trusts:

| Master Servicer | No. of Trusts | Original Face Amount | Current Amount | Collateral Loss | Loss Severity |
|-----------------|---------------|----------------------|----------------|-----------------|---------------|
| 1 IMPAC Funding Corp. | 5 | $7,750,463,000 | $676,194,291 | ($488,755,281) | 6.3% |
| 2 Financial Freedom | 1 | $489,188,567 | $320,731,055 | n/a | n/a |
| 3 Morgan Stanley | 1 | $850,000,000 | $311,238,915 | ($58,877,407) | 6.9% |
| 4 Litton Loan Servicing | 1 | $358,246,000 | $167,798,970 | ($152,248,359) | 42.5% |
| 5 Columbia National, Inc. | 1 | $1,375,335,500 | $89,918,856 | ($28,479,821) | 2.1% |
| 6 Irwin Union Bank & Trust Company | 2 | $616,025,000 | $87,801,225 | ($123,961,916) | 20.1% |
| 7 Wilshire Credit Corp | 1 | $189,831,957 | $73,414,127 | ($62,022,139) | $0.3 |
| Grand Total | 12 | $11,629,090,024 | $1,727,097,440 | ($914,344,923) | 7.9% |

## VI.    BACKGROUND

### A.    The Critical Enforcement Function Of The Indenture Trustee

39.    RMBS notes are debt instruments issued to investors by an issuing trust that holds one or more mortgage subpools. The corpus of the trust – like the Trusts at issue here – consists entirely of the underlying mortgage loans.

40.    A RMBS indenture trustee has certain contractual and common law obligations to the trust and its noteholders. By comparison, unlike the indenture trustee, noteholders have no right to act independently on behalf of the Trusts. Moreover, it is extremely difficult for

noteholders to act as a cohesive group where individual bondholder investments are relatively small, minimizing the economic incentive to take action or cooperate. This is exacerbated by the fact that the identities of the trust's noteholders are confidential and constantly change, as notes are actively traded.

41.    For each RMBS note issue, an indenture trustee is appointed to act as a type of agent on behalf of the noteholders collectively to ensure the "efficient centralized enforcement" of the sellers' and servicers' obligations. The governing agreements and the law mandate that an indenture trustee administer the trust as a representative of noteholders to help enforce their rights.

42.    The essential duties and responsibilities of the trustee are identical in all RMBS transactions – namely to represent the trusts and their investors as an independent third party. Between 2003 and 2009, private label RMBS offerings totaled more than $3 trillion. Yet, only a handful of major American financial institutions served as RMBS trustees and contractually agreed to perform the vitally important enforcement functions to protect RMBS investors. Among this handful of major RMBS trustees, Wells Fargo held the fourth largest market share during this period, serving as trustee in 10% of all RMBS securitizations.



Private Label RMBS Trustee Market Share
2003-2009 Cumulative

- Deutsche Bank — 22%
- US Bank — 17%
- Bank of New York — 13%
- Wells Fargo — 10%
- JPMorgan — 9%
- HSBC Bank — 7%
- LaSalle Bank — 7%
- Other — 15%

**B.      Securitization Process**

43.      The process of securitizing mortgages involves a number of steps, each of which is critical to finalize the securitization and sell the RMBS to investors.  First, a sponsor creates a loan pool from mortgages it originated or purchased from other financial institutions.

44.      Second, the sponsor transfers the loans to a "depositor," typically a bankruptcy-remote entity setup by the sponsor, which segments the cash flows and risks in the loan pool among different levels of investment or "tranches."  Generally, cash flows from the loan pool are applied in order of seniority, going first to the most senior tranches.  In addition, any losses to the loan pool due to defaults, delinquencies, foreclosure or otherwise, are applied in reverse order of seniority, and are generally applied first to the most junior tranches.

45.      Third, the depositor conveys the mortgage pool to the trust in exchange for the transfer of the RMBS to the depositor.

46.     Finally, the depositor sells the RMBS to an underwriter, and provides the revenue from the sale to the seller. The underwriter markets and sells the RMBS to investors.

47.     After the transaction closes, the servicer collects payments from the underlying borrowers. After collection, the servicer sends the funds to the trust, which then makes payments to the noteholders. Mortgage delinquencies and defaults reduce the available P&I payments to be paid to the trust and passed through to investors.

48.     Accordingly, if an underlying borrower does not timely make the required payments to the servicer, the servicer should take action to mitigate or minimize the losses to the trust, including foreclosing on the property and providing property maintenance to maximize the return on the investment to the noteholders. Foreclosures result in higher losses to the trust (and therefore to the noteholders) if the value of the collateral is lower than anticipated. For these reasons, proper loan origination and underwriting of the mortgages underlying the RMBS, and proper and timely loan servicing and oversight are essential to the quality of the RMBS and the timely receipt of P&I payments to the trust for distribution to the noteholders.

## VII.     THE GOVERNING AGREEMENTS

49.     Noteholders' rights and Wells Fargo's contractual duties, as Indenture Trustee for the Trusts at issue in this action, are set forth in the relevant securitization agreements, which include Mortgage Loan Purchase and Sale Agreements ("MLPAs"), the Trust Agreement, the Sale and Servicing Agreement ("SSA"), and the Indentures (or similar agreements) (collectively, the "Governing Agreements").

50.     Although the Governing Agreements for each of the Trusts are separate agreements that were individually negotiated and differ slightly in certain respects, the terms that are pertinent to the subject matter of this Complaint are substantially similar, if not identical, in all of the

Governing Agreements and impose substantially the same, if not identical, duties and obligations on the parties to the Governing Agreements.

### A. The Mortgage Loan Purchase And Sale Agreement

51. The MLPA is a contract between either the originator and the sponsor, or the sponsor and the depositor. The MLPA governs the terms of the sale of the mortgage loans acquired for securitization. In its capacity as "seller" under the MLPA, the originator or sponsor makes extensive representations and warranties concerning the characteristics, quality, and risk profile of the mortgage loans.

52. The seller's typical representations and warranties in the MLPAs include, *inter alia*, the following: (i) the information in the mortgage loan schedule is true and correct in all material respects; (ii) each loan complies in all material respects with all applicable local, state and federal laws and regulations at the time it was made; (iii) the mortgaged properties are lawfully occupied as the principal residences of the borrowers unless specifically identified otherwise; (iv) the borrower for each loan is in good standing and not in default; (v) no loan has a LTV ratio of more than 100%; (vi) each mortgaged property was the subject of a valid appraisal; and (vii) each loan was originated in accordance with the underwriting guidelines of the related originator. To the extent mortgages breach the seller's representations and warranties, the mortgage loans are worth less and are much riskier than represented.

53. Under the MLPAs, upon discovery or receipt of notice of any breach of the seller's representations and warranties that has a material and adverse effect on the value of the mortgage loans in the Trusts or the interests of the RMBS investors therein, the seller is obligated to cure the breach in all material respects. The MLPAs do not specify what constitutes "discovery" of a breach or what evidence must be presented to the seller in providing notice of a breach.

54. If a breach is not cured within a specified period of time, the seller is obligated to either substitute the defective loan with a loan of adequate credit quality, or repurchase the defective loan at a specified purchase price (the "Repurchase Price") equal to the outstanding principal balance and all accrued but unpaid interest on the loan to be paid to the Trust. For breaches related to a mortgage loan or acquired property already sold from the Trust (for example, as a result of foreclosure), the seller must pay to the Trust the amount of the Repurchase Price that exceeds the net liquidation proceeds received upon the sale of the mortgage loan or acquired property.

55. The MLPA's repurchase provisions ensure that the Trust need not continue to hold mortgage loans for which the seller breached its representations and warranties. Thus, the repurchase provisions transfer from the Trusts to the sellers the risk of any decline, or further decline, in the value of those mortgage loans.

56. Under the MLPAs, the demanding party must merely show that the breach has a material and adverse effect on the value of the mortgage loans in the Trusts or the interests of the Noteholders in the loans. The seller's cure, substitute and repurchase obligations do not require any showing that the related mortgage loan has experienced a realized loss, that the seller's breach of representations and warranties caused any realized loss in the related mortgage loan in the form of default or foreclosure, or that the demanding party relied on servicing and origination documents at any point in time.

57. Upon the sale of the mortgage loans to the Trust, the rights under the MLPAs, including the sellers' representations and warranties concerning the mortgage loans, were assigned to Wells Fargo, as Indenture Trustee for the benefit of the Noteholders, in accordance with the Indentures.

**B.     The Trust Agreement**

58.     The Trust Agreement is a contract between the Depositor, an entity known as the Owner Trustee, and other entities, which creates a Delaware statutory trust known as the "Issuer," which issues the notes.

**C.     The Sale And Servicing Agreement**

59.     The SSA (sometimes called a Transfer and Servicing Agreement) is a contract between the Depositor, the Master Servicer, the Issuer, the Sponsor and Wells Fargo, as the Indenture Trustee, among others, pursuant to which: (i) the Depositor conveys its right, title, and interest in the mortgage loans to the Issuer; (ii) the Issuer conveys to the Depositor certificates of the Issuer; and (iii) the Master Servicer agrees to supervise, monitor, and oversee the obligations of the servicer to service the loans.

**D.     The Indenture**

60.     The Indenture is a contract between the Issuer and Wells Fargo, as the Indenture Trustee, among others, pursuant to which the Issuer issues notes, which it conveys to the Depositor, again in exchange for the certificate described above. Subsequently, the notes are sold to investors. As part of the same agreement, the Issuer pledges its rights relating to the certificates to the Indenture Trustee to secure its P&I payment obligations on the notes. Wells Fargo, as the Indenture Trustee, holds this pledge on behalf of investors who purchase the notes.

**VIII.   WELLS FARGO'S DUTIES UNDER THE GOVERNING AGREEMENTS**

61.     The Governing Agreements, and in particular the SSAs and Indentures, set forth Wells Fargo's contractual duties and obligations to the Noteholders, which are substantially similar for each Trust.  Further, upon information and belief, Wells Fargo employed the same general set of policies and procedures to oversee and manage the Trusts regardless of variations among the Governing Agreements.

### A. Duty To Hold Trust Assets For The Benefit Of Noteholders

62.     The Governing Agreements require that Wells Fargo hold the Trust assets for the use and benefit of all present and future Noteholders.[6]

### B. Duties To Provide Notice Of Breaches And To Enforce Seller Repurchase Obligations

63.     The Governing Agreements require Wells Fargo to give prompt written notice to all parties upon its discovery of a breach of a representation or warranty made by a seller that materially and adversely affects the value of any mortgage loan or the interests of the Noteholders in any loan, and to take such action as may be necessary or appropriate to enforce the rights of the Trusts with respect to the breach.[7]

### C. Duties Regarding The Servicers

64.     Under the Governing Agreements, Wells Fargo, as Indenture Trustee, has certain duties with respect to enforcing the obligations of the servicers. In particular, where Wells Fargo learns of a servicer's failure to observe or perform in any material respect any other covenants or agreements under the SSAs, Wells Fargo must promptly provide written notice to the servicer.[8]

65.     The SSAs also set forth the Indenture Trustee's obligations upon occurrence of a Servicer "Event of Default," which is defined as a specified failure of the servicer to perform its

---

[6] *See* Exhibit 5, Chart 1.

[7] *See* Exhibit 5, Chart 2. Some of the Trusts' Governing Agreements are silent as to which entity is responsible for enforcing the sellers' compliance with their repurchase obligations, prior to an Event of Default. FMIC 2007-1, SSA § 3.02. Regardless, Wells Fargo's failure to provide notice of seller breaches it discovered or otherwise taking action against the responsible seller violated its contractual obligations. In addition, Plaintiffs allege the occurrence of Events of Default, upon which Wells Fargo has a duty to act as a prudent person and must exercise its right to enforce seller repurchase obligations. FMIC 2007-1 § 6.01(a).

