```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/10/2017
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

BLACKROCK ALLOCATION TARGET
SHARES: SERIES S PORTFOLIO, et al.,

                    Plaintiffs,         14-CV-09371 (KPF)(SN)

      -against-                **OPINION & ORDER**

WELLS FARGO BANK, NATIONAL
ASSOCIATION,

                    Defendant.

------------------------------------------------------------X
------------------------------------------------------------X

ROYAL PARK INVESTMENTS SA/NV,

                    Plaintiff,         14-CV-09764 (KPF)(SN)

      -against-

WELLS FARGO BANK, N.A.,

                    Defendant.

------------------------------------------------------------X
------------------------------------------------------------X

NATIONAL CREDIT UNION ADMINISTRATION
BOARD,

                    Plaintiff,         14-CV-10067 (KPF)(SN)

      -against-

WELLS FARGO BANK, N.A.,

                    Defendant.

------------------------------------------------------------X

```
------------------------------------------------------------------X
```
**PHOENIX LIGHT SF LTD. et al.,**

        **Plaintiffs,**    14-CV-10102 (KPF)(SN)

   -against-

**WELLS FARGO BANK, N.A.,**

        **Defendant.**

```
------------------------------------------------------------------X
------------------------------------------------------------------X
```
**COMMERZBANK A.G.,**

        **Plaintiff,**    15-CV-10033 (KPF)(SN)

   -against-

**WELLS FARGO BANK, N.A.,**

        **Defendant.**

```
------------------------------------------------------------------X
```

**SARAH NETBURN, United States Magistrate Judge:**

   This case is brought by dozens of certificateholders of residential mortgage-backed securities ("RMBS") trusts against the trustee, Wells Fargo Bank, National Association ("Wells Fargo"). The Court assumes the parties' familiarity with the case. The plaintiffs seek leave to re-underwrite a sample of loans to establish pervasive breach rates across the underlying loans of the trusts at issue to prove liability and damages. Wells Fargo opposes the motion because it believes the plaintiffs cannot prove their case through sampling but rather must prove each element of their claims on a loan-by-loan and trust-by-trust basis. A resolution of this question before re-underwriting findings have been produced is appropriate, given that the Court's

decision will affect the number of loans that the parties' experts will re-underwrite, as well as the accompanying costs and time needed to re-underwrite those loans.

The Court heard oral argument on the subject on October 28, 2016. Consolidated briefing was then ordered to determine whether sampling is appropriate in this matter. Having reviewed the submissions, affidavits, and exhibits, the Court, by Order dated February 24, 2017, denied plaintiffs' motion to re-underwrite a sampling of loans. The Court's reasoning for that Order follows.

## BACKGROUND

The underlying claims arise from Wells Fargo's role as trustee for 53 RMBS trusts.[1] As trustee, Wells Fargo owed certain limited, contractually-derived duties to the certificateholders set forth in the governing agreements, generally identified as the pooling and servicing agreements ("PSAs" or the "Agreements") and other related agreements, including the Mortgage Loan Purchase Agreements and Servicing Agreements. In general, an indenture trustee's duties are "strictly defined and limited to the terms of the indenture." Elliott Assocs. v. J. Henry Schroder Bank & Trust Co., 838 F.2d 66, 71 (2d Cir. 1988). An indenture trustee undertakes no obligations other than those expressly set forth in the agreements. See id.; see also Cruden v. Bank of N.Y., 957 F.2d 961, 976 (2d Cir. 1992) (construing indentures as contracts in accordance with traditional contract interpretation principles).

The most pertinent of the governing agreements to this decision are the PSAs—the contracts between the loan depositor, the trust administrator, the trustee, and the loan servicer. The PSAs contain representations and warranties ("R&W") made by the depositors, sellers,

---

[1] See Coordinated RMBS Trustee Actions Against Wells Fargo, Nos. 14-cv-9371, 14-cv-9764, 14-cv-10067, 14-cv-10102, 15-cv-10033, Plaintiffs' Joint Opposition to Defendant's Motion to Dismiss at 1 (BlackRock, ECF No. 201).

sponsors, and originators attesting to the credit quality and other characteristics of the underlying mortgage loans and their origination. Pursuant to the PSAs, Wells Fargo had specific duties with respect to enforcing the obligations of the loan sellers in the event of an R&W breach. The PSAs' relevant provisions and terms are largely identical. No party asserts that any variation between the PSAs would affect the outcome of this decision.

