UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____         │
│ DATE FILED: March 30, 2017       │
└─────────────────────────────────┘
```

------------------------------------------------X
          :
BLACKROCK ALLOCATION TARGET SHARES:  :
SERIES S PORTFOLIO, *et al.*,        :
          :
              Plaintiffs,    :
          :
          v.          :   14 Civ. 9371 (KPF) (SN)
          :
WELLS FARGO BANK, NATIONAL     :
ASSOCIATION, *et al.*,         :
          :
              Defendants.   :
          :
------------------------------------------------X  **OPINION AND ORDER**
          :
ROYAL PARK INVESTMENTS SA/NV,    :
*Individually and on Behalf of all Others* :
*Similarly Situated,*         :
          :
              Plaintiffs,    :
          :
          v.          :   14 Civ. 9764 (KPF) (SN)
          :
WELLS FARGO BANK, N.A,       :
*as Trustee,*            :
          :
              Defendant.   :
          :
------------------------------------------------X
          :
NATIONAL CREDIT UNION ADMINISTRATION :
BOARD, *as Liquidating Agent of U.S. Central* :
*Federal Credit Union, Western Corporate Federal* :
*Credit Union, Members United Corporate Federal* :
*Credit Union, Southwest Corporate Federal Credit* :
*Union, and Constitution Corporate Federal Credit* :
*Union,*          :
          :
              Plaintiff,    :
          :
          v.          :   14 Civ. 10067 (KPF) (SN)
          :
WELLS FARGO BANK, NATIONAL     :
ASSOCIATION,          :
          :
              Defendant.   :
          :



and                                        :
                                           :
NCUA GUARANTEED NOTES TRUST 2010-R1,       :
NCUA GUARANTEED NOTES TRUST 2010-R2,       :
NCUA GUARANTEED NOTES TRUST 2010-R3,       :
NCUA GUARANTEED NOTES TRUST 2011-R2,       :
NCUA GUARANTEED NOTES TRUST 2011-R4,       :
NCUA GUARANTEED NOTES TRUST 2011-R5,       :
and NCUA GUARANTEED NOTES TRUST 2011-      :
M1,                                        :
                                           :
                        Nominal            :
                        Defendants.        :
                                           :
------------------------------------------------------------X
                                           :
PHOENIX LIGHT SF LIMITED, *et al.*,        :
                                           :
                        Plaintiffs,        :
                                           :
              v.                           ;   14 Civ. 10102 (KPF) (SN)
                                           :
WELLS FARGO BANK, N.A.,                    :
                                           :
                        Defendant.         :
                                           :
------------------------------------------------------------X
                                           :
COMMERZBANK AG,                            :
                                           :
                        Plaintiffs,        :
                                           :
              v.                           :   15 Civ. 10033 (KPF) (SN)
                                           ;
WELLS FARGO BANK N.A.,                     :
                                           :
                        Defendant.         :
                                           :
------------------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:

In the near-decade since the collapse of the United States real-estate

market, this District has been inundated with lawsuits brought by putative

victims of that collapse against those they blame for it.  As time has lapsed,

and with it various statutes of limitation, the targets of these lawsuits — as well as the proffered bases of liability — have evolved.  The instant cases represent the latest wave:  They are brought by and on behalf of certificateholders ("Plaintiffs") of 53 residential-mortgage-backed securities ("RMBS") trusts (the "Trusts") against the Trusts' common Trustee, Wells Fargo Bank, National Association ("Wells Fargo" or "Defendant").  Plaintiffs allege that Defendant failed to discharge its duties as Trustee.  More specifically, Plaintiffs claim that Defendant discovered pervasive documentation errors, breaches of seller representations and warranties ("R&Ws"), and systemic loan-servicing violations, but disregarded its contractual obligations to protect Plaintiffs therefrom because, among other consequences, doing so would have exposed Defendant to liability for its own RMBS-related misconduct.

Defendant has moved to dismiss each of the above-captioned related actions for failure to state a claim.[1]  For the reasons set forth below, Defendant's motion is granted in part and denied in part.  In brief, Defendant's motion to dismiss Plaintiffs' breach of contract claims is denied; its motion to

---

[1]     Specifically, Defendant has moved to dismiss each of the five operative complaints in these actions: (i) the Amended Complaint in the action brought by certain BlackRock funds ("BlackRock") and others (the "BR Compl.," 14 Civ. 9371, Dkt. #102-06); (ii) the Amended Complaint in the action brought by Royal Park Investments SA/NV ("Royal Park") (the "RP Compl.," 14 Civ. 9764, Dkt. #24); (iii) the Second Amended Complaint in the action brought by the National Credit Union Administration Board (the "NCUAB") (the "NCUAB Compl.," 14 Civ. 10067, Dkt. #82), (iv) the Second Amended Complaint in the action brought by Phoenix Light SF Ltd. ("Phoenix Light") and others (the "PL Compl.," 14 Civ. 10102, Dkt. #80); and the Complaint in the action brought by Commerzbank AG ("Commerzbank") (the "CB Compl.," 15 Civ. 10033, Dkt. #1) (all five complaints, collectively, the "Complaints").  Because Defendant's five motions are contained in a consolidated brief, the Court will refer to them in this Opinion as a single motion.

dismiss Plaintiffs' tort claims is granted in part and denied in part; its motion

to dismiss Plaintiffs' claims under the Trust Indenture Act is granted in part

and denied in part; its motion to dismiss Plaintiffs' claims under the Streit Act

is granted; its motion to dismiss Plaintiff NCUAB's derivative claims is granted

without prejudice to NCUAB's ability to move for leave to replead; its motion to

dismiss NCUAB's direct claims is denied; and its motion to dismiss

Commerzbank's claims on timeliness grounds is denied.

BACKGROUND[2]

## A.   Factual Background

Explanations of the typical formation process and structure of RMBS

trusts abound in this District, and this Court will not here reinvent the wheel.

Only a brief description is provided for context.  *See also BlackRock Allocation*

*Target Shares* v. *Wells Fargo Bank, Nat'l Ass'n*, No. 14 Civ. 9371 (KPF) (SN),

2017 WL 953550, at *1-3 (S.D.N.Y. Mar. 10, 2017) (describing the background

of this consolidated action).

### 1.   RMBS Trusts Generally

The Trusts in the instant action were originally securitized by residential

mortgage loans, and created to facilitate the sale of those loans to investors.

---

[2]     This Opinion draws the facts in this section from the Complaints.  The Court takes all
well-pleaded allegations therein as true, as it must at this stage.  *See, e.g., Peralta* v. *St.
Luke's Roosevelt Hosp.*, No. 14 Civ. 2609 (KPF), 2015 WL 3947641, at *1 n.1 (S.D.N.Y.
June 26, 2015).  The Court has also reviewed the briefing submitted by the parties and
will refer to it as follows: Defendant's Memorandum of Law in Support of Defendant's
Motion to Dismiss the Complaints (14 Civ. 9371, Dkt. #171) will be referred to as "Def.
Br.," Plaintiffs' Joint Opposition to Defendant's Motion to Dismiss (14 Civ. 9371, Dkt.
#201) as "Pl. Opp.," and Defendant's Reply Brief in Further Support of Defendant's
Motion to Dismiss (14 Civ. 9371, Dkt. #208) as "Def. Reply."  Declarations in support of
this briefing and exhibits attached thereto are referred to by the name of the declarant
and the exhibit designation, e.g., "[ ] Decl., Ex. [ ]."

(BR Compl. ¶¶ 3-4).[3]  Such RMBS Trusts are formed according to the following process:  First, institutions known as "sponsors" or "sellers" acquire and pool residential mortgage loans.  (*Id.* at ¶¶ 5, 43).  Each sponsor also selects the loans' "servicer," "often an affiliate of the seller or originator, to collect payments on the loans."  (*Id.* at ¶ 5).  "Once the loans are originated, acquired and selected for securitization, the seller, through an affiliate called the depositor, creates a trust where the loans are deposited for the benefit of the Noteholders."  (*Id.*).  Then the depositor "segments the cash flows and risks in the loan pool among different levels of investment or 'tranches.'"  (*Id.* at ¶ 44).  Typically, "cash flows from the loan pool are applied in order of seniority, going first to the most senior tranches[,] [and] ... any losses to the loan pool due to defaults, delinquencies, foreclosure or otherwise, are applied in reverse order of seniority."  (*Id.*).  Next, "the depositor conveys the mortgage pool to the trust in exchange for the transfer of the RMBS to the depositor."  (*Id.* at ¶ 45).  "Finally, the depositor sells the RMBS to an underwriter, and provides the revenue from the sale to the seller.  The underwriter markets and sells the RMBS to investors."  (*Id.* at ¶ 46).

It is the sponsor-selected servicer's responsibility to collect loan principal and interest ("P&I") payments from the underlying borrowers.  (BR Compl. ¶ 47).  "After collection, the servicer sends the funds to the trust, which then makes payments to the noteholders.  Mortgage delinquencies and defaults

---

[3]  The Court cites to this Complaint for simplicity's sake.  Each of the Complaints contains a comparable description of RMBS trusts.

reduce the available P&I payments to be paid to the trust and passed through to investors." (*Id.*).  Therefore, "proper loan origination and underwriting of the mortgages underlying the RMBS, and proper and timely loan servicing and oversight" are of critical importance to investors, directly dictating their timely receipt of passed-through payments.  (*Id.* at ¶ 48).

### 2. The Trusts, the Governing Agreements, and Defendant's Duties Thereunder

The 53 Trusts at issue here are of two kinds: Pooling and Service Agreement ("PSA") Trusts and Indenture Trusts.[4]  41 of the 53 Trusts at issue in this case are PSA Trusts.  (Def. Br. 5).  PSA Trusts "are organized under New York [common] law."  *Ret. Bd. of Policemen's Annuity & Benefit Fund of City of Chi.* v. *Bank of N.Y. Mellon* (hereinafter, "*PABF III*"), 775 F.3d 154, 156 (2d Cir. 2014).  In a PSA trust, "[t]he right to receive trust income is parceled into certificates and sold to investors," who are called "certificateholders."  *Id.* (quoting *BlackRock Fin. Mgmt. Inc.* v. *Segregated Account of Ambac Assurance Corp.* (hereinafter, "*Ambac*"), 673 F.3d 169, 173 (2d Cir. 2012)).  "The terms of the securitization trusts as well as the rights, duties, and obligations of the trustee, seller, and servicer are set forth in [governing agreements, frequently styled as PSAs]."  *Id.* (alteration in original) (quotation mark omitted) (quoting *Ambac*, 673 F.3d at 173).

---

[4]     Defendant clarifies that while "Plaintiffs' complaints identify claims on behalf of 59 RMBS trusts, ... six of those trusts overlap with each other among the various actions." (Def. Br. 2 n.2).

12 of the 53 Trusts at issue in this case are Indenture Trusts.  (Def. Br. 5).  Indenture Trusts are governed by their Trust Agreements, Mortgage Loan Purchase and Sale Agreements ("MPLAs"), and Sale and Service Agreements ("SSAs").  (*See* BR Compl. ¶ 49).  *See generally BlackRock Allocation Target Shares*, 2017 WL 953550, at *1-3.  As Defendant explains,

> Indenture Trusts differ from PSA Trusts in that the Depositor conveys ownership of the pooled loans to the Issuer, which in turn issues its own notes pursuant to the indenture.  Under the indenture, the Issuer collateralizes the notes by pledging the mortgage loans to the indenture trustee, which holds the pledge on behalf of the noteholders.

(Def. Br. 5).

The PSAs, Trust Agreements, MPLAs, and SSAs (together, the "Governing Agreements") are of critical importance to Defendant's motion; they dictate the scope of Defendant's duties to Plaintiffs.  The duties of an RMBS trustee are "distinct from those of an 'ordinary trustee,' which might have duties extending well beyond the agreement."  *Phoenix Light SF Ltd.* v. *Bank of N.Y. Mellon* (hereinafter, "*PL/BNYM*"), No. 14 Civ. 10104 (VEC), 2015 WL 5710645, at *2 (S.D.N.Y. Sept. 29, 2015) (citing *AG Capital Funding Partners, L.P.* v. *State St. Bank & Tr. Co.*, 11 N.Y.3d 146, 156 (2008)); *see also Fixed Income Shares: Series M* v. *Citibank N.A.* (hereinafter, "*Fixed Income Shares*"), 130 F. Supp. 3d 842, 857-58 (S.D.N.Y. 2015).  In contrast, "the duties of an indenture trustee ... [are] governed solely by the terms of the indenture[.]"  *Millennium Partners, L.P.* v. *U.S. Bank Nat'l Ass'n*, No. 12 Civ. 7581 (HB), 2013 WL 1655990, at *3 (S.D.N.Y. Apr. 17, 2013) (quotation mark omitted), *aff'd sub nom. Millennium*

*Partners, L.P.* v. *Wells Fargo Bank, N.A.*, 654 F. App'x 507 (2d Cir. 2016)

(summary order), *and aff'd sub nom. Millennium Partners, L.P.* v. *Wells Fargo*

*Bank, N.A.*, 654 F. App'x 507 (2d Cir. 2016) (summary order).  "This is true

regardless of whether the trust is an indenture trust or a PSA [trust]."  *Royal*

*Park Invs. SA/NV* v. *HSBC Bank USA, Nat'l Ass'n* (hereinafter, "*RP/HSBC*"), 109

F. Supp. 3d 587, 597 (S.D.N.Y. 2015) (citing *Greenwich Fin. Servs. Distressed*

*Mortg. Fund 3 LLC* v. *Countrywide Fin. Corp.*, 603 F.3d 23, 29 (2d Cir. 2010);

*Bank of N.Y. Mellon* v. *Walnut Place LLC*, 819 F. Supp. 2d 354, 364-65 & n.6

(S.D.N.Y. 2011)).

Though the Governing Agreements at issue here are not identical,

Plaintiffs argue that they all impose four fundamental duties on Defendant:

- First, Defendant "must ensure that the Trusts take perfected, enforceable title to the mortgage loans and must certify receipt of complete mortgage loan files from the Seller." (Pl. Opp. 3 (citing BR Compl. ¶¶ 60, 62, 98, 159, Ex. 5; NCUAB Compl. ¶¶ 65-68, Ex. J; PL Compl. ¶¶ 58-67; CB Compl. ¶¶ 34-43)).  In the event that Defendant "discovers a material defect (*e.g.*, a missing document)," Defendant is obligated to "promptly identify the loan in its certifications, and require the Seller to cure or repurchase the loan."  (Pl. Opp. 3-4 (citing BR Compl. ¶¶ 6, 54, 98; NCUAB Compl. ¶¶ 70-71, 74-75; PL Compl. ¶¶ 65-66, 68; CB Compl. ¶¶ 41-42, 44)).

- Second, Defendant "must give notice to the Seller and other parties upon 'discovery' of any breach of the R&Ws which materially and adversely affects the interests of the Holders or the Trust, and thereafter enforce the obligations of the Seller to cure or repurchase the breaching loan." (Pl. Opp. 4 (citing BR Compl. ¶¶ 63, 164; RP Compl. ¶¶ 7-10; NCUAB Compl. ¶¶ 75, 377; PL Compl. ¶ 68; CB Compl. ¶ 44)).

- ▪ Third, Defendant "must promptly notify a responsible Servicer upon learning of the Servicer's failure to perform in any material respect, and demand that such servicing failure be timely remedied." (Pl. Opp. 4 (citing BR Comp. ¶¶ 1, 63-64; RP Compl. ¶ 10; NCUAB Compl. ¶¶ 75, 90; PL Compl. ¶ 80; CB Compl. ¶ 55)).

- ▪ And fourth, in the event of a "servicing 'Event of Default'" ("EOD") as defined in the Governing Agreements, Defendant acquires heightened obligations "to exercise the same degree of care and skill as a prudent person would in the conduct of his or her own affairs." (Pl. Opp. 4 (citing BR Compl. ¶¶ 27, 207; RP Compl. ¶¶ 17, 61; NCUAB Compl. ¶¶ 92, 414; PL Compl. ¶¶ 73-75; CB Compl. ¶¶ 49-51)).

The PSA Trusts define an EOD to "include a Servicer's failure to: (i) act in accordance with the normal and usual standards of practice of *prudent* mortgage servicers; (ii) ensure the loans are serviced legally; and (iii) promptly notify [Defendant] and other parties upon discovery of Sellers' R&W breaches." (Pl. Opp. 4 (citing BR Compl. ¶¶ 25-26; RP Compl. ¶¶ 57, 59; NCUAB Compl. ¶¶ 85-87, 285-89, 337; PL Compl. ¶¶ 68, 79-80; CB Compl. ¶¶ 44, 54-55)). Defendant's heightened obligations under the PSAs in the event of an EOD include "notifying the Servicer to require cure and notifying Certificateholders of any uncured [EODs]." (*Id.* at 4-5 (citing BR Compl. ¶ 26; RP Compl. ¶ 60; NCUAB Compl. ¶¶ 90-91, 290; PL Compl. ¶¶ 69, 73-77; CB Compl. ¶¶ 45, 49-52)).

The Indenture Trusts' Governing Agreements "contain similar provisions." (Pl. Opp. 5 (citing BR Compl. ¶¶ 68-70; NCUAB Compl. ¶ 97 n.12; PL Compl. ¶¶ 131-32)). EODs with regard to Indenture Trusts, however, are "triggered by conduct of the Issuer (*i.e.*, the Trust itself) rather than the

Servicer." (*Id.* (citing BR Compl. ¶¶ 68-70; NCUAB Compl. ¶ 87 n.12; PL Compl. ¶¶ 131-32)). Plaintiffs maintain that this is a distinction without a difference, because here "each Indenture Trust contracted separately with Sellers and Servicers ... [to] make certain R&Ws and agree to cure or repurchase defective loans," such that "known and unremedied Seller and Servicer defaults [would still] constitute ... a violation of the issuer's duties under the Indenture." (*Id.* (quotation marks omitted) (quoting *Royal Park/HSBC*, 109 F. Supp. 3d at 604) (citing BR Compl. ¶¶ 6, 59, 68; NCUAB Compl. ¶¶ 64-69, 74, 92; PL Compl. ¶ 131 & Ex. C)).