[8] *See* Exhibit 5, Chart 3.

servicing duties and cure this failure within a specified time period.[9] The SSAs identify several types of failures by the servicers that may give rise to a Servicer Event of Default, including the servicer's failure to observe or perform in any material respect any covenants or agreements in the SSA, the servicer's bankruptcy or insolvency, and for certain of the Indenture Trusts, Trigger Events tied to a Cumulative Loss Trigger Event or a Delinquency Trigger Event.

66.     If a Servicer Event of Default occurs under the SSA which a responsible officer of Wells Fargo, as Indenture Trustee, has received written notice or has actual knowledge of, Wells Fargo must give prompt written notice to all Noteholders of the Servicer Event of Default.[10]

67.     The remedies for uncured Servicer Events of Default include termination of the servicer and recoupment of Trust assets lost as a result of the servicers' violations.[11] As detailed herein, Wells Fargo did not perform its duties to enforce the obligations of the servicers, did not provide written notice of Servicer Events of Defaults to Noteholders and did not initiate any action against the servicers for the benefit of Noteholders.

### D.     Duties Upon An Indenture Event Of Default

68.     The Indenture requires the Issuer to enforce any rights with respect to the Trust and preserve and defend title to the Trust and the rights of the Indenture Trustee and the Noteholders in such Trust against the claims of all persons and parties.[12]

---

[9] *See* Exhibit 5, Chart 4.

[10] *See* Exhibit 5, Chart 6. Some of the Trusts' Indentures do not specifically set forth this provision. However, this variance is insignificant given that all the Trusts' Indentures incorporate the Indenture Trustee's duties under the TIA, whether or not they are physically contained in the Indenture, including the Indenture Trustee's duty to give notice to Noteholders upon knowledge of a default. *See* Exhibit 5, Chart 7; 15 U.S.C. § 77ooo(b).

[11] *See* Exhibit 5, Chart 8.

[12] *See* Exhibit 5, Chart 9.

69.     The Indentures define a "default" as "[a]ny occurrence which is or with notice or the lapse of time or both would become an Event of Default."[13] An Event of Default occurs under the Indenture, when, among other things, the Issuer fails to observe or perform any covenants or agreements made in the Indenture, and such default is not cured within a specified period of time after notice is given to the Trust by Wells Fargo, as Indenture Trustee.[14]

70.     Upon learning of the occurrence of a default, the Indenture requires the Issuer to provide written notice to Wells Fargo of the status of the default and what action the Issuer is taking or proposes to take with respect thereto.  The Indenture also requires the Issuer to provide Wells Fargo with prompt written notice of each Event of Default under the Indenture.[15]

71.     If an Event of Default under the Indenture has occurred and is continuing, Wells Fargo must exercise the rights and powers vested in it by the Indenture and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.[16] Such rights and powers under the Indenture expressly include Wells Fargo's ability to enforce the rights of the Trusts and Noteholders as against all parties responsible for harming the Trusts, including by instituting litigation against responsible sellers and servicers.[17]

72.     Under the Indenture, Wells Fargo must also promptly mail to each Noteholder notice of the Event of Default unless such Event of Default shall have been waived or cured, or in

---

[13] *See* Exhibit 5, Chart 10.

[14] *See* Exhibit 5, Chart 11.

[15] *See* Exhibit 5, Chart 12.

[16] *See* Exhibit 5, Chart 13.

[17] *See* Exhibit 5, Chart 14.

certain limited circumstances, if in good faith it determines that withholding the notice is in the best interests of Noteholders.[18]

## IX. THE TRUSTS SUFFERED FROM PERVASIVE BREACHES OF REPRESENTATIONS AND WARRANTIES BY THE SELLERS

73.     Each of the Trusts' loan pools contains a high percentage of loans that materially breached the sellers' representations and warranties, which adversely affected the value of those mortgage loans and the Trusts' and Noteholders' interests in those mortgage loans. Specifically, the representations and warranties regarding the originators' compliance with underwriting standards and practices, owner occupancy statistics, appraisal procedures, LTV and CLTV ratios were systemically and pervasively false. The falsity of these representations and omissions is demonstrated by: (1) the high default rates of the mortgage loans; (2) the collateral losses suffered by the Trusts; (3) the plummeting credit ratings of the RMBS; (4) evidence highlighting the Sellers' (i) routine abandonment of their underwriting guidelines, (ii) widespread fabrication of borrower and loan information, (iii) massive breaches of their representations and warranties, and (iv) engagement in predatory and abusive lending; and (5) the results of forensic reviews and re-underwriting of loans within the Trusts in other litigation.

### A.     The Trusts' Mortgage Loans Have Experienced High Delinquency, Modification, And Loss Severity Rates

74.     The extremely high delinquency, modification and collateral loss rates of the mortgage loans within the Trusts are strong evidence of the Sellers' misrepresentation of the credit quality and characteristics of the mortgage loans they sold to the Trusts. As reflected by Exhibits 3 and 4, the Trusts have experienced payment problems significantly beyond what was expected

---

[18] *See* Exhibit 5, Chart 15.

for loan pools that were properly underwritten, and which contained loans that actually had the characteristics the Sellers represented and warranted. As reflected by Exhibit 4, as of January 1, 2009, approximately 23.18% of the relevant mortgage loans across the Trusts were seriously delinquent. Within certain RMBS-sponsor labels, such as the Bear Stearns-label Trusts, approximately 45% of the relevant mortgage loans were delinquent. Moreover, an astounding 34.2% or more of the relevant mortgage loans were delinquent in at least six of the Trusts. Further, two of the Trusts have delinquency rates of above 40% for the mortgage loans remaining in the Trusts.

75. As reflected by Exhibit 8, loan modifications in the Trusts also dramatically increased beginning in early 2009, providing further evidence of systemic seller breaches of representations and warranties in the Trusts. In general, loan modifications change the terms of the original mortgage contract agreed to by the lender and borrower, typically to ease the borrower's monthly payment obligation so the borrower may remain current and avoid default. Loan modifications often include changes to the loan's interest rate, term, and/or outstanding principal. As with delinquency rates, the extent of loan modifications is indicative of breaches of representations and warranties for at least two reasons. First, escalating loan modifications correlate to misstated borrower income and creditworthiness. Second, the servicers' decisions to modify rather than foreclose on loans indicates that the underlying collateral is not adequate security to satisfy the outstanding balance, because the original LTV ratio (or CLTV ratio) was not as represented because the appraised property value was misstated and additional liens encumbered the mortgaged property.

76. As a result of the severe delinquencies, modifications, borrower defaults and foreclosures, the Trusts incurred tremendous collateral losses. By January 1, 2009, collateral losses

in the Trusts had already reached over $219 million. By January 1, 2011, realized losses increased to $607 million.

77.     The economic downturn cannot explain the abnormally high percentage of delinquencies, modifications, defaults, foreclosures, and losses observed in the loan pools ultimately backing the notes. Loan pools that were properly underwritten and contained loans with the represented characteristics would have experienced substantially fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquencies.

**B.      The Notes Have Experienced Massive Credit Downgrades**

78.     The significant rating downgrades experienced by the notes issued by the Trusts are also strong evidence that the underlying loans were improperly underwritten, and that they do not have the credit risk characteristics the sellers represented and warranted.

79.     Credit ratings are opinions about credit risk published by a rating agency. In issuing its credit ratings for RMBS, the rating agencies consider the quality of the underlying loan collateral and creditworthiness of the borrower to determine the relative likelihood that the RMBS may default. At the time of securitization, all of the Trusts' senior tranches were rated "investment grade." Bond rating firms, such as Standard & Poor's, use different designations consisting of upper- and lower-case letters 'A' and 'B' to identify a bond's credit quality rating. "AAA" and "AA" (high credit quality) and "A" and "BBB" (medium credit quality) generally are considered investment grade. An investment grade rating signifies that the bond has a relatively low risk of default and is judged by the rating agencies as likely to meet payment obligations such that banks and institutional investors are permitted to invest in them. Credit ratings for bonds below investment grade designations (*i.e.*, "BB", "B", "CCC", etc.) are considered low credit quality, and are commonly referred to as "junk bonds."

80. However, as public disclosures revealed the originators' and sponsors' systemic underwriting and securitization abuses and Wells Fargo began reporting severe collateral losses in the Trusts, the Trusts' notes' credit ratings were drastically downgraded. Currently, approximately 76% of the senior tranches in the Trusts had been downgraded at least once. Across all Trusts, over 86% of all notes had been downgraded by at least one credit rating agency. Finally, over 70% of the senior notes had been downgraded to junk bond status, a startling number.

### C.    The Systemic Disregard Of Underwriting Standards Was Pervasive During The Relevant Period

81. During the height of the mortgage and securitization boom in the U.S. market between 2004 and 2008, originators of residential mortgage loans sold loans securitized in RMBS that violated their stated underwriting guidelines and breached the representations and warranties made to the purchasers of the loan pools.

82. Government investigations and reports and newspaper reports have uncovered the extent of the loan originators' pervasive abandonment of underwriting standards. For example, the Permanent Subcommittee on Investigations in the United States Senate ("PSI") released a report detailing the causes of the financial crisis. Using Washington Mutual ("WaMu") as a case study, the PSI concluded through its investigation:

> Washington Mutual was far from the only lender that sold poor quality mortgages and mortgage backed securities that undermined U.S. financial markets. The Subcommittee investigation indicates that Washington Mutual was emblematic of a host of financial institutions that knowingly originated, sold, and securitized billions of dollars in high risk, poor quality home loans. These lenders were not the victims of the financial crisis; the high risk loans they issued became the fuel that ignited the financial crisis.[19]

---

[19] *Wall Street And The Financial Crisis: Anatomy Of A Financial Collapse*, United States Senate Permanent Subcomm. on Investigations, 112th Cong. 50 (2011).

83.     Similarly, in January 2011, the Financial Crisis Inquiry Commission ("FCIC")
issued its final report that detailed, among other things, the collapse of mortgage underwriting
standards and subsequent collapse of the mortgage market and wider economy.[20] The FCIC Report
concluded that there was a "systemic breakdown in accountability and ethics." "Unfortunately –
as has been the case in past speculative booms and busts – we witnessed an erosion of standards
of responsibility and ethics that exacerbated the financial crisis." *Id*. at xxii. The FCIC found:

> [I]t was the collapse of the housing bubble – fueled by low interest rates, easy and
> available credit, scant regulation, and toxic mortgages – that was the spark that
> ignited a string of events, which led to a full-blown crises in the fall of 2008.
> Trillions of dollars in risky mortgages had become embedded throughout the
> financial system, as mortgage-related securities were packaged, repackaged, and
> sold to investors around the world.

*Id*. at xvi.

84.     During the housing boom, mortgage lenders focused on quantity rather than quality,
originating loans for borrowers who had no realistic capacity to repay the loan. The FCIC Report
found "that the percentage of borrowers who defaulted on their mortgages within just a matter of
months after taking a loan nearly doubled from the summer of 2006 to late 2007." *Id*. at xxii.
Early Payment Default is a significant indicator of pervasive disregard for underwriting standards.
The FCIC Report noted that mortgage fraud "flourished in an environment of collapsing lending
standards . . . ." *Id*.