Plaintiffs' claims against Wells Fargo sound in contract. They are rooted specifically in Sections 2.03 and 8.01 of the PSAs. First, Section 2.03 provides in relevant part:

> Upon discovery or receipt of written notice of any materially defective document in, or that a document is missing from, a Mortgage File or of the breach by the Originators or the Seller of any representation or warranty under the related Originator Mortgage Loan Purchase Agreement or the Mortgage Loan Purchase Agreement, as applicable, in respect of any Mortgage Loan which materially adversely affects the value of such Mortgage Loan, Prepayment Charge or the interest therein of the Certificateholders, the Trustee shall promptly notify the applicable Originator or the Seller, as the case may be, the Servicer and the NIMS Insurer . . .and request that, in the case of a defective or missing document, the Seller cure such defect or deliver such missing document within 120 days from the date the Seller was notified of such missing document or defect or, in the case of a beach of a representation or warranty, request the related Originator or the Seller, as applicable, cure such breach within 90 days from the date the applicable Originator or the Seller, as the case may be, was notified of such breach. Notwithstanding the foregoing, any breach of a Deemed Material and Adverse Representation with respect to a Group 1 Mortgage Loan or Group 2 Mortgage Loan shall automatically be deemed to materially and adversely affect such Mortgage Loan or the interest of the related Certificateholders therein.
>
> If the Seller does not deliver such missing document or cure such defect or if the related Originator or the Seller, as applicable, does not cure such breach in all material respects during such period, the Trustee shall enforce such Originator's or the Seller's obligation, as the case may be, under the applicable Originator Mortgage Loan Purchase Agreement or the Mortgage Loan Purchase Agreement, or Additional Mortgage Loan Purchase Agreement as applicable, and cause such Originator or the Seller, as applicable, to repurchase such Mortgage Loan from the Trust Fund at the Purchase Price on or prior to the Determination Date following the expiration of such period (subject to Section 2.03(d)).

ABFC 2006-OPT1 PSA § 2.03(a). Section 2.03 imposes two threshold requirements before Wells Fargo must enforce the loan seller's repurchase obligation. Wells Fargo must "discover[]"

4

or obtain written notice of missing documentation in a mortgage file or an R&W breach. Id. And the breach or deficiency must "materially and adversely" affect the value of the particular loan. Id. Upon both requirements being satisfied, Wells Fargo's specific obligations as trustee take effect. Wells Fargo must promptly notify the originator or seller of the defect in the particular loan. If the seller fails to cure or repurchase the defective loan within either 120 days (if the defect is a missing document) or 90 days (if the defect is an R&W breach), Wells Fargo must then "enforce such Originator's or the Seller's obligation . . . to repurchase such Mortgage Loan." Id. This cure and repurchase mechanism, also referred to as the put-back remedy, constitutes the "sole remed[y]" in the event of an R&W breach. Id.

Without specifying particular loans, plaintiffs allege Wells Fargo breached its Section 2.03 obligations when it "discovered" breaching loans that had a material and adverse effect and failed to require cure or repurchase. The parties dispute (1) the meaning of "discovery" for purposes of Section 2.03 and (2) the appropriate method of proving Wells Fargo's breach of its Section 2.03 obligations. Plaintiffs argue that "discovery" requires only inquiry notice of breaches, which triggers Wells Fargo's duty to investigate breaches, determine breach rates, and enforce the seller's repurchase obligation. Wells Fargo responds that "discovery" requires plaintiffs to prove it had actual knowledge of breaches and that it had no duty, before the occurrence of a defined Event of Default, to investigate breaching loans. Regarding the method of proof for showing breach, plaintiffs argue that statistical sampling performed by their retained experts, rather than reviewing the entire universe of at-issue loans, has been allowed by other courts in this District and is appropriate in this context. According to plaintiffs, sampling will generate and extrapolate breach rates to the at-issue Trusts, as well as prove what a prudent person would have found if an investigation of breaches had been performed. Wells Fargo

contends that plaintiffs must show it knew of loan-specific breaches with a material and adverse effect and that sampling cannot capture such loan-level specificity.