### 3.     Defendant's Alleged Breaches

Plaintiffs contend that while serving as Trustee, Defendant realized that the Trusts contained numerous loans and loan files that materially breached the sellers' R&Ws. (Pl. Opp. 5 (citing BR Compl. ¶¶ 73-120; RP Compl. ¶¶ 70-103; NCUAB Compl. ¶¶ 104-282; PL Compl. ¶¶ 107-15, Ex. F; CB Compl. ¶¶ 80-89, Ex. F)). Plaintiffs infer Defendant's realization from a host of facts. For example, Defendant "received 'Document Exception Reports' prepared by the custodians identifying massive numbers of loan files that contained missing or incomplete documentation that were not cured within the specified time period." (*Id.* (citing BR Compl. ¶¶ 98-99; NCUAB Compl. ¶ 352; PL Compl. ¶¶ 63, 119-20; CB Compl. ¶¶ 39, 93-94)). And Defendant itself "tracked and reported the Trusts' performance in remittance reports, including unprecedented levels of delinquencies, early payment defaults, loss severity, credit downgrades and mortgage insurance rescissions," and "admitted" in its

"internal documents" that its findings constituted "clear indications of Seller breaches of R&Ws." (*Id.* at 5-6 (citing BR Compl. ¶¶ 110, 112; NCUAB Compl. ¶ 336; PL Compl. ¶¶ 53, 104; CB Compl. ¶¶ 29, 78)).  Additionally, in certain cases where "historical delinquencies and collateral losses were so severe that [they] caused 'Triggering Events' under the Trusts' [Governing Agreements]," Defendant had to "change the distribution of Trust proceeds, evaluate the performance of the Trusts' Servicers, make increased disclosures to the credit rating agencies, and in some instances declare [EODs]." (*Id.* at 6 (citing BR Compl. ¶ 111)).

Plaintiffs conclude that, given the many different sources of information, Defendant's responsible officers

> knew of and received written notice of Servicer breaches of duties with respect to specific loans in the Trusts, based on data from Servicers that it used to prepare monthly remittance reports and that identified and tracked when certain defaulted loans within the Trusts became distressed, when the loans were processed and eliminated, and the recurring annual and monthly servicing costs incurred by the Trusts for these defaulted loans.

(Pl. Opp. 7 (citing BR Compl. ¶¶ 146-53; RP Compl. ¶ 118; PL Compl. ¶¶ 128, 138-41; CB Compl. ¶¶ 103, 111-14)).  Indeed, Defendant "uniquely" had

> knowledge of the Servicers' systemically abusive servicing practices, including (i) [Defendant's] involvement in government investigations, prosecutions, and settlements targeting both itself and many of the Servicers for the same alleged improper servicing practices; and (ii) [Defendant's] responsible officers' receipt of written notice from Holders, monoline insurers and other stakeholders to other RMBS trusts regarding the same servicing violations by the same servicers to the Trusts here.

(*Id.* (citing BR Compl. ¶¶ 154-56; RP Compl. ¶¶ 121-27; NCUAB Compl. ¶¶ 258-60, 277-82; PL Compl. ¶¶ 142-48, Ex. H; CB Compl. ¶¶ 115-21, Ex. H)).  And Plaintiffs contend that Defendant's knowledge is evinced by its own internal records, which "further confirm that [Defendant] repeatedly received notice from investors and monoline insurers regarding systemic R&W violations."  (*Id.* at 6 (citing BR Compl. ¶¶ 100, 116; PL Compl. ¶¶ 99-102; CB Compl. ¶¶ 73-77)).

Even if Defendant lacked such direct notice and knowledge, they could not feign ignorance of the fact that "the Trusts were filled with loans originated by some of the most notorious financial-crisis-era lenders ... and were sponsored by banks with known securitization abuses."  (Pl. Opp. 6 (citing BR Compl. ¶¶ 80, 86, 94-95, Ex. 9; RP Compl. ¶ 71; NCUAB Compl. ¶¶ 47-48, 120-244; PL Compl. ¶¶ 109-10, Ex. F; CB Compl. ¶¶ 82-83, Ex. F)).  Plaintiffs argue that at a minimum, Defendant *had to be* aware of the "[h]ighly publicized news reports, lawsuits, and investigations concerning" its sellers, as well as the fact that "several of the Trusts [had] been the subject of RMBS investor lawsuits alleging pervasive loan underwriting abuses."  (*Id.* (citing BR Compl. ¶¶ 96-120, Ex. 10-11; RP Compl. ¶¶ 72-103; NCUAB Compl. ¶¶ 261-82; PL Compl. ¶¶ 107-15; CB Compl. ¶¶ 80-89)).

All of Plaintiffs' claims build on the foundation of Defendant's alleged discovery and knowledge of these breaches.  Plaintiffs allege that despite this awareness, Defendant took "virtually no action to enforce Seller obligations to repurchase defective loans and Servicer obligations to cure defaults and

reimburse the Trusts for damages." (Pl. Opp. 7 (citing BR Compl. ¶¶ 163-87;

RP Compl. ¶ 129; NCUAB Compl. ¶¶ 361-96; PL Compl. ¶¶ 115-18, 160-61; CB

Compl. ¶¶ 89-92, 129-30)). This "inaction" has caused "billions of dollars in

losses to the Trusts." (*Id.*).

### B.     Procedural Background

The Blackrock plaintiffs brought the first of these related cases against

Defendant on November 24, 2014. (2014 Civ. 9371, Dkt. #1). Royal Park

brought its action on December 11, 2014 (2014 Civ. 9764, Dkt #1); the NCUAB

brought its action on December 22, 2014 (2014 Civ. 10067, Dkt. #1); and

Phoenix Light and others brought their action on December 23, 2014 (2014

Civ. 10102, Dkt. #1). Royal Park, the NCUAB, and the Phoenix Light plaintiffs

all filed amended complaints on March 13, 2015. (2014 Civ. 9764, Dkt #24;

2014 Civ. 10067, Dkt. #27; 2014 Civ. 10102, Dkt. #25).

Defendant filed its Motion to Dismiss the Complaints in each of these

four cases on April 30, 2015. (2014 Civ. 9371, Dkt. #46-56).[5] The motion was

fully briefed as of June 29, 2015. (*Id.* at Dkt. #60-61). While the motion was

pending, on December 24, 2015, Commerzbank brought the fifth of the related

cases at issue in this Opinion. (2015 Civ. 10033, Dkt. #1). The case was

accepted as related to the four earlier-filed cases on December 28, 2015. (2015

Civ. 10033, Docket Entries dated December 28, 2015).

---

[5]     At the time, there was a fifth related case that has since been separated from the
original four, over which this Court does not preside, and which therefore is not at issue
in this Opinion: *Blackrock Balanced Capital Portfolio (FI)* v. *Deutsche Bank Nat'l Tr. Co.*,
No. 14 Civ. 9367 (JMF). To avoid confusion, this Court in this section only refers to
Defendant Wells Fargo.

Soon thereafter, on January 19, 2016, Judge Richard M. Berman, to whom these related cases were originally assigned, issued a Decision and Order resolving Defendant's motion to dismiss. (2014 Civ. 9371, Dkt. #95). Judge Berman declined to exercise supplemental jurisdiction over Blackrock's PSA-Trust-related claims, granted Defendant's motion in part, and declined to reach the merits of the parties' claims. (*Id.* at Dkt. #95). Judge Berman also extended to Plaintiffs the opportunity to amend their pleadings. (*Id.*; *see also* Dkt. #101). The Blackrock Plaintiffs accordingly filed their amended complaint on February 23, 2016. (*Id.* at Dkt. #105-06).

Defendant requested a pre-motion conference, which was scheduled for May 24, 2016. (2014 Civ. 9371, Dkt. #138, 158). During that conference, a briefing schedule was set for Defendant's contemplated motion to dismiss the operative complaints. (*Id.* at Dkt. #158).

Before any motion was filed, however, the five related cases at issue here were reassigned to the undersigned on June 17, 2016. (Docket Entries dated June 17, 2016). Defendant then filed its motion to dismiss each operative complaint on July 8, 2016. (2014 Civ. 9371, Dkt. #168-71). Plaintiffs filed their joint opposition on August 22, 2016 (*id.* at Dkt. #201-02), and Defendant its reply on September 6, 2016 (*id.* at Dkt. #208-09).

## DISCUSSION

### A.   Applicable Law

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in [the

plaintiffs'] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quotation marks and citation omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). In this regard, a complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference. *See, e.g.*, *Hart* v. *FCI Lender Servs., Inc.*, 797 F.3d 219, 221 (2d Cir. 2015) (citing Fed. R. Civ. P. 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion. A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.")).

"While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to '[nudge a plaintiff's] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) (quoting *Twombly*, 550 U.S. at 570). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

**B.     Analysis**

Defendant launches numerous attacks on Plaintiffs' pleadings, claiming that wholesale dismissal is warranted because: (i) Plaintiffs have failed to plead that Defendant discovered any of the alleged breaches of the Governing Agreements; (ii) Plaintiffs' breach-of-contract and fiduciary-duty claims are premised on an EOD that occurred, if at all, without Defendant's knowledge; (iii) Plaintiffs' tort claims are duplicative of their contract claims, violative of the economic-loss rule, and insufficiently pleaded; (iv) Plaintiffs do not, and cannot, have a cause of action under the Trust Indenture Act (the "TIA"); (v) the Streit Act, New York's analogue to the TIA, either does not apply to Plaintiffs' claims or was not violated; (vi) the NCUAB lacks standing to bring its derivative claims, which are actually improper direct claims; (vii) the NCUAB lacks standing to bring direct claims premised on Trusts unwound after it first brought its action; and (viii) Commerzbank's claims are time-barred.  The Court will consider each of these arguments in turn.

**1.     Defendant's Motion to Dismiss Plaintiffs' Breach-of-Contract Claims Is Denied**

**a.     Plaintiffs' Allegations Are Sufficient at the Pleading Stage**

Defendant's arguments on this first front focus on Defendant's alleged knowledge, or perhaps more properly, its lack thereof.  (Def. Br. 8).  That is, Defendant contends Plaintiffs have pleaded only generalized allegations that, at

most, Defendant may have been alerted "to a *possibility* of a breach, not that it discovered any *actual breaches* in the loans in the Trusts." (*Id.*).  Such allegations are insufficient as a matter of law, Defendant argues, because a viable breach-of-contract claim requires proof of a Trustee's actual notice of a breach.  *Id.* (quoting *Policemen's Annuity & Benefit Fund* v. *Bank of Am., NA* (hereinafter, "*PABF II*"), 943 F. Supp. 2d 428, 442 (S.D.N.Y. 2013), *abrogated on other grounds by PABF III*, 775 F.3d 154).

These arguments do not succeed.  To the contrary, courts in this District have repeatedly rejected similar arguments by reminding litigants of the difference between sufficient pleading and successful claims.  So too will this Court.

It is true that "[t]o prevail ultimately on the breach of contract claim, a plaintiff does have to demonstrate breach on a 'loan-by-loan and trust-by-trust basis.'"  *Phoenix Light SF Ltd.* v. *Deutsche Bank Nat'l Tr. Co.* (hereinafter, "*PL/DB*"), 172 F. Supp. 3d 700, 713 (quoting *Royal Park Invs. SA/N*V v. *Deutsche Bank Nat'l Tr. Co.* (hereinafter, "*RP/DB*"), No. 14 Civ. 4394 (AJN), 2016 WL 439020, at *6 (S.D.N.Y. Feb. 3, 2016)); *see also PABF III*, 775 F.3d at 162.  "But this is not a pleading requirement," because at the pleading stage such information "is uniquely in the possession of defendants."  *PL/DB*, 172 F. Supp. 3d at 713 (quotation marks omitted) (quoting *PABF II*, 943 F. Supp. 2d at 442).  "Rather, plaintiffs satisfy their [pleading] burden where their allegations raise a reasonable expectation that discovery will reveal evidence proving their claim."  *Id.*; *accord, e.g.*, *Royal Park Invs. SA/NV* v. *Bank of N.Y.*

17

*Mellon* (hereinafter, "*RP/BNYM*"), No. 14 Civ. 6502 (GHW) 2016 WL 899320, at

*4-5 (S.D.N.Y. March 2, 2016); *Blackrock Core Bond Portfolio* v. *U.S. Bank Nat'l

Ass'n*, No. 14 Civ. 9401 (KBF), 165 F. Supp. 3d 80, 99-100 (S.D.N.Y. Feb. 26,

2016); *RP/DB*, 2016 WL 439020, at *6; *PL/BNYM*, 2015 WL 5710645, at *4;

*RP/HSBC*, 109 F. Supp. 3d at 602-03.  (*See also* Pl. Opp. 9 & n.5).

Here, Plaintiffs have more than met this standard.  Plaintiffs have alleged

Defendant's knowledge of R&W breaches on the basis of Defendant's internal

documents:  Defendant received "exception reports identifying incomplete or

improperly documented loan files that were not corrected or addressed."  (Pl.

Opp. 11 (citing BR Compl. ¶¶ 98-99; PL Compl. ¶¶ 63, 118-20; CB Compl.

¶¶ 39, 93-94)).  Defendant also "received mortgage insurance coverage denials

and policy rescissions as a result of the improper loan underwriting," and

Defendant's internal documents both reflect that Defendant tracked "the

Trusts' abject performance," and "contain admissions that certain adverse

metrics were indicative of Seller R&W breaches."  (*Id.* at 11-12; *see also* BR

Compl. ¶ 110; NCUAB Compl. ¶ 336; PL Compl. ¶¶ 53, 104; CB Compl. ¶¶ 28,

78).  It is Plaintiffs' contention that such allegations "go far beyond many other

RMBS trustee complaints, which themselves have been found sufficient to state

a claim."  (*Id.* at 12).  The Court agrees.

For good measure, Plaintiffs also amass the R&W breach allegations with

which courts in this Circuit have become so familiar:  Plaintiffs allege, *inter

alia*, that Defendant had discovered and knew of the alleged breaches on the

basis of (i) "the abysmal performance of the Trust collateral" (BR Compl. ¶ 10);

(ii) "a steady stream of public disclosures [linking] the abject performance of the Trusts to systemic abandonment of underwriting guidelines" (*id.* at ¶ 12); (iii) various investor "putback initiatives" (*id.* at ¶¶ 14-17); (iv) investigations targeting Defendant's own deficient servicing operations (*id.* at ¶¶ 19-20); (v) notice Defendant received in its capacity as Trustee to other RMBS trusts "from investors of pervasive and systemic violations of representations and warranties by the loan sellers" (*id.* at ¶ 100); (vi) lawsuits brought by monoline insurers against sellers "for breach of their representations and warranties in connection with other RMBS trusts" to which Defendant has ties (*id.* at ¶ 116); and (vii) Defendant's analysis undertaken in connection with its provision of "collateral risk management services" (*id.* at ¶ 118). (*See also* RP Compl. ¶¶ 70-136; NCUAB Compl. ¶¶ 104-282; PL Compl. ¶¶ 107-15; CB Compl. ¶¶ 80-89). And with regard to several of the Trusts, "the historical delinquencies and collateral losses within the Trusts' loan pools [were] so severe that [they] ... caused 'Triggering Events' under the Trusts' Governing Agreements," some of which amounted to EODs. (BR Compl. ¶ 111). This Court finds, as have many others, that these allegations are sufficient to "raise a reasonable expectation that discovery will reveal evidence proving [Plaintiffs'] claim[s]." *PL/DB*, 172 F. Supp. 3d at 713 (quoting *PABF II*, 943 F. Supp. 2d at 442).

Additionally, Plaintiffs allege that EODs occurred when Servicers failed to "(i) act in accordance with the normal and usual standards of practice of *prudent* mortgage servicers; (ii) ensure the loans were serviced legally; and

(iii) promptly notify [Defendant] and other parties upon discovery [of Sellers'] R&W breaches." (Pl. Opp. 4 (citing BR Compl. ¶¶ 25-26; RP Compl. ¶¶ 57, 59; NCUAB Compl. ¶¶ 85-87, 285-89, 337; PL Compl. ¶¶ 68, 79-80; CB Compl. ¶¶ 44, 54-55)). These allegations also support Plaintiffs' claims that Defendant breached its post-EOD contractual duty to act as would a prudent person by failing to (i) notify Servicers of the R&W breaches of which it was aware, (ii) require those Servicers to cure those breaches, or to repurchase defective loans; (iii) notify Certificateholders of any uncured EODs; and (iv) reimburse the Trusts for damages. (Pl. Opp. 3-5, 7 (citing BR Compl. ¶¶ 163-87; RP Compl. ¶ 129; NCUAB Compl. ¶¶ 361-96; PL Compl. ¶¶ 115-18, 160-61; CB Compl. ¶¶ 89-92, 129-30)).

In sum, Plaintiffs have pleaded adequately that Defendant discovered and knew of the alleged breaches of the Trusts' Governing Agreements. Plaintiffs likewise adequately have pleaded that when Defendant failed to act despite its discovery and knowledge, it breached the Governing Agreements. Defendant's motion to dismiss Plaintiffs' breach-of-contract claims is denied.

### b. *Commerce Bank* Does Not Change This Court's Analysis

To its credit, Defendant acknowledges at the outset that its arguments regarding the adequacy of the Complaints' discovery and knowledge allegations implicate "issues that have been resolved repeatedly against RMBS trustees." (Def. Br. 8). Undaunted, Defendant contends that recent legal developments so "seriously undermine the federal court decisions to date rejecting the RMBS trustees' contract-based arguments" that this Court must chart a new course.