**D.     The Originators' Rampant Underwriting Failures**

85.     Much like other RMBS trusts of the same vintage, the Trusts have been materially
and adversely impacted by the loan origination industry's rampant underwriting failures. The

---

[20] *Final Report Of The National Commission Of The Causes Of The Financial And Economic Crisis In The United States*, Fin. Crisis Inquiry Comm'n ("FCIC Report") (2011).

originators' systemic and pervasive sale to the Trusts of residential mortgage loans in breach of representations and warranties is confirmed through numerous federal and state government investigations and published reports, well publicized news reports, and public and private enforcement actions that have described rampant underwriting failures throughout the period in which the Trusts were created and, more specifically, failures by the same originators whose mortgage loans were sold to the Trusts.

86.     Indeed, the mortgage loans underlying the Trusts were originated by some of the worst lenders during the relevant time period, including Impac, American Home, and Morgan Stanley. Through public and private investigations and litigation, each of these RMBS lenders have been shown to have systemically abandoned their own underwriting guidelines during the relevant time period, churning out billions of dollars in loans with LTVs, owner occupancy status, title condition and other qualities and characteristics that were materially different than as represented and saddling RMBS trusts, including those at issue here, with significantly impaired collateral. A summary of testimonial and documentary evidence as to each of these major originators of the mortgage loans to the Trusts is set forth in Exhibit 10.

E.     **The Systemic Disregard Of Prudent Securitization
Standards Was Pervasive During The Relevant Period**

87.     It is equally well documented that between 2004 and 2008, the sponsors that securitized the residential mortgages and transferred them into the RMBS trusts failed to conduct adequate due diligence reviews of the mortgage pools to ensure the mortgage loans were of the same credit quality as represented and complied with federal and state law, as well as that the purported mortgaged property's appraised value was accurate.

88.     As the FCIC Report noted:

The Commission concludes that firms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly

-31-

waived compliance with underwriting standards. Potential investors were not fully informed or were misled about the poor quality of the mortgages contained in some mortgage-related securities. These problems appear to have been significant.

FCIC Report at 187.

89.     As made clear in the FCIC Report, in their zeal to keep the securitization machine going and at the behest of originators, RMBS sponsors and their third party due diligence providers failed to analyze adequate sample sizes of the loan pools, sometimes reviewing as little as 2%-3% of the entire loan pools. Moreover, when the sponsors' and their due diligence firms identified high percentages of mortgage loans in their sample reviews as deficient, sponsors pervasively "waived in" mortgage loans to preserve their business relationships with the originators or to keep the defective loans off their own books. Consequently, by 2011, it was apparent to all players in the United States mortgage and securitization industry, including Wells Fargo, that the mortgage loans deposited in RMBS trusts issued between 2004 and 2008 materially breached the sponsors' representations and warranties.

90.     Recent landmark settlements between the government and major financial institutions have further detailed the systemic and pervasive disregard of underwriting standards by lenders during the relevant time period, and have confirmed that these practices infiltrated the Trusts. For example, on November 19, 2013, the Justice Department, along with federal and state regulators, announced a $13 billion settlement with JPMorgan – the largest settlement with a single entity in American history – to resolve federal and state civil claims arising out of the packaging, marketing, sale and issuance of 1,128 RMBS offerings by JPMorgan, Bear Stearns and WaMu prior to January 1, 2009, including eight of the Trusts. *See* Exhibit 12. As part of the settlement, JPMorgan acknowledged that it regularly included loans within the securitizations "***that did not***

-32-

*comply* with the originator's underwriting guidelines" and breached the originator's representations and warranties.

91.     On July 14, 2014, the Justice Department, together with federal and state regulators, announced a $7 billion settlement with Citigroup Inc. to resolve federal and state civil claims related to Citigroup's conduct in the packaging, securitization, marketing, sale and issuance of 633 RMBS offerings issued prior to January 1, 2009, including one of the Trusts. The settlement included an agreed upon statement of facts wherein Citigroup acknowledged that significant percentages of the mortgage loans within the securitizations contained material defects. *See* Exhibit 12.

92.     On August 21, 2014, the Justice Department, together with federal and state regulators, announced a $16.65 billion settlement with Bank of America Corporation, and Banc of America Mortgage Securities, as well as their current and former subsidiaries and affiliates (collectively, "Bank of America") to resolve federal and state civil claims related to Bank of America's conduct in the packaging, securitization, marketing, sale and issuance of 2,000 RMBS offerings issued prior to January 1, 2009, including six of the Trusts. The settlement included an agreed upon statement of facts wherein Bank of America acknowledged that significant percentages of the mortgage loans within the securitizations contained material defects. *See* Exhibit 12.

93.     On February 11, 2016, the Justice Department, together with federal and state regulators, announced a $3.2 billion settlement with Morgan Stanley to resolve federal and state civil claims related to Morgan Stanley's marketing, sale and issuance of RMBS, including one of the Trusts. As part of the agreement, Morgan Stanley acknowledged in writing that it failed to disclose critical information to prospective investors about the quality of the mortgage loans

-33-

underlying its RMBS and about its due diligence practices, which caused investors to suffered billions of dollars in losses. *See* Exhibit 12.

F.    **The Sponsors' Widespread Breach**
        **Of Representations And Warranties**

94.    As with other RMBS trusts of the same vintage, the Trusts have been materially impacted by the sponsors' faulty securitization practices. The sponsors' systemic and pervasive sale of residential mortgage loans in the Trusts in breach of representations and warranties is confirmed through several federal and state government investigations and published reports, well publicized news reports, and public and private enforcement actions that have described endemic due diligence failures throughout the period in which the Trusts were created and, more specifically failures by the same sponsors whose mortgage loans were deposited into the Trusts.

95.    In fact, it is now well-known that in connection with the securitization of loans for RMBS trusts including those at issue here, the Trusts' major sponsors, Impac, RBS Greenwich, Morgan Stanley, American Home, Credit Suisse and Bear Stearns, systemically disregarded their own and third-party due diligence reports reflecting the defective nature of the underlying mortgage loans, and as a result materially breached representations and warranties contained in the Governing Agreements. A summary of testimonial and documentary evidence as to each of the major sponsors of the mortgage loans to the Trusts is set forth in Exhibit 9.

G.    **Litigation Confirms The Sellers' Rampant Breaches**
        **Of Representations And Warranties By The Sellers**

96.    As reflected by Exhibit 11, at least two of the Trusts have been the subject of significant RMBS litigation which involved or was made known to Wells Fargo: *Prudential v. Bank of America*, No. 2:13-CV-01586 (D.N.J March 14, 2013), and *Texas County and District Retirement System v. J.P. Morgan Securities, et al.*, No. D-1-GN-14-000998 (Tex. Dist. Apr. 3, 2014). In each of these actions, investors provided detailed allegations concerning the sellers'

systemic abandonment of underwriting standards that resulted in these Trusts and Noteholders suffering substantial losses. In those actions, the plaintiffs' allegations were substantiated through forensic reviews of loan files for specific loans within the Trusts, which revealed rampant breaches of the sellers' representations and warranties concerning the loans' LTV ratios, owner occupancy, and other material qualities and characteristics.

## X. WELLS FARGO KNEW THAT THE TRUSTS WERE FILLED WITH DEFECTIVE LOANS

97. There is ample evidence that beginning in 2009 and by 2011, Wells Fargo knew that each of the Trusts' loan pools contained high percentages of mortgage loans that materially breached the sellers' representations and warranties regarding their characteristics and credit quality.

### A. Unresolved Exception Reports

98. Under the Governing Agreements, Wells Fargo was required to identify loan files that contained missing or incomplete documentation in the "Document Exception Report." Wells Fargo was also required to certify in the "Final Certification of the Trustee" that it had taken physical possession of the mortgage loan files, had reviewed all of the loan files for the mortgage loans in the Trusts and those files – other than those listed on the "Document Exception Report" – contained complete and accurate documentation and had been properly endorsed and assigned over to Wells Fargo as Indenture Trustee for the Trusts.

99. ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████

**B.    Wells Fargo And Its Responsible
        Officers Received Written Notice From
        Investors Of Pervasive And Systemic Seller Breaches**

100.    Wells Fargo's internal records have confirmed that ████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████

101.    On January 31, 2012, a group of major institutional mortgage investors in several dozen RMBS trusts sponsored by Morgan Stanley or its affiliates issued written instructions to Wells Fargo and U.S. Bank, as trustees, to open investigations into large numbers of ineligible mortgages in the loan pools securing those trusts and the deficient servicing of those loans (the "Morgan Stanley Putback Initiative"). The notices covered more than $25 billion of RMBS issued by Morgan Stanley from 2005 to 2007, including the trusts with common originators and sponsors at issue with the Trusts herein.

102.    The Morgan Stanley Putback Initiative identified and seeks to compel the repurchase of large quantities of loans originated by many of the same lenders that also originated large quantities of the loans sold to the Trusts, including Morgan Stanley ($850 million of loans sold to the Trusts) and American Home Mortgage ($1.3 billion of loans sold to the Trusts); and

(2) securitized by an investment bank that sponsored 1 of the Trusts: Morgan Stanley ($850 million of loans sold to the Trusts).

103. For example, on December 16, 2011, a group of major institutional mortgage investors in hundreds of RMBS trusts sponsored by JPMorgan or its affiliates issued written instructions to Wells Fargo, The Bank of New York Mellon ("BNYM"), HSBC, and U.S. Bank, as trustees, to open investigations into large numbers of ineligible mortgages in the loan pools securing those trusts and deficient servicing of those loans (the "JPMorgan Putback Initiative"). The notices covered more than $95 billion of RMBS issued by JPMorgan from 2005 to 2007. Less than two years later, Wells Fargo and the other trustees were presented with a $4.5 billion settlement offer covering 330 JPMorgan-sponsored RMBS trusts. On August 1, 2014 and October 2, 2014, all of the trustees involved in the JPMorgan Putback Initiative, including Wells Fargo, accepted JPMorgan's $4.5 billion offer for the vast majority of the 330 trusts included in the offer and petitioned the Supreme Court of the State of New York for approval of the settlement.

104. The JPMorgan Putback Initiative identified and seeks to compel the repurchase of large quantities of loans originated by many of the same lenders that also originated large quantities of the loans sold to the Trusts, including Impac ($7.7 billion of loans sold to the Trusts) and American Home Mortgage Corp. ($1.3 billion of loans sold to the Trusts).

105. On May 14, 2012, a group of major institutional mortgage investors in several hundred RMBS trusts sponsored by ResCap or its affiliates reached agreement with ResCap and its affiliated debtors to resolve claims for breaches of representations and warranties concerning large numbers of loans in the pools securing those trusts (the "ResCap Putback Initiative"). The settlement covered more than $320 billion of RMBS largely issued between 2004 and 2008, including 195 trusts for which Wells Fargo serves as trustee. The trustees for these trusts, which

-37-

were aware of the repurchase and servicing claims through, among other things, the bankruptcy proceedings, are Wells Fargo, U.S. Bank, and BNYM.

106.     The ResCap Putback Initiative identified and seeks to compel the repurchase of large quantities of loans originated by many of the same lenders that also originated large quantities of the loans sold to the Trusts, including Impac Funding ($7.7 billion of loans sold to the Trusts) and American Home ($1.3 billion of loans sold to the Trusts).

107.     Despite Wells Fargo's actual notice of widespread loan defaults and breaches by the same originators, sponsors, and servicers that originated, sponsored, and serviced the loans underlying the Trusts at issue here, as the examples above illustrate, Wells Fargo failed to act in accordance with its obligations under the Governing Agreements and TIA to enforce the originators' and sponsors' obligations to cure, substitute or repurchase defective mortgage loans and the servicers' obligations to follow proper servicing practices.