Second, with regards to plaintiffs' claims regarding Events of Default ("EOD" but often referred to in the PSAs as an Event of Termination), an EOD is defined in the PSAs as a failure of a servicer to perform its servicing duties in compliance with the governing agreements and to cure such failure within 30 days. See ABFC 2005-OPT1 PSA § 7.01(a). Wells Fargo's obligations under Section 8.01 are triggered by actual knowledge or written notice of an EOD:

> [T]he Trustee shall not be charged with knowledge of any failure by the Servicer to comply with the obligations of the Servicer referred to in clauses (i) and (ii) of Section 7.01(a) or any Servicer Event of Termination unless a Responsible Officer of the Trustee at the Corporate Trust Office obtains actual knowledge of such failure or the Trustee receives written notice of such failure from the Servicer, the NIMS Insurer or the Majority Certificateholders. In the absence of such receipt of such notice, the Trustee may conclusively assume that there is no Servicer Event of Termination.

Id. at § 8.01. According to plaintiffs, in the aftermath of the housing and financial crisis, the failure of servicers to promptly notify Wells Fargo upon their discovery of mortgage loan R&W breaches constituted an EOD. Plaintiffs further contend that Wells Fargo obtained actual knowledge of such failures based on publicly available information. Once Wells Fargo acquired actual knowledge or written notice of a defined EOD, it was required to "exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs." Id. Plaintiffs construe this prudent person standard to require Wells Fargo to have performed a thorough investigation of the loans in the trusts. According to plaintiffs, Wells Fargo's failure to perform that investigation, to then uncover the existence and rate of defective loans, and finally to enforce repurchase was a breach of its obligation under Section 8.01 to act as a prudent person.

**DISCUSSION**

**I.     Rule 26 and Proportionality**

In general, statistical sampling is an accepted method of proving liability in this District, "including in cases relating to RMBS and involving repurchase claims." Assured Guar. Mun. Corp. v. Flagstar Bank, FSB ("Flagstar"), 920 F. Supp. 2d 475, 512 (S.D.N.Y. 2013); see, e.g., Assured Guar. Mun. Corp. v. DB Structured Prods., Inc., No. 650705/2010, 2014 WL 3282310, at *6, 8 (N.Y. Sup. Ct. 2014); Syncora Guarantee Inc. v. EMC Mortg. Corp., No. 09 Civ. 3106 (PAC), 2011 WL 1135007, at *6 n.4 (S.D.N.Y. 2011). But a court should not authorize the expense and burden of sampling if it is not "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Indeed, it is a core function of the court to prevent unwarranted costs and delays in the resolution of every action. See Fed. R. Civ. P. 1. While Rule 26 sets forth various factors to evaluate proportionality, on this discovery motion, the Court's focus is on "the importance of the discovery in resolving the issues" and "whether the burden or expense of the proposed discovery outweighs its likely benefit." Id. The Court will not authorize discovery that, in its estimation, is unlikely to advance any claim or defense in this case. See Henry v. Morgan's Hotel Grp., Inc., No. 15 Civ. 1789 (ER)(JLC), 2016 WL 303114, at *3 (S.D.N.Y. Jan. 25, 2016) (internal citation and quotation marks omitted) (Rule 26(b)(1) is "intended to encourage judges to be more aggressive in identifying and discouraging discovery overuse by emphasizing the need to analyze proportionality before ordering production of relevant information.").

The parties have represented that the contemplated sampling will cost hundreds of thousands, if not millions, of dollars, will require months to conduct, and will likely result in challenges to the admissibility of the evidence. And as set forth more fully below, Wells Fargo believes such evidence cannot prove plaintiffs' claims. Such discovery should not be undertaken

7

lightly. Critically, however, the Court's ruling is on a discovery motion. And while this opinion reaches a conclusion on the burden of proof for the parties' claims and defense, such conclusion is intended to guide the Court's proportionality analysis. Accordingly, at summary judgment or trial, conclusions of law set forth in this opinion should not be deemed to have law-of-the-case effect.

## II.     Section 2.03 Breach of Representation and Warranty Claims

### A.  Plaintiffs Must Proceed Loan by Loan

Notwithstanding a pending motion to dismiss, plaintiffs must be ready to prove Wells Fargo's alleged misconduct "loan-by-loan and trust-by-trust." Ret. Bd. of the Policemen's Annuity and Benefit Fund of the City of Chicago v. Bank of N.Y. Mellon, 775 F.3d 154, 162 (2d Cir. 2014) ("Retirement Board"). "Whether [the trustee of an RMBS trust] was obligated to repurchase a given loan" requires "examining *which loans, in which trusts*, were in breach of the representations and warranties." Id. (emphasis added). The Court of Appeals in Retirement Board rejected plaintiffs' wholesale proof that the defendant trustee "violated its duties when it failed to notify certificateholders of Countrywide's breaches of the governing agreements, failed to force Countrywide to repurchase defaulted mortgage loans, and failed to ensure that the mortgage loans held by the trusts were correctly documented." Id. In the related HSBC coordinated action, the court has echoed the requirement that "[c]ertainly, at trial or summary judgment, plaintiffs must prove their claims loan-by loan and trust-by-trust." Royal Park Investments SA/NV v. HSBC Bank USA, Nat'l Ass'n, 109 F. Supp. 3d 587, 601 (S.D.N.Y. 2015).