(*Id.*).  In support, Defendant relies upon the First Department's "rejection" in *Commerce Bank* v. *Bank of N.Y. Mellon*, 35 N.Y.S.3d 63 (1st Dep't 2016), of the theory that an RMBS Trustee has a duty to "nose to the source" upon learning facts suggestive of breach.[6]

This Court does not dispute *Commerce Bank*'s relevance to its analysis. Indeed the case addresses the very question now before the Court — the sufficiency of pleaded facts regarding an RMBS-trustee defendant's knowledge of breach.  *Commerce Bank*, 35 N.Y.S.3d at 64.  And there, the First Department found the facts alleged by the *Commerce Bank* plaintiffs insufficient to state a claim.  *Id.*  Reviewing the PSAs at issue, the court recited their common requirement that the Trustee discover an R&W breach with regard to a "loan-to-loan ratio, whether there are other liens on a property, whether a loan was underwritten pursuant to [a nonparty's] underwriting guidelines," and so on.  *Id.*  The First Department concluded the plaintiffs "*[did] not allege* that defendant discovered breaches of such representations and warranties."  *Id.* (emphasis added).

But the First Department did not elaborate on the bases for this conclusion.  And without more, this Court will not read *Commerce Bank* to conflict with the very case law from this District that the First Department cited therein as "persuasive" in its analysis of pleading sufficiency.  *See Commerce*

---

[6]     Defendant also cites an oral ruling by New York State Supreme Court Justice Charles E. Ramos "that discovery or actual knowledge cannot be inferred from generic public information about originator and servicer misconduct." (Def. Br. 10).  This decision is not germane to the Court's analysis here, where Plaintiffs have alleged knowledge on the basis of far more than generic public information.

*Bank*, 35 N.Y.S.3d at 64 (citing *RP/BNYM*, 2016 WL 899320, at *4 (collecting cases); *PL/DB*, 172 F. Supp. 3d at 712-13).  Significantly, Defendant assumes that the *Commerce Bank* plaintiffs and Plaintiffs here suffer from the same pleading deficiency, *viz.*, a failure to plead Defendant's actual discovery of R&W breaches.  (Def. Br. 8-10).  But the First Department's analysis is not so clear.  That court said only that the *Commerce Bank* plaintiffs "*do not allege* that defendant discovered breaches of such representations and warranties." *Commerce Bank*, 35 N.Y.S.3d at 64 (emphasis added).  The court did not explain what precisely it found lacking.  This Court cannot therefore determine precisely where the *Commerce Bank* court would draw a line; the insufficiency of the allegations in that case do not preclude the Court from finding the far more robust allegations in this case to be sufficient.

Moreover, the Court notes that the *Commerce Bank* court was considering pleading sufficiency under a different standard.  Defendant has challenged Plaintiffs' pleading under Federal Rule of Civil Procedure 12(b)(6), the analytical requirements of which are outlined above.  The *Commerce Bank* court analyzed pleading sufficiency under New York Civil Practice Law and Rules § 3211(a)(1) and (7).  Even allowing for a similarity between Section 3211(a)(7) and Rule 12(b)(6), *see Util. Metal Research, Inc.* v. *Generac Power Sys., Inc.*, No. 02 Civ. 6205 (FB) (RML), 2004 WL 2613993, at *3 n.1 (E.D.N.Y. Nov. 18, 2004) ("This is … a distinction without a difference."), *aff'd in part, vacated in part, and remanded on other grounds*, 179 F. App'x 795 (2d Cir. 2006) (summary order), the different standard required by § 3211(a)(1) casts

*Commerce Bank*'s relevance into doubt.  *See, e.g.*, *DDR Constr. Servs., Inc.* v. *Siemens Indus., Inc.*, 770 F. Supp. 2d 627, 647-48 (S.D.N.Y. 2011) ("Rule 3211(a)(1) allows dismissal on the ground that 'a defense is founded upon documentary evidence.'" (quoting N.Y. C.P.L.R. 3211(a)(1))).  It is possible, for example, that the *Commerce Bank* court considered defenses not available to this Court at this stage.  Stated simply, *Commerce Bank* is not sufficiently specific for this Court to determine the precise manner in which the First Department concluded that the plaintiffs therein had not alleged the defendant's discovery.

Defendant also contends that the First Department relieved RMBS Trustees of a duty to "nose to the source."  (Def. Br. 10).  But that contention overstates the First Department's holding.  In considering a trustee's duties prior to an EOD, the First Department recited the well-settled proposition "that prior to default, indenture trustees owe note holders [only] an extracontractual duty to perform basic, nondiscretionary, ministerial functions."  *Commerce Bank*, 35 N.Y.S.3d at 65 (quotation mark omitted) (quoting *AG Capital Funding Partners*, 11 N.Y.3d at 157).  This limited pre-default duty, the Court concluded, did not encompass a duty to monitor or a duty to "nose to the source" of improper servicing.  *Id.*

This holding is not inconsistent with the District decisions cited by the First Department.  Prior to considering a trustee's pre-default duties, the *Commerce Bank* court had found that the plaintiffs there had not alleged the requisite discovery by the defendant.  *Commerce Bank*, 35 N.Y.S.3d at 64-65.

That is, the plaintiffs had alleged no discovery of R&W breaches, and no provision of written notice of any EOD. *Id.* Thus, the court reasoned, the defendant could not have violated any duty to afford plaintiffs notice. *Id.* at 65. Pre-default, and without default discovery or written notice, the *Commerce Bank* defendant had no such duty. *Id.*

Courts in this Circuit have agreed. They have held that while "[l]earning of facts merely suggestive of a breach would not require the Trustee to immediately raise a claim," "*upon receipt of such notice*, it becomes incumbent upon the [Trustee] to pick up the scent and nose to the source." *Policemen's Annuity & Benefit Fund of City of Chi.* v. *Bank of Am., NA* (hereinafter, "*PABF I*"), 907 F. Supp. 2d 536, 553 (S.D.N.Y. 2012) (alterations in original) (emphasis added) (quotation marks omitted) (quoting *MASTR Asset Backed Sec. Tr. 2006-HE3 ex rel. U.S. Bank Nat'l Ass'n* v. *WMC Mortg. Corp.*, Civil Nos. 11-2542 (JRT/TNL), 12-1372 (JRT/TNL), 12-1831 (JRT/TNL), 12-2149 (JRT/TNL), 2012 WL 4511065, at *6 (D. Minn. Oct. 1, 2012)). In *Commerce Bank*, there was no notice, no discovery, and therefore no duty to "nose to the source." This is consistent with the law in this Circuit; it does not undermine it.

Finally, even if Defendant's proffered interpretation of *Commerce Bank* were correct, this Court would be skeptical of its authority. As noted above, the case was decided under New York law that differs significantly from Rule 12(b)(6). And a district court only is "bound to apply the law as interpreted by New York's intermediate appellate courts," absent "persuasive evidence that the New York Court of Appeals ... would reach a different conclusion." *Cornejo* v.

*Bell*, 592 F.3d 121, 130 (2d Cir. 2010) (omissions in original) (emphasis added) (quotation marks omitted) (quoting *Pahuta* v. *Massey-Ferguson, Inc.*, 170 F.3d 125, 134 (2d Cir. 1999)).  Here, there is such persuasive evidence; it is the abundant case law from this District that the First Department itself cited as persuasive and made no attempt to distinguish.

### 2.    Defendant's Motion to Dismiss Specific R&W Claims Is Denied

In a catch-all section in its opening brief, Defendant takes issue with various subsets of Plaintiffs' claims.  First, Defendant argues that Plaintiffs have improperly alleged violations of duties to enforce repurchase obligations with regard to certain Trusts that created no such obligations.  (Def. Br. 16). Second, Defendant identifies three Trusts for which "Plaintiffs failed to allege that [Defendant] knew of R&W breaches prior to the expiration of the Warrantors' obligations to repurchase loans that breached R&Ws."  (*Id.*). Third, Defendant argues that for "four additional Trusts, Plaintiffs fail to include any allegation regarding the relevant Warrantors, let alone allegations supporting a plausible inference that [Defendant] had knowledge of R&W breaches within the applicable limitations period."  (*Id.* at 17).  And fourth, Plaintiffs argue that Defendant cannot be held liable for any failure to enforce its obligations to cure, substitute, or repurchase faulty loans against Warrantor American Home Mortgage Acceptance, Inc. ("AHM"), because AHM filed for bankruptcy in 2007.  (*Id.* at 17-18).

Plaintiffs rebut each allegation.  First, Plaintiffs dispute Defendant's argument that certain Trusts do not impose repurchase obligations on

Defendant; they claim that the relevant governing agreements, read as a whole, require that Defendant "notify specified parties upon its discovery of a material R&Ws breach," which notice "triggers [the] Seller repurchase obligations" that Defendant "has power to enforce."  (Pl. Opp. 13 (citing BR Compl. ¶¶ 63 & n.7, 193; RP Compl. ¶¶ 52-55; NCUAB Compl. ¶¶ 73-75; PL Compl. ¶¶ 44, 68; CB Compl. ¶ 44)).  Second, Plaintiffs disclaim a duty to "allege the precise time of [Defendant's] discovery of R&W breaches or knowledge of Servicer events of default, which will be fleshed out in discovery."  (*Id.* at 14)  In a similar vein, Plaintiffs argue to Defendant's third point that any "statute of limitations defense cannot be resolved at this stage because it involves factual questions as to when and against whom the claims accrued, whether violations were continuing, and whether tolling applies."  (*Id.*).  And fourth, Plaintiffs reject Defendant's arguments regarding AHM's 2007 bankruptcy because "this argument also involves questions of fact that cannot be resolved at the pleading stage, such as what enforcement efforts [Defendant] made or failed to make before AHM declared bankruptcy, whether it should have submitted a bankruptcy claim, and what other responsible parties or claims remain available, including for ongoing Servicer violations."  (*Id.* at 14-15).

Ultimately, the Court agrees with Plaintiffs.  Each of Defendant's arguments implicating the statute of limitations is premature; the Court cannot resolve these issues from the face of the Complaints.  *See Staehr* v. *Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (noting that a statute of limitations defense may be "raise[d] ... in a pre-answer Rule 12(b)(6) motion if

the defense appears on the face of the complaint").  Working backwards from Defendant's last argument, the Court cannot determine at this stage the implications of AHM's 2007 bankruptcy filing for Defendant's duties with regard to the AHM-2004 Trust.  As Plaintiffs argue, the possible existence of other responsible parties or claims, including claims for ongoing Servicer violations, precludes resolution of this issue at present.  Because, as the Court found above, Plaintiffs need not allege loan-specific breaches at this stage, and because Plaintiffs have raised the specter of tolling agreements and ongoing breaches, the Court is also unable to determine as a matter of law that Plaintiffs have insufficiently alleged discovery of R&W breaches before expiration of applicable statutes of limitations.  (Pl. Opp. 14 & n.8).  And finally, the Court finds that Plaintiffs have alleged that Defendant breached its obligations even with regard to Trusts the Governing Agreements of which "are silent as to which entity is responsible for enforcing the sellers' compliance with their repurchase obligations, prior to an [EOD]."  (BR Compl. ¶ 63 & n.7 (citing as an example FMIC 2007-1, SSA § 3.02)).  At this stage, Plaintiffs are not required to specify precisely when, and precisely on what basis, Defendant breached each of its contractual obligations.

### 3.   Defendant's Motion to Dismiss Plaintiffs' Tort and Fiduciary-Duty Claims Is Granted in Part and Denied in Part

#### a.   Defendant's Motion to Dismiss Plaintiffs' General Negligence Claim Is Granted

The Court next turns to Defendant's challenges to Plaintiffs' tort claims, beginning with their claim for negligence.  By way of background, "[t]o establish

27

a negligence claim under New York law, a plaintiff must demonstrate that:
[i] the defendant owed the plaintiff a cognizable duty of care as a matter of law;
[ii] the defendant breached that duty; and [iii] plaintiff suffered damage as a
proximate result of that breach." *Millennium Partners*, 2013 WL 1655990, at *4
(citing *McCarthy* v. *Olin Corp.,* 119 F.3d 148, 156 (2d Cir. 1997)).  However, "[a]
tort claim cannot be sustained if it 'do[es] no more than assert violations of a
duty which is identical to and indivisible from the contract obligations which
have allegedly been breached.'"  *Id.* (second alteration in original) (quoting
*Metro. W. Asset Mgmt., LLC* v. *Magnus Funding, Ltd.*, No. 03 Civ. 5539 (NRB),
2004 WL 1444868, at *9 (S.D.N.Y. June 25, 2004)); *see also Luxonomy Cars,*
*Inc.* v. *Citibank, N.A.*, 408 N.Y.S.2d 951, 954 (2d Dep't 1978).  In other words,
"a breach of contract will not give rise to a tort claim unless a legal duty
independent of the contract itself has been violated."  *RP/BNYM*, 2016 WL
899320, at *7 (quotation mark omitted) (quoting *Bayerische Landesbank, N.Y.*
*Branch* v. *Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 58 (2d Cir. 2012) (citing
*Clark-Fitzpatrick, Inc.* v. *Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987))).

Here, the sole basis of Plaintiffs' general negligence claim is Defendant's
alleged breach of its contractual obligations.  (*See, e.g.*, BR Compl. ¶ 163
(asserting that Defendant was negligent "by failing to (i) provide notice to the
parties to the Governing Agreements and/or the responsible sellers upon its
discovery of these breaches, and (ii) take any action to enforce the sellers'
repurchase of the defective mortgage loans")).  As such, "the claim is precluded

as duplicative." *RP/DB*, 2016 WL 439020, at *9 (quotation mark omitted) (quoting *Bayerische Landesbank*, 692 F.3d at 58).

To be clear, Plaintiffs at times plead more specific tort claims under the rubric of negligence, and those claims are neither addressed nor dismissed here.  The Court grants Defendant's motion only insofar as it applies to Plaintiffs' claims that Defendant was negligent in performing its contractual duties.  The Court will consider the viability of Plaintiff's additional tort claims in greater depth in the sections that follow.

### b.    Defendant's Motion to Dismiss Plaintiff's Pre-Default Fiduciary-Duty Claims Is Granted

Plaintiffs' fiduciary duty claims divide temporally into pre- and post-default claims.  This Court will consider them chronologically.

"Prior to an Event of Default, an indenture trustee's duty is governed solely by the terms of the indenture, with two exceptions: a trustee must still '[i] avoid conflicts of interest, and [ii] perform all basic, non-discretionary, ministerial tasks with due care." *RP/HSBC*, 109 F. Supp. 3d at 597 (quoting *Ellington Credit Fund, Ltd.* v. *Select Portfolio Servicing Inc.*, 837 F. Supp. 2d 162, 192 (S.D.N.Y. 2011)).  However, "[t]hese two pre-default obligations are not construed as *fiduciary* duties, but as obligations whose breach may subject the trustee to *tort* liability." *Id.* (quotation marks omitted) (quoting *Ellington Credit Fund, Ltd.*, 837 F. Supp. 2d at 192); *see also PL/DB*, 172 F. Supp. 3d at 719 ("[C]onflict of interest claims and the claims that [Defendant] did not perform ministerial acts with due care are not proper breach of fiduciary claims under New York law, and can only be pleaded in the complaint as negligence

29

claims."); *PL/BNYM*, 2015 WL 5710645, at *7; *AG Capital Funding Partners,* 11 N.Y.3d at 157.  Therefore, insofar as Plaintiffs' conflict-of-interest and ministerial-task claims are pleaded as violations of Defendant's fiduciary duties, Plaintiffs fail to state a claim and Defendant's motion to dismiss is granted.

### c.   Defendant's Motion to Dismiss Plaintiff's Post-EOD Fiduciary-Duty Claims Is Denied

With regard to an indenture trustee's fiduciary duties, however, an EOD is transformative:  After an EOD, "an indenture trustee's fiduciary duties expand under the New York common law such that 'fidelity to the terms of an indenture does not immunize an indenture trustee against claims that the trustee has acted in a manner inconsistent with his or her fiduciary duty of undivided loyalty to trust beneficiaries.'"  *PL/DB*, 172 F. Supp. 3d at 717-18 (quoting *BNP Paribas Mortg. Corp.* v. *Bank of Am., N.A.*, 778 F. Supp. 2d 375, 401 (S.D.N.Y. 2011)); *see also Beck* v. *Mfrs. Hanover Tr. Co.*, 632 N.Y.S.2d 520, 527-28 (1995).  A trustee's obligations "come more closely to resemble those of an ordinary fiduciary, regardless of any limitations or exculpatory provisions contained in the indenture."  *RP/HSBC*, 109 F. Supp. 3d at 597 (quotation marks omitted) (quoting *BNP Paribas Mortg. Corp.*, 778 F. Supp. 2d at 401); *see also Beck*, 632 N.Y.S.2d at 527.  A trustee is not required to act beyond the powers conferred by the governing agreements, but it "must, as prudence dictates, exercise those singularly conferred prerogatives in order to secure the basic purpose of any trust indenture, the repayment of the underlying obligation."  *Id.* (quotation marks omitted) (quoting *Philip* v. *L.F. Rothschild &*

*Co.*, No. 90 Civ. 0708 (WHP), 2000 WL 1263554, at *5 (S.D.N.Y. Sept. 5, 2000)

(quoting *Beck*, 632 N.Y.S.2d at 528)); *see also RP/DB*, 2016 WL 439020, at *2.

As described above, Plaintiffs have alleged that EODs occurred when
Servicers failed to "(i) act in accordance with the normal and usual standards
of practice of *prudent* mortgage servicers; (ii) ensure the loans are serviced
legally; and (iii) promptly notify [Defendant] and other parties upon discovery
[of Sellers'] R&W breaches."  (Pl. Opp. 4 (citing BR Compl. ¶¶ 25-26; RP Compl.
¶¶ 57, 59; NCUAB Compl. ¶¶ 85-87, 285-89, 337; PL Compl. ¶¶ 68, 79-80; CB
Compl. ¶¶ 44, 54-55)).  And Defendant breached its post-EOD duty to act as
would a prudent person by failing to (i) notify Servicers of the R&W breaches of
which it was aware, (ii) require those Servicers to cure those breaches, or to
repurchase defective loans; (iii) notify Certificateholders of any uncured EODs;
and (iv) reimburse the Trusts for damages.  (Pl. Opp. 7 (citing BR Compl.