### C.     Wells Fargo Monitored The Performance Of The Trusts

108.     Wells Fargo and its responsible officers had discovered by 2009 that the Trusts' loan pools were afflicted by severe and pervasive breaches of seller representations and warranties by virtue of the Trusts' abject performance.  Indeed, as Wells Fargo has admitted in internal documents ███████████████████████████████████████████████████
██████████████████████████████

109.     As noted above, it was evident by January 2009 that given the extremely high mortgage loan delinquency, modification, default, foreclosure and loss severity rates within the Trusts' loan pools, the mortgage loans sold to the Trusts were not as the sellers had represented and warranted.

110. Wells Fargo was aware of these events as they monitored the Trusts' performance. For example, they were provided with regular reports regarding the performance of the mortgage loans in each of the Trusts by the servicers and other of its agents. In addition, Wells Fargo published monthly reports of the performance of the mortgage loans in each of the Trusts, which included delinquent loans, loans that had gone into foreclosure and those which had realized losses upon the sale of their collateral. Moreover, Wells Fargo was acutely aware of the credit ratings for the Trusts because as part of the rating agencies' ongoing surveillance and monitoring of the Trusts, Wells Fargo fielded inquiries and provided detailed data to the rating agencies so that they could make informed decisions on their grading of the securities.

111. Indeed, for at least 3 of the Trusts, the historical delinquencies and collateral losses within the Trusts' loan pools has been so severe that it has caused "Triggering Events" under the Trusts' Governing Agreements, causing Wells Fargo to change the distribution of Trust proceeds, evaluate the performance of the Trusts' servicers, and make increased disclosures to the credit rating agencies. Moreover, for two of the Trusts, such Triggering Events constituted Events of Default under the Governing Agreements contractually obligating Wells Fargo to take on heightened duties, including acting prudently to protect Noteholders' rights and taking action against responsible parties.

112. ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

**D.     Wells Fargo Received Written Notice Of
        Pervasive And Systemic Seller Breaches From Insurers**

113.     Wells Fargo also discovered that the Trusts' loan pools contained high percentages of mortgage loans that materially breached the originators' and sponsors' representations and warranties through high rates of denials of mortgage insurance coverage for defaulted loans. Internal communications confirm that Wells Fargo ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████

114.     Wells Fargo also discovered that the Trusts' loan pools contained high percentages of mortgage loans that materially breached the originators' and sponsors' representations and warranties through its involvement in financial guaranty insurer litigation involving these same originators and sponsors in its capacity as trustee or servicer.

115.     Financial guaranty insurers provide financial guaranty insurance for RMBS issued from many of the Trusts. Under the Governing Agreements for these insured RMBS, the mortgage loan sellers to the Trusts made numerous representations and warranties concerning quality and origination practices for the mortgage loans. The Governing Agreements for the insured RMBS also create a repurchase protocol pursuant to which the monoline insurers must provide notice of a breach of representation and warranty to the responsible mortgage loan seller and the parties to the Governing Agreement (including the Trustee), in order to compel the responsible mortgage loan seller to repurchase loans that breach representations and warranties.

116.     Monoline insurers have initiated numerous lawsuits against responsible mortgage loan sellers for breach of their representations and warranties in connection with other RMBS trusts to which Wells Fargo serves as trustee or a Wells Fargo affiliate served as sponsor. Prior to filing suit against the originators and/or sponsors, the monoline insurers (unlike Noteholders) were

often able to obtain access to loan files or conduct a forensic loan level review of the loans, which showed systemic and pervasive breaches of the representations and warranties in securitizations with the same sellers to the Trusts.

117.    Plaintiffs are informed and believe that consistent with the repurchase protocol under the Trusts' governing documents, Wells Fargo was notified by both the responsible mortgage loan sellers and the parties to the Governing Agreements of these sellers' systemic and pervasive breaches of representations and warranties.

### E.    Wells Fargo Discovered Widespread Seller Breaches Of Representations And Warranties In Other Capacities

118.    In addition to acting as a trustee, ████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

119.    Wells Fargo was also among the largest mortgage loan servicer to the RMBS industry during the relevant period, servicing a portfolio of nearly 9 million loans.  Many of these loans were originated and sponsored by the same mortgage loan sellers to the Trusts.  In connection with servicing these loan sellers' loans, Wells Fargo was in a front row seat to view mortgage loan sellers' abusive underwriting and securitization practices.  For example, as servicer to these other RMBS trusts containing loan pools originated and securitized by the same mortgage loan sellers to the Trusts, Wells Fargo prepared monthly reports for the trustees that detailed the similarly poor performance of these loan pools.  Additionally, as servicer, Wells Fargo knew of the credit agencies' similar downgrading of these trusts as result of the poor credit quality of these same

originators' and sponsors' loan pools. Further, in servicing and administrating the loans, including during the modification process, Wells Fargo examined the loan files of mortgage loans originated and sponsored by these entities and in the process discovered systemic and pervasive breaches of representations and warranties in the loan pools. ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

F. **Reports, Investigations And Litigation Involving The Sellers**

120. As discussed above, since 2009 there has been a steady stream of public disclosures regarding the originators' systemic underwriting abuses and the sponsors' faulty securitization practices. As a result of the highly publicized government investigations, reports and enforcement actions, as well as high profile RMBS litigation involving the originators, sponsors and the Trusts themselves, Wells Fargo and its responsible officers knew that the Trusts' loan pools contained high percentages of mortgage loans that materially breached seller representations and warranties.

XI. **THE TRUSTS SUFFER FROM PERVASIVE SERVICER VIOLATIONS**

121. In the aftermath of the financial crisis, the mortgage loan servicing industry has received increased scholarly, public, regulatory and political attention as a result of rampant servicing abuses in connection with the administration of and foreclosing on mortgage loans backing private-label RMBS.

122. Much like other private-label RMBS trusts of the same vintage, each of the Trusts suffer from ongoing Servicer Events of Default caused by the servicers' failure to observe and perform, in material respects, the covenants and agreements imposed on them by the Governing Agreements. The servicers' breach of their covenants is confirmed through federal and state government investigations and published reports, well publicized news reports, and public and private enforcement actions that have described RMBS servicers' systemic and pervasive deviation

from usual, customary and lawful servicing practices in their administration of mortgages and, more specifically, illegal and illicit servicing activities by the same servicers who service the loans held by the Trusts.

### A. The Servicers Failed To Give Notice Of Seller Breaches Of Representations And Warranties

123. As with the Trustee, the Indentures require the servicers to give prompt written notice to all parties to the SSAs of a breach of a representation or warranty made by a seller in respect of the mortgage loans that materially and adversely affects the value of any mortgage loan or the interests of the Noteholders in any such mortgage loan, upon the servicer's discovery of such breach.

124. In many cases, the servicers are affiliates of the sellers because in connection with the sale of a loan pool, the seller secured the retention of servicing rights to loans for its servicing division. These servicers had actual knowledge of their affiliate mortgage loan sellers' abusive underwriting and securitization practices and, therefore, had actual knowledge at the time of the Trusts' purchase of these loans that the sellers included high percentages of defective loans within the loan pools. These servicers failed to notify parties to the SSAs of the discovery of mortgages that were in violation of applicable representations and warranties at the time they were purchased by the Trusts, and failed to enforce the sellers' repurchase obligations, despite their awareness of loans that were in violation of representations and warranties.

125. Further, as noted above, the servicers have regularly modified mortgage loans held by the Trusts. Plaintiffs are informed and believe that in the process of modifying these mortgage loans, the servicers have discovered that specific loans breached applicable seller representations and warranties as the loan modification process involves scrutinizing the underlying origination and mortgage loan files, and any supplemental information provided by the borrower to assess the

borrower's ability to pay. In fact, borrowers often conceded in their loan modification requests that they had overinflated their income and/or lied about their employment status, and thus were unable to make their mortgage payments. Thus, in the process of performing loan modifications, the servicers had to have discovered breaches of representations and warranties regarding the characteristics of the loan, the creditworthiness of the borrower, the adequacy of the collateral and the title status of the mortgages. Nevertheless, the servicers systemically failed to notify the other parties of these breaches.

126. As also set forth above, there has been widespread public evidence of the originators' abandonment of underwriting guidelines and the sponsors' faulty securitization practices that made the servicers aware of material seller breaches of representations and warranties within the Trusts' loan pools. Nevertheless, the servicers have not notified the other parties to the SSAs of these seller breaches or enforced the sellers' repurchase obligations.

127. Further, the servicers have been specifically notified by monoline insurers of pervasive breaches by the sellers. Notwithstanding the servicers' "discovery" of material breaches of representations and warranties, the servicers have not notified the other parties to the SSAs of these breaches.

128. The servicers' systemic and pervasive failure to give notice of the sellers' material breaches of representations and warranties and to enforce the sellers' repurchase obligations have materially affected the rights of the Trusts and all Noteholders in that they have deprived the Trusts of mortgage loans of adequate credit quality, or alternatively funds representing the "Repurchase Price" under the Governing Agreements, with respect to each defective mortgage loan.

**B.    The Servicers Have Violated Their Prudent Servicing Obligations**

129. The SSAs require that the servicer service and administer the mortgage loans for and on behalf of the Noteholders (i) in the same manner in which it services and administers similar

mortgage loans for its own portfolio or for other third parties, giving due consideration to customary and usual standards of practice of prudent institutional mortgage lenders servicing similar loans; (ii) with a view to maximizing the recoveries with respect to such mortgage loans on a net present value basis; and (iii) without regard to, among other things, the right of the servicer to receive compensation or other fees for its services under the SSA, the obligation of the servicer to make servicing advances under the SSA, and the servicer's ownership, servicing or management for others of any other mortgage loans.

130.    As demonstrated by Exhibit 13, highly publicized government enforcement actions, private litigation and settlements involving the servicers demonstrate that the servicers have systemically and pervasively violated these prudent servicing obligations.

131.    The servicers' systemic and pervasive failure to observe their prudent servicing obligations have materially affected the rights of the Trusts and all Noteholders in that the violations have exacerbated the Trusts' losses and have fostered uncertainty as to the timely recovery of collateral.

**C.     The Servicers Have Violated Their Foreclosure Obligations**

132.    The SSAs require the servicers to use their best efforts, consistent with accepted servicing practices, to foreclose upon or otherwise comparably convert the ownership of properties securing such of the mortgage loans as they come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments. Moreover, each of the SSAs contemplate that foreclosures and liquidations of defaulted mortgages will proceed forthwith and in accordance with applicable law, provided the documentation is in order, as a matter of fairness to all parties.

133. As demonstrated by Exhibit 13, highly publicized government enforcement actions, private litigation and settlements involving the servicers demonstrate that the servicers have systemically and pervasively violated these foreclosure obligations.

134. As reflected by Exhibit 13, studies show that the servicers have also routinely kept defaulted mortgages on their books, rather than foreclose or liquidate them. Indeed, in several states, the average number of days for delinquent loans in foreclosure in the Trusts have doubled or quadrupled. The servicers' delay in foreclosing has allowed the servicers to charge unearned and unwarranted servicing fees, as well as unauthorized fees for default-related services, on mortgages that would have been liquidated but for the servicers' breach of their duties.

135. The servicers' systemic and pervasive violation of their foreclosure obligations have materially affected the rights of the Trusts and all Noteholders in that the Trusts have incurred costs of remedying procedural errors and re-filing affidavits and other foreclosure documents. The Trusts have also been forced to bear costs related to disputes over note ownership or authority to foreclose, and to allegations of procedural violations through the use of inaccurate affidavits and improper notarizations. The Trusts have further incurred losses as a result of delays or other damages caused by the weaknesses in the servicers' foreclosure processes.