Courts in this District have dismissed theories of generalized wrongdoing after the pleading stage. In denying motions to dismiss, courts have affirmed that more specific proof will

8

be needed at summary judgment or trial. See <u>Blackrock Core Bond Portfolio, et al. v. U.S. Bank Nat'l Ass'n</u>, 165 F. Supp. 3d 80, 100 (S.D.N.Y. 2016) ("[W]hen the question is one of plausibility of allegations, plaintiffs may ride the coattails of some of this work. Down the road at trial, they will be put to their proof. At that point, relying on wrongs elsewhere demonstrated would be insufficient."). Other courts, in weighing the evidence provided at summary judgment or trial, have emphasized the need for loan-specific proof. At summary judgment, the court in <u>MASTR</u> denied plaintiff trustees' argument of "pervasive breach," that is, the argument that defendant should have been on notice that "a significant number of loans, beyond those specifically identified, were also in breach" based on government investigations, ratings downgrades, and other information publicly available at the time. <u>MASTR Adjustable Rate Mortg. Trust 2006-OA2 v. UBS Real Estate Secs. Inc.</u>, No. 12 Civ. 7322 (PKC), 2015 WL 764665, at *11 (S.D.N.Y. Jan. 9, 2015) ("<u>MASTR I</u>"). Similarly, the <u>U.S. Bank</u> court could not, at trial, "determine whether the Trusts have proved that UBS received notice or otherwise discovered that a loan was in beach *unless the loan is identified*," stressing the need to show "breaches on an individualized loan-by-loan basis." <u>U.S. Bank, N.A. v. UBS Real Estate Secs., Inc.</u>, No. 12 Civ. 7322 (PKC)(JCF), 2016 WL 4690410, at *27, 75 (S.D.N.Y. Sept. 6, 2016) ("<u>U.S. Bank</u>").

### B. Section 2.03 Claims Contain Loan-Specific Elements

To prevail on their § 2.03 breach of contract claims, plaintiffs must establish that Wells Fargo failed to act as required under the PSA. The elements of such a claim require establishing loan-specific proof related to a particular defect, that that defect was material to the value of the loan, that Wells Fargo failed to act with respect to the loan-specific remedies available for a particular defect, and that such failure caused the plaintiffs harm. Plaintiffs seek to use samples

of loans pulled from 53 trusts to prove Wells Fargo's liability with respect to each of those trusts by extrapolating breach rates. But replacing loan-specific proof with extrapolated pool- or trust-wide breach rates ignores the Court of Appeals' requirement that breaches be proven on a loan-by-loan basis.

Plaintiffs must first show which specific loans were in breach because any defect that would be cured by repurchase is loan-specific. That is, Wells Fargo must discover "any materially defective document in, or that a document is missing from, *a Mortgage File*" or that there was "a breach by the Originators or the Seller of any representation or warranty . . . in respect of *any Mortgage Loan* . . . ." ABFC 2006-OPT1 PSA § 2.03(a) (emphasis added); see also Retirement Bd., 775 F.3d at 162 ("And whether a loan's documentation was deficient requires looking at individual loans and documents."). To do so, plaintiffs must establish the relevant underwriting guidelines and show that the loan breached a specific R&W.

The materiality of an R&W breach is also loan-specific. Pursuant to the PSAs, only those breaches that "materially adversely affects the value of *such Mortgage Loan*, Prepayment Charge or the interest therein of the Certificateholders" trigger a cure or repurchase obligation. ABFC 2006-OPT1 PSA § 2.03(a) (emphasis added); see also MASTR Adjustable Rate Mortgs. Trust 2006-OA2 v. UBS Real Estate Secs. Inc., No. 12 Civ. 7322 (PKC), 2015 WL 797972, at *3 (S.D.N.Y. Feb. 25, 2015) ("Materiality is determined not by the degree of deviation from the internal underwriting standards, but by how the deviation affects the Certificateholders in relation to 'such Mortgage Loan.'" (internal quotation marks omitted)) ("MASTR II"); MASTR I, at *16 ("The Trusts may rely upon proof that *as to a specific loan*, there is a material or significant increase in the risk of loss." (emphasis added)); Lehman XS Trust, Series 2006–4N v. GreenPoint Mortg. Funding, Inc., 991 F. Supp. 2d 472, 479 (S.D.N.Y. 2014).