¶¶ 163-87; RP Compl. ¶ 129; NCUAB Compl. ¶¶ 361-96; PL Compl. ¶¶ 115-18,
160-61; CB Compl. ¶¶ 89-92, 129-30)).  As were these allegations sufficient to
support a post-EOD breach-of-contract claim, so too are they sufficient to
support Plaintiffs' post-EOD, breach-of-fiduciary-duty claim.  However, for the
reasons explained more fully below, the portion of this claim that is duplicative
in its remedy with Plaintiffs' breach-of-contract claims is ultimately barred by
the economic-loss doctrine, and Defendant's motion to dismiss that portion of
the claim is granted.

### d. Defendant's Motion to Dismiss Plaintiffs' Breach-of-Due Care-Claim Is Granted in Part and Denied in Part

"Under New York law, 'an indenture trustee owes a duty to perform its ministerial functions with due care, and if this duty is breached the trustee will be subjected to tort liability.'" *PL/DB*, 172 F. Supp. 3d at 717 (quoting *AG Capital Funding Partners,* 11 N.Y.3d at 157).  In other RMBS cases, courts in this District have recognized that this duty of due care is extra-contractual and, as such, not duplicative of a plaintiff's contract claims.  *See, e.g.*, *id.* at 718 (citing *Nat'l Credit Union Admin. Bd.* v. *U.S. Bank Nat'l Ass'n* (hereinafter, "*NCUAB/U.S. Bank II*"), No. 14 Civ. 9928 (KBF), 2016 WL 796850, at *11 (S.D.N.Y. Feb. 25, 2016)); *PL/BNYM*, 2015 WL 5710645, at *7; *RP/HSBC*, 109 F. Supp. 3d at 609 n.127.  The Court finds as much here.  Again, the Court clarifies that Defendant's motion to dismiss these claims is granted to the extent that Plaintiffs have pleaded that Defendant breached its duty to perform ministerial functions with due care in breaching Defendant's *contractual* obligations.  It is denied with regard to Plaintiffs' claims that Defendant breached a duty to act with due care *other than* by "systematically disregard[ing] its contractual ... duties." (NCUAB Compl. ¶ 343).[7]  *See also PL/DB*, 172 F. Supp. 3d at 718 n.7 (citing *AG Capital*, 866 N.Y.S.2d at 584-85)

---

[7]    The Court shares Judge Koeltl's dismay with regard to Plaintiffs' mode of pleading: Plaintiffs' complaints include "discursive histor[ies]" of Defendant's conduct and then include "all of those allegations by incorporation in all the specific causes of action including ... for breach of fiduciary duty and for negligence and gross negligence." *Phoenix Light SF Ltd.* v. *Deutsche Bank Nat'l Tr. Co.*, 172 F. Supp. 3d 700, 718 n.8 (S.D.N.Y. 2016).  This presents the Court with the difficult task of untangling a mass of allegations to determine whether they may support actionable tort claims.  "This form of pleading is not ideal and leaves to further motion practice a realistic determination of the scope of the tort claims in this case." *Id.*

("[T]he plaintiffs appear to conflate the duty to perform ministerial acts with due care with their allegations that [the defendant] negligently performed or failed to perform certain duties under the contract.  Only tort claims premised on the former survive because New York recognizes a duty to perform ministerial acts as an extra contractual duty.").

### e.    Defendant's Motion to Dismiss Plaintiffs' Conflict-of-Interest Claims Is Denied

To plead properly a conflict-of-interest claim, a plaintiff must allege more than the existence of a "relationship between an issuer and an indenture trustee that is mutually beneficial and increasingly lucrative."  *RP/HSBC*, 109 F. Supp. 3d at 598 (quotation mark omitted) (quoting *CFIP Master Fund, Ltd.* v. *Citibank, N.A.*, 738 F. Supp. 2d 450, 475 (S.D.N.Y. 2010) (quoting *Page Mill Asset Mgmt.* v. *Credit Suisse First Boston Corp.*, No. 84152 (MBM), 2000 WL 877004, at *2 (S.D.N.Y. June 30, 2000))); *accord, e.g.*, *RP/BNYM*, 2016 WL 899320, at *7.  Nor does "[t]he mere fact that an indenture trustee does repeat business with an entity ... create a conflict of interest."  *RP/HSBC*, 109 F. Supp. 3d at 610.  Such "bald assertions of conflict" are not sufficient; a plaintiff must show that a trustee "personally benefitted" from the alleged misconduct. *Id.* at 598 (quoting *Elliott Assocs.* v. *J. Henry Schroder Bank & Tr. Co.*, 838 F.2d 66, 70 (2d Cir. 1988)).

Courts in this District have found this requirement satisfied where a plaintiff alleges a defendant's complicity in a "quid pro quo system."  *RP/BNYM*, 2016 WL 899320, at *7; *RP/DB*, 2016 WL 439020, at *9 (quoting *Ellington Credit Fund*, 837 F. Supp. 2d at 193); *RP/HSBC*, 109 F. Supp. 3d at 610.  If a

defendant is alleged to have "turn[ed] a blind eye to breaches of R&Ws in the hopes that counterparties would later 'return a favor,'" courts will find that the defendant personally benefited from its decision not to act with regard to the known breaches, which "constitut[es] a conflict of interest." *RP/BNYM*, 2016 WL 899320, at *7; *see also, e.g.*, *Fixed Income Shares*, 130 F. Supp. 3d at 858 (finding plaintiffs had alleged defendant was "economically beholden" to sellers and servicers because defendant "faced repurchase liability for the sale and securitization of its own loans if [defendant] took action against them").

Here, Plaintiffs have alleged that Defendant refused to act against sellers and servicers "because doing so would have exposed [Defendant's] own misconduct as a Seller or Servicer for other RMBS trusts in which these same entities served as either trustee or servicer." (Pl. Opp. 21 (citing BR Compl. ¶¶ 173-77; RP Compl. ¶¶ 151-52; NCUAB Compl. ¶¶ 355-59; PL Compl. ¶¶ 149-58; CB Compl. ¶¶ 122-27)). And this conflict, Plaintiffs allege, was "exacerbated" by Defendant's "ongoing business relationships with the Sellers, Servicers and related companies," the servicers' payment of Defendant's trustee fees, and Defendant's economic disincentive to declare EODs. (*Id.* (citing BR Compl. ¶¶ 21, 178-85; RP Compl. ¶¶ 21-24, 63, 137-43; NCUAB Compl. ¶ 360; PL Compl. ¶¶ 149-58; CB Compl. ¶¶ 122-27)). While these exacerbating allegations alone might not be sufficient to support Plaintiffs' conflict-of-interest claims, they are certainly sufficient when coupled with Plaintiffs' *quid pro quo* contention. Defendant's motion to dismiss Plaintiffs' conflict-of-interest claims is accordingly denied.

### f.   Defendant's Motion to Dismiss Plaintiffs' Claims for Breach of the Implied Covenant of Good Faith and Fair Dealing Is Granted

"New York law ... does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *PL/DB*, 172 F. Supp. 3d at 721 (omission in original) (quoting *Harris* v. *Provident Life & Accident Ins. Co.,* 310 F.3d 73, 81 (2d Cir. 2002)). "A plaintiff can maintain a claim for breach of the implied covenant of good faith and fair dealing simultaneously with a breach of contract claim 'only if the damages sought by the plaintiff for breach of the implied covenant are not intrinsically tied to the damages allegedly resulting from breach of contract.'" *Id.* (quoting *Page Mill Asset Mgmt.* v. *Credit Suisse First Bos. Corp.,* No. 98 Civ. 6907 (MBM), 2000 WL 335557, at *8 (S.D.N.Y. Mar. 30, 2000)).

Again, the viability of this claim must be considered at two stages — before and after an alleged EOD.  Before a trustee discovers an EOD, a trustee has "no duties other than its contractual duties," and "any cause of action for breach of implied duties cannot stand."  *PL/BNYM*, 2015 WL 5710645, at *9. Accordingly, Plaintiffs' claims that Defendant breached an implied covenant of good faith and fair dealing before it discovered any EOD must be dismissed.

After an EOD, a trustee's obligations are not so circumscribed by the Governing Agreements, as explained above.  At this stage, the Court must determine whether the "damages sought by [Plaintiffs] for breach of the implied covenant are not intrinsically tied to the damages allegedly resulting from

breach of contract." *PL/DB*, 172 F. Supp. 3d at 721 (quoting *Page Mill Asset Mgmt.*, 2000 WL 335557, at *8 (quotation marks omitted)).

Despite Defendant's argument in its opening brief that this tort claim must be dismissed, Plaintiffs do not defend it. Instead, Plaintiffs' tort arguments focus on the conflict-of-interest claim. Accordingly, the Court could find Plaintiffs' implied covenant claim to be abandoned.

But even were it not abandoned, this claim would fail. Plaintiffs argue only that Defendant breached this covenant in failing to fulfill its contractual obligations. (*See, e.g.*, PL Compl. ¶ 201 ("[Defendant] owed Plaintiffs, as express, intended third party beneficiaries under the PSAs, a duty of good faith and fair dealing *pursuant to the PSAs* that required [Defendant] to ensure that it did not, by act or omission, injure the rights of the Plaintiffs to receive the benefits and protections provided for *under the PSAs*." (emphases added))). Plaintiffs' breach-of-contract and breach-of-implied-covenant claims are based on the same alleged facts, and therefore the latter must fail. Defendant's motion to dismiss Plaintiffs' claims regarding a breach of an implied covenant of good faith and fair dealing is granted. *See, e.g.*, *PL/DB*, 172 F. Supp. 3d at 721; *Commerzbank AG* v. *HSBC Bank USA* (hereinafter, "*CB/HSBC*"), No. 15 Civ. 10032 (LGS), 2016 WL 3211978, at *3-4 (S.D.N.Y. June 8, 2016) (collecting cases).

### 4. The Economic-Loss Doctrine Bars Plaintiffs' Claims Insofar as They Seek Only the Benefit of Plaintiffs' Contract

Plaintiffs' allegations that Defendant breached duties independent of its contracts do not, themselves, "allow evasion of the economic loss rule, which

presents a second, distinct barrier" to tort claims stemming from contractual relationships.  *RP/HSBC*, 109 F. Supp. 3d at 599.  The economic-loss rule provides that "a contracting party seeking only a benefit of the bargain recovery may not sue in tort notwithstanding the use of familiar tort language in its pleadings."  *Phoenix Light SF Ltd.* v. *U.S. Bank Nat'l Ass'n* (hereinafter, "*PL/U.S. Bank*"), No. 14 Civ. 10116 (KBF), 2016 WL 1169515, at *9 (S.D.N.Y. Mar. 22, 2016) (quotation marks omitted) (quoting *17 Vista Fee Assocs.* v. *Teachers Ins. & Annuity Ass'n of Am.*, 693 N.Y.S.2d 554, 559 (1st Dep't 1999)); *accord NCUAB/U.S. Bank II*, 2016 WL 796850, at *11.  However, "the rule allows such recovery in the limited class of cases involving liability for the violation of a professional duty."  *Hydro Inv'rs, Inc.* v. *Trafalgar Power Inc.*, 227 F.3d 8, 18 (2d Cir. 2000) (citing *17 Vista Fee Assocs.*, 693 N.Y.S.2d at 560; *Robinson Redev. Co.* v. *Anderson*, 547 N.Y.S.2d 458, 460 (3d Dep't 1989)).  A court considering the application of this doctrine therefore must scrutinize with care a plaintiff's proffered extra-contractual claims.

Courts in this District have split with regard to the application of the economic-loss doctrine to tort claims brought against an RMBS trustee. *Compare RP/HSBC*, 109 F. Supp. 3d at 608-10, *with PL/U.S. Bank*, 2016 WL 1169515, at *9.  Dispositive in each case has been the nature of the plaintiff's claims:  Does plaintiff allege damages that flow from the violation of a professional duty, or merely from the violation of the governing agreements? Courts have denied motions to dismiss where plaintiffs have pleaded tort claims grounded in extra-contractual duties.  *See, e.g.*, *PL/DB*, 172 F. Supp. 3d

at 719 (holding that, with regard to the economic-loss doctrine, "[t]he dispositive issue is whether [defendant] owed duties to the plaintiffs that were separate from the duties set forth in the PSAs and the Indenture Agreements" and reasoning that because "[s]everal of the plaintiffs' arguments supporting the negligence, gross negligence, and breach of fiduciary duty claims are not duplicative of the breach of contract claim[,] … the motion to dismiss the tort claims cannot be granted on this basis"); *RP/HSBC*, 109 F. Supp. 3d at 608-10 (denying motion to dismiss with regard to breaches of extra-contract duty to avoid conflicts of interest and post-EOD fiduciary duties, but granting motion to dismiss negligent misrepresentation claim absent a "special duty for [defendant] to refrain from negligently making misrepresentations to Certificateholders").  Conversely, motions to dismiss have been granted where plaintiffs pled only damages arising from a defendant's contract obligations. *See, e.g.*, *PL/U.S. Bank*, 2016 WL 1169515, at *9 ("While the cause of action for breach of fiduciary duty may arise from common law duties and not from the PSA, 'the injury' and 'the manner in which the injury occurred and the damages sought persuade us that plaintiffs' remedy lies in the enforcement of contract obligations,' and is barred by the economic loss doctrine." (quoting *Bellevue S. Assocs.* v. *HRH Constr. Corp.*, 78 N.Y.2d 282, 293 (1991))); *NCUAB/U.S. Bank II*, 2016 WL 796850, at *11 (same).

This Court draws the same line.  The economic-loss doctrine does not foreclose Plaintiffs' claims that Defendant breached its duty to perform ministerial acts with due care and its duty to avoid conflicts of interest.  At

least at this stage, Plaintiffs have pleaded that Defendant breached extra-contractual duties, for which Plaintiffs are owed damages that do not lie simply in the enforcement of Defendant's contractual obligations.  However, insofar as Plaintiffs have pleaded that Defendant breached, for example, its post-EOD fiduciary duty in failing to act as it was contractually required to, the economic-loss doctrine *does* bar Plaintiffs' claims.  Defendant's motion to dismiss that subset of Plaintiffs' tort claims is granted.

### 5. Defendant's Motion to Dismiss Plaintiffs' TIA Claims Is Granted in Part and Denied in Part

#### i. Plaintiffs' TIA Claims Regarding PSA-Governed Trusts Are Dismissed

Plaintiffs assert claims under Sections 315(a), (b), and (c) of the TIA.[8] Because claims under the TIA can only be asserted with respect to the 12

---

[8]  "The [TIA] was enacted because previous abuses by indenture trustees had adversely affected 'the national public interest and the interest of investors in notes, bonds [and] debentures,' and Congress sought to address this national problem in a uniform way." *Bluebird Partners, L.P.* v. *First Fid. Bank, N.A. N.J.*, 85 F.3d 970, 974 (2d Cir. 1996) (citations omitted) (quoting 15 U.S.C. § 77bbb(a)) (citing S. Rep. No. 248, 76th Cong., 1st Sess. 3 (1939)).  "The Act is 'designed to vindicate a federal policy of protecting investors.'"  *Id.* (emphasis omitted) (quoting *In re Nucorp Energy Sec. Litig.*, 772 F.2d 1486, 1489 (9th Cir. 1985)).  As relevant here, Section 315(a) provides that, prior to default,

> (1) the indenture trustee shall not be liable except for the performance of such duties as are specifically set out in such indenture; and (2) the indenture trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, in the absence of bad faith on the part of such trustee, upon certificates or opinions conforming to the requirements of the indenture; but the indenture trustee shall examine the evidence furnished to it pursuant to [S]ection 77nnn of this title to determine whether or not such evidence conforms to the requirements of the indenture.

15 U.S.C. § 77ooo(a).  Section 315(b) requires that

> [t]he indenture trustee shall give to the indenture security holders ... notice of all defaults known to the trustee, within ninety days after the occurrence thereof: *Provided*, That such indenture

Trusts governed by Indenture Agreements, the Court here considers only the viability of those claims; any claims brought under the TIA with respect to the PSA-governed Trusts are dismissed to the extent that Plaintiffs have not already withdrawn them.  *See PABF III*, 775 F.3d at 155 (holding that the TIA does not "impose obligations on the trustees of RMBS trusts governed by pooling and servicing agreements"); *PL/DB*, 172 F. Supp. 3d at 721 (dismissing TIA claims with respect to PSA-governed trusts on this basis).  (*See also* Def. Br. 22; Pl. Opp. 18 & n.14).

### ii. Defendant's Motion to Dismiss Plaintiffs' Section 315(a) Claim Is Granted

With respect to the Indenture Trusts, an interesting antecedent issue concerns whether Plaintiffs can bring a TIA claim at all.  Sections 315(a), (b), and (c) of the TIA do not afford an express private right of action.  *See* 15 U.S.C. § 77ooo; *see also, e.g.*, *Blackrock Allocation Target Shares: Series S Portfolio* v. *Bank of N.Y. Mellon* (hereinafter, "*BR/BNYM*"), 180 F. Supp. 3d 246,

---

shall automatically be deemed (unless it is expressly provided therein that such provision is excluded) to provide that, except in the case of default in the payment of the principal of or interest on any indenture security, or in the payment of any sinking or purchase fund installment, the trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee, or a trust committee of directors and/or responsible officers, of the trustee in good faith determine that the withholding of such notice is in the interests of the indenture security holders.

*Id.* at § 77ooo(b).  And Section 315(c) dictates that

[t]he indenture trustee shall exercise in case of default (as such term is defined in such indenture) such of the rights and powers vested in it by such indenture, and to use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

*Id.* at § 77ooo(c).

254 (S.D.N.Y. 2016) ("Section 315 of the TIA does not expressly create a federal private cause of action."), *motion to certify appeal denied sub nom. Blackrock Allocation Target Shares Series S Portfolio* v. *Bank of N.Y. Mellon*, No. 14 Civ. 9372 (GBD), 2016 WL 5812627 (S.D.N.Y. Oct. 4, 2016); *Fixed Income Shares*, 130 F. Supp. 3d at 848.  For Plaintiffs' claims to proceed, therefore, the Court must find an implied private right of action.