**D.    The Servicers Have Violated Their Modification Obligations**

136. The SSAs provide that the servicers agree to a modification of any mortgage loan only in certain specified circumstances. When modifications are required to remedy predatory lending or foreclosures violations, the SSAs require that the seller or the servicer – and not the Trusts or the Noteholders – bear the costs to cure such breach.

137. The servicers have breached the SSAs by agreeing to modify loans held in the Trusts for the purpose of settling predatory lending claims made by various attorneys general against their parent companies while breaching their obligation to demand that the offending

mortgage seller (their parent companies) bear the costs of curing the violation, as well as the expenses reasonably incurred in enforcement of the seller's obligation to cure predatory mortgages. The servicers have also breached the SSAs by agreeing to modify loans held in the Trusts for the purpose of settling claims related to their wrongful servicing and foreclosure practices made by various attorneys general. The servicers' violation of their modification obligations have materially affected the rights of the Trusts and all Noteholders in that the servicers and their parent companies have been unjustly enriched to the detriment of the Trusts and Noteholders by using Trust collateral to settle claims that are not, and could never be, made against the Trusts.

138.    The servicers' abuse of their modification obligations is further illustrated by their increasing use of "unrecognized forbearances." The servicers modify delinquent mortgage loans by granting forbearances to the borrowers for extended periods of time which act to reduce the principal amount of the mortgage loan. The forbearances allow the servicers to lower their advanced principal payments on the loans. Nevertheless, the servicers do not formally write-down the loan balance or make any recognition on the Trusts' accounts. Thus, the mortgage loans remain in the Trusts at full value, thereby allowing the servicers to earn full servicing fees, which are calculated as a percentage of the total principal amount of the mortgage loans in the Trusts' loan pools, although the mortgage loans are accruing interest at a lower principal amount and without the servicers having to make any advances. The servicers' pervasive use of "unrecognized forbearances" harm the Trusts and their Noteholders since they pay higher servicing fees to the servicers and are not informed in a timely manner about impairments to mortgage loans in the underlying loan pools.

### E.    The Servicers Have Abused Their Servicing Advances Obligations

139.    The SSAs provide that the servicers are to advance P&I on a loan only if they determine that the advance payment is recoverable. The SSAs further provide that the servicers may only recover servicing advances that are customary, reasonable and necessary out-of-pocket costs and expenses incurred in the performance by the servicers of their servicing obligations.

140.    The servicers have abused their advancing obligations to enrich themselves to the direct detriment of the Trusts. In particular, the servicers have manipulated the recoverable designation to their advantage. During low interest rate environments, the servicers have designated severely delinquent loans as recoverable so that the loans would be kept in the Trusts' loan pools and the servicers could continue to earn their servicing fees on these loans, which exceed the relatively low cost of financing the advances on these delinquent loans. However, when interest rates have increased, the servicers have strategically switched the mortgage loans' designation from recoverable to unrecoverable. The switch in designation enables the servicers to recoup all prior advances as a senior claim of the Trusts.

141.    The Trusts and their Noteholders are harmed by the servicers' manipulation of the recoverable designation because the Trusts incur more interest rate risk exposure than expected since the servicers' recoverability designations are strategically determined as a function of interest rates, as opposed to the value of the mortgaged property as required under the SSAs.

142.    Finally, despite the requirement that servicing advances were to be incurred only for reasonable and necessary out-of-pocket costs, the servicers instead utilized affiliated vendors – who marked up their services to a level 100% or more above the market price – to provide services related to the preservation, restoration, and protection of mortgaged property, in a fraudulent, unauthorized, and deceptive effort to supplement its servicing income. These improper servicing advancing have exacerbated the Trusts' losses.

F.    **Certain Trusts Have Experienced Triggering Events**

143.    Due to the abject performance of the underlying loan collateral, certain of the Trusts have experienced Triggering Events tied to collateral delinquency and loss performance that altered these Trusts' base cashflow allocation in order to protect senior tranches and caused an Event of Default to occur within these Trusts, including the IMM 2005-2 and IMM 2005-6 trusts.

G.    **Certain Servicers Went Insolvent**

144.    Finally, certain of the Trusts have experienced Events of Defaults as a result of the insolvency or bankruptcy of certain of the servicers, including IMM 2004-11, IMM 2004-6, IMM 2005-2, IMM 2005-3 and IMM 2005-6.

XII.    **WELLS FARGO HAS KNOWN OF SERVICER VIOLATIONS PLAGUING THE TRUSTS**

145.    There is ample evidence that, beginning in early 2009 and continuing to the present, Wells Fargo and its responsible officers have known of the above described widespread and severe failures on the part of the servicers to observe or perform in material respects their obligations under the SSAs.

A.    **Wells Fargo And Its Responsible Officers Received Written Notice From Interested Parties Of Pervasive And Systemic Servicer Breaches**

146.    As confirmed by Wells Fargo's internal documents, ████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████

147. For example, according to internal documents, ███████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████

148. Similarly, on December 16, 2011, investors provided notice to Wells Fargo and four other RMBS trustees of, among other things, master servicer violations by JPMorgan and JPMorgan predecessor entities (Bear Stearns and WaMu) in connection with $95 billion of RMBS issued by various affiliates of JPMorgan from 243 trusts issued between 2005 and 2007 under the BALTA, BSABS, BSARM, BSMF, CFLX, CHASE, JPALT, JPMAC, JPMMT, PRIME, SACCO, SAMI, WAMU, and WMALT labels. The investors demanded that Wells Fargo open an investigation of ineligible mortgages and deficient servicing of these loans. The December 16, 2011 notice put Wells Fargo on notice of systemic deficient servicing practices by JPMorgan and its affiliates, some of the largest servicers for the Trusts. Indeed, this same investor group reached an agreement with JPMorgan that calls for the payment of $4.5 billion in cash to 330 trusts issued under these JPMorgan RMBS labels to settle mortgage repurchase and servicing claims, as well as for the implementation of substantial servicing changes to mortgage loans in the covered trusts to rectify the pervasive servicing deficiencies by JPMorgan and its affiliates. On August 1, 2014 and October 2, 2014, all of the trustees involved in the JPMorgan Putback Initiative – including

Wells Fargo – accepted JPMorgan's $4.5 billion offer for the vast majority of the 330 trusts and petitioned the Supreme Court of the State of New York for approval of the settlement.

149.    Similarly, on January 31, 2012, an investor group issued instructions to Wells Fargo, Deutsche Bank, and U.S. Bank, as trustees, to open investigations of ineligible mortgages in pools securing over $25 billion of RMBS issued by various affiliates of Morgan Stanley and deficient servicing of those loans.

150.    On September 19, 2012, the same investor group sent a Notice of Non-Performance ("September 19, 2012 Notice") to Wells Fargo and other RMBS trustees, as well as Morgan Stanley, the servicer or master servicer, identifying breaches by Wells Fargo of specific servicing covenants in PSAs for ninety-five trusts from the Morgan Stanley-label IXIS, MSAC, and MSM and SAST shelves.  The September 19, 2012 Notice alleged that these servicing failures had materially impaired the rights of the holders and constituted ongoing events of default in the servicer's performance under the relevant PSAs.  The December 16, 2011, January 31, 2012 Notice and the September 19, 2012 Notice, put Wells Fargo on notice of systemic deficient servicing practices.

151.    On January 23, 2015, holders in 119 RMBS trusts issued a Notice of Non-Performance to Wells Fargo and four other entities in their capacity as trustees, securities administrators, and/or master servicers, regarding the material failures of Ocwen as Servicer and/or Master Servicer, to comply with its covenants and agreements under those trusts' governing agreements.  The holders' Notice of Non-Performance detailed systemic servicing failures by Ocwen, a major servicer of the Trusts.  Such servicing failures include (i) using trust funds to "pay" Ocwen's required "borrower relief" obligations under a regulatory settlement, through implementation of modifications on trust-owned mortgages that have shifted the costs of the

settlement to the trusts and enriched Ocwen unjustly; (ii) employing conflicted servicing practices that enriched Ocwen's corporate affiliates, including Altisource and Home Loan Servicing Solutions, to the detriment of the trusts, investors, and borrowers; (iii) engaging in imprudent and wholly improper loan modification, advancing, and advance recovery practices; (iv) failing to maintain adequate records, communicate effectively with borrowers, or comply with applicable laws, including consumer protection and foreclosure laws; and (v) failing to account for and remit accurately to the trusts' cash flows from, and amounts realized on, trust-owned mortgages. The holders further alleged that these claimed defaults and deficiencies in Ocwen's performance have materially affected the rights of the holders and constitute an ongoing Servicing Event of Default under the applicable governing agreements. The January 23, 2015 notice put Wells Fargo on notice of systemic deficient servicing practices by Ocwen, which is one of the largest servicer for the Trusts.

**B.     Wells Fargo Had Knowledge Of The Servicers' Failures
Through The Monthly Servicer And Remittance Reports**

152.    Wells Fargo and its responsible officers knew of the servicers' improper servicing practices through the servicers' servicing reports and the monthly remittance reports Wells Fargo published. These reports apprised Wells Fargo of the servicers' breach of duty to provide notice of breaches of seller representations and warranties and failure to enforce the sellers' repurchase obligations by detailing the Trusts' early loan payment defaults, increasing loan modifications, staggering losses, and write-downs due to the poor credit quality of the loans, but did not reflect the servicers' actions to enforce the sellers' repurchase obligations.

153.    The reports apprised Wells Fargo of the servicers' breach of their duty to perform prudent and customary servicing practices with respect individual loans within the Trusts by reflecting the servicers' excessive fees and failure to pursue appropriate loss mitigation strategies.

The reports also informed Wells Fargo of the servicers' breach of their duty to perform prudent foreclosure by detailing the servicers' excessive delay in foreclosing on properties securing the Trusts' loans and incurring unnecessary legal and administrative expenses due to inaccurate loan documentation. The reports further informed Wells Fargo of the servicers' breach of their duties with respect to modifying loans, including using Trust funds to pay the servicers' required borrower relief obligations under regulatory settlements, through implementation of modifications on Trust-owned mortgages that shifted the costs of the settlement to the Trusts and enriched the servicers unjustly. Finally, the servicing reports disclosed the servicers' abuse of their advancing obligations by reflecting the unnecessary and inflated expenses related to delinquent loans.

### C. Wells Fargo Itself Was Involved In Government Enforcement Actions And Litigation Stemming From The Servicers' Violations

154. Wells Fargo and its responsible officers knew of the servicers' improper servicing practices because, as described in greater detail below, Wells Fargo and its affiliates, in their capacity as servicers to other RMBS trusts, were targets together with many of the servicers for the Trusts in highly publicized governmental investigations, prosecutions and settlements. For example, along with thirteen other of the nation's largest servicers, the Federal Reserve System, the OCC, the FDIC, and the OTS (collectively, the "Agencies"), similarly found deficiencies in Wells Fargo's servicing and foreclosure processes. Accordingly, the Agencies brought a formal enforcement action against Wells Fargo, and Wells Fargo participated in a joint settlement including Aurora, Bank of America, Citibank, Goldman, HSBC, JPMorgan Chase, MetLife Bank, Morgan Stanley, PNC, Sovereign, SunTrust, and U.S. Bank. Wells Fargo's involvement in such proceedings would have made it acutely aware of the deficiencies of each of the other servicers subject to these actions.