Sampling will not "adequately distinguish between breaches that are material and adverse as to a particular loan and those that are not." MASTR I, at *10 ("[A] failure to follow internal underwriting standards—which is a breach of a representation and warranty at issue—may or may not significantly increase the risk of a loss in a particular borrower's loan, *i.e.*, 'such Mortgage Loan.'"). Sampling may fail to capture whether the nature of the breach had a material and adverse effect at the time a repurchase obligation, if any, was triggered, especially when the sample that plaintiffs here draw consists of current loan performance information. Sampling may also detect a technical breach or deviation from underwriting standards but fail to capture mitigating circumstances or compensating factors. For example, a missing verification of employment in a loan file is a technical deviation of the underwriting guidelines. Yet the defect may not have had any material and adverse effect (and is therefore not an R&W breach requiring a repurchase remedy) if the borrower was actually employed and earned a stable income

Finally, the cure and repurchase remedies—the sole remedies under the PSAs—are themselves loan-specific. See ABFC 2006-OPT1 PSA § 2.03(a) (to "repurchase *such Mortgage Loan* from the Trust Fund at the Purchase Price") (emphasis added). The "Purchase Price" is defined as the sum of the "Principal Balance" as of the date of purchase, the "accrued interest on such Principal Balance at the applicable Mortgage Interest Rate," unreimbursed "Servicing Advances," and reasonably incurred expenses. ABFC 2006-OPT1 PSA § 1.01(a). Accordingly, all the components of the "Purchase Price" are specific to a particular loan. "Thus, the repurchase mechanism established by the parties is targeted to a specific loan, and not to a group or category of loans." MASTR I, at *11; see also U.S. Bank, 2016 WL 4690410, at *27 ("[L]oan-specific repurchase remedy" applies to "breaches on an individualized, loan-by-loan basis").

### C. Plaintiffs' Authority Is Inapposite

Plaintiffs rely on Flagstar as an example of the admissibility of statistical sampling. In Flagstar, a monoline insurer alleged fraud against the defendant who served as the sponsor, servicer, depositor, and originator of all the loans underlying the two trusts at issue. At trial, the defendant challenged the use of statistical sampling to prove liability, arguing that materiality required a consideration of the loan file. Judge Rakoff rejected this argument, concluding that sampling was a "widely accepted method of proof in . . . cases relating to RMBS and involving repurchase claims" and that the sample was "reflective of the proportion of the individual members in the entire pool exhibiting any given characteristic." 920 F. Supp. 2d at 512. Flagstar, however, does not provide categorical support for the plaintiffs' position that sampling, as applied in this context, will generate loan-specific proof of liability. In Flagstar, sampling was used to show the extent of defects within only two trusts where all the loans were underwritten using the same guidelines. Plaintiffs' proposed strategy of extrapolating breach rates from a sample of loans to all 53 trusts, involving numerous originators, servicers, sponsors, depositors, and differing underwriting guidelines, is one that Judge Rakoff's holding did not cover. Flagstar therefore stands on factual footing that is distinguishable from the specific context here.[2]

Plaintiffs have marshaled other cases approving the use of sampling to prove liability and damages. But many of those cases are inapposite. They involve claims sounding in fraud, which require a critical mass of breaching loans rather than loan-specific breaches. See, e.g., Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc., 104 F. Supp. 3d 441 (S.D.N.Y. 2015); Fed. Hous. Fin. Agency v. JPMorgan Chase & Co., No. 11 Civ. 6188 (DLC), 2012 WL 6000885 (S.D.N.Y.

---

[2] To the extent Judge Rakoff found that inquiry notice of pervasive breaches was adequate to trigger Flagstar's obligations, this Court declines to impose an inquiry notice standard on the trustee under these governing agreements.