The Court concludes, as have its sister courts in this Circuit, that a private right of action *is* implied under Sections 315(b) and (c), but not under Section 315(a).  Considering first Section 315(a), this Court agrees with the other courts to consider the question that "this [S]ection limits, rather than creates, liability."  *RP/BNYM*, 2016 WL 899320, at *8.  Here, Plaintiffs allege that Defendant violated Section 315(a)(1)'s mandate that "the indenture trustee shall not be liable except for the performance of such duties as are specifically set out in such indenture," 15 U.S.C. § 77ooo(a), by violating the duties specifically set out in the Indenture Agreements.  (NCUAB Compl. ¶ 440; RF Compl. ¶ 175).  But Section 315(a)(1) does not *impose* liability for Indenture Agreement violations; it rather *limits* possible liability to claims premised on Indenture Agreement violations.  Accordingly, Defendant's motion to dismiss Plaintiffs' claims under Section 315(a) is granted.

### iii. Defendant's Motion to Dismiss Plaintiffs' Sections 315(b) and (c) Claims Is Denied

A different result obtains under Sections 315(b) and (c).  Neither the Supreme Court nor the Second Circuit has determined whether either section

41

affords an implied private right of action.  But the Second Circuit has cited

favorably case law consistent with such an implied right.  *See Bluebird*

*Partners, L.P.* v. *First Fid. Bank, N.A.*, 85 F.3d 970, 974 (2d Cir. 1996) (agreeing

with observations of *Zeffiro* v. *First Pa. Banking & Tr. Co.*, 623 F.2d 290 (3d Cir.

1980), "which established a private cause of action under the [TIA]").  And

district courts within this Circuit addressing the question more directly have

found the same:  "[S]everal courts in this [D]istrict have found a private right of

action to exist under these [S]ections."  *RP/BNYM*, 2016 WL 899320, at *8

(collecting cases); *see also Fixed Income Shares*, 130 F. Supp. 3d at 848

(collecting cases).

 Defendant decries Plaintiffs' reliance on cases like *Zeffiro*, which it claims

are "inconsistent with the Supreme Court's most recent private right of action

jurisprudence — *Stoneridge*, *Sandoval*[,] and *Armstrong* v. *Exceptional Child*

*Ctr., Inc.*, 135 S. Ct. 1378, 1387 (2015) (plurality) — which require express

textual indicators of a private action and remedy."  (Def. Br. 22 (parenthetical

omitted)).  The Court has reviewed that jurisprudence, as well as persuasive

authority from this District finding an implied private right of action under

Sections 315(b) and (c), and cannot agree with Defendant's claims.

 In *Fixed Income Shares*, Judge Furman considered this issue with care,

specifically grappling with the implications of *Sandoval*.  First, Judge Furman

looked to the reasoning of *Zeffiro*, which reasoning he noted "rel[ied] heavily on

the factors articulated by the Supreme Court in *Cort* v. *Ash*, 422 U.S. 66, 95

(1975)" and was cited with approval by the Second Circuit in *Bluebird.*  130 F.

Supp. 3d at 848-49.  Judge Furman recounted that the *Zeffiro* court had found that:

> Congress intended to create a private right of action under the TIA because [i] the TIA was enacted for the benefit of a special class, namely, debenture holders; [ii] legislative history revealed Congress's intention "to nationalize the issues of concern in the Act"; [iii] the Securities and Exchange Commission ("SEC") has no power to enforce the terms of an indenture after it has been qualified under the Act, leaving private lawsuits as the only possible enforcement mechanism; and [iv] "[i]t is unquestionable that Congress intended to legislate over trust indentures and deal with the problem on a national scale."

*Id.* (quoting *Zeffiro*, 623 F.2d at 296-301).

Judge Furman also noted that Judge Mukasey had likewise found the TIA's "text and legislative history [to] support the inference that Congress intended to permit debenture holders to sue in federal court."  130 F. Supp. 3d at 849 (quoting *LNC Invs., Inc.* v. *First Fid. Bank, Nat'l Ass'n*, 935 F. Supp. 1333, 1339 (S.D.N.Y. 1996)).  Both judges "emphasized that the SEC is not entitled to enforce the terms of indentures covered by the TIA."  *Id.*; *see also id.* at 849-50.  All of this, Judge Furman concluded, together with the lack of evidence supporting a contrary interpretation and the TIA's legislative history, confirmed that Sections 315(a) and (b) afforded implied private rights of action. *Id.* at 849-50.

Judge Furman noted, however, that he had been given "pause" by the Supreme Court's decision in *Alexander* v. *Sandoval*, 532 U.S. 275 (2001).  130 F. Supp. 3d at 850.  In particular, the court was troubled because *Sandoval*

"reasoned that '[s]tatutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons.'" *Id.* (alteration in original) (quoting *Sandoval*, 532 U.S. at 289). However, Judge Furman concluded that while "the TIA provisions at issue are phrased in terms of the trustee's duties rather than the investors' entitlement," they differed from those at issue in *Sandoval* because their focus "is not solely on the [trustee], but also on the individuals [they] protect[ ]." *Id.* (alterations in original) (quoting *Zatuchni* v. *Richman*, No. 07 Civ. 4600, 2008 WL 3408554 (CMR), at *9 (E.D. Pa. Aug. 12, 2008)). "Sections 315(b) and (c) impose specific duties that the trustee must perform *to protect investors*, and 'a statute that imposes fiduciary *duties* necessarily implies corresponding *rights* in the beneficiaries.'" *Id.* (first emphasis added) (quoting *Int'l Union of Operating Eng'rs, Local 150, AFL-CIO* v. *Ward*, 563 F.3d 276, 286 (7th Cir. 2009)). Therefore, *Sandoval* did not persuade Judge Furman "to depart from the longstanding view that a private right of action exists to enforce Sections 315(b) and (c)." *Id.* Nor has it persuaded other Courts in this District. *See e.g.*, *RP/BNYYM*, 2016 WL 899320, at *8 ("The Court finds Judge Furman's analysis of this issue in *Fixed Income Shares* persuasive and adopts Judge Furman's conclusions here.").

Later, in *Blackrock Allocation Target Shares*, Judge Daniels elaborated on Judge Furman's *Sandoval* analysis; Judge Daniels considered whether the Supreme Court's subsequent decision in *Stoneridge Investment Partners, LLC* v. *Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008), had "abrogated prior case law

holding that the TIA establishes a private cause of action." *BR/BNYM*, 80 F. Supp. 3d at 255.  In *Stoneridge*, the Supreme Court held that there may be "an implied cause of action only if the underlying statute can be interpreted to disclose the intent to create one."  552 U.S. at 164.  The *Stoneridge* Court affirmed *Sandoval*'s holding that the express provision of a single method of enforcement suggests a Congressional intent to preclude others.  *Id.* at 163. The Court also, however, distinguished its case from those "in which Congress has enacted a regulatory statute and then has accepted, over a long period of time, broad judicial authority to define substantive standards of conduct and liability."  *Id.*

Judge Daniels picked up on this distinction, noting that "[c]ourts have unanimously recognized a private cause of action under the TIA for at least thirty-five years."  *BR/BNYM*, 180 F. Supp. 3d at 255.  And he reiterated Judge Furman's argument that Section 315 imposes specific fiduciary duties, and so necessarily implies corresponding rights in beneficiaries.  *Id.* at 255-56.  Judge Daniels, too, determined that neither *Sandoval* nor *Stoneridge* precluded recognition of an implied private cause of action under the TIA.  *Id.*; *see also Ret. Bd. of the Policemen's Annuity & Benefit Fund of City of Chi.* v. *Bank of N.Y. Mellon*, No. 11 Civ. 5459 (WHP), 2015 WL 9275680, at *2-3 (S.D.N.Y. Dec. 18, 2015) (Pauley, *J.*) (holding that *Stoneridge* and *Sandoval* "do not contravene the line of authority holding that a private right of action exists under Section 315 of the TIA" because (i) "courts have unanimously interpreted Section 315 as implying a private right of action for at least 35 years" and (ii) Section 315

imposes "fiduciary duties, which necessarily impl[y] corresponding rights in the beneficiaries"), *motion to certify appeal denied sub nom. Ret. Bd. of the Policemen's Annuity & Benefit Fund of City of Chi.* v. *Bank of N.Y. Mellon*, No. 11 Civ. 5459 (WHP), 2016 WL 2744831 (S.D.N.Y. May 9, 2016).

This Court reaches the same conclusion, even after considering the Supreme Court's plurality decision in *Armstrong* v. *Exceptional Child Center, Inc.*, — U.S. —, 135 S. Ct. 1378 (2015), which Judges Furman, Daniels, and Pauley did not have occasion to discuss. *Armstrong* reaffirmed the two *Sandoval* concerns that prior courts have found the TIA to address: (i) it noted the lack of rights-creating language that conferred a right to sue upon a statute's beneficiaries, and (ii) it found private enforcement impliedly precluded by the provision of an alternate enforcement mechanism. *Id.* at 1387. Because here, as Judges Furman, Daniels, and Pauley found, and as longstanding precedent confirms, Sections 315(b) and (c) of the TIA (i) necessarily create rights in their beneficiaries and (ii) do not allow potentially preclusive SEC enforcement, *Armstrong* does not change this Court's conclusion that the TIA "unambiguously confer[s]" a private right of action. *Id.* at 1388. The Court declines Defendant's invitation to stand alone against the jurisprudential tide.

Because Defendant does not otherwise challenge the viability of Plaintiffs' TIA claims, the Court denies Defendant's motion to dismiss Plaintiffs' TIA claims under Section 315(b) and (c).[9]

---

[9]    This resolution is critical to the Court's jurisdiction in this case: "[A]n affirmative answer" to the private-right-of-action question "is necessary to support jurisdiction." *LNC Invs., Inc.* v. *First Fid. Bank, Nat'l Ass'n*, 935 F. Supp. 1333, 1338 (S.D.N.Y. 1996).

### 6. Defendant's Motion to Dismiss Plaintiffs' Streit Act Claims Is Granted

The parties agree that the Streit Act, Article 4A of the New York Real Property Law, does not apply to the 12 Indenture Trusts at issue here. (Def. Br. 24; Pl. Opp. 23 n.18; Def. Reply 10). Accordingly, to the extent that Plaintiffs have pleaded violations of the Streit Act implicating the Indenture Trusts, those claims are dismissed. *See, e.g., PL/DB*, 172 F. Supp. 3d at 722-23 (citing N.Y. Real Prop. Law § 130-k) ("[O]nly the 45 PSA Trusts are potentially subject to the Streit Act because they are not covered by the TIA."); *RP/HSBC*, 109 F. Supp. 3d at 599 (same).

As for the PSA Trusts, Plaintiffs allege that Defendant violated Section 126(1) of the Streit Act when it "failed to exercise its rights under the Governing Agreements after becoming aware of numerous Events of Default, failed to

---

The parties here have not disputed this Court's jurisdiction, though a lack thereof with regard to the PSA-governed claims was dispositive in Judge Berman's Decision and Order resolving Defendant's first motion to dismiss. *See Blackrock Allocation Target Shares* v. *Deutsche Bank Nat'l Tr. Co.*, No. 14 Civ. 9367 (RMB), 2016 WL 269570, at *1 (S.D.N.Y. Jan. 19, 2016). Judge Berman found that he *could* exercise supplemental jurisdiction because "there arguably [could] be sufficient facts 'to demonstrate that the claims relating to the PSA Trusts form part of the same case or controversy as those relating to the Indenture Trusts.'" *Id.* at *4 (quoting *Fixed Income Shares: Series M* v. *Citibank N.A.*, 130 F. Supp. 3d 842, 851 (S.D.N.Y. 2015)). However, Judge Berman declined to exercise supplemental jurisdiction because he found (i) the state-law claims substantially predominated over the federal claims, (ii) judicial economy would not be furthered by such an exercise, and (iii) there was evidence that Plaintiffs were engaging in forum-shopping. *Id.* at *4-5. Judge Berman granted Defendant's motion to dismiss, but provided Plaintiffs with leave to replead. *Id.* at *5.

Plaintiffs amended. Because (i) Judge Berman was correct in finding that he *could* exercise supplemental jurisdiction; (ii) Plaintiffs' federal Trust claims are no longer as numerically overwhelmed, and therefore substantially predominated, by Plaintiffs' PSA Trust claims; (iii) discovery in this case has progressed significantly since Judge Berman's Decision and Order; and (iv) Defendant has not moved the Court to withhold supplemental jurisdiction over Plaintiffs' PSA Trust claims, the Court affirms here that it has and is exercising supplemental jurisdiction over Plaintiffs' state-law claims. *See* 28 U.S.C. § 1367.

notify Certificateholders and other parties of deficiencies, failed to take steps to address those deficiencies, and ... failed to enforce the repurchase, cure or substitution of defective Mortgage Loans." (RP Compl. ¶¶ 198-99; *see also* NCUAB Compl. ¶¶ 430, 432; PL Compl. ¶¶ 197-98; CB Compl. ¶¶ 165-66).[10] However, Courts in this District have held consistently that Section 126(1) "requires only that trust instruments include certain provisions, and does not itself impose any affirmative duties on trustees." *CB/HSBC*, 2016 WL 3211978, at *2; *see also id.* at 2-3 (collecting cases holding the same, and noting the dearth of support for defendant's argument to the contrary); *PL/DB*, 172 F. Supp. 3d at 723 (dismissing Section 126(1) claim because "[§] 126(1) does not create any additional duties for trustees beyond the duties in the PSAs, and only requires that certain types of provisions be included in the indenture agreement," and plaintiff's complaint did "not allege that the PSAs omitted" those provisions); *accord, e.g.*, *PL/U.S. Bank*, 2016 WL 1169515, at *10-11; *RP/BNYM*, 2016 WL 899320, at *11; *NCUAB/U.S. Bank II*, 2016 WL 796850, at *12; *PL/BNYM*, 2015 WL 5710645, at *11.

---

[10]     That section provides:

> No trustee shall hereafter accept a trust under any trust indenture or mortgage within the contemplation of this article or act as trustee thereunder unless the instrument creating the trust shall contain the following provisions, among others, which confer the following powers and impose the following duties upon the trustees:

> 1.   In the case of an event of default (as such term is defined in such instrument), to exercise such of the rights and powers vested in the trustee by such instrument, and to use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

N.Y. Real Prop. Law § 126(1).

This Court now adds its voice to the judicial chorus:  Plaintiffs fail to plead a claim under Section 126(1) of the Streit Act because Plaintiffs have not pleaded that Defendant accepted a deficient trust instrument and Section 126(1) imposes no further duty.[11]

In several of the operative pleadings, Plaintiffs reference "a duty" imposed "upon the trustee to discharge its duties under the applicable indenture with due care to ensure the orderly administration of the trust and to protect the trust beneficiaries' rights"; this language echoes Section 124 of the Streit Act. (RP Compl. ¶ 69; *see also* NCUAB Compl. ¶¶ 13, 100).  But only the NCUAB's Complaint seems to allege that Defendant violated Section 124.  (*See* NCUAB Compl. ¶ 431 ("In addition, Section 124 of the Streit Act imposes a duty upon the trustee to discharge its duties under the applicable indenture with due care in order to ensure the orderly administration of the trust and protect the trust beneficiaries' rights." (citing N.Y. Real Prop. Law § 124))).  All told, the extent to which Plaintiffs intend to allege violations of Section 124 is unclear.  Fortunately, the law is not so ambiguous:  Section 124 "is a preliminary section that does not create any duties."  *CB/HSBC*, 2016 WL 3211978, at *2 (quoting *RP/HSBC*, 109 F. Supp. 3d at 610); *accord NCUAB/U.S. Bank II*, 2016 WL

---

[11]    Plaintiffs raise for the first time in their opposition brief the existence of an additional duty under Section 130-e.  (Pl. Opp. 23).  However, Plaintiffs do not allege that any duty imposed by Section 130-e was violated by Defendant, nor have they pleaded any such violation.  Accordingly, the Court will not consider the viability of a Streit Act claim under Section 130-e.  Moreover, the Court is skeptical that such a claim could succeed even if pleaded properly.  *See Commerzbank AG* v. *Deutsche Bank Nat'l Tr. Co.*, No. 15 Civ. 10031 (JGK), 2017 WL 564089, at *10 (S.D.N.Y. Feb. 10, 2017) ("The exclusive remedy afforded to an aggrieved party under Section 130-e is the removal of the trustee. [Plaintiff] has not pleaded that it is entitled to such relief.").

796850, at *12 ("Plaintiff's claims under Section 124 are not actionable because Section 124 is the preamble to the Streit Act and does not impose any obligations.  Instead, it merely recites the New York state legislature's purpose in enacting the law and its applicability to trustees with offices in New York."). Therefore, to the extent that Plaintiffs may have brought claims under Section 124 of the Streit Act, those claims are dismissed.

The Court is not persuaded by Plaintiffs' arguments that these conclusions are not in keeping with the purpose, legislative history, and case law that motivated the Streit Act.  (*See* Pl. Opp. 22-23).  The Court's decision is in keeping with *current* case law and with the Streit Act's plain text. Defendant's motion to dismiss Plaintiffs' Streit Act claims is granted.[12]

### 7.    Defendant's Motion to Dismiss NCUAB's Claims Is Granted in Part, Without Prejudice, and Denied in Part

While most of Defendant's arguments are applicable to all five Plaintiffs, Defendant mounts individualized arguments against the NCUAB and Commerzbank.  Beginning with the former, and because the NCUAB stands in a different position than its peer Plaintiffs, the Court will provide a brief background of the genesis of its claims before considering the issue of its standing.

---

[12]    "Because Defendant's motion is granted as to the Streit Act claim[s], the Court does not address whether the Streit Act applies to RMBS trusts or whether it provides a private cause of action for damages."  *Phoenix Light SF Ltd.* v. *Bank of N.Y. Mellon*, No. 14 Civ. 10104 (VEC), 2015 WL 5710645, at *11 n.11 (S.D.N.Y. Sept. 29, 2015).