155.     These and other public enforcement actions and private litigation highlighting the servicers' improper servicing practices were well known throughout the RMBS industry, including by Wells Fargo and the other principal financial crisis-era trustees.  For example, in October 2010 Deutsche Bank – which serves as trustee for more than 1,000 RMBS trusts – issued a notice to all RMBS holders in trusts for which Deutsche Bank served as trustee.   Deutsche Bank's notice acknowledged that it had been "widely reported in the news media" that "several major U.S. loan servicers" had "suspended certain foreclosures in some or all states" due to allegations and investigations regarding "defects in foreclosure practices, procedures and/or documentation." Also in October 2010, Deutsche Bank sent an "urgent and time sensitive" memorandum to all servicers of mortgage loans included in any RMBS trust for which Deutsche Bank acts as trustee. In the memorandum, Deutsche Bank discussed "an urgent issue requiring your [the servicers] immediate attention" – specifically, the same "serious . . . defects in foreclosure practices, procedures and/or documentation" discussed in Deutsche Bank's notice to holders.   The memorandum referred to the expansive scope of the reported servicer deficiencies, and admitted that foreclosure abuses such as the execution and filing by servicers or their agents of documents containing untrue assertions of fact "would constitute a breach of that Servicer's obligations under the [PSAs] and applicable law." Wells Fargo, as servicer to more than 150 RMBS trusts for which Deutsche Bank serves as trustee, received Deutsche Bank's memorandum.

156.     In addition, internal communications ████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
██████████████████████

### D. Wells Fargo Discovered Widespread Servicer Breaches In Other Capacities

157. As noted above, in addition to acting as a trustee, ███████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

158. Similarly, Wells Fargo was also among the largest mortgage loan servicer to the RMBS industry, including acting as Master Servicer for several hundred RMBS trusts. In connection with serving as Master Servicer for these Trusts, Wells Fargo had default oversight responsibilities over subservicers, which included the Servicers for the Trusts. In carrying out its default oversight, which included ███████████████████████████████████ ███████████████████████████████ Wells Fargo learned of the Servicers' systemic servicing deficiencies.

### XIII. NUMEROUS INDENTURE EVENTS OF DEFAULT HAVE OCCURRED

159. The Issuers have systemically failed to perform material covenants and agreements under the Indentures, including by failing to: (i) "enforce the rights to the mortgage loans"; (ii) "preserve or defend title to the Trust Estate and the rights of the Indenture Trustee and the Noteholders in such Trust Estate against the claims of all persons and parties"; and (iii) failing to provide written notice to Wells Fargo of all defaults and Events of Default.

160.    Based on the abject performance of the Trusts and widespread public evidence of the originators' abandonment of underwriting guidelines, the sponsors' faulty securitization practices, and the servicers' failures to perform material covenants and agreements under the SSAs, the Issuers have known of material seller breaches of representations and warranties within the Trusts' loan pools.  The Issuers have breached their obligations under the Indenture to (i) require the sellers to cure, substitute, or repurchase nonconforming mortgage loans; (ii) demand that the servicers cure their servicing violations; and (iii) provide written notice to Wells Fargo of all defaults and Events of Default.

XIV.    **WELLS FARGO'S KNOWLEDGE OF INDENTURE EVENTS OF DEFAULT**

161.    Beginning in early 2009 and continuing to the present, Wells Fargo and its responsible officers have known of the above described Indenture Events of Default.  Each month, Wells Fargo, as Indenture Trustee, prepared cash distribution summaries that detailed the growing rate of mortgage loan delinquencies, modifications, defaults, foreclosures, servicing advances and fees, and realized credit losses in each of the Trusts.  These summaries were also required to identify any mortgage loan that had been repurchased by a responsible seller, or received a credit from the responsible servicer.  However, because no mortgage loans were repurchased by sellers for having been underwritten in violation of the represented underwriting standards, or received credits by the servicer for improper servicing violations, Wells Fargo knew that there were enormous unresolved problems with the credit quality, servicing and administration of the mortgage loans in the Trusts, that defective mortgage loans were not being repurchased by the Sellers, that the Trusts were not being reimbursed for losses attributable to servicing violations, and that the Issuers were not acting to enforce the Trusts' rights as against responsible sellers and servicers.  Wells Fargo also knew that the Issuers were failing to carry out their obligations to provide notice of all known Events of Default.

## XV.   WELLS FARGO FAILED TO DISCHARGE ITS CRITICAL PRE- AND POST-DEFAULT DUTIES

162.   Despite Wells Fargo's knowledge of the Trusts' high default rates and poor performance, breaches of representations and warranties made by the originators, sellers, depositors, and sponsors, servicer violations, and issuer breaches, Wells Fargo failed to perform its duties as Trustee to protect the Trusts and Noteholders.

### A.   Failure To Enforce The Trusts' Repurchase Rights Against Responsible Sellers

163.   As set forth above, beginning in 2009 and by 2011, Wells Fargo and its responsible officers discovered the Trusts contained loans that materially breached the sellers' representations and warranties, which adversely affected the value of those mortgage loans and the Trusts' and Noteholders' interests in those mortgage loans. Wells Fargo breached its contractual and statutory duties under TIA and was negligent by failing to (i) provide notice to the parties to the Governing Agreements and/or the responsible sellers upon its discovery of these breaches, and (ii) take any action to enforce the sellers' repurchase of the defective mortgage loans.

### B.   Failure To Provide Notice To The Servicers Of Servicer Events Of Default

164.   As set forth above, beginning in 2009 and continuing to the present, Wells Fargo and its responsible officers knew of failures on the part of the servicers to observe or perform in material respects their covenants or agreements in the SSAs, including the servicers' (i) failure to give notice to the other parties of seller breaches of representations and warranties upon discovery thereof and enforce the sellers' repurchase obligations; (ii) violations of prudent servicing obligations; (iii) violations of foreclosure obligations; (iv) violations of modification obligations; and (v) improper servicing advances. Wells Fargo knew that these servicers' breaches were material and that they could give rise to "Events of Default" as defined by the SSAs.

165. Wells Fargo breached its contractual and statutory duties under the TIA by failing to provide notice to the servicers of these defaults and Events of Default and terminating the servicers.

**C.    Failure To Act Prudently Subsequent To Indenture Events Of Default**

166. As set forth above, beginning in 2009 and continuing to the present, Wells Fargo and its responsible officers have known of uncured and continuing Indenture Events of Default as a result of the Issuers' numerous breaches under the Indentures. Consequently, under the Indentures, Wells Fargo had and continues to have the obligation to exercise the rights and powers vested in it by the Governing Agreements, and to use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

167. A prudent person would have taken action to protect the Trusts and their Noteholders from the known seller breaches of representations and warranties by exercising all of its rights under the Governing Agreements to enforce the sellers' repurchase obligations, including timely conducting an investigation to determine all of the materially breaching mortgage loans and bringing suit against the sellers for specific performance to compel their repurchase of those loans. Wells Fargo breached its contractual, statutory and fiduciary duties by failing to act prudently and take these actions.

168. A prudent person would have also taken action to protect the Trusts and their Noteholders from the known servicer violations by exercising all of its rights under the Governing Agreements to enforce the servicers' prudent servicing obligations, including ensuring that all Servicer Events of Default were cured, terminating the servicers, substituting itself as the substitute servicer or replacing the servicers, and enforcing the servicers' obligations to reimburse the Trusts

for losses caused as a result of their breaches through suit if necessary. Wells Fargo breached its contractual, statutory and fiduciary duties by failing to act prudently and taking these actions.

**D.    Failure To Provide Notice To Noteholders
       Of The Uncured Indenture Events Of Default**

169.    As set forth above, known Indenture Events of Default occurred, remained uncured for the requisite period of time and are continuing. Consequently, under the Indentures, Wells Fargo also had and continues to have the obligation to provide all Noteholders with notice of these Indenture Events of Default.

170.    Wells Fargo had no good faith reason for failing to provide notice of these Indenture Events of Default to the Noteholders. Accordingly, Wells Fargo breached its contractual, statutory and fiduciary duties by failing to provide all Noteholders with notice of these Indenture Events of Default.

**XVI.   WELLS FARGO FAILED TO PROTECT THE
        TRUSTS DUE TO ITS CONFLICTS OF INTEREST**

171.    Wells Fargo failed and unreasonably refused to discharge its critical pre- and post-default duties owed to the Trusts and all Holders because acting to diligently protect the interests of the Trusts would have conflicted with its own interests.

**A.    Wells Fargo Was Economically
       Beholden To The Mortgage Loan Sellers**

172.    Trustees are selected by the sponsor, which is often an affiliate of the servicer. While Wells Fargo was charged with representing the interests of the Trusts and all Holders, it was economically beholden to the sponsors. Accordingly, Wells Fargo was incentivized to not require servicers to take necessary action because these servicers were affiliated with the sponsors that provided valuable trustee appointments. In short, Wells Fargo failed to protect the Trusts because it did not want to risk losing significant business from these sponsors.

**B.  Wells Fargo Was Engaged In The
    Same Wrongful Servicing Activities**

173.    Wells Fargo failed and unreasonably refused to take action to protect the Trusts and

Holders against seller breaches and servicer violations because it would have exposed that Wells

Fargo itself was engaged in the same servicing misconduct in its role as servicer for other

mortgages and RMBS trusts.

174.    As noted above, during the fourth quarter of 2010, the Federal Reserve, the OCC,

the FDIC, and the OTC conducted on-site reviews of the adequacy of controls and governance

over servicers' foreclosure processes at Wells Fargo.  The reviews uncovered significant problems

in foreclosure processing at Wells Fargo, including "critical weaknesses in [Wells Fargo's]

foreclosure governance processes, foreclosure document preparation processes, and oversight and

monitoring of third-party vendors, including foreclosure attorneys."[21]

175.    On April 13, 2011, based on the deficiencies in the review and the risk of additional

issues as a result of weak controls and processes, the Federal Reserve Board initiated formal

enforcement actions requiring Wells Fargo & Company, the corporate parent of Wells Fargo, to

address its pattern of misconduct and negligence related to deficient practices in residential

mortgage loan servicing and foreclosure processing.  According to the Federal Reserve Board press

release, "[t]hese deficiencies represent significant and pervasive compliance failures and unsafe

and unsound practices at [Wells Fargo]."  The enforcement action required Wells Fargo to improve

its residential mortgage loan servicing and foreclosure processing practices.

---

[21] *See* Interagency Review of Foreclosure Policies and Practices, Federal Reserve System (Apr.
2011), at 2

176.    In addition, the OCC entered into consent orders with Wells Fargo and several other servicers (the "OCC Consent Orders").  In the OCC Consent Order with Wells Fargo, the government found, among other things, that beginning in 2009 Wells Fargo filed false or otherwise defective affidavits in connection with foreclosure proceedings and failed to exercise adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third-party management, and training for its foreclosure-related services.

177.    Due to the fact that Wells Fargo itself was engaging in the same illicit and improper acts as the servicers for the Trusts, and had other conflicts, Wells Fargo failed to enforce the servicer violations, or even alert the Holders to the servicers' misconduct.

### C.    Wells Fargo Originated And Sponsored Defective Loans

178.    Wells Fargo, as an originator and sponsor for other RMBS trusts, sold billions of dollars of loans that breached representations and warranties.  From 2004 through 2008, Wells Fargo was a leading sponsor of private-label mortgage-backed securities, sponsoring over 162 RMBS offerings under the WFALT, WFHET, and WFMBS labels that were collateralized by a total of over $164.6 billion in certificates issued from trusts ("Wells Fargo-Sponsored Trusts").  Some of the same entities that acted as sellers or servicers to the Trusts acted in the capacity as trustee for the Wells Fargo-Sponsored Trusts, including Bank of America, U.S. Bank, and HSBC.