Dec. 3, 2012). They involve a monoline plaintiff, which is not limited to a repurchase remedy. See, e.g., Assured Guar. Mun. Corp. v. DB Structured Prods., Inc., No. 650605/2010, 2014 WL 3282310 (N.Y. Sup. Ct. July 3, 2014); Flagstar, 920 F. Supp. 2d 475; Syncora Guarantee Inc. v. EMC Mortg. Corp., No. 09 Civ. 3106 (PAC), 2011 WL 1135007 (S.D.N.Y. Mar. 25, 2011); MBIA Ins. Corp. v. Countrywide Home Loans, Inc., No. 602825/08, 2010 WL 5186702 (N.Y. Sup. Ct. Dec. 22, 2010). They hinge on a trustee plaintiff suing a loan sponsor on the ground of pervasive breach. See, e.g., Law Debenture Trust Co. of N.Y. v. WMC Mortg., LLC, No. 12 Civ. 1538 (CSH), 2015 WL 9581729 (D. Conn. Dec. 30, 2015); Deutsche Bank Nat'l Trust Co v. WMC Mortg., LLC, No. 12 Civ. 933 (CSH), 2014 WL 3824333 (D. Conn. Aug. 4, 2014).

None of these cases counsels this Court to authorize costly expert discovery that will not satisfy the plaintiffs' burden of proof required by the Court of Appeals and the terms of the PSAs.

**D. Section 2.03 Claims Require Proving "Discovery" of the Underlying Breach**

    **1. Meaning of "Discovery"**

Plaintiffs argue that "discovery" as used in Section 2.03 requires only inquiry or constructive notice (i.e., Wells Fargo should have known of pervasive R&W breaches), citing decisions that define the "discovery" of a breach as the moment a party "knows or *should* know that the breach has occurred." Bank of N.Y. Mellon Trust Co., Nat'l Ass'n v. Morgan Stanley Mortg. Capital, Inc., No. 11 Civ. 505 (CM)(GWG), 2013 WL 3146824, at *19 (S.D.N.Y. June 19, 2013) (internal citation and quotation marks omitted). The Court, however, reads "discovery" as used in Section 2.03 to mean actual knowledge. This interpretation is consistent with the contractual remedies available under the PSA and Wells Fargo's limited duties.

The repurchase remedy contemplated in Section 2.03 rests on the ability of an RMBS trustee to undertake concrete measures (i.e., enforce the originator's or the seller's repurchase obligation) with respect to a specific defect, in a specific loan, in a specific trust. A trustee cannot undertake those measures without knowing the specific missing document or the specific breach. Without specific proof that the trustee knew of the particular breach, the plaintiffs cannot establish that the trustee failed to act.

As an example of inquiry notice, plaintiffs cite a letter from Financial Security Assurance, Inc., the certificate insurer for three of the at-issue RMBS trusts for which Wells Fargo served as trustee, warning Wells Fargo's corporate trust services department of that it had "good reason" to believe that many of the mortgage loans did not satisfy the representations and warranties made by the originators pursuant to the PSAs but without identifying *specific* breaches. Pls.' Mem. at 9–10. Plaintiffs argue that Wells Fargo should have "discovered" the breaches in the three trusts because it should have known they existed due to pervasive breach rates discovered by investors in one of the trusts. But without knowing the specific document defects in specific loans, Wells Fargo could not have "discovered" any breaches in the trust and provide notice. See U.S. Bank, 2016 WL 4690410, at *27–28 (Plaintiffs' constructive knowledge argument was "little more than a reformulation of [plaintiffs'] pervasive breach theory" and ignored the fact that the sole remedies contemplated by the PSAs only applied to "breaches on an individualized loan-by-loan basis." (internal quotation marks omitted)).

Equating "discovery" with constructive knowledge is also inconsistent with the bargained-for terms of the PSAs, which limit Wells Fargo's pre-EOD duties as trustee to the four corners of the governing agreements. See, e.g., ABFC 2005-HE2 PSA § 8.01 (requiring the

trustee, prior to a Servicer EOD, to "perform such duties and only such duties as are specifically set forth in this Agreement").