### a.    Factual Background

Plaintiff NCUAB manages the NCUA.  As relevant here:

> The National Credit Union Administration ("NCUA") is
> an independent agency of the Executive Branch of the
> United States Government that, among other things,
> charters and regulates federal credit unions, and
> operates and manages the National Credit Union Share
> Insurance Fund ("NCUSIF") and the Temporary
> Corporate Credit Union Stabilization Fund ("TCCUSF").
> The TCCUSF was created in 2009 to allow the NCUA to
> borrow funds from the United States Department of the
> Treasury ("Treasury Department") to stabilize corporate
> credit unions under conservatorship or liquidation, or
> corporate credit unions threatened with
> conservatorship or liquidation.  The NCUA must repay
> all monies borrowed from the Treasury Department for
> the purposes of the TCCUSF by 2021.  The NCUSIF
> insures the deposits of account holders in all federal
> credit unions and the majority of state-chartered credit
> unions.  The NCUA has regulatory authority over state-
> chartered credit unions that have their deposits insured
> by the NCUSIF.

(NCUAB Compl. ¶ 17 (citing Federal Credit Union Act, 12 U.S.C. §§ 1751,

1752a(a)).  In certain specified circumstances, the NCUAB "may close an

insured credit union and appoint itself the Liquidating Agent for such credit

union.  As liquidating agent for a failed credit union, the [NCUAB] succeeds to

all rights, titles, powers, and privileges of the credit union, its members,

accountholders, officers, and directors."  (*Id.*).

At various times in 2010, the NCUAB placed certain corporate credit

unions ("CCUs") into conservatorship, and then into involuntary liquidation,

"appointing itself as the liquidating agent."  (NCUAB Compl. ¶ 24).  In this

capacity, the NCUAB "succeeded to all rights, titles, powers, and privileges of

the CCUs and of any member, account holder, officer or director of the CCUs,

with respect to the CCUs and their assets, including the right to bring the claims asserted in this action." (*Id.* at ¶ 25). As liquidating agent, the NCUAB had the right to "sue on the CCUs' behalf." (*Id.*).

Also in 2010, "the NCUA and the [NCUAB] as liquidating agent created the NCUA Guaranteed Notes Program (the 'NGN Program') as a means of liquidating the distressed investment securities from ... five failed CCUs (the 'Legacy Assets'), thereby stabilizing funding for the credit union system." (NCUAB Compl. ¶ 27). This program entailed the transfer of certain Legacy Assets, "including the CCU's investment in the [T]rusts at issue" in this case, to trusts (the "NGN Trusts"). (*Id.*). To create the NGN Trusts, "the NCUA Board in its Capacity as Liquidating Agent (as Sellers) transferred the [CCUs' RMBS] certificates to the NGN Trusts (as Issuers) pursuant to the NGN Trust Agreements, and [Defendant] (as Owner Trustee) caused the Owner Trust Certificates ... to be issued" to the NCUAB. (*Id.* at ¶ 29). The NGN Trusts are Delaware statutory trusts, created pursuant to and governed by the Delaware Statutory Trust Act, 12 Del. Code §§ 3801-3826 (the "DSTA"). (Pl. Opp. 26).

Once the RMBS certificates were conveyed to the NGN Trusts, and the NCUAB left with only its Owner Trust Certificates, the NGN Trusts executed a second transaction. The Trusts entered into an Indenture Agreement with the Bank of New York Mellon ("BNYM"), through which they "(as Issuers) pledged the [c]ertificates and the other assets of the trust estates to [BNYM] (as Indenture Trustee) and caused ... Notes to be issued pursuant to the NGN

Indentures." (NCUAB Compl. ¶ 29). "BNYM (as Indenture Trustee) [then] delivered the Notes [to] ... Initial Purchasers for further sale to investors." (*Id.*).

The NGN Trust Agreements facilitated the following exchange:  The NCUAB as liquidating agent "transferred and assigned" the former CCU-owned certificates, as well as the NCUAB's "rights, title, and interest to assert the claims at issue in this [case] to the NGN Trusts," and in exchange, the NCUAB received "certain certificates that represent a beneficial ownership interest in the NGN Trusts (the 'Owner Trust Certificates')." (NCUAB Compl. ¶ 30).  This beneficial ownership interest entitled the NCUAB in its capacity as Liquidating Agent "to payments from the NGN Trusts after the principal balance of the Notes issued by the various NGN Trusts has been reduced to zero." (*Id.*; *see also id.* at ¶ 31).  And the NCUA, "in its capacity as an agency of the Executive Branch of the United States Government (in such capacity, the 'Guarantor') provided a guarantee, backed by the full faith and credit of the United States, of the timely repayment of all principal and interest to the investors in the NGN Trusts." (*Id.* at ¶ 32; *id.* at Ex. D).

### b.  Defendant's Motion to Dismiss NCUAB's Derivative Claims Is Granted

Defendant's standing claim with regard to the NCUAB is intertwined with its challenge to the NCUAB's claims on their merits:  Defendant claims that that the NCUAB lacks standing to assert its derivative claims (which, according to Defendant, are not in fact derivative), and, further, that the NCUAB lacks standing to bring direct claims as well.  The Court will consider first the

threshold question of the NCUAB's standing, before addressing the derivative or direct nature of the claims the NCUAB asserts standing to bring.[13]

### i.      Procedural History

To consider properly the NCUAB's derivative claims, the Court first revisits events that followed the NGN Trust formation process described above. Critical to the Court's analysis of the NCUAB's standing is the fact that through the NGN Indenture Agreement, "BNYM was granted the right to take action against Defendant with respect to the certificates and the Trusts." (NCUAB Compl. ¶ 33; *id.* at Ex. B). Specifically, the Granting Clause of the Indenture Agreement gave BNYM as Indenture Trustee "all of [the Trusts'] right, title and interest in and to ... the Underlying Securities ... , and all distributions thereon, ... [and] all present and future claims, demands, causes, and choses in action in respect of the foregoing, including ... the rights of the [Trusts (as the Issuers)] under the Underlying Securities and Underlying Agreements." (*Id.* at Ex. B).

On January 30, 2015, NCUA in its capacity as Guarantor asked BNYM to exercise this right and pursue the claims at issue in the instant action.

---

[13]     Defendant originally challenged the standing of both the NCUAB and Royal Park with regard to the derivative claims brought by each. Royal Park has subsequently abandoned its derivative claims. (Pl. Opp. 33 n.34 ("Royal Park's action was brought as a class action, or in the alternative, derivatively in the right and for the benefit of the Covered Trusts against Wells Fargo. In light of recent authority, which has no effect on NCUA's claims whatsoever, Royal Park is electing to proceed only on a class basis." (citing RP Compl. ¶¶ 1-2; *Royal Park Invs. SA/NV* v. *Deutsche Bank Nat'l Tr. Co.*, No. 14 Civ. 4394 (AJN), 2016 WL 439020, at *6 (S.D.N.Y. Feb. 3, 2016)))).

(NCUAB Compl. ¶ 34).  On February 24, 2015, BNYM declined to do so, stating

that

> BNY Mellon as Indenture Trustee on the various NCUA
> re-securitization trusts does not intend to pursue the
> claims outlined in the Amended Complaints[.]  We take
> no position on the merits, but acknowledge and agree
> that the Guarantor [NCUA] has the right to pursue
> claims based on the re-securitization Trust Indentures
> when the Indenture Trustee fails to do so after receiving
> notice (which we have for the claims in the Amended
> Complaints).

(*Id.*; *see also id.* at Ex. G).  In a sworn declaration provided on July 13, 2015,

BNYM modified its position regarding the NCUAB's standing slightly:

> BNYM, solely in its capacity as the Indenture Trustee of
> the NGN Trusts, does not object to NCUA's pursuit of
> the NCUA Suits on behalf of the NGN Trusts.  BNYM,
> solely in its capacity as the Indenture Trustee of the
> NGN Trusts, takes a neutral position with respect to any
> challenge to NCUA's standing and leaves it to the
> decision of the courts presiding over the NCUA Suits.
> The statements made in this paragraph 5 are made in
> reliance on NCUA's statement in its letter to BNYM,
> dated July 7, 2015, that: "In bringing the NCUA Suits
> on behalf of the NGN Trusts, the NCUA Board has fully
> committed to protecting the best interests of the NGN
> Trusts and the NGN Noteholders.  Recoveries on claims
> brought on behalf of the NGN Trusts will be remitted to
> the NGN Indenture Trustee for deposit into the NGN
> Trust accounts."

(*Id.*; *see also id.* at Ex. I).

Subsequently, "for the certificates in the NGN Trusts, the [NCUAB] as

liquidating agent" brought the claims in the instant case "derivatively on behalf

of the NGN Trusts, and [named] each NGN Trust … herein as a nominal

defendant."  (NCUAB Compl. ¶ 35).  The NCUAB asserts standing to bring its

action on three bases: "as liquidating agent [with] an interest in the NGN

Trusts as the holder of the NGN Owner Trust Certificates, as an express third-party beneficiary of the NGN Trust Indentures, and pursuant to its authority under 12 U.S.C. § 1787 as the liquidating agent of the CCUs." (*Id.*). [14]

## ii.    Analysis

Defendant's preliminary challenge to the NCUAB's standing is its argument that the NCUAB cannot vindicate the NGN Trusts' rights because the Trusts themselves were not entities capable of such vindication; because a trust is not an entity that can sue, another entity cannot sue on its behalf. (Def. Br. 24).  Plaintiffs retort that the specific Trusts at issue are an exception to this rule.  While common-law trusts may not be entities with the capacity to sue or be sued (*id.* (citing *Tran* v. *Bank of N.Y.*, No. 13 Civ. 580 (RPP), 2014 WL

---

[14]    In its opening brief, Defendant argues that Plaintiffs may not bring derivative actions on behalf of RMBS Trusts because such claims can only be brought directly, by investors in those Trusts; the RMBS Trusts themselves were not the parties who suffered the alleged harm and who would receive the benefit of recovery.  (Def. Br. 29-30 (citing *Yudell* v. *Gilbert*, 949 N.Y.S.2d 380, 381 (1st Dep't 2012) (adopting the test for determining whether a claim is direct or derivative established in *Tooley* v. *Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004)))).  But, as Plaintiffs clarify, the NCUAB has not attempted to bring derivative claims on behalf of the RMBS trusts for which Defendant serves as Trustee.  (Pl. Opp. 33).  The NCUAB's derivative claims are brought on behalf of the NGN Trusts, in the NGN Trusts' capacity as RMBS certificateholders.  Defendant abandoned this argument on reply, and so the Court will consider it no further in the following section.  Defendant's motion to dismiss any derivative claims brought on behalf of the RMBS Trusts is denied as moot, because, as the NCUAB affirms, the NCUAB has brought no such claims.

The Court also will not consider whether the NCUAB has standing to sue on behalf of the NGN Trusts "as an express third-party beneficiary of the NGN Trust Indentures, and pursuant to its authority under 12 U.S.C. § 1787 as the liquidating agent of the CCUs." (NCUAB Compl. ¶ 35).  Defendant has not challenged and Plaintiffs have not defended the NCUAB's standing on these bases.  Moreover, the courts in this District to have considered the question have found that neither the NCUAB's third-party-beneficiary status nor its authority under 12 U.S.C. § 1787 afford it standing to sue.  *See Nat'l Credit Union Admin. Bd.* v. *HSBC Bank USA, Nat'l Ass'n*, 117 F. Supp. 3d 392, 398-99 (S.D.N.Y. 2015); *Nat'l Credit Union Admin. Bd.* v. *U.S. Bank Nat'l Ass'n*, No. 14 Civ. 9928 (KBF), 2015 WL 2359295, at *4 (S.D.N.Y. May 18, 2015).  For the reasons those Courts articulated, this Court would find the same.

1225575, at *1 n.4 (S.D.N.Y. Mar. 24, 2014); *Bu ex rel. Bu* v. *Benenson*, 181 F. Supp. 2d 247, 249 & n.1 (S.D.N.Y. 2001)), the NGN Trusts are Delaware statutory trusts afforded the capacity to sue and be sued under the DSTA.  (Pl. Opp. 30 & nn.30-32).  *See* 12 Del. Code § 3804(a) (establishing that a Delaware statutory trust is a juridical entity that "may sue and be sued"); *Nat'l Credit Union Admin. Bd.* v. *U.S. Bank Nat'l Ass'n* (hereinafter, "*NCUAB/U.S. Bank I*"), No. 14 Civ. 9928 (KBF), 2015 WL 2359295, at *4 (S.D.N.Y. May 18, 2015) ("[T]he NGN Trusts are Delaware statutory trusts, which are separate legal entities with their own indenture trustee.  These trusts are statutorily empowered to sue and be sued in their own right." (citation omitted)).  The Court agrees with Plaintiffs.

Accepting the proposition that the DSTA empowers the NGN Trusts to sue, the Court must determine whether the NCUAB may sue derivatively in NGN Trust's stead.  Defendant's second challenge to the NCUAB's derivative claims proceeds from its first:  Both build on the foundational principle that "[a] plaintiff who asserts a derivative cause of action must establish the existence of a cause of action in the party whose rights are sought to be enforced.  A cause of action cannot be derived from a source in which it does not exist." *Waters* v. *Horace Waters & Co.*, 201 N.Y. 184, 188 (1911).  (*See also* Def. Br. 25 (citing Fed. R. Civ. P. 23.1 for proposition that derivative action permissible to "enforce a right that the corporation or association may properly assert")).  Defendant argues that the NGN Trusts transferred their rights to sue with regard to the RMBS certificates to BNYM in the Indenture Agreement.

(Def. Br. 24-25 (citing NCUAB Compl. Ex. B)).  Therefore, it claims, the NCUAB
has no right to assert derivative claims on behalf of the NGN Trusts, because
the Trusts have no right to sue in the first instance.  (*Id.*).[15]

Again, in analyzing these claims, the Court finds itself traveling what is
fast becoming become a well-worn path in this District.  Within the past two
years alone, both Judges Scheindlin and Forrest have considered challenges to
the NCUAB's standing to bring direct and derivative claims against an RMBS
trustee; indeed Judge Forrest has done so twice.  *See NCUAB/U.S. Bank II*,
2016 WL 796850, at *8; *Nat'l Credit Union Admin. Bd.* v. *HSBC Bank USA, Nat.
Ass'n* (hereinafter, *NCUAB/HSBC*"), 117 F. Supp. 3d 392, 398-99 (S.D.N.Y.
2015); *NCUAB/U.S. Bank I*, 2015 WL 2359295, at *4.

---

[15]    As an aside, the Court notes that Defendant brought its motion to dismiss under
Federal Rule of Civil Procedure 12(b)(6) rather than under Rules 12(b)(1) (permitting
dismissal for lack of subject-matter jurisdiction) or 23.1 (establishing prerequisites and
pleading requirements for derivative suits).  And this distinction is not without import:
"In contrast to a motion to dismiss pursuant to Rule 12(b)(6)," for example, "a Rule 23.1
motion to dismiss for failure to [meet the rule's pleading requirements] is not intended
to test the legal sufficiency of the plaintiffs' substantive claim.  'Rather, its purpose is to
determine who is entitled, as between the corporation and its shareholders, to assert
the plaintiff's underlying substantive claim on the corporation's behalf."  *In re Veeco
Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 273 (S.D.N.Y. 2006) (quoting *Levine* v.
*Smith*, 1989 WL 150784, at *5 (Del. Ch. 1989), *aff'd*, 591 A.2d 194 (Del. 1991)).
Similarly, a motion under Rule 12(b)(6) differs from a motion under Rule 12(b)(1):  "[A]
typical dismissal under Rule 12(b)(6), *i.e.*, for failure to state a claim, is an adjudication
on the merits with preclusive effect," *All. for Envtl. Renewal, Inc.* v. *Pyramid Crossgates
Co.*, 436 F.3d 82, 88 n.6 (2d Cir. 2006), while dismissals for lack of standing are
without prejudice, *Wyatt* v. *Fed. Commc'ns Comm'n*, No. 15 Civ. 1935 (WHP), 2016 WL
4919958, at *2 n.3 (S.D.N.Y. Sept. 14, 2016).  Moreover, while a Rule 12(b)(1) motion
permits a court to consider evidence outside the pleadings, a Rule 12(b)(6) motion
typically does not.  *See Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 558-59 (2d Cir. 2016);
*Tandon* v. *Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014).
Here, the Court finds Defendant's decision to move only under Rule 12(b)(6) to be
curious, because the substance of Defendant's Rule 12(b)(6) argument with regard to
the NCUAB's standing is that the NCUAB lacks standing "to enforce a right" that the
NGN Trusts "may properly assert" because the NGN Trusts have no such right.  *See*
Fed. R. Civ. P. 23.1.

In each of their 2015 opinions, Judges Scheindlin and Forrest found that the NCUAB lacked standing at least in part because it had failed to meet the requirements imposed by Federal Rule of Civil Procedure 23.1 and Delaware law to bring a derivative suit.  Judge Forrest found that the NCUAB had failed to state a derivative claim on behalf of the NGN trusts because the NCUAB had sued to recover for itself:  "[I]f NCUA were in fact acting in a derivative capacity ... for the NGN Trusts, any recovery would necessarily go to those Trusts."  *NCUAB/U.S. Bank I*, 2015 WL 2359295, at *5 (citing 12 Del. Code § 3816(a) ("A beneficial owner may bring an action ... in the right of a statutory trust to recover a judgment in its favor[.]")).  Moreover, the NCUAB had failed to satisfy Rule 23.1's demand-futility requirement:  "Rule 23.1 requires NCUA to 'state with particularity' its efforts to obtain the desired action from persons with authority and 'the reasons for not obtaining the action or not making the effort.'  It has failed to do so."  *Id.* at *6 (citation omitted) (quoting Fed. R. Civ. P. 23.1(b)(3)).  Judge Scheindlin reached the same conclusion on two different bases.  She found that the NCUAB had failed (i) to verify its complaint as Rule 23.1 requires and (ii) to name the NGN Trusts "as nominal defendants so that they can receive the monetary award in the event of recovery."  *NCUAB/HSBC*, 117 F. Supp. 3d at 400.  Putting these pleading defects to the side, Judge Forrest was more skeptical than Judge Scheindlin with regard to the NCUAB's standing, but neither judge dismissed the NCUAB's pleading on such a basis. *Compare NCUAB/U.S. Bank I*, 2015 WL 2359295, at *5 (reasoning that "if NCUA were in fact acting in a derivative capacity — *and if it could* — for the

NGN Trusts," the NCUAB would not have sought recovery for itself (emphasis added)), *with NCUAB/HSBC*, 117 F. Supp. 3d at 399 ("NCUA may, however, assert a claim derivatively on behalf of the NGN Trusts."). Both judges gave the NCUAB leave to amend its pleading to remedy its standing-related deficiencies. *See NCUAB/U.S. Bank I*, 2015 WL 2359295, at *6; *NCUAB/HSBC*, 117 F. Supp. 3d at 404.