179.    Many of the underlying residential mortgage-backed loans for Wells Fargo-Sponsored Trusts were originated and serviced by Wells Fargo affiliates.  In addition, Wells Fargo acquired loans for its securitizations from mortgage originators that later became known to be among the worst in the industry, including First Franklin, Option One, New Century, WMC, and Countrywide, among others.  As a mortgage loan seller, both as an originator and sponsor, Wells

Fargo made representations and warranties to the Wells Fargo-Sponsored Trusts regarding the quality and characteristics of the mortgage loans.

180.    There is widespread public evidence of pervasive violations of seller representations and warranties in the Wells Fargo-Sponsored Trusts. For example, in an interview before the FCIC on June 1, 2010, Darcy Parmer, a former Wells Fargo underwriter and quality assurance analyst from 2004 until 2007, testified that "at least half the loans she flagged for fraud were nevertheless funded, over her objections" and that she was aware of "hundreds and hundreds and hundreds of fraud cases" in Wells Fargo's home equity loan division. FCIC Report at 162. Illustrating the consequences of Wells Fargo's fraudulent origination practices, on April 28, 2011, The Union Central Life Insurance Company ("Union Central") sued Wells Fargo, in its capacity as sponsor, for misrepresenting the quality of the loans underlying the $43 million in Wells Fargo securities in which Union Central had invested. *See The Union Central Life Ins. Co., et al. v. Credit Suisse First Boston Mortg. Sec. Corp., et al.*, No. 1:11-cv-02890 (S.D.N.Y.). Wells Fargo and Union Central came to a confidential settlement agreement in February 2012.

181.    In addition, in July 2011, the Federal Reserve Board issued a cease and desist consent order to Wells Fargo & Co. and Wells Fargo Financial, Inc., in part for "falsif[ying] information about borrowers' incomes to make it appear that the borrowers qualified for loans when they would not have qualified based on their actual incomes." Wells Fargo also paid an $85 million penalty. *Press Release*, Board of Governors of the Federal Reserve System (July 20, 2011).

182.    On October 1, 2013, Wells Fargo announced that it would pay Freddie Mac $869 million ($780 million after credit for loans already repurchased) to repurchase loans that Wells Fargo originated and sold to Freddie Mac that breached Wells Fargo's representations and warranties. The settlement resolved Freddie Mac's repurchase claims for loans sold to the agency

before January 1, 2009. Likewise, on October 11, 2013, Wells Fargo announced that it would pay $541 million to Fannie Mae to settle claims over similarly defective Wells Fargo mortgage loans.

183.     Other government entities have also sued Wells Fargo for lying about the characteristics and quality of its loans. In August 2012, the FDIC, as receiver for the now-defunct Alabama-based Colonial Bank ("Colonial"), sued Wells Fargo and twelve other large banks for misrepresentations in connection with the sale of RMBS to Colonial. The complaint alleged that Wells Fargo made material misrepresentations in the offering documents regarding LTV ratios, owner occupancy rates, compliance with appraisal standards, and loan issuance practices. *See FDIC As Receiver For Colonial Bank v. Chase Mortg. Fin. Corp., et al.*, No. 12-CV-6166 (S.D.N.Y. Aug. 10, 2012).

184.     On October 9, 2012, HUD filed suit against Wells Fargo, alleging that Wells Fargo, as originator, made false statements and certifications to HUD regarding the eligibility of loans for HUD mortgage insurance and "engaged in a regular practice of reckless origination and underwriting" from May 2001 through October 2005. *United States v. Wells Fargo Bank, N.A.*, No. 12-cv-07527 (S.D.N.Y. Oct. 9, 2012) Compl. ¶2. In September 2013, U.S. District Judge Jesse M. Furman rejected Wells Fargo's motion to dismiss and allowed HUD's claims to proceed.

185.     Accordingly, because Wells Fargo itself faced enormous repurchase liability for billions of dollars of loans originated and sold by Wells Fargo in breach of representations and warranties, including Wells Fargo-originated loans in RMBS trusts serviced by the same servicers as the Trusts, Wells Fargo was disincentivized to take any action against the servicers for the Trusts, or even alert the Holders to servicer misconduct.

### 1.     Wells Fargo's Appointment Of A Separate Trustee Is Ineffective

186.     Wells Fargo has filed a series of Petitions for Instructions in the Administration of a Trust, pursuant to Minn. Stat. § 501B.16, in Minnesota state court, Hennepin County, seeking a

court order confirming the appointment of Law Debenture Trust Company of New York, as a separate trustee for the purpose of evaluating potential repurchase claims.

187. Wells Fargo's appointment of a separate trustee is ineffective. Despite knowing of the sellers' breaches of representations and warranties and Events of Default as early as 2009, when repurchase claims were timely, Wells Fargo waited until 2012 to begin seeking their appointment, after the six-year statute of limitations for the Trusts' contractual putback claims had arguably already run. Moreover, the appointment of Law Debenture Trust as separate trustee does nothing to mitigate Wells Fargo's conflicts of interest where Law Debenture Trust is economically andn otherwise beholden to Wells Fargo.

## XVII. CAUSATION

188. Wells Fargo's failure and unreasonable refusal to enforce the Trusts' and Noteholders' rights against the sellers and servicers, and its violations of its other contractual, statutory, fiduciary and independence duties, along with its negligence, have directly and proximately caused billions of dollars in Trust assets to waste away. The mortgage loans conveyed to the Trusts did not comply with seller representations and warranties, but were instead of a lower quality, which increased the risk of defaults in the P&I payments owed to the Trusts. Moreover, servicer violations have exacerbated the Trusts' losses. Had Wells Fargo performed its duties as Indenture Trustee, in particular, had it adequately enforced the obligations of the sponsors and originators to cure, substitute, or repurchase mortgage loans that breached representations and warranties, it would have prevented the Trusts from incurring substantial losses and Trust assets from dissipating. Had Wells Fargo enforced the Trusts' rights against servicers for reimbursement of losses caused by their misconduct as required, it would have benefited the Trusts and their Noteholders.

## XVIII. DAMAGES

189.     The Trusts have incurred substantial damages attributable to Wells Fargo's breaches of its contractual, statutory, fiduciary, and common law duties. In particular, the Trusts' loan pools are filled with loans of inadequate credit quality, which increased the risk of delinquency. As a result of the loans' poor credit quality, the Trusts have experienced enormous delinquency rates, collateral write-downs, and losses, and have incurred and continued to incur significant losses in connection with servicer violations. Damages incurred by the Trusts and caused by the Indenture Trustee's violation of law will be the subject of expert testimony for proof at trial.

## XIX.  CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Breach Of Contract)

190.     Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

191.     The Governing Agreements are valid contracts that memorialize the issuance of notes of beneficial interests in the Trusts, and establish Wells Fargo's contractual duties and obligations, in its capacity as Indenture Trustee, to the Trusts and their Noteholders. Each of the relevant contractual provisions is substantively similar, if not identical, in all of the Governing Agreements, and imposes substantially the same, if not identical, duties and obligations on Wells Fargo in its capacity as Indenture Trustee.

192.     As current holders of Notes issued by each of the Trusts, Plaintiffs are express, intended third party beneficiaries under the Governing Agreements entitled to enforce the performance of the Trustee.

193.     Under each of the Governing Agreements, Wells Fargo owed a duty to the Trusts and all Noteholders (i) to give prompt written notice to all parties to the Governing Agreements of

a breach of a representation or warranty made by the seller in respect of the mortgage loans that materially and adversely affects the value of any mortgage loan or the interests of the Noteholders in any such mortgage loan, upon Wells Fargo's knowledge of the breach; and (ii) to take such action with respect to the breach as may be necessary or appropriate to enforce the rights of the Trusts with respect to the breach.

194.     As set forth above, Wells Fargo materially breached each Governing Agreement by (i) failing to provide prompt written notice to all parties to the Governing Agreements and related responsible parties of breaches of the sellers' mortgage loan representations and warranties, upon Wells Fargo's discovery of the breaches; and (ii) failing to enforce the sellers' obligation to repurchase, substitute, or cure such defective mortgage loans.

195.     The SSAs define a Servicer "Event of Default" to include the failure by the servicer to observe or perform in any material respect the covenants or agreements by the servicer set forth in the SSAs, which continues unremedied for no more than thirty to sixty days after written notice of the failure has been given to the servicer by the indenture trustee requiring the same to be remedied, or actual knowledge of the failure by a "Servicing Officer" of the servicer, whichever is earlier.

196.     As set forth herein, Servicer Events of Default have occurred, remained uncured for the applicable period of time, and are continuing as a result of the servicers' failure to observe and perform, in material respects, the covenants and agreements imposed on them by the SSAs.

197.     Wells Fargo and its responsible officers had knowledge of these and other defaults by the servicers through, among other things, public reports, lawsuits, exception reports, remittance reports, and the increasing delinquency and loss rates for the Trusts. Nevertheless, Wells Fargo failed to deliver written notices to the servicers of the defaults or terminate the

servicers. Similarly, Wells Fargo failed to provide Noteholders with notice of these Servicer Events of Default. By failing to take these actions, Wells Fargo materially breached the SSAs.

198.    As set forth herein, Indenture Events of Default have occurred, remained uncured for the applicable period of time, and are continuing as a result of the issuers' defaults in their performance of their obligations under the Indentures. Wells Fargo and its responsible officers had knowledge of these and other defaults by the issuers through, among other things, public reports, lawsuits, exception reports, remittance reports, and the increasing delinquency and loss rates for the Trusts. Consequently, under the Indentures, Wells Fargo had and continues to have the obligation to exercise the rights and powers vested in it by the Governing Agreements, and to use the same degree of care and skill in their exercise as a prudent person would use under the circumstances in the conduct of the person's own affairs. A prudent person would have exercised all of the indenture trustee's rights to recover for these Indenture Events of Default, and would have done so promptly. Similarly, Wells Fargo failed to provide Noteholders with notice of these Indenture Events of Default. By failing to take these actions, Wells Fargo materially breached the Indentures.

199.    Wells Fargo's material breaches of the Governing Agreements have directly and proximately caused damages to the Trusts and Noteholders in that they have deprived the Trusts of valuable remedies and depleted millions of dollars of Trusts' assets. For example, had Wells Fargo protected the rights of the Trusts and Noteholders by enforcing the sellers' obligation to cure, repurchase, or substitute mortgage loans affected by breaches of representations and warranties, the Trusts would have received either cured or substitute mortgage loans of adequate credit quality or funds representing the "Repurchase Price" with respect to each defective mortgage loan. Wells Fargo's inaction with respect to the sellers has allowed the Trusts to be filled with

defective mortgage loans of poor credit quality that have increased the severity of the Trusts' losses. Similarly, had Wells Fargo enforced the servicers' prudent servicing obligations, the Trusts would have been able to avoid incurring unnecessary losses and expenses. Wells Fargo's inaction with respect to the servicing violations has exacerbated losses experienced by the Trusts.

200. Wells Fargo's material breaches of the Governing Agreements have injured all Noteholders, including Plaintiffs and the Class, in that they have caused Plaintiffs' losses and have diminished the value of the notes held by the Noteholders and have prevented the Noteholders from protecting the rights of the Trusts.