Specifically, the PSAs did not obligate Wells Fargo to investigate until it received notice or obtained actual knowledge of a Servicer EOD (rather than constructive notice of potential breaches). See PPSI 2005-WLL1 PSA § 8.02(v) ("Prior to the occurrence of a Servicer Event of Default hereunder and after the curing of all Servicer Events of Default which may have occurred, the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement . . . unless requested in writing to do so by the NIMS Insurer or the Holders of Certificates entitled to at least 25% of the Voting Rights. . . ."); U.S. Bank, 2016 WL 4690410, at *28 ("The parties could have, but did not, bargain for additional remedies or a notice provision that did not turn on loan-specific knowledge. The [plaintiffs] therefore may not rely on evidence of 'constructive knowledge' or 'pervasive breach' to prove UBS's knowledge of breached warranties."). Before a Servicer EOD, "an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement." Royal Park, 109 F. Supp. 3d at 597. Consistent with Section 8.02(v) of the PSAs, the First Department has ruled that an RMBS trustee has no "duty to 'nose to the source'" with respect to "*discover[ing]* if Events of Default or Master Servicer Event of Defaults [sic] or *other PSA breaches* had occurred." Commerce Bank v. Bank of N.Y. Mellon, 141 A.D.3d 413, 415–16 (1st Dep't 2016) (rejecting plaintiffs' allegation that a trustee's general awareness of loan defaults, litigation, and other public information was sufficient to trigger an investigation of breaches (emphasis added)).

Importing a "should have known" standard is also inconsistent with previous decisions that have emphasized the limited role of an indenture RMBS trustee. See Ellington Credit Fund,

15

Ltd. v. Select Portfolio Servicing, Inc., 837 F. Supp. 2d 162, 189 (S.D.N.Y. 2011) (holding that trustees did not have any "monitoring or safeguarding duties beyond those explicitly provided in the PSA"); Commerce Bank, 141 A.D.3d at 415 ("Plaintiffs allege that defendant [trustee] had the duty to notify them that other parties to the PSA had failed to perform their obligations and that the Master Servicer was covering up defendant's failures. However, in order to give plaintiffs such notice, defendant would have had to monitor other parties. A failure to monitor other parties plainly does not involve the performance of basic non-discretionary ministerial tasks." (internal citation and quotation marks omitted)).

### 2. Sampling Will Not Demonstrate Actual Knowledge

Sampling cannot establish that Wells Fargo had actual knowledge of specific breaches on the requisite loan by loan basis. See MASTR I, at *10 (rejecting sampling on the ground that "the terms of the PSAs foreclose such a broad and improvised remedy"); FHFA v. UBS Ams., Inc., 2013 WL 3284118, at *15 (S.D.N.Y. June 28, 2013) ("[E]vidence of generalized knowledge" cannot qualify as "circumstantial evidence of particularized, actual knowledge."). While sampling may identify deficiencies within a drawn loan pool, Wells Fargo's duties as trustee, including its obligation to enforce the repurchase remedy, are triggered only when it knew or received written notice of a defect for a particular loan in the trust. Conducting a sampling review seven or eight years after the fact cannot establish which specific loans Wells Fargo would have actually found to be in breach had it performed an investigation at the time.

### III. Section 8.01 Servicer Event of Default Claims

Under the PSAs, a Servicer EOD (and, relatedly, Wells Fargo's duty to act as a prudent investor) is triggered by a servicing breach by a Servicer, defined as "the failure by the Servicer to make any required Servicing Advance . . . or the failure by the Servicer duly to observe or

16

perform, in any material respect, any other covenants, obligations or agreements of the Servicer as set forth *in this Agreement*." See ABFC 2005-HE2 PSA § 7.01(a) (emphasis added). The Servicer's subsequent failure to cure the breach within 30 days culminates in a Servicer EOD. Wells Fargo's heightened duties are triggered only when it obtains actual knowledge or written notice of an EOD. Even when it does receive notice or knowledge, however, its obligations are "still circumscribed by the indenture." Royal Park, 109 F. Supp. 3d at 597.

Plaintiffs claim that, because of the widespread, public nature of the financial crisis, servicer EODs occurred when servicers failed to notify Wells Fargo of R&W breaches. Wells Fargo acquired actual knowledge of these failures, based on publicly available information and notices. Plaintiffs further assert that Wells Fargo breached its obligations under Section 8.01 when, after obtaining actual knowledge of such servicer EODs, it failed to proceed as a prudent person would (i.e., by failing to investigate, to uncover the full extent of breaching loans, and to then successfully repurchase the loans). According to plaintiffs, re-underwriting a sample of loans would prove the existence and rate of breaching loans. But as with their Section 2.03 claims, plaintiffs' reliance on sampling as a method of proof for their Section 8.01 claims is unavailing.