Only Judge Forrest had a subsequent opportunity to revisit the question of NCUAB's standing,[16] and she found that the NCUAB lacked standing. Judge Forrest's analysis is instructive, and the Court summarizes it here.

Judge Forrest began with every court's initial task in a putative derivative action: the determination of "who has the right to assert a direct claim, and who stands in a derivative position with regard to that claim." *NCUAB/U.S. Bank II*, 2016 WL 796850, at *9. She found that in her case, this analysis was complicated by an assignment of rights that took place in two steps. *See id.* First, the NCUA as the liquidating agent and seller, transferred all interests it had in the underlying securities to the NGN Trusts, including its right to pursue a claim relating to the underlying RMBS. *Id.* Second, the NGN Trusts transferred their rights to BNYM, the Indenture Trustee. *Id.* As did the first, so too did this second transfer divest the transferor of any right to pursue a direct claim. Judge Forrest therefore found that "[t]he party who stands in direct line to assert a derivative claim" was not the plaintiff, "but, rather, the

---

[16]   The defendant in Judge Scheindlin's case, which was reassigned to Judge Schofield on April 19, 2016, did not file a renewed motion to dismiss NCUAB's pleading on the basis of its standing or lack thereof. (*See generally* Docket, No. 15 Civ. 2144 (LGS) (SN)).

Trustee of the NGN Trust." *Id.* The NCUAB stood "twice removed." *Id.* "At the very least," Judge Forrest reasoned, this meant that the NCUAB standing "in a derivative position to an intervening holder of any rights ... would need to fulfill the Rule 23.1 demand requirement vis-à-vis [Defendant] (Owner Trustee)." *Id.* at *10. Defendant would then, "if it chose to pursue such claims, be required to make its own demand on BNYM. In other words, a derivative claim based on a derivative claim." *Id.*

This conclusion, Judge Forrest found, was confirmed by the "breadth and completeness of the Granting Clause," the expansive language of which itself "forecloses derivative claims." *NCUAB/U.S. Bank II*, 2016 WL 796850, at *10. Allowing that there could be cases in which a party "grant[s] all rights to an underlying asset" but "retain[s] a right to sue directly as a party retaining a beneficial ownership interest," Judge Forrest found that hers was not such a case: "The contractual agreements together effected a complete transfer of all rights including explicitly the right to sue." *Id.* (emphasis omitted).

Unsurprisingly, Plaintiffs take issue with Judge Forrest's reasoning. Among other criticisms, Plaintiffs argue that Judge Forrest "disregarded the fundamental role of a trustee vis-à-vis its trust and beneficial owners, and erroneously treated the Indenture assignment from the NGN Trust to the Indenture Trustee as divesting NCUA of its ability to bring a derivative claim," apparently viewing the Indenture Trustee as "an entity entirely separate and apart from its duties and role as trustee *to* the NGN Trust and its beneficiaries." (Pl. Opp. 29). Because "BNYM *also* is a trustee of the NGN

Trust with duties flowing *directly* to beneficial owners, including NCUA," Plaintiffs argue, the NCUAB is not twice removed from BNYM. (*Id.* at 29-30). Moreover, Plaintiffs argue that Judge Forrest confused the NCUAB's rights to bring direct and derivative claims. The NCUAB brings its derivative claim on behalf of the NGN Trusts, on the basis of the Trusts' right to bring that claim directly and BNYM's acquiescence to the NCUAB's suit. (Pl. Opp. 31). The NCUAB admits that it has no standing to bring a direct claim against Defendant on the basis of its beneficial-owner status alone. (*Id.*). But, citing to the DSTA, the NCUAB argues that as a beneficial owner holding Owner Trust Certificates, it is statutorily authorized "to sue derivatively 'if persons with authority to do so have refused to bring the action,' and where trust 'property is held or will be held by a trustee or trustees ... for the benefit of ... beneficial owners." (*Id.* at 31-32 (citing 12 Del. Code §§ 3801(g), 3816(a))).

This Court reaches the same conclusion as did Judge Forrest, though its reasoning is slightly different. "Under the NGN Trust Agreements, the [NCUAB] as liquidating agent transferred and assigned its rights, title, and interest to assert the claims at issue ... to the NGN Trusts." (NCUAB Compl. ¶ 30 (citing Ex. C, NGN Trust Agreement § 3.01)).[17] The NGN Trusts subsequently entered into Indenture Agreements with BNYM, the Indenture Trustee. And "[u]nder the NGN Indentures, BNYM was granted the right to take action against Defendant with respect to the [RMBS] certificates and the Trusts." (NCUAB

---

[17]     The NCUAB has represented that the relevant NGN agreements are substantively similar, and attached representative examples as exhibits to its pleading. The Court can therefore consider them. *See Goel*, 820 F.3d at 559.

Compl. ¶ 33; *see also id.* at Ex. B (granting BNYM all "right, title, and interest

in and to ... all present and future claims, demands, causes and choses in

action in respect of the [RMBS certificates]")).  BNYM was also empowered and

authorized

> to do all things not inconsistent with the provisions of
> [the] Indenture that it may deem advisable in order to
> enforce the provisions hereof or to take any action with
> respect to a default or an Event of Default hereunder,
> or to institute, appear in or defend any suit or other
> proceeding with respect hereto, or to protect the
> interests of the Noteholders and the Guarantor.

(*Id.* at Ex. B § 5.01(a)(i)).

Plaintiffs argue that irrespective of the NGN Trusts' conveyance of their

right to bring suits with respect to the certificates to BNYM, BNYM was also a

trustee of the NGN Trust with duties flowing directly to beneficial owners.  This

the Court does not dispute.  Plaintiffs' argument, however, elides the role of the

NGN Trusts in the equation.  It may be true that BNYM owed duties to the

NCUAB as a beneficial owner.  But the NCUAB cannot bring a derivative suit

simply because it meets certain prerequisites: It is a beneficial owner, and it

has made a demand of BNYM.  In so arguing, Plaintiffs miss the forest for the

trees.  The NCUAB may only sue "to enforce a right that [the Trusts] *may*

*properly assert* but ha[ve] failed to enforce."  Fed. R. Civ. P. 23.1 (emphasis

added).  And here, there is no underlying right, because the NGN Trusts

contracted it away.

Still, the NCUAB insists that the DSTA authorizes its suit.  The NCUAB is

correct insofar as the DSTA provides that

63

> [a] beneficial owner may bring an action in the Court of Chancery in the right of a statutory trust to recover a judgment in its favor if persons with authority to do so have refused to bring the action or if an effort to cause those persons to bring the action is not likely to succeed.

12 Del. Code. § 3816(a).[18]  However, the DSTA also expressly limits this right. It specifies that "[a] beneficial owner's right to bring a derivative action *may be subject to such additional standards and restrictions, if any, as are set forth in the governing instrument of the statutory trust.*"  *Id.* § 3816(e) (emphasis added).

Here, the NCUAB is a beneficial owner of the NGN Trusts insofar as it is a holder of NGN Owner Trust Certificates (NCUAB Compl. ¶ 30); these gave the NCUAB a beneficial interest in the NGN Trusts, to which Trusts the NCUAB transferred the former-CCUs' RMBS certificates.  (*Id.* at ¶¶ 29-30).  Had this been the only transaction, the NCUAB may well have had standing as a beneficial owner in the NGN Trusts to assert claims against Defendant on the NGN Trusts' behalf.  Those Trusts had a claim as RMBS certificateholders, and the NCUAB may have been able to vindicate their claim in a derivative suit.

---

[18]   The Court looks to Delaware law here because Delaware law governed the NGN Trusts' formation.  *See In re Goldman Sachs Mut. Funds*, No. 04 Civ. 2567 (NRB), 2006 WL 126772, at *5 n.11 (S.D.N.Y. Jan. 17, 2006) ("Because the Funds are series of the Trusts, which were formed under Delaware law, that state's law governs the issue of whether a claim should be brought derivatively." (citing *Kamen* v. *Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98 (1991))).  Moreover, Section 10.13 of the Trust Agreement specifies that it "shall be governed by and construed in accordance with the laws of the state of Delaware."  (NCUAB Compl., Ex. C).  *See Debussy LLC* v. *Deutsche Bank AG*, No. 05 Civ. 5550 (SHS), 2006 WL 800956, at *2 (S.D.N.Y. Mar. 29, 2006) ("Not only was the Trust established under Delaware law ... but also the Trust Agreement explicitly sets forth that the Agreement 'shall in all respects be governed by, and construed in accordance with, the laws of the state of Delaware, including all matters of construction, validity and performance.'" (citations omitted)), *aff'd*, 242 F. App'x 735 (2d Cir. 2007) (summary order).

This was not the only transaction, however.  In the very moment the NGN Trusts became certificateholders, they entered into the Indenture Agreement with BNYM, to which agreement the NCUAB was not a party.  In the Indenture Agreement, the NGN Trusts "assign[ed] the Trust Estate as collateral to the Indenture Trustee, to be held by the Indenture Trustee, as security for the benefit of the Noteholders and the Guarantor."  (NCUAB Compl., Ex. B at 5).  The NGN Trusts also granted to BNYM all of their "right, title and interest in and to" the Trust Estate as well as "all present and future claims, demands, causes and choses in action."  (*Id.*).  This language effected a broad grant of rights to BNYM.  Any right to sue that the NCUAB had against Defendant with regard to the Trust Estate was transferred, along with that Estate, to BNYM.

The Court understands Plaintiffs to be arguing that the NCUAB's DSTA-conferred right to bring a derivative claim exists notwithstanding the Granting Clause; the DSTA created a specific right for Delaware-statutory-trust trustees that could not be, or at least was not here, contracted away by the NGN Trusts.  But this argument would require the Court to read the sweeping language of the Granting Clause to have limits that it lacks on its face.  This the Court will not do.  As Judge Forrest held, the "contract must be read to mean what it says."  *NCUAB/U.S. Bank II*, 2016 WL 796850, at *10.  New York law, which governs the Indenture Agreement (*see* NCUAB Compl., Ex. B), requires the Court to enforce the plain meaning of contracts when that meaning is clear and unambiguous.  *See, e.g.*, *Law Debenture Tr. Co. of N.Y.* v. *Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (quoting *Greenfield* v. *Philles Records, Inc.*, 98

65

N.Y.2d 562, 569 (2002)).  The Court must do so here.  The word "all" must

mean "*all*," such that "[t]he breadth and completeness of the Granting Clause

forecloses derivative claims."  *NCUAB/U.S. Bank II*, 2016 WL 796850, at *10.

Moreover, reading the DSTA to imply a right that exists despite and

unaffected by the parties' agreements would be inconsistent with the

preference that the statute consistently evinces for freedom of contract.  Here,

"[p]rinciples of contract law trump the principle of pursuing of a claim

derivatively upon which plaintiff relies[,]" because that is what the DSTA itself

requires.  *NCUAB/U.S. Bank II*, 2016 WL 796850, at *10.  The DSTA expressly

states that its policy is "to give maximum effect to the principle of freedom of

contract and to the enforceability of governing instruments."  12 Del. Code

§ 3825(b).  And throughout its provisions, the statute establishes default rules,

but makes clear that they are subject to modification by contract.  *See, e.g.*, *id.*

§ 3802(b) ("Except as provided in the governing instrument, a beneficial owner

is obligated to the statutory trust to perform any promise to contribute cash,

property, or to perform services[.]"); *id.* § 3803(a) ("Except to the extent

otherwise provided in the governing instrument of the statutory trust, the

beneficial owners shall be entitled to the same limitation of personal liability

extended to stockholders of private corporations for profit[.]"); *id.* § 3806(d)

("Unless otherwise provided in a governing instrument, a trustee or beneficial

owner or other person shall not be liable to a statutory trust or to another

trustee or beneficial owner[.]").  The DSTA permits parties to contract even to

eliminate entire categories of rights and liabilities, if that is their preference.

*See id.* § 3806(e) ("A governing instrument may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a trustee, beneficial owner or other person to a statutory trust[.]").  And where the DSTA's default rules are *not* subject to modification by contract, the statute makes that plain.  *See, e.g.*, *id.* § 3804(e) ("[A] beneficial owner who is not a trustee may not waive its right to maintain a legal action or proceeding in the courts of the State with respect to matters relating to the organization or internal affairs of a statutory trust."); *id.* § 3806(e) ("[A] governing instrument may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing[.]").

Precisely for this reason, the few cases to interpret the DSTA and similar statutes have affirmed that a court must give force to the parties' bargain.  *See Grand Acquisition, LLC* v. *Passco Indian Springs DST*, 145 A.3d 990, 999 (Del. Ch. 2016), *as revised* (Sept. 7, 2016) ("[T]he prefatory clause in Section 3819 is what indicates that a DST's governing document may restrict the inspection rights granted under that section."), *aff'd*, No. 469, 2016, 2017 WL 836929 (Del. Mar. 3, 2017); *Hartsel* v. *Vanguard Grp., Inc.*, C.A. No. 5394-VCP, 2011 WL 2421003, at *21 (Del. Ch. June 15, 2011) ("The DSTA is enabling in nature and, as such, permits a trust through its declarations of trust to delineate additional standards and requirements with which a stockholder-plaintiff must comply to proceed derivatively in the name of the trust.  The Declarations for both [Delaware statutory trusts] have done just that[.]"), *aff'd*, 38 A.3d 1254

(Del. 2012); *cf. Elf Atochem N. Am., Inc.* v. *Jaffari*, 727 A.2d 286, 293-94 (Del. 1999) ("Although [plaintiff] correctly points out that Delaware law allows for derivative suits against management of an LLC, [plaintiff] contracted away its right to bring such an action in Delaware and agreed instead to dispute resolution in California.").

Here, the contracts are clear. The Trust Agreement established that the NCUAB was "the sole beneficial owner of the portion of the [RMBS certificates] it [was] conveying to the Trust." (NCUAB Compl., Ex. C, § 2.10(iv)). In Section 3.01, the NCUAB agreed that it would "contribute, transfer, convey and assign to, and deposit with, the Trust, without recourse, *all* of such Seller's right, title and interest in and to the portion of the Trust Estate consisting of such Seller's portion of the [RMBS certificates]." (*Id.* at § 3.01 (emphasis added)). And this conveyance was to be "absolute," and also was "intended by the parties, other than for federal, state and local income and franchise tax purposes, to constitute a sale of the [RMBS certificates] and all other assets constituting the Trust Estate by each Seller to the Trust." (*Id.* at § 2.14(b)). Beneficial owners were expressly left without "legal title to any part of the Trust Estate solely by virtue of their status as Certificateholders." (NCUAB Compl. ¶ 10.02). Thus, all of the NCUAB's rights regarding the RMBS securities were conveyed to the NGN Trusts. Then, as previously discussed, the Trusts conveyed all of their interests in those securities to the Indenture Trustee BNYM.

In sum: The NCUAB lacks standing to bring a derivative claim against Defendant on behalf of the NGN Trusts because the NGN Trusts lack standing

to bring a claim against Defendant, having transferred all rights to such claim to BNYM through the Indenture Agreement.  Defendant's motion to dismiss the NCUAB's derivative claims is granted.

### c.   Defendant's Motion to Dismiss the NCUAB's Direct Claims Is Denied

Separately, Defendant opposes the NCUAB's standing to bring certain direct claims "arising from certificates previously held by a 'recently unwound' NGN Trust."  (Def. Br. 30 (citing NCUAB Compl. ¶ 26 & n.2)).  Defendant asserts that this Court must assess the NCUAB's standing as of the original complaint, despite the NCUAB's subsequent amendment thereof.  (*Id*.).  In support of this argument, Defendant quotes language attributed to an unpublished Memorandum Decision and Order issued by Judge Forrest on May 11, 2016:  "The subsequent winding-down of one NGN trust does not ... change the fact that at the time NCUA brought this suit, it did not have standing to pursue claims on behalf of the NGN trusts."  (Def. Br. 30 (citing 14 Civ. 9928, Dkt. #141)).

As a preliminary matter, the Court agrees with the NCUAB that Defendant here confuses the standards for Article III standing and "real-party-in-interest" status.  (Pl. Opp. 33-34).  "The Second Circuit has held that when defendants assert that a party other than plaintiff has standing, 'their unspoken premise [is] that [plaintiffs] lacked standing because [the non-party] remained ... the real party in interest.'"  *Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co. Inc.*, 888 F. Supp. 2d 478, 484 (S.D.N.Y. 2012) (quoting *Advanced Magnetics, Inc.* v. *Bayfront Partners, Inc.*, 106 F.3d 11, 20 (2d Cir.

69

1997)) (citing *Dayton Monetary Assocs.* v. *Donaldson, Lufkin & Jenrette Sec.