**SECOND CAUSE OF ACTION**
**(Violation Of The Trust Indenture Act Of 1939, 15 U.S.C. §§ 77ooo(b) And (c))**

201. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

202. Section 315 of the TIA sets out the duties and responsibilities of an indenture trustee, such as Wells Fargo. Section 315(b) states that the "trustee shall give to the indenture security holders . . . notice of all defaults known to the trustee, within ninety days after the occurrence thereof," unless the indenture trustee believes withholding such notice is in the best interests of the Noteholders. 15 U.S.C. § 77ooo(b) (citing 15 U.S.C. § 77mmm(c)). Here, there were numerous defaults, including (i) the failure of originators and sponsors to repurchase or substitute defective or nonconforming loans in the Trusts; (ii) the failure on the part of the servicers to observe and perform covenants and agreements set forth in the SSAs, including failing to provide notice of known breaches of the sellers' representations and warranties and servicing and failing to administer the mortgage loans in accordance with applicable law and customary and usual standards of practice of mortgage lenders and loan servicers; and (iii) the failure on the part of the issuers to perform their obligations under the Indentures. Given the great importance of

those defaults to the Noteholders' interests, Wells Fargo had no good faith reason for failing to provide notice of those defaults. Accordingly, by failing to provide this notice, Wells Fargo violated Section 315(b) of the TIA.

203. Section 315(c) of the TIA states that an indenture trustee is to "exercise in case of default (as such term is defined in such indenture)" all of the powers available to it under the indenture agreement, using "the same degree of care and skill in their exercise, as a prudent man would exercise" in conducting his own affairs. 15 U.S.C. § 77ooo(c). Again, given the obvious importance of the defaults set forth in the preceding paragraph, which impaired the rights of the Trusts and Noteholders, any prudent person under those circumstances would have promptly exercised all of the Indenture Trustee's rights to, among other things, (i) enforce the sellers' obligation to repurchase, substitute, or cure defective mortgage loans; and (ii) require the servicers' cure all servicing breaches and reimburse the Trusts for losses caused from servicing violations. By failing to exercise its rights in those circumstances, Wells Fargo violated Section 315(c) of the TIA.

204. Wells Fargo's violations of the TIA have directly and proximately caused actual damages to the Trusts and Noteholders in that they have deprived the Trusts of valuable remedies and allowed billions of dollars of the Trusts' assets to waste away. For example, had Wells Fargo protected the rights of the Trusts by enforcing the sellers' obligation to cure, repurchase, or substitute mortgage loans affected by breaches of representations and warranties, the Trusts would have received either cured or substitute mortgage loans of adequate credit quality or funds representing the "Repurchase Price" of the defective mortgage loans. Wells Fargo's inaction with respect to the sellers has allowed the Trusts to be filled with defective mortgage loans of poor credit quality that have increased the severity of the Trusts' losses. Similarly, had Wells Fargo

enforced the servicers' servicing obligations, the Trusts would have been able to avoid unnecessary losses. Wells Fargo's inaction with respect to the servicers has exacerbated losses experienced by the Trusts.

205.     Wells Fargo's violations of the TIA have caused actual damages to all Noteholders, including Plaintiffs and the Class by diminishing the value of the notes held by the Noteholders and preventing the Noteholders from protecting the rights of the Trusts.

**THIRD CAUSE OF ACTION**
**(Breach Of Fiduciary Duty)**

206.     Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

207.     Under New York law, after the occurrence of an Event of Default, Wells Fargo's duties expanded to include a fiduciary duty owed to the Trusts and all Noteholders, regardless of any limitations or exculpatory provisions contained in the Indenture. This fiduciary duty included the obligation to exercise its contractually conferred rights and powers in good faith and to bring all available claims for the benefit of the Trusts and the Noteholders following an Event of Default. Following the Events of Default described above, Wells Fargo breached its fiduciary duties to the Trusts and all Noteholders in several respects.

208.     First, Wells Fargo, in its capacity as Indenture Trustee, had standing under the Governing Agreements to bring claims against the sellers of the Trusts for breach of their representations and warranties under the Governing Agreements. At the time of the Indenture Events of Default, meritorious claims existed against the sellers for breach of their representations and warranties under the Governing Agreements. Wells Fargo, however, failed to promptly enforce the sellers' obligation to cure, repurchase, or substitute mortgage loans that had defective mortgage files or were affected by breaches of the sponsors' and originators' representations and

-70-

warranties, including by filing suits on behalf of the Trusts against the sellers. Moreover, Wells Fargo failed to provide notice to the Noteholders of the breaches or of its intention not to enforce the sellers' obligation to cure, repurchase, or substitute the loans with defective mortgage files and breaches of representations and warranties.

209.    Wells Fargo's failure to promptly enforce the sellers' obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of the sellers' representations and warranties, as well as its failure to provide notice to the Noteholders of its intention not to promptly enforce the sellers' obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of the sellers' representations and warranties, constituted breaches of Wells Fargo's post-Event of Default fiduciary duty to all Noteholders.

210.    Second, Wells Fargo, in its capacity as Indenture Trustee, presently has standing to bring meritorious claims against the servicers to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the SSAs, including to service and administer the mortgage loans in accordance with applicable law and customary and usual standards of practice of mortgage lenders and loan servicers. Wells Fargo, however, has refused and continues to refuse to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the SSAs, including by filing suits on behalf of the Trusts against the servicers for compensatory and injunctive relief for harm caused to the Trusts and Noteholders as a result of servicing violations. Moreover, Wells Fargo has failed to provide notice to the Noteholders of the servicing violations or of its intention not to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the SSAs. Wells Fargo's failure to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the SSAs, as well as its

-71-

failure to provide notice to the Noteholders of the servicing violations or of its intention not to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the SSAs, constitutes breaches of Wells Fargo's post-Event of Default fiduciary duty to all Noteholders.

211.   Wells Fargo's breach of its fiduciary duty has directly and proximately caused damages to the Trusts.  Specifically, the Trusts' injury includes the loss of verdicts, settlements, or awards, and the interest that the Trusts would have recovered against the sellers and servicers but for Wells Fargo's breach of its fiduciary duty.

212.   Wells Fargo's breaches of its fiduciary duty have injured all Noteholders, including Plaintiffs and the Class, in that they caused Plaintiffs' losses and have diminished the value of the notes held by the Noteholders and have prevented the Noteholders from protecting the rights of the Trusts.

## FOURTH CAUSE OF ACTION
### (Breach Of Duty To Avoid Conflicts Of Interest)

213.   Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

214.   Under New York law, Wells Fargo, as Indenture Trustee, had certain extra-contractual duties to the Trusts and all Noteholders, including the duty to avoid conflicts of interest. This duty to avoid conflicts of interests applies notwithstanding the terms of the instrument that purports to define the duties of the trustee.

215.   Under each of the Governing Agreements, Wells Fargo holds the loans for the benefit of the Trusts and all Noteholders, including Plaintiffs and the Class.

216.   Under each of the Indentures, Wells Fargo had the discretion to enforce the sellers' repurchase obligations and to prevent the servicers from engaging in activities outside of

customary and usual standards of practice of prudent mortgage servicers with respect to any mortgage loans that Wells Fargo held for the benefit of the Trusts and all Noteholders.

217. As alleged in detail above, Wells Fargo knew of seller breaches of representations and warranties and that the servicers were engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with regard to their servicing and administration of the mortgage loans in the Trusts.

218. As alleged herein, in its capacity as servicer with regard to other mortgage loans and RMBS trusts, Wells Fargo was involved in the same wrongful conduct and servicing violations in which many of the same sellers, servicers or their affiliates were serving as servicers or trustees. In addition, in their capacity as a seller with regard to other mortgage loans and RMBS trusts, Wells Fargo's affiliates had sold loans in breach of specific representations and warranties to RMBS trusts in which many of the same sellers, servicers or their affiliates were serving as servicers or trustees. Moreover, Wells Fargo was economically beholden to the sellers.

219. Because Wells Fargo faced liability for its wrongful servicing practices and for the sale and securitization of its own loans in breach of its specific representations and warranties, and since it was economically beholden to the sellers, Wells Fargo failed to take any action against the servicers and sellers, or even notify the Noteholders that the servicers or sellers were engaged in this misconduct.

220. Wells Fargo's breach of its duty to avoid conflicts of interests has directly and proximately caused damages to the Trusts and Noteholders. For example, had Wells Fargo not been conflicted, it would have enforced the sellers' repurchase obligations and exercised its discretion to prevent the servicers from engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with respect to any mortgage loans. Wells

Fargo's inaction has relieved the sellers' of their repurchase liability, and allowed the servicers to charge improper fees that have been passed along to the Trusts and to delay in foreclosing on mortgage loans, which has increased the costs of foreclosure.

221.     Wells Fargo's breaches of its duty to avoid conflicts of interests have injured all Noteholders, including Plaintiffs and the Class, in that they caused Plaintiffs' losses and have diminished the value of the notes held by the Noteholders and have prevented the Noteholders from protecting the rights of the Trusts.

## XX.     CLASS ACTION ALLEGATIONS

222.     Plaintiffs bring this action as a class action on behalf of themselves and a class consisting of all current owners of notes issued by the Trusts (the "Class") that have suffered damages as a result of Wells Fargo's misconduct alleged herein. Excluded from the Class are Wells Fargo, the sellers and the servicers, and, for each of them, their respective parents, affiliates, officers and directors, legal representatives, successors or assigns, and any entity in which they respectively have or had a controlling interest.

223.     The members of the Class are so numerous that joinder of all members is impractical. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained though appropriate discovery, Plaintiffs believe that there are at least hundreds of members of the proposed Class. Record beneficial owners and other members of the Class may be identified from records maintained by Wells Fargo or third parties and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

224.     Plaintiffs' claims are typical of the claims of the members of the Class as (i) Plaintiffs and the members of the Class all acquired notes issued by the Trusts, and held them at or after the time of Wells Fargo's misconduct; (ii) all the claims are based upon the Governing

Agreements, which are substantially in the same form, common law and the TIA; (iii) Wells Fargo's alleged misconduct was substantially the same with respect to all Class members; (iv) and all Class members suffered similar harm as a result. Thus, all members of the Class are similarly affected by Wells Fargo's statutory, contractual, and common law breaches and violations that are alleged of herein.

225. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained competent counsel with experience in class action and asset-backed securities litigation.

226. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- Whether Wells Fargo breached its contractual and common law duties to Plaintiffs and the Class under the Governing Agreements.

- Whether Wells Fargo violated the TIA.

- Whether and to what extent Plaintiffs and members of the Class have suffered damages as a result of Wells Fargo's breaches of its statutory, contractual, and common law duties and the proper measure of damages.

227. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. There will be no difficulty in the management of this action as a class action.

## XXI.  RELIEF REQUESTED

WHEREFORE, Plaintiffs demand judgment as follows:

(a)     Determining this action to be a proper class action under Fed. R. Civ. P. 23, certifying Plaintiffs as Class Representatives, and appointing Bernstein Litowitz Berger & Grossmann LLP as Class Counsel;

(b)     Awarding damages in favor of Plaintiffs and the Class against Wells Fargo for all damages sustained as a result of Wells Fargo's wrongdoing;

(c)     Requiring Wells Fargo to take corrective actions, including taking all necessary actions to reform and improve its internal policies and procedures to comply with its Indenture Trustee obligations under the Governing Agreements and applicable laws, and to protect the Trusts and the Noteholders from a repeat of the damaging events described herein;

(d)     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

(e)     Granting any other and further relief that the Court deems just and proper.

## XXII.  JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: February 23, 2016

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP

/s/ _Blair A. Nicholas_

BLAIR A. NICHOLAS

BLAIR A. NICHOLAS (admitted *Pro Hac Vice*)
TIMOTHY A. DELANGE (admitted *Pro Hac Vice*)
BENJAMIN GALDSTON (admitted *Pro Hac Vice*)
BRETT M. MIDDLETON (admitted *Pro Hac Vice*)
DAVID R. KAPLAN (admitted *Pro Hac Vice*)
LUCAS E. GILMORE (admitted *Pro Hac Vice*)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:    (858) 793-0070
Fax:    (858) 793-0323

*Counsel for Plaintiffs and the Class*