### A. EODs Require Loan-Specific Proof

Plaintiffs assert that servicer EODs include a servicer's failure to "promptly send notice to Wells Fargo and the other parties upon discovery of mortgage loan representation and warranty breaches." Pls.' Mem. at 17. But this failure by the servicers to send notice is premised on the existence of underlying R&W breaches that are loan-specific in nature. Accordingly, in order to prove the occurrence of a servicer EOD tied to loan R&W breaches, plaintiffs will need to prove (1) the existence of loan-specific, material and adverse R&W breaches, (2) the

servicer's discovery of those individual breaching loans, and (3) the servicer's failure to report those loans to Wells Fargo.

### B. Wells Fargo's Actual Knowledge of EODs

In order to trigger Section 8.01's prudent person standard, Wells Fargo must have obtained actual knowledge or written notice of the EOD. Plaintiffs argue that, based on publicly available information, Wells Fargo obtained actual knowledge of widespread breaches of mortgage loan R&Ws and of servicers' failure to report those breaches. But this publicly available information did not identify individual loans in breach. Generalized information indicating the *trusts* with loan defaults or R&W breaches cannot substitute for proof that servicers had actual knowledge of *loan-specific* R&W breaches and that Wells Fargo actually knew of the servicers' failure to report those breaches. As discussed above, sampling will not aid plaintiffs in this endeavor.

### C. Wells Fargo's Failure to Investigate and Enforce Repurchase

In addition, plaintiffs have not demonstrated that under Section 8.01's prudent person standard, Wells Fargo was obligated to investigate unreported R&W breaches, such as by performing some kind of sampling review, and failed to do so. First, even in the post-EOD context, "[t]he trustee is not required to act beyond his contractually conferred rights and powers." Royal Park, 109 F. Supp. 3d at 597. Any investigatory duty assumed by the trustee is still limited by the terms of the governing agreements, which allow a trustee to refrain from expending or risking its own funds in conducting an investigation without securing satisfactory indemnification. See PPSI 2005-WLL1 PSA § 8.02(v). The plaintiffs have not established that the PSAs required Wells Fargo to assume the highly burdensome task of performing a review of the trusts in order to find the specific breaching loans.

Second, plaintiffs have cited no evidence, such as industry standards or customs at the time, showing that performing some kind of sampling review, identifying and investigating loan breaches, and subsequently enforcing repurchase was "what a prudent person would have done" following an EOD. Pls.' Mem. at 17 ("[I]n hundreds of cases filed in the aftermath of the financial crisis, RMBS trustees have sought to enforce repurchase obligations with respect to all loans breaching R&Ws *through the use of sampling*." (emphasis added)). The argument that Wells Fargo should have performed an extensive sampling review of the loans at issue is "simply too distant a leap for this Court to make without plausible allegations that other MBS trusts' trustees have taken similar action in similar circumstances (bolstering the actions a 'prudent person' would have taken)." Policemen's Annuity & Benefit Fund of City of Chi. v. Bank of Am., N.A., 907 F. Supp. 2d 536, 666 (S.D.N.Y. 2012).

### D. Existence of Specific Defective Loans Had an Investigation Been Performed

Sampling, according to plaintiffs, will "prove the existence and rate of defective loans Wells Fargo would have found had it acted as a prudent person." Pls.' Mem. at 18. But to successfully enforce repurchase of a specific loan after a defined EOD had occurred, Wells Fargo would have needed to locate the individual breaching loans themselves rather than determine trust-wide breach rates. It is not clear how sampling can show that after performing an investigation, Wells Fargo would have located the *specific* breaching loans outside of a sample based on the existence and rate of defective loans within the given sample. Plaintiffs have cited no authority affirming that in the context of a defendant RMBS trustee obtaining actual knowledge of servicer EODs, the rate of breaches in a sample of breaching loans allows the trustee to then identify specific breaching loans outside the sample. This attenuation is made all the more glaring by the fact that the loans in the trusts at issue vary in terms of maturity date,

interest rate, and type. See Policemen's Annuity and Benefit Fund of City of Chi., 907 F. Supp. 2d at 547 (holding that "loan defaults" in one trust "will not 'infect' the value of certificates" issued by another trust).

## CONCLUSION

Accordingly, plaintiffs' motion to re-underwrite a sampling of loans for the purpose of proving Wells Fargo's liability or damages beyond the loans in the sample is DENIED. The parties are directed to the Court's February 24, 2017 Order as to submitting a joint status letter regarding Phase II of the Loan Re-Underwriting Protocol and Wells Fargo's January 18, 2017 Daubert motion.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:   New York, New York
         March 10, 2017