Corps.*, No. 91 Civ. 2050, 1998 WL 236227 (SHS), at *6 (S.D.N.Y. Mar. 31,
1998) (noting that in such a situation, the distinction between "real party in
interest" and a lack of standing is "merely semantic")).   Here, Defendant's real
concern with respect to standing is whether the NCUAB was the proper owner
of its direct claims at the time it brought the instant action; in other words, a
concern that the NCUAB may not have been the "real party in interest" when it
originally brought its claims.   *See Digizip.com, Inc.* v. *Verizon Servs. Corp.*, 139
F. Supp. 3d 670, 679 (S.D.N.Y. 2015).   Such an argument implicates Federal
Rule of Civil Procedure 17(a), rather than Article III.   *See id.* (considering
difference between Rule 17's implication of "the prudential aspect of standing"
and an argument under Article III).[19]

Considered as such, Defendant's argument fails.   As explained above, the
NGN Trusts transferred all rights to assert claims regarding the certificates
comprising the Trust Estate to BNYM in the Indenture Agreement.   However,
these rights reverted to the NCUAB as the NGN Trusts were unwound and the
RMBS certificates conveyed back.   (Pl. Opp. 33 (citing NCUAB Compl. ¶ 26

---

[19]     On reply, Defendant changes tack, recasting its original argument as one that the
NCUAB lacked "a cognizable injury when it commenced this litigation." (Def. Reply 14).
Because this argument is raised for the first time on reply, this Court need not consider
it.   *Cf. Cruz* v. *Zucker*, 116 F. Supp. 3d 334, 349 n.10 (S.D.N.Y. 2015) (finding
arguments not raised in an opening brief waived), *reconsideration denied,* 195 F. Supp.
3d 554 (S.D.N.Y. 2016), *on reconsideration*, No. 14 Civ. 4456 (JSR), 2016 WL 6882992
(S.D.N.Y. Nov. 14, 2016).   But even if the Court were to construe Defendant's original
arguments as arguments against the NCUAB's Article III standing, it is skeptical that
they could succeed.   To the extent Defendant disputes standing on the basis of a lack of
"injury," the NCUAB "had Article III standing at the outset, even before it held the
certificates directly, based on its NGN Owner Trust Certificates the value of which were
diminished by [Defendant's] PSA breaches." (Pl. Opp. 34).

n.2)).  Rule 17 "allows for the substitution of a real party in interest," *see In re SLM Corp. Sec. Litig.*, 258 F.R.D. 112, 115 (S.D.N.Y. 2009), and the Second Circuit instructs that "Rule 17(a) substitution of plaintiffs should be liberally allowed," *House of Europe Funding I Ltd.* v. *Wells Fargo Bank, N.A.*, No. 13 Civ. 519 (RJS), 2015 WL 5190432, at *2 (S.D.N.Y. Sept. 4, 2015) (quoting *Advanced Magnetics*, 106 F.3d at 20).  Here, NCUAB's substitution of itself as the direct claimant for itself as a derivative claimant would only replace an incorrect party with the real party in interest.  The Court does not expect that substitution would "alter[] the original complaint's factual allegations as to the events or the participants." *House of Europe Funding I Ltd.*, 2015 WL 5190432, at *2 (quoting *Advanced Magnetics*, 106 F.3d at 20).  Defendant's motion to dismiss the NCUAB's direct claims on this basis is denied.

> ### d.   The Dismissal of the NCUAB's Derivative Claims Is Without Prejudice

Defendant contends that the NCUAB's dismissal should be with prejudice.  (Def. Br. 26).  It argues that allowing the NCUAB to amend its pleading would cause undue delay and prejudice, and would moreover be futile absent a basis to relate back the NCUAB's new claims.  (*Id.* at 27-29).

Plaintiffs dispute each of these claims.  They remind the Court of the liberal standard afforded by Rule 17 for substitution.  (Pl. Opp. 32).  They further explain that the NCUAB did not amend its complaint earlier because it believed in good faith that the case law in this area was in flux, and was awaiting the Court's disposition of the issue in this case.  (*Id.*).  And Plaintiffs assert that there is no relation-back problem because Rule 17 provides that a

substituted party's "claims will relate back to the date of the original complaint." (*Id.* (quotation marks omitted) (quoting *Advanced Magnetics*, 106 F.3d at 21)).

The Court agrees with Plaintiffs. If the NCUAB still wishes to amend its pleading, it may move the Court for leave to do so. However, the NCUAB is advised that it will have to identify the party with whom it will replace itself and explain how such a substitution would rectify the standing deficiencies identified above. The NCUAB must further address, in detail, the contemplated impact that a substitution (and, conversely, a failure to substitute) would have on this case, particularly the ongoing discovery schedule.

### 8. Defendant's Motion to Dismiss Commerzbank's Claims as Untimely Is Denied

Finally, Defendant raises a claim of timeliness solely as to Commerzbank, resolution of which requires a determination of the applicable statute of limitations. "Under New York's 'borrowing statute,' a case filed by a non-resident plaintiff requires application of the shorter statute of limitations period, as well as all applicable tolling provisions, provided by either New York or the state where the cause of action accrued." *Cantor Fitzgerald Inc.* v. *Lutnick*, 313 F.3d 704, 710 (2d Cir. 2002) (citation omitted) (citing N.Y. C.P.L.R. § 202); *Antone* v. *Gen. Motors Corp., Buick Motor Div.*, 64 N.Y.2d 20, 26 (1984)).[20] "New York follows 'the traditional definition of accrual — a cause of

---

[20]    New York Civil Practice Law and Rules Section 202 provides:

> An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the

action accrues at the time and in the place of the injury.'" *Cantor Fitzgerald Inc.*, 313 F.3d at 710 (quoting *Glob. Fin. Corp.* v. *Triarc Corp.*, 93 N.Y.2d 525, 529 (1999)); *see also Commerzbank AG* v. *Deutsche Bank Nat'l Tr. Co.* (hereinafter, "*CB/DB*"), No. 15 Civ. 10031 (JGK), 2017 WL 564089, at *5 (S.D.N.Y. Feb. 10, 2017) (citing *Portfolio Recovery Assocs., LLC* v. *King*, 14 N.Y.3d 410, 416 (2010) (noting that, where a cause of action has been assigned, the question of where and when the cause of action accrued focuses on the original assignor)). And "[w]here, as here, the 'injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss.'" *Cantor Fitzgerald Inc.*, 313 F.3d at 710 (quoting *Global Fin. Corp.*, 93 N.Y.2d at 529); *see also Norex Petroleum Ltd.* v. *Blavatnik*, 23 N.Y.3d 665, 671 (2014) ("As a resident of Alberta, Canada, alleging purely economic injuries, [plaintiff's] injuries accrued in Alberta."). For purposes of the borrowing statute, the residency of a corporate plaintiff is typically the corporation's place of incorporation or principal place of business. *See, e.g.*, *CB/DB*, 2017 WL 564089, at *5; *IKB Deutsche Industriebank AG* v. *McGraw Hill Fin., Inc.*, No. 14 Civ. 3443 (JSR), 2015 WL 1516631, at *3 (S.D.N.Y. Mar. 26, 2015) (finding that corporate plaintiff resided in Germany because it was incorporated and had its principal place of business in Germany), *aff'd*, 634 F. App'x 19 (2d Cir. 2015) (summary order).

---

cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply."

At the outset, the Court notes that the following facts are not in dispute: (i) the applicability of New York's statute of limitations; (ii) the economic nature of Commerzbank's alleged injuries; (iii) Commerzbank's residency in Germany, on the basis of its incorporation and maintenance of its principal place of business in that country; and (iv) the fact that Commerzbank is asserting claims assigned to it by Dresdner Bank, a German entity; Eurohypo AG New York Branch, a German entity; Barrington II CDO Ltd., a Cayman Islands entity; and Palmer Square 3 Limited, an Irish entity. (CB Compl. ¶¶ 16-17).[21] The parties' central disagreement is this: Defendant argues that Commerzbank's claims are untimely under the three-year statute of limitations imposed by German Civil Code § 195, because Commerzbank knew before January 1, 2012, of Defendant's alleged breaches. (Def. Br. 31-33). Commerzbank retorts that (i) it alleged ongoing breaches throughout Defendant's tenure as Trustee; (ii) the identification of the place of accrual presents a question of fact ill-suited for resolution at this stage; and (iii) even if its claims accrued in Germany, Defendant has not shown they are untimely under German law. (Pl. Opp. 34-40). The Court notes that a nearly identical argument was presented to and resolved by Judge Koeltl very recently in a case also brought by Commerzbank. *See CB/DB*, 2017 WL 564089, at *5-9.[22] The

---

[21]   Commerzbank has not addressed whether the laws of Ireland or the Cayman Islands might apply in the event that its claims accrued prior to their assignments.

[22]   The Court notes also that Judge Daniels issued a Memorandum Decision and Order only days prior to the issuance of this Opinion, on March 21, 2017, in which he reached the same conclusion as did Judge Koeltl regarding the applicability of the German statute of limitations to RMBS claims brought by Commerzbank AG. *See Commerzbank*

Court is aided here by Judge Koeltl's thoughtful analysis, and reaches the same conclusion.

First, the Court rejects Commerzbank's invocation of the "financial base" exception to New York's accrual rules. Commerzbank argues that German law may not apply because

> Commerzbank's acquisitions and other activities related to certificates were conducted at and through Commerzbank AG London Branch ("London Branch"), which is a separate financial base[,] and "[w]here a plaintiff maintain[s] [a] separate financial base and where the impact of the financial loss is felt at that location, it may constitute an alternative place of injury" under the New York borrowing statute.

(Pl. Opp. 35-36 (alterations in original) (quoting *Beana* v. *Woori Bank*, No. 05 Civ. 7018 (PKC), 2006 WL 2935752, at *6 (S.D.N.Y. Oct. 11, 2006))). But as Judge Koeltl found, no law supports the equation of a separate branch with a separate base. *See CB/DB*, 2017 WL 564089, at *6. On the contrary, case law abounds supporting a distinction between the two. *Id.* (collecting cases).

Even if a branch *could* constitute a base, Commerzbank has not made any effort to show that this case is one of the "extremely rare case[s] where the party has offered unusual circumstances" to justify the Court's employment of the financial-base exception. *CB/DB*, 2017 WL 564089, at *6 (alteration in original) (quotation marks omitted) (quoting *Deutsche Zentral-Genossenschaftsbank AG* v. *HSBC N. Am. Holdings, Inc.*, No. 12 Civ. 4025 (AT), 2013 WL 6667601, at *5 (S.D.N.Y. Dec. 17, 2013)). The pleading language

---

v. *Bank of N.Y. Mellon*, No. 15 Civ. 10029 (GBD), 2017 WL 1157278 (S.D.N.Y. Mar. 21, 2017).

considered by Judge Koeltl is identical to the language included in Commerzbank's Complaint in the instant case: "The sales of the Sold Certificates were made by London Branch and the economic losses from those sales were experienced in Commerzbank in England and/or in Germany where Commerzbank is located." (*Compare* CB Compl. ¶ 132, *with CB/DB*, 2017 WL 564089, at *6). Considering this language, Judge Koeltl concluded that it was apparent that Commerzbank could not "establish the presence of unusual circumstances ... , such as a showing that it was operating so far outside of normal corporate banking existence at the time its claims accrued that they could not be said to have accrued in Germany." *CB/DB*, 2017 WL 564089, at *6. Judge Koeltl also rejected Commerzbank's attempt to circumvent this finding by casting it as a factual determination inappropriate for resolution on a motion to dismiss. *Id.* at *7.

Considering the very same language as did Judge Koeltl, this Court reaches the very same conclusion. "Even if all of the material decisions with respect to the purchase of the Certificates were made at the London branch of Commerzbank, Commerzbank ultimately felt its economic losses at its principal place of business and state of incorporation: Germany." *CB/DB*, 2017 WL 564089, at *6. Because the law is clear that "Commerzbank's branches have no separate existence from Commerzbank," this conclusion is apparent from the face of Commerzbank's Complaint, and the Court needs no discovery to reach it. *Id.* at *7. Commerzbank must show that each of its claims is timely under German law.

Finding that German law applies, the Court must consider whether it bars Commerzbank's claims.  The silver lining of the "proliferation of RMBS litigation in America involving claims that accrued in Germany" is that "American courts have recently had the opportunity to interpret the German statute of limitations applicable to this case."  *CB/DB*, 2017 WL 564089, at *7. The parties, the parties' experts, and recent case law agree on the applicable provisions of German law, and their general requirements:

> [T]he relevant provision of German law is Section 195 of the German Civil Code, which has a three-year limitations period.  That period begins to run at the end of the calendar year in which [i] the claim arose and [ii] the plaintiff either has knowledge of the circumstances giving rise to the claim and the identity of the defendant, or would have had such knowledge but for gross negligence.  [U]nder German law, a plaintiff has knowledge of the circumstances giving rise to the claim when she obtains knowledge of the facts necessary to commence an action in Germany with an "expectation of success" or "some prospect of success," though not without risk and even if the prospects of success are uncertain[.]  To satisfy this standard, a plaintiff need not know all the relevant details or have conclusive proof available; knowledge of the factual circumstances underlying the claim is sufficient.

*Id.* at *7-8 (quoting *IKB Deutsche Industriebank AG* v. *McGraw Hill Fin., Inc.*, 634 F. App'x 19, 22 (2d Cir. 2015) (summary order)).  (*See also* Sidman Decl., Ex. 20; Kane Decl., Ex. 3).[23]

---

[23]  Rule 44.1 of the Federal Rules of Civil Procedure permits the Court to consider, "in determining foreign law … any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  Fed. R. Civ. P. 44.1.  The Rule further provides that "the court's determination must be treated as a ruling on a question of law."  *Id.*  "Accordingly, foreign law should be argued and briefed like domestic law.  As with domestic law, judges may rely on both their own research and the evidence submitted by the parties to determine foreign law."  *Commerzbank AG* v. *Deutsche Bank Nat'l Tr. Co.*, No. 15

Defendant argues that "Commerzbank has affirmatively alleged that it had knowledge of [Defendant's] alleged breaches prior to January 1, 2012" because Commerzbank pled that at the time of its sale of certain RMBS certificates in 2011, "it was apparent that Wells Fargo had breached its duties and would not take steps to remedy its failures." (Def. Br. 32 (quoting CB Compl. ¶ 132)). But the Court cannot find this admission, even together with Commerzbank's 2011 lawsuit "against several rating agencies in connection with RMBS" (*id.*), sufficient to prove that the German statute of limitations accrued on or before the end of 2011. The German standard for accrual is high: "Under German law, Commerzbank must have had sufficient knowledge of each element of each of its claims with respect to each Trust for Section 195 to bar all of the claims that accrued in Germany." *CB/DB*, 2017 WL 564089, at *8. And courts in this Circuit are skeptical of "[l]imitations-based arguments in RMBS fraud actions ... at the motion to dismiss phase," given the difficulty that inheres in such cases for plaintiffs "in obtaining sufficient notice of the facts underlying their claims." *Id.* at *8 (quotation marks omitted) (quoting *HSN Nordbank AG* v. *RBS Holdings USA Inc.*, No. 13 Civ. 3303 (PGG), 2015 WL 1307189, at *6 (S.D.N.Y. Mar. 23, 2015) (collecting cases)).

---

Civ. 10031 (JGK), 2017 WL 564089, at *7 (S.D.N.Y. Feb. 10, 2017) (citation omitted) (quoting *Sealord Marine Co.* v. *Am. Bureau of Shipping*, 220 F. Supp. 2d 260, 271 (S.D.N.Y. 2002)). Here, the Court finds that the parties' proffered expert opinions largely overlap in their recitation of the law, but reach different conclusions regarding the application of that law to the parties' timeliness dispute. (*Compare* Sidman Decl., Ex. 20, *with* Kane Decl., Ex. 3).

This Court shares this skepticism.  Ultimately, it cannot determine, from the face of the Complaint, "that Commerzbank had sufficient knowledge of each element of each of its claims with respect to each, or any, Trust [at the relevant time] such that it could have commenced this action with an expectation, or some prospect, of success."  *CB/DB*, 2017 WL 564089, at *8.  Discovery may prove Defendant's timeliness challenge meritorious, but the Court cannot find it so at this stage.  Defendant's motion to dismiss Commerzbank's Complaint as untimely under German law is denied.[24]

## CONCLUSION

For the foregoing reasons, Defendant's motion is GRANTED IN PART and DENIED IN PART as described in the text of this Opinion.  If the NCUAB still wishes to amend its pleading, it is directed to move the Court for leave to do so within two weeks of this Opinion and Order.

The Clerk of Court is directed to terminate the following motions:  in Case No. 14 Civ. 9371, the motion pending at Docket Entry #169; in Case

---

[24]    In its reply brief, Defendant for the first time posits a timeliness challenge to Commerzbank's claims based on New York's six-year statute of limitations for breach-of-contract claims.  (Def. Reply 14).  Ironically, this timeliness argument fails by reason of its untimeliness.  *Cf. Cruz*, 116 F. Supp. 3d at 349 n.10.  But even if it had been raised in Defendant's opening brief, this contention would fail for the same reason as do Defendant's arguments with regard to German law.  The Court cannot determine from the face of the NCUAB Complaint the date on which Defendant *knew* of the loan-specific breaches it must prove.  Admittedly, Plaintiffs' admission that "by January 1, 2009, [Defendant] [had] discovered that *all* of the Trusts' loan pools contained high percentages of mortgage loans that materially breached the Sellers' R&Ws" does Plaintiffs no favors.  (Pl. Opp. 14 (citing BR Compl. ¶ 97; NCUA Compl. ¶ 104; PL Compl. ¶ 97; CB Compl. ¶ 71)).  But discovery of these high breach percentages is not precisely the same as discovery of the relevant breaches themselves.  Indeed, Defendant's duties with regard to R&Ws breached by the sellers *could not possibly* be violated until some period of time following those breaches, because they arise from Defendant's failure to disclose and cure those breaches.

No. 14 Civ. 9764, the motion pending at Docket Entry #113; in Case No. 14

Civ. 10067, the motion pending at Docket Entry #126; in Case No. 14 Civ.

10102, the motion pending at Docket Entry #111; and in Case No. 15 Civ.

10033, the motion pending at Docket Entry #56.

    SO ORDERED.

Dated:     March 30, 2017  
           New York, New York

                                  _____  
                                    KATHERINE POLK FAILLA  
                                United States District Judge